# 22-1835

## United States Court of Appeals
## for the Second Circuit

---

JOSEPH DIAZ,

*Petitioner-Appellant*,

*v.*

MARK MILLER, SUPERINTENDENT, GREEN HAVEN CORRECTIONAL FACILITY,

*Respondent-Appellee.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT

---

## BRIEF FOR PETITIONER-APPELLANT

---

Robert S. Dean
Center for Appellate Litigation
*Counsel for Petitioner-Appellant*
120 Wall Street, 28th Floor
New York, NY 10005
212-577-2523

Katharine Skolnick
(NY Bar #4760914)
kskolnick@cfal.org
*Of Counsel*
212-577-2523 (ext. 501)

November 21, 2022

# TABLE OF CONTENTS

*TABLE OF AUTHORITIES* ......................................................................iii

*STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION* ..................................................................................1

*PRELIMINARY STATEMENT* ..........................................................1

*ISSUE STATEMENT* ............................................................................2

*STANDARD OF REVIEW* ....................................................................2

*STATEMENT OF FACTS* ....................................................................2

**After the Trial Court Overrules Mr. Diaz's Confrontation Clause Objection, the Prosecutor Relies Heavily on the Crime Scene Report and Diagram, Resulting in Mr. Diaz's Manslaughter Conviction. ..........................................2**

The Prosecution's Case at Trial ..........................................................2

Tensions Rise on East 146th Street ................................................. 3

The Shootout ........................................................................................ 4

Eyewitness Accounts Differ ............................................................. 5

The Police Investigate ...................................................................... 8

The Court Allows the Prosecution to Admit the Crime Scene Detective's Diagram, Photographs, and Report through a Surrogate Detective, Whose own Duplicate Diagram is also Admitted ...................................................... 10

The Prosecution Uses the Crime Scene Documents to Establish its Theory ... 13

Opening Statement ....................................................................... 13

Detective Brown Uses the Diagrams and Report to Place People and Ballistics ............................................................ 13

The Ballistics Expert Situates Evidence Based on Brown's Derivative Diagram ............................................................. 15

Eyewitnesses Also Use the Diagram to Frame Their Testimony ................. 16

During a Site Visit, the Jurors Receive Brown's Diagram ............................. 16

During Summations, The Prosecution Uses the Crime Scene Documents to Plug Holes in its Case ............................................ 16

The Medical Examiner's Conclusions ................................................. 17

The Defense Case ............................................................................ 17

Jury Deliberations, Verdict, and Sentence ............................................. 17

**On Appeal, the State Appellate Division Finds no Confrontation Clause Violation. ....................................................................... 18**

**The Magistrate Recommends Granting the Writ.** .......................................... 19

**The District Court Adopts the Report and Recommendation in Part but Denies the Petition for a Writ.** ....................................................... 23

*SUMMARY OF ARGUMENT* ........................................................... 24

*ARGUMENT* ............................................................................ 25

*Where Joseph Diaz's Confrontation Rights Were Violated by the Introduction Through a Surrogate Police Witness of the Only Piece of Evidence Tying Mr. Diaz to the Bullet that Caused the Victim's Death, the State Cannot Meet its Burden of Establishing Harmless Error Under any Standard.* ........................... 25

    A. Applicable Standards ............................................................... 25

    B. The Constitutional Violation was not Harmless. .............................. 30

        1. The Pre-*Brown* Standard Applies. ...................................... 30
        2. In Any Event, Mr. Diaz Can Prevail Under Both Standards...................... 31
          a. The *Brecht* Standard Is Satisfied. ................................. 31
          b. AEDPA Is Also Satisfied. ............................................ 35

*CONCLUSION* ........................................................................... 38

*CERTIFICATE OF COMPLIANCE* ............................................... 39

## TABLE OF AUTHORITIES
### Cases

*Alvarez v. Ercole*, 763 F.3d 223 (2d Cir. 2014) ...................................................31, 36

*Brady v. Maryland*, 373 U.S. 83 (1963) ................................................................. 28

*Brecht v. Abramson*, 507 U.S. 619 (1993) ......................................................passim

*Brown v. Davenport*, 142 S.Ct. 1510, 2022 WL 1177498 (Apr. 21, 2022) .................passim

*Brumfield v. Cain*, 576 U.S. 305 (2015) ................................................................. 31

*Bullcoming v. New Mexico*, 564 U.S. 647 (2011) .......................................18, 24, 35

*Chapman v. California*, 386 U.S. 18 (1967) ......................................................passim

*Cotto v. Herbert*, 331 F.3d 217 (2d Cir. 2003), *overruled on other grounds by Crawford*, 541 U.S. 36 ....................................................................................................... 33

*Crawford v. Washington*, 541 U.S. 36 (2004). ............................ 12, 20, 24, 33

*Davis v. Ayala*, 576 U.S. 257 (2015) ..................................................................... 26

*Davis v. Washington*, 547 U.S. 813 (2006) ........................................................... 24

*Diaz v. Bell*, 2022 WL 3371214 (S.D.N.Y. Aug. 16, 2022) ................................... 1

*Eze v. Senkowski*, 321 F.3d 110 (2d Cir. 2003) ................................................... 31

*Fischer v. Forrest*, 968 F.3d 216 (2d Cir. 2020) .................................................. 30

*Fry v. Pliler*, 551 U.S. 112 (2007) ....................................................................26, 30

*Fuentes v. Griffin*, 829 F.3d 233 (2d Cir. 2016) .................................................. 28

*Garlick v. Lee*, 1 F.4th 122, 128 (2d Cir. 2021), *cert. denied*, 142 S.Ct. 1189 (2022)..passim

*Greene v. Fisher*, 565 U.S. 34 (2011) .................................................................... 28

*Greenlaw v. United States*, 554 U.S. 237 (2008) .................................................. 31

*Gutierrez v. McGinnis*, 389 F.3d 300 (2d Cir. 2004) .......................................28, 38

*Henry v. Poole*, 409 F.3d 48 (2d Cir. 2005) ....................................................28, 29

*Lafler v. Cooper*, 566 U.S. 156 (2012) ................................................. 28

*Mendoza v. Sec'y, Florida Dep't of Corr.*, 761 F.3d 1213 (11th Cir. 2014) ........................... 31

*Messiah v. Duncan*, 435 F.3d 186 (2d Cir. 2006) ................................... 2

*Michigan v. Bryant*, 562 U.S. 344 (2011) ............................................... 24

*Orlando v. Nassau County Dist. Atty. Office*, 915 F.3d 113 (2d Cir. 2019) ......................... 29

*People v. Acevedo*, 112 A.D.3d 454 (N.Y. App. Div. 2013) ................................................. 18

*People v. Crimmins*, 36 N.Y.2d 230 (N.Y. Ct. App. 1975) ........................................... 18, 37

*People v. Diaz*, 151 A.D.3d 502 (N.Y. App. Div. 2017), *lv. denied* 9 N.Y.3d 1126 (N.Y. Ct. App. 2017) ................................................................. 18, 23, 35

*People v. Freycinet*, 11 N.Y.3d 38 (N.Y. Ct. App. 2008) ...................................................... 18

*People v. John*, 27 N.Y.3d 294 (N.Y. Ct. App. 2016) ........................................................... 18

*Rosen v. Superintendent Mahanoy SCI*, 972 F.3d 245 (3d Cir. 2020) .................................. 29

*Scrimo v. Lee*, 935 F.3d 103 (2d Cir. 2019) ....................................................................... 29

*Strickland v. Washington*, 466 U.S. 668 (1984) ............................................................. 28, 29

*United States v. Gladden*, 394 F.Supp.3d 465 (S.D.N.Y. 2019) .......................................... 30

*White v. Woodall*, 572 U.S. 415 (2014)……………………………………………29

*Williams v. Supt., SCI Green*, 2022 WL 1321128, \*16-22 (M.D. Pa. May 3, 2022) ........ 29

*Williams v. Taylor*, 529 U.S. 362 (2000) ....................................................................... 28, 29

*Wilson v. Sellers*, 138 S.Ct. 1188 (2018) ............................................................................ 28

*Wood v. Ercole*, 644 F.3d 83 (2d Cir. 2011) ........................................................... 26, 31, 34

*Young v. Conway*, 698 F.3d 69 (2d Cir. 2012) .................................................................... 28

*Zappulla v. New York*, 391 F.3d 462 (2d Cir. 2004) ...................................................... 27, 31

iv

## Statutes

28 U.S.C. § 1291 ........................................................................................ 1

28 U.S.C. § 2253(c) .................................................................................... 1

28 U.S.C. § 2254 ...........................................................................1, 25, 29

## Other Authorities

Justin Murray, A Contextual Approach to Harmless Error Review, 130 Harv. L. Rev. 1791, 1793-94 (2017)................................................................................ 36

Rule 22 of the Federal Rules of Appellate Procedure...................................... 1

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

JOSEPH DIAZ,

*Petitioner-Appellant,*

v.

MARK MILLER,
Superintendent, Green Haven Correctional Facility,

*Respondent-Appellee.*

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

This is an appeal from a denial, without a hearing, of a petition brought pursuant to 28 U.S.C. § 2254, decided August 16, 2022, by the Hon. Analisa Torres, U.S.D.J. *Diaz v. Bell*, 2022 WL 3371214 (S.D.N.Y. Aug. 16, 2022). By the same decision and order, Judge Torres granted a Certificate of Appealability pursuant to 28 U.S.C. § 2253(c) as to "whether the Appellate Division's harmless error finding was unreasonable," as "reasonable jurists could debate" this question. *Id.* at *7. Jurisdiction is based upon 28 U.S.C. § 1291 and Rule 22 of the Federal Rules of Appellate Procedure. A Notice of Appeal was timely filed on August 23, 2022.

## PRELIMINARY STATEMENT

Petitioner-Appellant Joseph Diaz appeals from an order of the United States District Court for the Southern District of New York, which denied his petition for a writ of *habeas corpus*. Mr. Diaz is presently incarcerated pursuant to a December 10,

2014, judgment of conviction of the New York State Supreme Court, Bronx County.

## ISSUE STATEMENT

1. Where Joseph Diaz's confrontation rights were violated by the introduction of the only evidence tying Mr. Diaz to the bullet that caused the victim's death, can the State meet its burden of establishing harmless error?

## STANDARD OF REVIEW

Whether a confrontation clause violation was harmless is an issue of law that this Court reviews *de novo*. *E.g.*, *Messiah v. Duncan*, 435 F.3d 186, 196 (2d Cir. 2006).

## STATEMENT OF FACTS

### After the Trial Court Overrules Mr. Diaz's Confrontation Clause Objection, the Prosecutor Relies Heavily on the Crime Scene Report and Diagram, Resulting in Mr. Diaz's Manslaughter Conviction.

### The Prosecution's Case at Trial

On September 22, 2009, at 3:20 p.m., a shootout on East 146th Street in the Bronx between two rival groups caused the death of bystander Aisha Santiago. The two crews were helmed, respectively, by Jason Irrizary and Robert Vargas. Each eyewitness gave a different account of the shooting, and the prosecution's theory—that a .45-caliber bullet from a gun firing east had struck the victim—came from ballistic evidence collected by Detective Glenn Jacklitsch, a crime scene investigator who had processed the scene and generated a crime scene report and diagram, but did not testify at trial.

<u>Tensions Rise on East 146th Street</u>

The shooting occurred because of escalating tensions between two groups: one led by Jason Irrizary, whose aunt, a loanshark named "Red," was owed money by Barbara Lopez. Lopez's teenage son, Robert Vargas, led the rival group (T421,[1] T616-17).

The trouble began when Red approached Lopez about the debt on September 21 on Lopez's stoop at 409 E. 146th Street (T616-17). In response, Vargas threatened to "shoot [Red] in the face" (T425, T429, T431, T617-19). Red believed she was being disrespected and reported the threat to her nephew, Irrizary (T620, T425).

The next day, Irrizary went with his brother Raul and cousin Manuel to see Red at East 146th Street and Willis Avenue. As they were talking to her, they saw a teenager they thought was Vargas, and Irrizary threatened, "if anything happen[s] to my aunt there's going to be problems" (T433). The teen denied having anything to do with Red; he was, in fact, "Gordo," who also lived on the block (T433-44, 439).

Moments later, Red confronted Lopez (T438). Meanwhile, as Irrizary and his family walked down the street, they again passed Gordo, whom Irrizary still believed was Vargas, and Irrizary told Gordo to get out of his face (T439-40). Gordo and Irrizary began fighting, and Gordo sliced Irrizary's hand with a knife (T440-41, T453, T661-62).

---

[1] Page citations preceded by "T" are to the trial record below, uploaded to Docket Entry 13 below. All other citations are to the Joint Appendix, denoted with "JA" (Volume 1) or "JA2" (Volume 2), or to Southern District of New York Docket entries as noted.

Irrizary claimed at trial that he alone fought Gordo (T429), but two other witnesses gave different accounts. Gordo's friend Latroy Ewell said Irrizary, Raul, and Manuel were all beating Gordo (T587). Ewell tried to break up the fight, and Red yelled that Irrizary was fighting Gordo, not Vargas (T439, T588-89). Susana Castro, another neighbor, testified that Irrizary and four other tall, slim Latino men were fighting with Gordo (T621-22). Three were dressed in white t-shirts, and two wore black hooded sweatshirts (T621-22).

Irrizary then yelled a threat: "Clear the fucking block because I'm coming back" (T620, T624, T662). Irrizary wrapped his bleeding hand in his white t-shirt and returned home to clean the wound (T441-42, T462). He talked to Red by phone but denied retrieving a weapon (T443-44, T452).

<u>The Shootout</u>

Irrizary, "angry" about the slashing, returned to the block fifteen to thirty minutes later (T444). He went into a bodega to buy water, and, when he exited, again encountered Gordo and Ewell (T444-49, 453-56). Irrizary refused Ewell's attempts to broker peace (T453-56, 589-91).

Ewell's friend Orlando Soto, Gordo, and another man named Fifty emerged from a laundromat on the south side of East 146th Street as the dispute was escalating. Soto, observing from a car's length away, believed there might be a physical fight between Soto's friends, who were facing west toward Willis Avenue, and the crew including Irrizary and four to five Latino men, facing east (T251-55, 257-59, 281, 286-87).

4

Suddenly, from near the corner of Willis and East 146th Street, someone from Irrizary's side fired shots toward Lopez's building at 409 E. 146th Street, and at least two people, including Ewell and Vargas, standing in front of 409, fired back. Ms. Santiago, in front of 445 E. 146th Street, east of the gunfight, was killed by a stray bullet.

<u>Eyewitness Accounts Differ</u>

Eyewitnesses gave inconsistent and irreconcilable accounts. One witness was certain that Irizarry was Ms. Santiago's shooter; others identified Mr. Diaz to police. Photographs showed that the two men resembled each other. Witnesses variously described the shooter as Latino or Black; wearing a red shirt or white shirt; having a hat or no hat. None mentioned seeing on the shooter's neck the prominent tattoo that Mr. Diaz had. The gun the shooter wielded was alternately described as a .45 or a 9mm.

Orlando Soto, the first eyewitness, testified that he saw his friends Ewell and Gordo walking east along the north side of 146th Street (T287-88). After hearing gunshots, he saw one of the men from Irrizary's group—wearing a red shirt, blue jeans, and baseball cap of indeterminate color obscuring his face—standing on the northeast corner of 146th and Willis, point a large silver gun eastward (T262-64, 269, 289-90, 294-95, 306). Soto had a side view of the man but mentioned no tattoo; at the time, Mr. Diaz had a "large" tattoo on the right side of his neck reading, "loyalty" (T290, 307, 707). Soto admitted he could not see where the shooter was standing in relation to others (T289-90). He heard return gunfire from 409 and saw Ewell shooting toward the strangers (T252, 264-65). At that point Soto dropped to the ground, hearing gunfire but looking

5

down (T265, 293). He noticed "a lot" of people running toward Brook Avenue (T266-67). A few days later, Soto viewed a lineup and, after a "long time," identified Mr. Diaz (T270-77, 303, 710). At trial, however, Soto could not identify Mr. Diaz, admitting that he was "not too good with faces" and his memory had faded (T295-96).

Latroy Ewell, who was himself indicted for attempted murder for his role in the shooting, and who had pleaded guilty to weapon possession but not yet been sentenced by Mr. Diaz's trial, recalled someone firing at him while he was in front of 409 E. 146th Street (T569-78, 592-93, 595-96). However, he did not identify Mr. Diaz as the shooter.

Neighbor Susana Castro also witnessed the shootout. She had been waiting outside 417 East 146th Street for her son to return from school when she saw Irrizary and four others fighting with Gordo (T620-22). She saw Irrizary saying he would return, then observed Irrizary return to the block and start firing toward 409, while Ewell and Vargas returned fire (T627-41, 663-71). She testified that two of Irrizary's friends, wearing black hooded sweatshirts, had guns, but she did not see them fire (T650, 673). After diving to the ground, she looked up to see Irrizary standing in front of 412-15, still shooting east (T643-47, 675-77).

Later, she viewed a photo array and identified Irrizary, whose face she had spent "quite a while" observing on September 22, as the shooter (T655-66, 668-74). She had "no doubt" he was the shooter (T647, 673-74).

Irrizary testified too. He denied having anything to do with the shooting, and he did not identify Mr. Diaz as the shooter. Instead, he admitted having a series of verbal

disputes with Gordo and his friends, after which he heard an unspecified number of gunshots from an unidentifiable direction (T456-57). As he was running on East 146th across Willis and toward Third Avenue, someone pointed out that a person had been shot, and he turned to see his stepbrother, Anthony Pena Guzman, on the ground by a bodega on the corner of Willis and 146th Street, shot in the leg (T463-67).

Michael Jones testified. Jones was a self-described "public figure . . . in the recording industry," convicted of petit larceny in 2003 and 2008, and previously a witness in another criminal case, who happened to have stopped his car outside Papa John's pizza on the northwest corner of Willis and East 146th Street (T505-06). After crossing the street to use an ATM, he crossed back to Papa John's, brushing against a man in a red shirt (T507). He bought pizza, buckled himself into his car, and heard two shots nearby (T508, 528-29, 535-36). As he leaned his seat back to avoid crossfire, he looked left and with "a clear line of sight," saw the same man in the red shirt holding the gun in front of him (T508-11, 529, 541). Initially, Jones testified that he saw the man fire "more shots," but later backtracked, saying that he had not seen the man fire the gun, just hold it in front of him (T509, 535). Jones heard eight to ten more shots (T511, 534). He saw the man in red hand the gun to a man wearing a white t-shirt, who wrapped the gun in another white shirt before running in the opposite direction from the man in red (T509-10). Jones told the grand and trial juries he believed the gun was a 9mm (T511, 541).

As Jones exited his car, the man in red ran past him (T511). Jones went into Papa John's, "threw" a baby and mother onto the floor, "dived" on top of the baby, and told

someone from the pizzeria to call 911 (T511). He heard more shots while inside Papa John's but did not know from what direction (T534, 547-48). He emerged from the restaurant and saw the same man in red run past again (T516). The man was Hispanic; wore jeans and, he repeatedly emphasized, no hat; and sported a "low haircut" that he could see because he had no hat, and a "wolfing out" beard (T515, 517, 526-27, 536). He was unsure whether the red garment was a shirt or sweatshirt (T539). Surveillance video recovered by the police from Papa John's showed someone in red at two points, but the person he was identifying as the shooter had no hat after the first series of shots but wore a hat after the second series (T512-14, 537-39). He mentioned nothing about the man having a neck tattoo. Instead, Jones simply said that the man in red was a "little taller" than himself, at 5'10" (T507-08, 526). Irrizary is 5'11", whereas Diaz is 6'2" (T437-38, 706). Nonetheless, Jones identified Mr. Diaz in two identification procedures and at trial (T520-24, 567).

The victim's nine-year-old son A.F. was standing on the steps into 445 East 146th when he heard two shots, looked towards Willis Avenue, then turned to see that his mother had been shot (T748-49, 758-62).

### The Police Investigate

By the time the police arrived, there were still dozens of people scattered along East 146th Street (T413-14, 719-20). They soon noticed Irrizary, wearing a bloody white t-shirt, standing over his injured stepbrother Pena (T384, 406).

8

Despite the massive police presence on the block, Soto did not tell any officers he saw the shooting; it was only when Detective Joseph O'Neil was canvassing in Soto's building that night that Soto mentioned having witnessed the incident (T270). The only specific characteristic of the shooter that he noted was his red shirt (T304-05).

Det. O'Neil later visited Pena, who had been shot, before he went into surgery, first learning that Pena's friend Joseph Diaz had been involved (T138, 141, 151, 177, 208-09). Irrizary later testified that while his stepbrother Pena was friends with Mr. Diaz, he himself knew Diaz only casually (T467-71). While Mr. Diaz was awaiting trial, Irrizary visited him in jail and put money in his commissary account (T496-500).

A couple of hours later, Crime Scene Unit Detective Glenn Jacklitsch arrived to take photographs and collect evidence (T192-93). From what he gathered, Jacklitsch prepared crime scene reports and created a diagram depicting where he had found evidence, including ballistics. But, because Jacklitsch was "retired" by the trial, the prosecutor called Detective Paul Brown to testify about Jacklitsch's investigation instead (T6, 59-60). Brown had not been involved in this investigation at all; rather, he was a crime scene unit member who could speak to the training and protocols for crime scene investigators (T57-63). All the information Brown provided at trial came from Jacklitsch's reports, and Brown had prepared for trial by reviewing Jacklitsch's notes and reports, speaking with the prosecutor, and visiting the crime scene three weeks before trial—five years after the shooting—to get a "feel of the location" (T59-60, 65-66, 70, 125).

9

<u>The Court Allows the Prosecution to Admit the Crime Scene Detective's
Diagram, Photographs, and Report through a Surrogate Detective, Whose
own Duplicate Diagram is also Admitted</u>

Through Brown, the prosecutor sought to admit: photographs Jacklitsch took of the

crime scene (People's Exhibits 1-56); Jacklitsch's crime scene reports (People's Exhibit

57 (JA2: 26-69)), which Brown characterized as a "combination of the reports that was

generated by . . . Detective Jacklitsch in regards to this investigation" (T66-67); a

diagram Jacklitsch prepared of the crime scene and where he found each piece of

evidence (People's Exhibit 62 (JA2-71)); and a diagram Brown created (People's Exhibit

58A (JA2-70)) that was meant to "duplicate" Jacklitsch's diagram (T107).[2]

The photographs depicted all evidence Jacklitsch collected, and the crime scene

report contained thumbnail versions of those photographs, along with information

about "how the photo was taken . . . the direction in which the photo was taken and

the location in question, and the brief description of what the photo is" (T88). The

crime scene report also included written descriptions of each piece of evidence, what

Jacklitsch believed it to be, and where he found it (see JA2: 26-69).

Brown had browsed the handwritten field report Jacklitsch made, which purportedly

formed the basis of Jacklitsch's typed report that was entered into evidence, but he did

not compare the two (T84-85). Brown did not know whether any of the evidence

---

[2] Each of the documents Jacklitsch prepared in connection with his crime scene analysis listed his
name, his shield number, and the "crime scene run number [09-4994] . . . unique only for that particular
job" (T98). On each document, he also listed the crime he was investigating: "Homicide, F/A," which
stood for "homicide and a felonious assault" (T99; Exhibits).

depicted in the photographs had been moved, or where it was located before photos were taken (T85-86). As for the measurements included in Jacklitsch's report, Brown had "an idea" of who took them but did not know what instrument was used to take those measurements, or the accuracy of the unknown instrument (T85-86). He said that in 2009, crime scene investigators had access to "a tape measure, and a wheel measuring device" (T107).

Brown testified that, when making his own crime scene diagram a few weeks before trial, his goal was to "duplicate" Jacklitsch's (T107). Brown used Jacklitsch's diagram as the template for where to place all twenty-five pieces of evidence on his own, including where the ballistics evidence was found (T122, 143). Using Google Maps "to get that same location," Brown then used Jacklitsch's diagram and photographs "to duplicate what" Jacklitsch did (T107). He testified that "by looking at Detective Jacklitsch's diagram and taking measurements from his diagram . . . I was able to plot the measurements of the *possible evidence* that was collected. *They are not exact but there is an approximate location of where all of the evidence was located*" (T143 (emphases added)). He also used Jacklitsch's diagram to figure out where to place the cars in his own (T144, 197).

Brown's diagram, like Jacklitsch's, showed where Jacklitsch supposedly found each of the twenty-five pieces of evidence. Brown added a color-coded key to his diagram, listing the twenty-five pieces of evidence; in the key, he added a "J" in front of each number to represent that Jacklitsch had collected the evidence.

Counsel conducted voir dire, then objected to this evidence's admission (T86-89, 92, 104-05, 112-13). Specifically, he argued that admitting the photographs, crime scene report, and Jacklitsch's diagram would violate "*Crawford*"[3] because the documents had been created by someone not present in court and perhaps not truly unavailable (T89, 92, 104-05). Critically, he noted, these documents were testimonial, as they "are to establish that my client was the shooter and this is where he was based on what is essentially set forth in those documents; where shell casings were found, forty-five caliber, nine millimeter" (T89). Specifically, "those statements in there as to measurements and where things were found are testimonial in nature and they explicitly go to the accusation part that it was my client who committed the crime" (T96). He noted that bullet trajectory was critical to the case, and that by disallowing him to probe "exact measurements," the court was "denying . . . the right to render a viable defense to this case to say this couldn't have possibly happened" (T90).

Brown's diagram, too, was objectionable, counsel argued, "for the same reasons expressed before, and based on my voir dire," as was an enlarged, black-and-white version (T112-13). He also argued that Jacklitsch's diagram was not accurate, which was harmful because "it's going to let the jury see that oh it's possible that a bullet would have wound up over there" (T104-05).

The court admitted all disputed documents into evidence (T96-98, 105, 112-13).

---

[3] *Crawford v. Washington*, 541 U.S. 36 (2004).

<u>The Prosecution Uses the Crime Scene Documents to Establish its
Theory</u>

*Opening Statement*

During its opening, the prosecution had previewed what it believed "definitively"
proved "that the defendant fired the death shot:" ballistics evidence placing .45-caliber
shells at the corner of 146th Street and Willis, and a .45 bullet in a car trunk east of the
victim (T28-29). Jacklitsch had gathered and documented this evidence. Referring to
eyewitnesses, the prosecution invited the jury to ask whether anything "like a street sign,
a tree" blocked their views (T33). These were features noted on the two diagrams.

*Detective Brown Uses the Diagrams and Report to Place People and Ballistics*

After the court admitted the crime scene documents at trial, Brown testified for over
100 transcript pages—a sizeable part of the prosecution's evidentiary presentation—
about the evidence Jacklitsch collected, and the jurors were given a copy of Brown's
diagram as an aid during his testimony (T66-71, 87-88, 98-104, 106-09, 113-14, 137-68,
192-206). He provided information about each of the fifty-six photographs Jacklitsch
took, explaining where he believed Jacklitsch was standing when he took each one, what
Jacklitsch said it depicted, and where it was located on his diagram. Brown said
repeatedly that he was relying on Jacklitsch's report for this information (T122-23, 125).

For instance, Brown testified that Exhibit 17 (Photograph 22) portrayed "an
overall view of some of the ballistic evidence" Jacklitsch collected on the corner of
Willis Avenue and 146th Street. According to Jacklitsch's reports, he recovered six

casings discharged from a .45-caliber Winchester at this corner, which were designated as numbers 1 through 6 on the diagrams (T122-23). Also according to his reports, Jacklitsch recovered three discharged casings from a 9mm Luger in front of 409 East 146th Street (T124).

Brown also testified that Jacklitsch found a bullet impact mark in front of building 445, and a bullet hole in the trunk of a Nissan parked on the north side of 146th Street, in front of building 455, east of Santiago, and about two football fields away from the corner of Willis and 146th (T152, 195). There was a deformed .45-caliber copper-jacketed bullet inside the trunk (T142, 149-50, 195, 200-01). Brown admitted that the distance of that car from the curb at Willis and 146th was a measurement that "could have been made" by Jacklitsch but was not, but that Brown would have made had he been the investigator (T195-96).

He further testified that there were shell casings from a .22-caliber rifle or cartridge inside of a fenced area of 413 and 415 East 146th Street (T334).

Brown continued in this manner, going through each entry in Jacklitsch's crime scene report. He testified that, based on Jacklitsch's notes, there was no test for blood evidence at the scene or the bullet found in the trunk (T200). Nor were there tests for traces of copper, lead, or brass (T201).

*The Ballistics Expert Situates Evidence Based on Brown's Derivative Diagram*

Detective Jonathan Fox, an NYPD Firearms Analyst, testified as an expert about the ballistics evidence from the scene (T320). In so doing, he relied extensively on Jacklitsch's crime scene report and Brown's duplicate diagram.

Fox explained that the ballistics Jacklitsch had labeled J1 to J6 were .45 auto cartridge casings all ejected from the same firearm (T328-29, 336). The seven cartridge casings, marked by Jacklitsch as J7 to J12, and J15 and so marked on Brown's diagram based on Jacklitsch's findings, were 9mm Luger cartridge casings all from the same gun (T329, 333, 336-37). According to Jacklitsch's reports, these were found in front of 413-415 East 146th Street (JA2-70, JA2-71, T344-47). Fox identified the evidence Jacklitsch labeled J19 and J20 as .22 casings fired from the same gun (T334-36). There were several other ballistics fragments that were too small for Fox to identify (T337-41). Fox identified number J22 as a .45 bullet (T342). J18 and J14 in the diagram were deformed jackets, and J22 was a deformed .45 bullet; all were fired from the same gun (T340-44). Fox used Brown's diagram to testify that J14 was found in front of building 409, J22 was found in the car, and J18 was found in the fence outside of 413-415 East 146th Street (T344-47).

Fox testified that a .45 semi-automatic ejects cartridges, but that a .45-caliber revolver would not, so it was possible that two .45-caliber weapons were used during this incident (T356-57).

*Eyewitnesses Also Use the Diagram to Frame Their Testimony*

Eyewitnesses Soto, Irrizary, Jones, Castro, and A.F. noted their locations at the scene based on the diagram (T254-56, 259, 431, 457, 530-32, 623-24, 637-39, 644-45, 751-52).

*During a Site Visit, the Jurors Receive Brown's Diagram*

When the jurors visited the scene, they were given Brown's diagram for reference (T374-76, 386-88, 767-70). They were instructed to exit the bus at two points, informed by the diagram: the northeast corner of E. 146th and Willis, and in front of building 445 (T769-70).

*During Summations, The Prosecution Uses the Crime Scene Documents to Plug Holes in its Case*

Because Ms. Santiago died during a gun battle in which there were multiple shooters, and it was impossible to say which kind of bullet struck her, the prosecutor—who acknowledged that this was not an "easy case," as eyewitnesses "saw things differently"—relied on ballistics evidence collected by Detective Jacklitsch to tie the fatal shot to Irrizary's crew, and to Mr. Diaz specifically (T939-40). He relied on ballistics collected by Jacklitsch and memorialized in his diagram to theorize that Mr. Diaz stood on the northeast corner of Willis Avenue and 146th Street, shooting a .45-caliber gun east, towards Mr. Vargas's building at 409 146th Street. Vargas and Ewell shot back, facing west. The bullet that struck Ms. Santiago—standing east of building 409—must have come from Mr. Diaz's gun because Detective Jacklitsch had found a

discharged .45 bullet east of Ms. Santiago. He repeatedly referenced the ballistics documented on the diagram, arguing that the "crime scene evidence speaks for itself" (T947-50, 991).

The prosecutor also argued that Castro was mistaken in her belief that Irrizary was the one shooting east, and, relying on the diagram, argued that the cars must have blocked her view (T958).

### The Medical Examiner's Conclusions

Dr. Margaret Prial, who performed Santiago's autopsy, testified it was impossible to determine what kind of bullet struck her, from which direction it had been fired, and how far away the shooter had been (T798-803, 806).

### **The Defense Case**

Officer Berlinda Acevedo testified that she was sitting in the courtyard of 510 East 146th Street, across from 445, when she heard five shots, a pause, then two more shots (T811-14). After she heard the gunshots, she saw "a male black wearing a red shirt" running on 146th Street towards Brook Avenue (T812-13).

### **Jury Deliberations, Verdict, and Sentence**

The jury asked for the crime scene diagram twice during its two days of deliberations, before and in conjunction with the surveillance video, after which it convicted Mr. Diaz of first-degree manslaughter (T1051-52, 1079, 1090-91). On December 10, 2014, the court sentenced Mr. Diaz to twenty-five years' incarceration plus five years' post-release supervision.

## On Appeal, the State Appellate Division Finds no Confrontation Clause Violation.

Before the Appellate Division, Mr. Diaz renewed his contention that Detective Jacklitsch's crime scene report and diagram, as well as Detective Brown's duplicate diagram, were testimonial under *Bullcoming* and *Melendez-Diaz* (JA166-80).

The Appellate Division rejected Mr. Diaz's confrontation claim, finding the evidence "not testimonial" since it "[did] not link the commission of the crime to a particular person" (quoting *People v. John*, 27 N.Y.3d 294, 315 (N.Y. Ct. App. 2016); citing *People v. Freycinet*, 11 N.Y.3d 38, 42 (N.Y. Ct. App. 2008), and *People v. Acevedo*, 112 A.D.3d 454, 455 (N.Y. App. Div. 2013)). *People v. Diaz*, 151 A.D.3d 502, 502-03 (N.Y. App. Div. 2017).

The court continued:

> In any event, any error in admitting the crime scene report and diagrams prepared by a nontestifying officer was harmless under the standard for constitutional error (*see People v. Crimmins*, 36 N.Y.2d 230 (N.Y. Ct. App. 1975)), because evidence showing the locations where the officer found cartridge cases and other ballistics evidence shed little or no light on any of the disputed issues at trial, and there is no reasonable possibility that this evidence affected the verdict.

*Id.* at 503.

Mr. Diaz renewed these arguments in a request for leave to the New York Court of Appeals, citing relevant federal constitutional provisions and Supreme Court case law (JA2: 5-19). On August 24, 2017, a Judge of that court denied leave to appeal. *People v. Diaz*, 29 N.Y.3d 1126 (N.Y. Ct. App. 2017) (JA2-25).

## **The Magistrate Recommends Granting the Writ.**

Mr. Diaz timely petitioned for a writ of *habeas corpus* in the Southern District of New York. He argued that the Appellate Division's non-testimonial finding was both an unreasonable application of, and contrary to, clearly-established Supreme Court precedents (Dkt. Entry 4: Mem., 26-42). Specifically, he argued that the Appellate Division decision unreasonably applied the clearly-established testimonial standard and was contrary to clearly-established law because its rule—the report must "link the commission of the crime to a particular person"—was squarely rejected by *Melendez-Diaz* (Dkt. Entry 4: Mem., 37-38).[4] This error had affected the verdict under the *Brecht v. Abramson*,[5] rule, he argued, because it was "unreasonable" to conclude, as the state court had, that the crime scene reports and diagram—in a case where no forensic, ballistics, surveillance, or statement evidence connected Mr. Diaz to the crime—"shed little or no light on any of the disputed issues at trial" (Dkt. Entry 4: Mem., 42-48 (citing Appellate Division decision)).

The State contended that the Appellate Division's non-testimonial finding was a reasonable application of precedent (Dkt. Entry 12: Mem., 10-11). It further argued that, nonetheless, the locations of ballistics identified in the report and diagrams were

---

[4] Mr. Diaz also argued that he had exhausted his claims, his petition was timely, and no successive-petition bar foreclosed his present petition (Dkt. Entry 4: Mem., 22-26). The State did not argue otherwise, and the District Court agreed (JA: 47-48).

[5] 507 U.S. 619 (1993).

"largely inconsequential" (Dkt. Entry 12: Mem., 13). In arguing harmlessness, the State invoked *Brecht* as the governing standard (Dkt. Entry 12: Mem., 15-18).

Following additional briefing on the impact of *Garlick v. Lee*,[6] in her April 14, 2022 Report & Recommendation ("R&R"), Magistrate Judge Debra Freeman recommended granting the writ. She agreed with Mr. Diaz that the Appellate Division had violated his confrontation rights in admitting Jacklitsch's crime scene diagram and report, and Brown's diagram, as the court had improperly imported a "known-suspect" test rather than the clearly-established "primary purpose" test laid out in *Crawford* and *Melendez-Diaz* (JA56-65). The state court decision was clearly erroneous and an unreasonable application of federal law (JA65).

As relevant here, the Magistrate also found that the error was not harmless (JA66-68). Specifically, she pointed out that the wrongfully admitted evidence went to the central disputed issues in the case: during a gunfight, who fired the fatal shot, from where, and from what weapon (JA66). The medical examiner had not been able to say what type of bullet killed Santiago, how far away the shooter was standing, and where, relative to Santiago (*id.*). Further, the eyewitnesses differed in their accounts of who had been the shooter and provided no clarity on the types of guns the shooters had fired, or from where (*id.*). She noted that the prosecution relied for its theory on the ballistics

---

[6] 1 F.4th 122 (2d Cir. 2021), *cert. denied*, 142 S.Ct. 1189 (2022). There, this Court held that New York courts had erred in finding that evidence is only testimonial if it links a particular suspect to a crime and upheld a *habeas* grant to a petitioner against whom an autopsy report had been improperly admitted through a surrogate witness. *Id.* at 125.

evidence, about which Detectives Fox and Brown could testify based solely on what Jacklitsch had memorialized in his report and diagram (*id.*).

While the prosecution had also presented eyewitness testimony, the Magistrate found that it varied on critical details of appearance and clothing, and was fragmented because no single witness had seen the entire event (JA67-68). The eyewitness accounts also did not match Jacklitsch's report and diagrams on which Fox and Brown had relied; for example, Jones believed the gun was a 9mm, but the ballistics evidence the prosecution presented suggested a .45-caliber weapon had killed Santiago (JA67). Under these circumstances, the court found, the eyewitnesses "did not answer the question of which bullet—of the many fired by more than one participant in the shootout—killed Santiago" (*id.*). Instead, "[i]t was the evidence supplied by Detective Jacklitsch that enabled the prosecution to fill in any evidentiary gaps in the eyewitnesses' testimony" (JA68). Indeed, the prosecution heavily relied on that evidence in summation (*id.*).

Respondent objected. In addition to arguing that the Magistrate had erred on the merits (JA72-78), Respondent disputed her harmless error finding, contending that the judge had reviewed the state court determination *de novo* rather than exercising the deference due under the then-governing standard that *habeas* "relief is unwarranted unless 'in light of the record as a whole, [the constitutional violation] had a substantial and injurious effect'" on the verdict (JA78-79 (citing *Brecht*, 507 U.S. at 638)).

Since the time of the R&R, the Supreme Court had issued its decision in *Brown v. Davenport*,[7] which Respondent argued now governed (JA79). Under that standard, which required that a federal court grant *habeas* relief only where the petitioner can prevail under both the *Brecht* and Antiterrorism and Effective Death Penalty Act's ("AEDPA") unreasonable-application-of-*Chapman*[8] rules, respondent contended that Mr. Diaz could not succeed (JA79). Respondent also made a handful of objections to the way in which the Magistrate had considered the evidence (JA81-85).

Mr. Diaz first invited the District Court to overrule the objections relating to the merits, citing *Garlick*, which equally applied here (JA88-91). Turning to the remaining objections, he argued that, no matter the standard (*Brecht*, AEDPA, or *Brown*), there was no way the offending evidence's admission was harmless (JA91-96). Initially, he added, Respondent had waived the argument that any other standard should apply by invoking *Brecht* before the Magistrate (JA91-92).

Nonetheless, Mr. Diaz argued, he had satisfied the new test under *Brown*, as the error was not harmless under either *Brecht* or AEDPA (JA92-95). He pointed to the *Brecht* factors, arguing that each favored Mr. Diaz (JA92-94). Then, he discussed how unreasonably the Appellate Division had applied *Chapman* by stating perfunctorily that the crime scene documents "shed little or no light on any of the disputed issues at trial"

---

[7] 142 S.Ct. 1510, 2022 WL 1177498 (Apr. 21, 2022).

[8] *Chapman v. California*, 386 U.S. 18 (1967).

(JA95 (quoting *Diaz*, 151 A.D.3d at 503). "No fairminded jurist," he contended, could draw this conclusion because, even "assuming Mr. Diaz was present," which was all the eyewitness testimony weakly established, "the nontestifying detective's crime scene reports and diagram constituted the *only* way he could be linked to the bullet that supposedly killed Santiago, as the eyewitness testimony did not establish that just one shooter was firing east, nor that Mr. Diaz had been that shooter" (*id.* (quoting *Brown*, 2022 WL 1177498, *9)). Accordingly, he argued, the writ should issue.

### The District Court Adopts the Report and Recommendation in Part but Denies the Petition for a Writ.

The District Court agreed with Mr. Diaz that his confrontation rights had been violated but denied the petition (JA97, 104-08). Specifically, the court rejected the Magistrate's findings on the question of harmless error.[9] In recounting the facts, the District Court referenced eyewitness testimony, including Castro's assertion that Mr. Diaz was not the shooter and that two other men in the group at Willis Avenue had guns (JA98-99). Yet, in discussing the ballistics evidence furnished by Jacklitsch (via Brown) and Fox, the District Court mentioned only the .45-caliber bullet in the nearby car (JA100). It noted that the prosecution had relied on "the ballistics evidence as described in Brown's diagram" in summation to "urge the jury" that Mr. Diaz was the shooter who killed the victim (*id.*).

---

[9] Where Respondent objected to factual characterizations, the District Court reviewed them *de novo*; otherwise, it adopted them as found (JA97 n.1).

In evaluating harmless error, the District Court applied *Brown* and found the Magistrate had improperly engaged in *de novo* review of harm; thus, it conducted its own analysis (JA104, 109). It found that "[e]ven assuming, *arguendo*, that the admission of the documents had a 'substantial and injurious effect'" on the verdict under *Brecht*, under *Brown*, it could not concur that "every fair[-]minded jurist would agree" the error was prejudicial (JA109-10). Even though the District Court itself might "not have found the admission of the documents to be harmless in light of the apparent contradictions and inconsistencies in some of the eyewitnesses' testimony and the prosecution's seeming reliance on the documents," it believed that "a reasonable jurist" could reach that conclusion because "[m]ultiple witnesses named Petitioner as the shooter and placed him, Santiago, and the other shooting participants in locations that logically connect[ed]" Mr. Diaz to the fatal shot (JA110).

The District Court granted Mr. Diaz a certificate of appealability (JA110-11). He now appeals to this Court.

## SUMMARY OF ARGUMENT

As the District Court correctly held, the New York State Appellate Division unreasonably applied *Crawford v. Washington*[10] and its clearly-established progeny[11] when

---

[10] 541 U.S. 36 (2004).

[11] *Bullcoming v. New Mexico*, 564 U.S. 647 (2011); *Michigan v. Bryant*, 562 U.S. 344 (2011); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009); *Davis v. Washington*, 547 U.S. 813 (2006).

it found non-testimonial a crime scene report and diagram prepared by a non-testifying detective (as well as a derivative diagram by the surrogate testifying officer).

Yet, the District Court erred in rejecting the portion of the Magistrate's Report and Recommendation finding that this confrontation error was not harmless. This decision was incorrect for two reasons. First, the District Court applied the wrong harmless-error standard, the hybrid *Brecht v. Abramson*[12]-AEDPA rule announced in *Brown v. Davenport*,[13] which post-dated the briefing before the Magistrate. Second, even if *Brown* did apply, the state court's harmless-error determination was not one that any reasonable jurist could make. Accordingly, this Court should reverse the decision denying Mr. Diaz's *habeas* petition.

## ARGUMENT

**Where Joseph Diaz's Confrontation Rights Were Violated by the Introduction Through a Surrogate Police Witness of the Only Piece of Evidence Tying Mr. Diaz to the Bullet that Caused the Victim's Death, the State Cannot Meet its Burden of Establishing Harmless Error Under any Standard.**

### A. <u>Applicable Standards</u>

Under 28 U.S.C. § 2254(d)(1), part of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a writ of *habeas corpus* must issue when the state court's "decision" was "contrary to, or involved an unreasonable application of, clearly

---

[12] 507 U.S. 619 (1993).

[13] 142 S.Ct. 1510, 2022 WL 1177498 (Apr. 21, 2022).

established Federal law, as determined by the Supreme Court." Until April 21, 2022, the Supreme Court had held that a federal court could grant a writ following its independent assessment of the prejudicial effect of the error under *Brecht v. Abramson*, 507 U.S. 619 (1993); it did not also require finding that the last reviewing state court's harmless-error analysis was itself "contrary to, or involved an unreasonable application of, clearly established federal law. *See Fry v. Pliler*, 551 U.S. 112, 119 (2007) (finding it "implausible" that AEDPA, "without saying so," replaced *Brecht* with the "more liberal AEDPA/*Chapman* standard," and a "formal application of *both* tests" was unnecessary where the "latter obviously subsumes the former"); *Davis v. Ayala*, 576 U.S. 257, 267-68 (2015) (holding *habeas* petitioners must establish the more stringent "actual prejudice" standard under *Brecht*, not just the *Chapman v. California*, 386 U.S. 18 (1967), harmless-beyond-a-reasonable-doubt test); *Wood v. Ercole*, 644 F.3d 83, 93-94 (2d Cir. 2011) (concluding "that the 'unreasonable application of *Chapman*' standard does not survive *Fry*").

On that date, the Supreme Court decided that a writ could issue only if the federal court found both standards met. *See Brown v. Davenport*, 142 S.Ct. 1510, 2022 WL 1177498 (Apr. 21, 2022). Applying that rule, the Court found that even if the petitioner in *Brown* could show that he met the *Brecht* standard, he could not prevail under AEDPA; accordingly, his petition must be rejected. *Id.* at 1531. What the *Brecht* Court required was a finding that the error had a "substantial and injurious effect" on the verdict, not just that the constitutional error was harmless beyond a reasonable doubt.

507 U.S. at 623 (internal citations omitted). In making the evaluation, the federal court must decide whether it alone "harbors grave doubt" about the verdict. *Brown*, 142 S.Ct. at 1525. Relevant to the *habeas* court's determination of whether the error was harmless under that standard are the following factors: (1) the strength of the prosecution's case, (2) the prosecutor's conduct vis-à-vis the improperly admitted evidence, (3) the importance of the erroneously admitted evidence, and (4) whether the improper evidence was cumulative. *Zappulla v. New York*, 391 F.3d 462, 468 (2d Cir. 2004); *see also Garlick v. Lee*, 1 F.4th 122, 128 (2d Cir. 2021) ("Whether a Confrontation Clause violation amounts to harmless error depends on "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case." (internal citations omitted)). A state court's finding that an error was harmless may be overturned if "objectively unreasonable." *Zappulla*, 391 F.3d at 467. The federal court may look to the "whole body" of decisional law, not just Supreme Court precedents. *Brown*, 142 S.Ct. at 1525.

The AEDPA standard involves an assessment of whether the state court had acted "contrary to" or "unreasonably applied" *Chapman*—*i.e.*, that no "fairminded jurist could reach the state court's conclusion" under Supreme Court precedents. *Brown*, 142 S.Ct. at 1525 (internal citation omitted). Where the state court expressly undertakes harmless-error analysis, its determination is subject to AEDPA's deferential standard of review—

*i.e.*, whether it "unreasonably applied *Chapman*." *See Gutierrez v. McGinnis*, 389 F.3d 300, 306-07 (2d Cir. 2004). The court must "train its attention on the particular reasons— both legal and factual—why state courts rejected a state prisoner's federal claims." *Wilson v. Sellers*, 138 S.Ct. 1188, 1191-92 (2018) (internal quotation marks omitted).

Moreover, the state court is entitled to no deference not only where no reasonable jurist could reach its conclusion but also where no reasonable jurist could adopt its *reasoning. See Fuentes v. Griffin*, 829 F.3d 233, 249-53 (2d Cir. 2016) (evaluating New York Court of Appeals' specific reasoning in assessing materiality under *Brady v. Maryland*, 373 U.S. 83 (1963), and concluding it was unreasonable); *Henry v. Poole*, 409 F.3d 48, 71-72 (2d Cir. 2005) (same, as to prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984)). The relevant date for determining clearly-established law is the date of the last state merits decision: here, June 8, 2017 (the Appellate Division decision). *Greene v. Fisher*, 565 U.S. 34, 40 (2011).

When the state court applies a legal rule that violates clearly-established Supreme Court precedent, AEPDA's "contrary to" standard is satisfied and a *habeas* court reviews the federal claim *de novo. E.g., Lafler v. Cooper*, 566 U.S. 156, 173 (2012) (state court's application of the wrong prejudice standard in an ineffective assistance case triggered *de novo* review); *Young v. Conway*, 698 F.3d 69, 84-85 (2d Cir. 2012); *Williams v. Taylor*, 529 U.S. 362, 405-06, 412-13 (2000).

On the other hand, a state court "unreasonably applies" clearly-established law when its "decision 'identifies the correct governing legal principle'" from Supreme Court

decisions "but unreasonably applies that principle to the facts of the prisoner's case." *E.g.*, *Orlando v. Nassau County Dist. Atty. Office*, 915 F.3d 113, 122 (2d Cir. 2019) (quoting *Williams*, 529 U.S. at 413). Meeting the standard requires an "objectively unreasonable" state-court determination that "fairminded" jurists would reject. *White v. Woodall*, 572 U.S. 415, 419-20 (2014). While difficult, the standard is not "insurmountable." *Rosen v. Superintendent Mahanoy SCI*, 972 F.3d 245, 256 n.83 (3d Cir. 2020). A "decision need not teeter on 'judicial incompetence' to warrant relief under Section 2254." *Scrimo v. Lee*, 935 F.3d 103, 112 (2d Cir. 2019) (internal quotations omitted). In fact, while the *habeas* standard is a difficult one to meet, *see generally* 28 U.S.C. § 2254, federal courts maintain a critical role in policing the rights-protective function of state courts, and must not hesitate to step in to correct a serious injustice. *See Williams*, 529 U.S. at 411 (recognizing that federal courts retain the power of "independent judgment," post-AEDPA, to review a state court decision); *see, e.g.*, *Williams v. Supt., SCI Green*, 2022 WL 1321128, *16-22 (M.D. Pa. May 3, 2022) (finding that a Confrontation Clause error was so damaging that "'law and justice' require *habeas* relief" (citing *Brown*, 142 S.Ct. at 1524)); *Henry*, 409 F.3d at 69-71 (criticizing New York courts' repeated application of an ineffective-assistance-of-counsel standard that appears at odds with *Strickland*, 466 U.S. 668).

**B. The Constitutional Violation was not Harmless.**

On this appeal, Mr. Diaz agrees with the District Court's finding that the state courts violated his confrontation rights under clearly-established Supreme Court law by allowing the introduction of the crime scene report and diagrams. *See Garlick*, 1 F.4th 122.

Accordingly, the only issue at this stage is whether the admission of these documents was harmless. Under any standard, it was not.

1. The Pre-*Brown* Standard Applies.

Initially, because of the timing of the Magistrate's decision, the pre-*Brown* standard should govern.

*Brown v. Davenport* had not been announced at the time of the R&R. Throughout the proceedings below, the State invoked *Brecht* and *Fry*, not any other standard (Resp. Mem. at 15-16). Accordingly, its request to the District Court to apply *Brown*'s dual-standard test was waived, and the District Court should not *sua sponte* have applied it. *See, e.g., United States v. Gladden*, 394 F.Supp.3d 465, 480 (S.D.N.Y. 2019) ("[I]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal citations omitted); *Fischer v. Forrest*, 968 F.3d

30

216, 221 (2d Cir. 2020) (affirming decision rejecting arguments made for first time in objections to R&R).[14]

2. <u>In Any Event, Mr. Diaz Can Prevail Under Both Standards.</u>

a. The <u>Brecht</u> Standard Is Satisfied.

Jacklitsch's inadmissible crime scene report and diagram, and Brown's inadmissible derivative diagram and surrogate testimony, had a "substantial and injurious effect or influence" on the verdict. *Brecht*, 507 U.S. at 623. The State cannot carry its "significant burden" of establishing otherwise. *Alvarez v. Ercole*, 763 F.3d 223, 233 (2d Cir. 2014) (internal quotation marks omitted).

Applying the *Zappulla* factors, Mr. Diaz must prevail. First, the prosecution's case was weak and speculative, the "single most critical factor" in determining harmlessness. *Wood*, 644 F.3d at 94 (internal citations omitted). No eyewitness to this chaotic event saw the entire shootout, making their respective and collective testimony incomplete and inconsistent. *See Alvarez*, 763 F.3d at 234 (affirming *habeas* grant where there were

---

[14] Mr. Diaz acknowledges that this Court has held that the standard of review is not waivable. *See Eze v. Senkowski*, 321 F.3d 110, 120-21 (2d Cir. 2003). However, the Circuits are not unified on this point. *See Mendoza v. Sec'y, Florida Dep't of Corr.*, 761 F.3d 1213, 1236-37 (11th Cir. 2014) (finding that petitioner could not argue for an alternate standard of review for the first time on appeal). The Supreme Court has not yet weighed in. It has, however, held that a party may waive whether AEDPA is the appropriate standard of review if not raised in *certiorari* briefing. *See Brumfield v. Cain*, 576 U.S. 305, 322-23 (2015); *see also Greenlaw v. United States*, 554 U.S. 237, 243-44 (2008) ("In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present . . . as . . . parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." (internal citation omitted)).

two eyewitness identifications of petitioner during a shootout). Some testified that the assailant had worn red; others said white. To some, he wore a hat, and to others he had none. No one mentioned a neck tattoo, despite several witnesses, such as Soto, having a right-side view of the shooter; Mr. Diaz, at that time, had a prominent such tattoo. Of the eyewitnesses, only two identified Mr. Diaz as the shooter (though one of those later could not identify him at trial), and the one who had the longest opportunity to observe, Susana Castro, identified *Irrizary*, who plainly had an expressed motive here: to avenge his aunt and seek retribution for the earlier fight. The grainy surveillance footage does not rule out Irrizary as the shooter, nor meaningfully inculpate Mr. Diaz.

One eyewitness said that the shooter had fired a gun different than a .45, and one testified to seeing *three* people in Irrizary's group with guns. The medical examiner could not say what type of bullet had killed Ms. Santiago, such that the jury was left to rely on the theory put forward through Detective Jacklitsch's report: that Mr. Diaz had stood on the corner of Willis and East 146th Street firing the .45-caliber gun that killed the victim. But all that the medical examiner's testimony established was that *any* gun at the scene could have struck Santiago. Adding to the uncertainty was that dozens of people were at or milling about the scene in the aftermath, reducing the likelihood that the evidence was carefully preserved in place.

Second, the prosecutor relied heavily on the disputed evidence as a critical part of its case. Detective Brown, who had not actually been to the crime scene during the investigation, testified for a significant portion of the prosecution's case about

32

Jacklitsch's investigation, which Jacklitsch had memorialized in the diagram and report. Brown then duplicated the diagram, giving it the imprimatur of truth, even though he had done no more than visit the site years later. Brown described as fact locations from which Jacklitsch had supposedly recovered bullet casings, and information about a car that had a bullet hole in its trunk east of where Santiago had been shot, yet the defense had no meaningful opportunity to test the truthfulness and accuracy of these critical facts. The jurors were deprived of the ability to "assess[]" Jacklitsch's "credibility" through the "well-established" and "important[t]" mechanism of cross-examination. *Cotto v. Herbert*, 331 F.3d 217, 257-58 (2d Cir. 2003), *overruled on other grounds by Crawford*, 541 U.S. 36. Moreover, Brown offered information about landmarks such as cars and trees that could have affected certain witnesses' ability to view, yet he did not personally observe any of these features contemporaneously with the shooting.

Detective Fox, too, based his expert conclusions on what Jacklitsch had gathered and documented, opining on what guns had discharged what bullets, and from where. Notably, he stated that two separate .45-caliber weapons could have been fired.

The jurors were then invited to visit the scene, diagram in hand, where they viewed two locations that Brown's testimony and evidence had made critical parts of the prosecution's case.

Unsurprisingly, the State depended heavily on the offending evidence during summation. The prosecution relied on the ballistics evidence and the diagram to advance its theory that Mr. Diaz had been near Willis Avenue and East 146th Street

33

with other members of Irrizary's group, shooting a .45-caliber weapon eastward. Because Jacklitsch documented finding a .45 bullet east of Ms. Santiago, the prosecutor argued it had been Mr. Diaz who had fired the fatal shot. This supposed finding had not been subject to adversarial testing, though. Moreover, even the ballistics expert, relying on Jacklitsch's diagram, had testified that there could have been *two* .45-caliber firearms used during the incident. As this Court has noted, it is the practice of a "skilled advocate" to "focus[] the jury's attention on the strengths of his case" in summation, *Wood*, 644 F.3d at 98, and that is precisely what the prosecutor here did. Thus, the Appellate Division's conclusion to the contrary that this evidence meant little to nothing is plainly flawed.

During deliberations, the jurors asked twice to view the crime scene diagram, further supporting that it impacted their deliberations. As the Magistrate correctly found, the "prosecution's case against Petitioner was largely constructed from the information contained in Detective Jacklitsch's crime scene report and diagram" (JA67). Thus, the erroneously admitted evidence was undoubtedly critically important to the outcome.

Finally, the report and diagrams were hardly cumulative, as they furnished the *only* evidence linking the fatal shot to the shooter who had been standing on the corner of E. 146th Street and Willis Avenue. Without the offending evidence, the jury would have had no reasonable basis for believing either that it was Mr. Diaz alone who fired east (of the three in Irrizary's group who had guns), or that he wielded the same caliber gun as the fatal bullet (of the several that were noted as being at the scene, including the

9mm that Jones believed he saw firing east). Only the crime scene diagrams and report allowed those inferences to be drawn.

As the *Brecht* Court noted, *habeas corpus* serves as a "bulwark" against "fundamental" unfairness and protects against "extreme malfunctions" of state criminal legal systems. 507 U.S. at 634 (internal citations omitted). Until this Court stepped in, New York courts had been botching application of the Confrontation Clause, completely ignoring *Melendez-Diaz, Bullcoming*, and other clear Supreme Court precedents. *See Garlick*, 1 F.4th at 135-36. The Appellate Division's harmless error finding here was no more carefully reasoned. Rather, as it missed in its slapdash application of *Chapman*, the improperly admitted crime scene evidence, which went to the heart of the case, did in fact have a "substantial and injurious effect." Thus, Mr. Diaz has established this part of the *Brown* test.

### b. *AEDPA Is Also Satisfied.*

Here, while the state court selected the appropriate harmless-error standard— constitutional error under *Chapman*—it applied this rule in a wholly unreasonable manner and arrived at an unreasonable result. In the Appellate Division's estimation, the crime scene reports and diagrams "shed little or no light on any of the disputed issues at trial." *Diaz*, 151 A.D.3d 502. To the contrary, this evidence went to *all* disputed issues at trial, such as causation and identity, and furnished the exclusive proof connecting the person the prosecution theorized was Mr. Diaz to the fatal shot. Its finding otherwise smacks of just the sort of "results-based" review that state courts are

conducting, frequently "bungling" the application of harmless-error doctrine in the process. Justin Murray, A Contextual Approach to Harmless Error Review, 130 Harv. L. Rev. 1791, 1793-94 (2017).

Here, there was no forensic evidence, nor any statements from Mr. Diaz or others, linking him to the crime. *See Alvarez*, 763 F.3d at 234 (noting, in finding the prosecution's case weak, the significance of the lack of forensic evidence implicating *habeas* petitioner). The grainy surveillance footage merely confirmed that there was a man in red at the scene, but whether he was the same person Soto testified to seeing with a gun was unclear, nor was it clear whether the video itself captured one man or two different men in red—one with a hat, and one without. Whether the video showed Mr. Diaz or even the person who fired the bullet that struck Ms. Santiago was completely unknowable from the lawfully admissible evidence at trial.

The ballistics evidence, which Detective Fox did not himself personally collect but rather relied on the non-testifying Detective Jacklitsch's report to elucidate, was all that linked the shooter at the corner to the bullet that killed Ms. Santiago. That ballistics evidence was *exclusively developed by Jacklitsch*, who was never subject to cross-examination on his "methods, conclusions, and reliability." *Garlick*, 1 F.4th at 136. Instead, everything the jury heard was supplied by someone "who did not conduct or even participate in" the evidence-gathering. *Id.*

By contrast, the eyewitness testimony established no more than that Mr. Diaz might have been present at the scene and left critical questions unresolved. Only two of the

eyewitnesses identified Mr. Diaz, and, as his attorney pointed out in summation, he shared a height, build, hairstyle, and facial hair with the other person identified as a shooter, Irrizary, who had a motive to be there firing a gun. Additionally, *no* witness noted a prominent neck tattoo, which Mr. Diaz had at the time. But, even assuming Mr. Diaz was present, the nontestifying detective's crime scene reports and diagram (and Brown's derivative diagram) constituted the *only* way he could be linked to the bullet that supposedly killed Santiago, as the eyewitness testimony did not establish that just one shooter was firing east, nor that Mr. Diaz had been that shooter. It did not even establish that the victim had been struck by a bullet from the gun that some eyewitnesses testified to seeing being fired.

Indeed, Detective Jacklitsch not only had drafted the report and diagram but was also the single source for placement of every detail, from the location of bullets and their type—including the bullet supposedly found in the trunk east of the victim—to the location of cars and trees on the block that might have affected the ability to view.

Thus, there is simply no way that the error in admitting this proof was "harmless beyond a reasonable doubt" under *Chapman* or *People v. Crimmins*, 36 N.Y.2d 230 (N.Y. Ct. App. 1975), the New York case incorporating the *Chapman* constitutional harmless-error standard. Accordingly, the Appellate Division did not reasonably apply *Chapman*. The District Court itself even found the errors not harmless, simply saying that reasonable minds could differ. But, it offered no analysis of why or how, and the foregoing analysis demonstrates there simply is no such reasonable conclusion.

In fact, where a state court expressly engages in harmless-error analysis, the federal judge does not simply review harmless error *de novo* but rather examines the reasoning of the state court and whether *that* was reasonable. *See Gutierrez*, 389 F.3d at 306-07. As the crime scene report and diagrams unquestionably played an important role in the jury's assessment of identity and location of the shooter, two major sources of dispute at trial, there is simply no way to conclude, as the Appellate Division did, that the admission of these documents shed "little or no light" on the disputed issues at trial. The District Court was wrong to police the state-court finding only for standard-issue prejudice, and the Appellate Division's conclusion is entitled to no deference now.

## CONCLUSION

The order below should be reversed, and the writ should issue.

Respectfully submitted,

Robert S. Dean (RD-0772)
Center for Appellate Litigation
*Attorney for Appellee-Petitioner*
120 Wall Street, 28th Floor
New York, New York 10005
(212) 577-2523
rdean@cfal.org

BY:

_____
Katharine Skolnick (KS-1123)
*Of Counsel*
(212) 577-2523 (ext. 501)
kskolnick@cfal.org
November 21, 2022

38

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of and Local Rule 32.1(a)(4), as it contains 9,638 words, excluding the parts of this document exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Garamond font.

_____

Katharine Skolnick
November 21, 2022