# 22-1835

## United States Court of Appeals for the Second Circuit

JOSEPH DIAZ,

*Petitioner-Appellant*,

*v.*

MARK MILLER, SUPERINTENDENT, GREEN HAVEN CORRECTIONAL FACILITY,

*Respondent-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT

## JOINT APPENDIX: VOLUME I OF II

Robert S. Dean
Center for Appellate Litigation
*Counsel for Petitioner-Appellant*
120 Wall Street, 28th Floor
New York, NY 10005
212-577-2523

November 18, 2022

Katharine Skolnick
(NY Bar #4760914)
kskolnick@cfal.org
*Of Counsel*
212-577-2523 (ext. 501)

# TABLE OF CONTENTS

S.D.N.Y. Docket Sheet……………………………………………………....JA1

Report and Recommendation……………………………………………..JA6

State's Objections to Report and Recommendation…………………………JA71

Petitioner's Response………………………………………………………JA87

District Court Order…………………………………………………………JA97

Notice of Appeal……………………………………………………………JA112

Appellate Division Appellant's Brief………………………………………....JA113

Appellate Division Respondent's Brief………………………………………JA217

Appellate Division Reply Brief………………………………………………JA277

CLOSED,APPEAL,HABEAS,CASREF,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:18-cv-10121-AT-VF

Diaz v. Bell
Assigned to: Judge Analisa Torres
Referred to: Magistrate Judge Valerie Figueredo
Cause: 28:2254 Petition for Writ of Habeas Corpus (State)

Date Filed: 11/01/2018
Date Terminated: 08/16/2022
Jury Demand: None
Nature of Suit: 530 Habeas Corpus (General)
Jurisdiction: Federal Question

**Petitioner**

**Joseph Diaz**                     represented by   **Katharine Rachel Skolnick**
                                                     Center for Appellate Litigation
                                                     120 Wall Street
                                                     New York, NY 10005
                                                     (212) 577-2523 x501
                                                     Fax: (212)-577-2535
                                                     Email: kskolnick@cfal.org
                                                     *ATTORNEY TO BE NOTICED*

V.

**Respondent**

**Superintendent Earl Bell**        represented by   **Joshua Weiss**
                                                     Bronx District Attorney's Office
                                                     198 East 161st Street
                                                     Bronx, NY 10451
                                                     (718)-838-6229
                                                     Email: weissjo@bronxda.nyc.gov
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Marianne Stracquadanio**
                                                     Bronx County District Attorney's Office
                                                     198 East 161st Street
                                                     Bronx, NY 10451
                                                     (718)-838-6100
                                                     Email: mcstracquadanio@gmail.com
                                                     *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 11/01/2018 | 1 | PETITION FOR WRIT OF HABEAS CORPUS pursuant to 28 U.S.C. 2254. Document filed by Joseph Diaz. (Attachments: # 1 Supplement Memorandum of Law, # 2 Civil Cover Sheet, # 3 In Forma Pauperis request)(Skolnick, Katharine) (Entered: 11/01/2018) |
| 11/02/2018 |   | ***NOTICE TO ATTORNEY TO PAY THE FILING FEE. Notice to Attorney Katharine Rachel Skolnick. Civil Case Opening Fee of $5 Due: for 1 Petition for Writ of Habeas Corpus. The filing fee due was not paid; either in whole or in part. If the filing fee is not |

|  |  | paid within five (5) days or In Forma Pauperis request filed, per Amended Standing Order 15-mc-131, this case will be administratively closed. Filing Fee due by 11/7/2018. (sj) (Entered: 11/02/2018) |
|---|---|---|
| 11/02/2018 |  | ***NOTICE TO ATTORNEY TO ELECTRONICALLY FILE CIVIL COVER SHEET. Notice to Attorney Katharine Rachel Skolnick. Attorney must electronically file the Civil Cover Sheet. Use the event type Civil Cover Sheet found under the event list Other Documents. (sj) (Entered: 11/02/2018) |
| 11/02/2018 | 2 | CIVIL COVER SHEET filed. (Skolnick, Katharine) (Entered: 11/02/2018) |
| 11/02/2018 | 3 | FILING ERROR - DEFICIENT PROCEED IN FORMA PAUPERIS PDF ERROR REQUEST TO PROCEED IN FORMA PAUPERIS. Document filed by Joseph Diaz. (Skolnick, Katharine) Modified on 11/6/2018 (sj). (Entered: 11/02/2018) |
| 11/02/2018 | 4 | FIRST MEMORANDUM OF LAW in Support re: 1 Petition for Writ of Habeas Corpus . Document filed by Joseph Diaz. (Skolnick, Katharine) (Entered: 11/02/2018) |
| 11/06/2018 | 5 | REQUEST TO PROCEED IN FORMA PAUPERIS. Document filed by Joseph Diaz. (Skolnick, Katharine) (Entered: 11/06/2018) |
| 11/06/2018 |  | ***NOTICE TO ATTORNEY REGARDING CIVIL. CASE OPENING STATISTICAL ERROR CORRECTION: Notice to attorney Katharine Rachel Skolnick. The following case opening statistical information was erroneously selected/entered: Cause of Action code 28:2241; County code Bronx. The following correction(s) have been made to your case entry: the Cause of Action code has been modified to 28:2254; the County code has been modified to Clinton. (sj) (Entered: 11/06/2018) |
| 11/06/2018 |  | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Analisa Torres. Please download and review the Individual Practices of the assigned District Judge, located at http://nysd.uscourts.gov/judges/District. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at http://nysd.uscourts.gov/ecf_filing.php. (sj) (Entered: 11/06/2018) |
| 11/06/2018 |  | Magistrate Judge Debra C. Freeman is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: http://nysd.uscourts.gov/forms.php. (sj) (Entered: 11/06/2018) |
| 11/06/2018 |  | Case Designated ECF. (sj) (Entered: 11/06/2018) |
| 11/06/2018 | 6 | ORDER OF REFERENCE TO A MAGISTRATE JUDGE: Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for Habeas Corpus. Referred to Magistrate Judge Debra C. Freeman. SO ORDERED. (Signed by Judge Analisa Torres on 11/06/2018) (ama) (Entered: 11/06/2018) |
| 11/06/2018 | 7 | ORDER GRANTING IFP APPLICATION: Leave to proceed in this Court without prepayment of fees is authorized. 28 U.S.C. § 1915. SO ORDERED. (Signed by Judge Analisa Torres on 11/06/2018) (ama) (Entered: 11/06/2018) |
| 11/15/2018 | 8 | NOTICE OF APPEARANCE by Marianne Stracquadanio on behalf of Earl Bell. (Stracquadanio, Marianne) (Entered: 11/15/2018) |
| 01/24/2019 | 9 | ORDER, It is hereby ORDERED THAT: 1. Pursuant to Rule 4, Respondent shall serve and file any opposition to the Petition no later than March 25, 2019. Responding papers shall include the transcripts and records of all relevant trial and post conviction proceedings, the briefs submitted on appeal, and such other information as may be necessary for this Court |

| | | to determine whether Petitioner has exhausted his state remedies. 2. Petitioner shall serve and file reply papers, if any, no later than May 24, 2019. ( Responses due by 3/25/2019, Replies due by 5/24/2019.) (Signed by Magistrate Judge Debra C. Freeman on 1/24/2019) (kv) (Entered: 01/24/2019) |
|---|---|---|
| 01/24/2019 | | Set/Reset Deadlines: Earl Bell answer due 3/25/2019. (kv) (Entered: 01/28/2019) |
| 03/20/2019 | 10 | **FILING ERROR - DEFICIENT DOCKET ENTRY (SEE 11 Declaration) -** DECLARATION of Marianne Stracquadanio in Opposition re: 1 Petition for Writ of Habeas Corpus. Document filed by Earl Bell. (Attachments: # 1 Exhibit Petitioner's Appellate Brief and Reply, # 2 Exhibit Respondent's Appellate Brief, # 3 Exhibit Petitioner's Leave Application, # 4 Exhibit Respondent's Leave Application Response) (Killian, Nancy) Modified on 3/22/2019 (db). (Entered: 03/20/2019) |
| 03/20/2019 | 11 | DECLARATION of Marianne Stracquadanio in Opposition re: 1 Petition for Writ of Habeas Corpus. Document filed by Earl Bell. (Attachments: # 1 Exhibit Petitioner's Appellate Brief and Reply, # 2 Exhibit Respondent's Brief, # 3 Exhibit Petitioner's Leave Application, # 4 Exhibit Respondent's Leave Application Response)(Stracquadanio, Marianne) (Entered: 03/20/2019) |
| 03/20/2019 | 12 | MEMORANDUM OF LAW in Opposition re: 1 Petition for Writ of Habeas Corpus . Document filed by Earl Bell. (Stracquadanio, Marianne) (Entered: 03/20/2019) |
| 03/20/2019 | 13 | STATE COURT TRANSCRIPT of proceedings in the Supreme Court, County of Bronx, Case Number 3971/2009, (Attachments: # 1 Supplement, # 2 Supplement, # 3 Supplement, # 4 Supplement, # 5 Supplement, # 6 Supplement, # 7 Supplement, # 8 Supplement, # 9 Supplement, # 10 Supplement)(Stracquadanio, Marianne) (Entered: 03/20/2019) |
| 04/15/2019 | 14 | FIRST REPLY MEMORANDUM OF LAW in Support re: 1 Petition for Writ of Habeas Corpus . Document filed by Joseph Diaz. (Skolnick, Katharine) (Entered: 04/15/2019) |
| 06/03/2020 | 15 | FIRST LETTER addressed to Magistrate Judge Debra C. Freeman from Katharine Skolnick dated 06/03/2020 re: Supplemental Authority. Document filed by Joseph Diaz.. (Skolnick, Katharine) (Entered: 06/03/2020) |
| 06/09/2020 | 16 | FIRST LETTER addressed to Magistrate Judge Debra C. Freeman from Respondent dated June 9, 2020 Document filed by Earl Bell..(Stracquadanio, Marianne) (Entered: 06/09/2020) |
| 06/17/2021 | 17 | SECOND LETTER addressed to Magistrate Judge Debra C. Freeman from Katharine Skolnick o/b/o Joseph Diaz dated 06/15/2021 re: Supplemental Case Law. Document filed by Joseph Diaz..(Skolnick, Katharine) (Entered: 06/17/2021) |
| 02/25/2022 | 18 | THIRD LETTER addressed to Magistrate Judge Debra C. Freeman from Katharine Skolnick dated February 25, 2022 re: 1:18-cv-10121-AT-DCF Diaz v. Bell, Case Law Update. Document filed by Joseph Diaz..(Skolnick, Katharine) (Entered: 02/25/2022) |
| 04/14/2022 | 19 | REPORT AND RECOMMENDATION re: 1 Petition for Writ of Habeas Corpus filed by Joseph Diaz. For all of the foregoing reasons, I respectfully recommend that Petitioner's Petition for a Writ of Habeas Corpus (Dkt. 1) be granted and that Respondent be directed to release Petitioner from custody unless the People of the State of New York decide to re-try him within the next ninety (90) days. Given that this Court recommends that the Petition be granted, there is no need to issue a Certificate of Appealability for purposes of appeal. If, however, the District Court does not adopt this Report and Recommendation and denies the Petition, I would further recommend that, because Petitioner has made a substantial showing of the denial of a constitutional right, a certificate of appealability issue on the questions of (1) whether the Supreme Court's Confrontation Clause precedent clearly established that the statements at issue were testimonial, and (2) if so, whether the |

JA3

Appellate Division's decision denying Petitioner's Confrontation Clause claim involved an unreasonable application of, that precedent. See 28 U.S.C. § 2254(d). Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Analisa Torres, United States Courthouse, 500 Pearl Street, New York, New York 10007, Room 2210, if required by Judge Torres's Individual Practices. Any requests for an extension of time for filing objections must be directed to Judge Torres. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. See Thomas v. Arn, 474 U.S. 140, 155 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair Ltd., 838 F.2d 55, 58 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983). Objections to R&R due by 4/28/2022 (Signed by Magistrate Judge Debra C. Freeman on 4/14/2022) Copies sent by Chambers to all counsel via ECF (ks) (Entered: 04/14/2022)

| 04/18/2022 | 20 | NOTICE OF APPEARANCE by Joshua Weiss on behalf of Earl Bell..(Weiss, Joshua) (Entered: 04/18/2022) |
| 04/18/2022 | 21 | FIRST LETTER MOTION for Extension of Time addressed to Judge Analisa Torres from Joshua P. Weiss dated 04/18/2022. Document filed by Earl Bell..(Weiss, Joshua) (Entered: 04/18/2022) |
| 04/19/2022 | 22 | LETTER RESPONSE in Opposition to Motion addressed to Judge Analisa Torres from Katharine Skolnick dated 04/19/2022 re: 21 FIRST LETTER MOTION for Extension of Time addressed to Judge Analisa Torres from Joshua P. Weiss dated 04/18/2022. . Document filed by Joseph Diaz..(Skolnick, Katharine) (Entered: 04/19/2022) |
| 04/19/2022 | 23 | ORDER denying 21 Letter Motion for Extension of Time. DENIED. SO ORDERED. (Signed by Judge Analisa Torres on 4/19/2022) (ks) (Entered: 04/19/2022) |
| 04/28/2022 | | NOTICE OF REDESIGNATION TO ANOTHER MAGISTRATE JUDGE. The above entitled action has been redesignated to Magistrate Judge Valerie Figueredo. Please note that this is a reassignment of the designation only. (laq) (Entered: 04/28/2022) |
| 04/28/2022 | | NOTICE OF REASSIGNMENT OF A REFERRAL TO ANOTHER MAGISTRATE JUDGE. The referral in the above entitled action has been reassigned to Magistrate Judge Valerie Figueredo, for Habeas Corpus. Magistrate Judge Debra C. Freeman no longer referred to the case. (laq) (Entered: 04/28/2022) |
| 04/28/2022 | 24 | OBJECTION to 19 Report and Recommendations Document filed by Earl Bell..(Weiss, Joshua) (Entered: 04/28/2022) |
| 05/10/2022 | 25 | FIRST RESPONSE re: 24 Objection to Report and Recommendations . Document filed by Joseph Diaz..(Skolnick, Katharine) (Entered: 05/10/2022) |
| 08/16/2022 | 26 | ORDER for 19 Report and Recommendations. The Court has reviewed de novo those portions of the R&R to which Respondent specifically objects and has reviewed the remainder of the R&R for clear error. For the reasons stated above, the Court ADOPTS the R&R with respect to its analysis of the Confrontation Clause violation, and REJECTS the R&R with respect to its analysis of the harmless error issue. Petitioner's application for a writ of habeas corpus under § 2254 is DENIED and his request for a COA is GRANTED. The Clerk of Court is directed to close the case. (Signed by Judge Analisa Torres on 8/16/2022) (ate) (Entered: 08/16/2022) |
| 08/23/2022 | 27 | FIRST NOTICE OF APPEAL from 26 Order Adopting Report and Recommendations,,. |

| | |
|---|---|
| | Document filed by Joseph Diaz. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Skolnick, Katharine) (Entered: 08/23/2022) |
| 08/23/2022 | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 27 Notice of Appeal. (tp) (Entered: 08/23/2022) |
| 08/23/2022 | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 27 Notice of Appeal filed by Joseph Diaz were transmitted to the U.S. Court of Appeals. (tp) (Entered: 08/23/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/24/2022 15:47:15 | | |
| **PACER Login:** | kateskolnick1123 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:18-cv-10121-AT-VF |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

JA5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH DIAZ,

                          Petitioner,

        -against-

SUPERINTENDENT EARL BELL,

                          Respondent.

18cv10121 (AT) (DF)

**REPORT AND
RECOMMENDATION**

**TO THE HONORABLE ANALISA TORRES, U.S.D.J.:**

Petitioner Joseph Diaz ("Petitioner"), who, according to publicly available records, is currently incarcerated at Green Haven Correctional Facility in Beekman, New York ("Green Haven"),[1] filed a petition pursuant to 28 U.S.C. § 2254 seeking a writ of habeas corpus (the "Petition") on the grounds that the trial court violated his rights under the Confrontation Clause of the Sixth Amendment when it permitted the prosecution to introduce a crime scene report, diagrams, and photographs without producing for cross examination the witness who prepared those documents. Respondent Earl Bell, Superintendent of the Clinton Correctional Facility,[2] acting through the Bronx County District Attorney's Office, opposes the Petition on the grounds that the introduction of the above-described documents through the testimony of a substitute

---

[1] *See* New York State Department of Corrections and Community Supervision, *Inmate Information*, http://nysdoccslookup.doccs.ny.gov/ (accessed Apr. 10, 2022).

[2] At the time Petitioner filed his Habeas Petition, he was incarcerated at the Clinton Correctional Facility. (*See* Petition Under 28 U.S.C. § 2254 For Writ of Habeas Corpus By A Person In State Custody, dated Oct. 23, 2018 ("Pet.") (Dkt. 1).) Now, because he is incarcerated at Green Haven, the current superintendent of Green Haven should be substituted as the proper respondent.

witness did not violate Petitioner's Confrontation Clause rights, and that, in any event, Petitioner

is not entitled to habeas relief under the applicable standard of review.

For the reasons set forth below, I recommend that the Petition be GRANTED.

## BACKGROUND

### A. Factual Background[3]

The facts summarized herein are taken from the evidence at Petitioner's trial, which was

conducted in October 2014 before Justice Newman, in the New York Supreme Court, Bronx

County. The crimes with which Petitioner was charged all related to a 2009 shooting, in which

multiple people were involved (with some witnesses later calling the event a "shootout"), and in

which one individual (Aisha Santiago ("Santiago")) was killed. Petitioner was accused by the

prosecution of having been the shooter who caused Santiago's death, and he was tried by a jury

on five counts: second-degree intentional murder (N.Y. Penal Law § 125.25(1)); second-degree

depraved indifference murder (N.Y. Penal Law § 125.25(2)); first-degree intentional

manslaughter (N.Y. Penal Law § 125.20(1)); second-degree reckless manslaughter (N.Y. Penal

Law § 125.15(1)); and second-degree criminal possession of a weapon (N.Y. Penal Law

§ 265.03). (*See* Appendix: 28 U.S.C. § 2254 Petition ("App'x"), at A31.)[4]

---

[3] The transcripts of the state court proceedings in this case have been submitted by
Respondent and are included in Dkt. 13. Petitioner's pretrial proceedings, trial, and sentencing
were all conducted before the Honorable Barbara F. Newman, J.S.C. The transcript of the
pretrial proceedings ("Pretrial Tr.") starts at Dkt. 13, at "ECF 1" (referring to the page number
affixed to the document when it was uploaded to the Court's Electronic Case Filing ("ECF")
system). The transcript of the jury *voir dire* starts at Dkt. 13-2, at 20. The transcript of
Petitioner's trial, held from October 1, 2014 through October 20, 2014 ("Trial Tr."), starts at
Dkt. 13-4, at 77. The transcript of Petitioner's sentencing on December 10, 2014 ("Sentencing
Tr."), starts at Dkt. 13-9, at 1089. When referencing these transcripts herein, this Court will cite
to the transcripts' own internal page numbers, rather than to the page numbers affixed by the
ECF system.

[4] When Petitioner filed the instant Habeas Petition, his counsel also submitted, in hard
copy, a bound "Appendix," which contains certain materials that were before trial court and the

At trial, the prosecution presented testimony from several individuals, including eyewitnesses to the shootout, the paramedic who arrived at the scene, the medical examiner who performed an autopsy of Santiago, a ballistics expert, and officers of the New York City Police Department ("NYPD") who were either present on the scene or were later involved in the criminal investigation or the development of the prosecution's case.  The defense called one witness, an off-duty police officer who had been in the neighborhood at the time of the shooting, and Petitioner did not take the stand to testify in his own defense.

### 1.    The Events Leading up to the Shootout

The shootout that resulted in Santiago's death took place on September 22, 2009, at 3:20 p.m., on East 146th Street in the Bronx, New York.  (Trial Tr., at 43-44, 285-87.)  It had been the result of rising tensions between Jason Irrizary ("Irrizary") (the nephew of Elizabeth Thomas (known as "Red"), who was a "loan shark" in the neighborhood), and Robert Vargas ("Vargas") (the teenage son of Barbara Lopez ("Lopez"), an individual who had owed Red money).  (*Id.*, at 421, 616-17.)

More specifically, according to the trial testimony of Susana Castro ("Castro"), who lived in the neighborhood and witnessed these events, on September 21, 2009, Red had approached Lopez – at East 146th Street – about the money Lopez owed her.  (*Id.*, at 616-17.)  According to Castro, Vargas (Lopez's son) was there at the time, and he told Red that Lopez was not going to give her the money and, further, he threatened to shoot Red "in the face."  (*Id.*, at 617-19.)

---

courts on direct appeal, including the indictment and the trial exhibits.  Although it is this Court's general practice to cite to the transcripts of the state court proceedings that have been submitted by Respondent and filed on the ECF docket, this Court will cite to this Appendix, where necessary.

Castro recalled that, before leaving, Red responded, "Oh, you want to disrespect me. Okay." (*Id.*, at 620.)

Irrizary (Red's nephew) testified at trial that, later that same day, Red told him about Vargas's threat to her. (*Id.*, at 424.) In addition, Irrizary testified that, on the next day, September 22, he, together with Red and two others – Irrizary's brother (Raul Irrizary ("Raul")) and cousin (Manuel Irrizary ("Manuel")) – returned to 146th Street. (*Id.*, at 430.) Irrizary recalled that, once there, Red saw Lopez and confronted her. (*Id.*, at 428.) Irrizary testified that a man named "Gordo" was also present, and that Irrizary, Raul, and Manuel proceeded to get into a "scuffle" or fight with Gordo because they had mistakenly believed him to be Vargas. (*Id.*, at 437-39.) Irrizary testified that, during this fight, Gordo sliced Irrizary's hand with a knife. (*Id.*, at 440-41.) Latroy Ewell ("Ewell") (a friend of Gordo's who witnessed the fight) testified to observing Gordo engage in a fight with the three men and to trying to break it up. (*Id.*, at 587-88.) Castro, who witnessed the fight as well, testified that, when the fight did break up and Irrizary left the scene, Irrizary yelled out: "Clear the block, I'm fucking coming back." (*Id.*, at 624.)

According to Irrizary, he went home after the fight to clean his wound, and then returned to the area of East 146th Street and Willis Avenue about 15 minutes later. (*Id.*, at 444-46.) Irrizary testified that, when he returned, he did not see any of his family members in the area, so he walked into a store on the northeast corner of Willis and East 146th Street to buy a water bottle. (*Id.*, at 447-49.) Irrizary further testified that, when he exited the store and started walking east down 146th Street, he once again encountered Gordo and Ewell. (*Id.*, at 452-56.) According to both Irrizary's and Ewell's testimony, it was at this time that another verbal altercation started between Gordo and Irrizary. (*Id.*, at 453-56; 589-91.)

4

Another witness who testified at trial, Orlando Soto ("Soto"), recalled that he was coming out of the laundromat at 420 East 146th Street, on the south side of the street, when he witnessed this latest argument between Irrizary and Gordo from a car-length's distance.  (*Id.*, at 281-83.) More particularly, Soto recalled seeing three or four people from the neighborhood – including his friends Ewell, Gordo, and another man known as "Fifty" – arguing with a group of four or five Hispanic men whom Soto did not recognize.  (*Id.*, at 251-55, 257-59, 281-85.)  Soto testified that he had thought, at the time, that a physical fight might break out, so he had stopped to watch the argument.  (*Id.*, at 255, 260, 286-88.)  Soto recalled that, during this altercation, his friends had faced west, towards Willis Avenue, while the other men involved had faced east.  (*Id.*, at 285.)

It was soon after this that the shootout occurred.  Multiple witnesses, whose accounts of the incident varied, testified at Petitioner's trial, and their testimony is summarized below.  For ease of reference, the relative locations of the buildings mentioned in the witnesses' accounts (from west to east) are shown here:



### a.   <u>Soto's Account</u>

First, Soto testified that, as he saw his friends begin to walk east on the north side of 146th Street towards Brook Avenue, he heard several gunshots.  (*Id.*, at 287-88.)  Soto stated that he saw one of the men from the other group (a person he did not know) standing on the sidewalk at the northeast corner of 146th and Willis, holding a large silver gun straight ahead of him,

5

pointing east.  (*Id.*, at 260, 262-64, 269, 288-289, 306.)  Soto testified that the man holding the

silver gun was Hispanic, and Soto claimed that he was "sure" that this man was wearing a red

shirt and blue jeans, as well as a baseball cap.  (*Id.*, at 263, 290, 294-95.)  At trial, Soto testified

that the hat was also red, but acknowledged that he was "not too sure" about that.  (*Id.*, at 263,

294-95.)  Soto also conceded that he had not been able to see the whole group of people on the

corner, nor could he be certain as to where the man holding the silver gun had been standing in

relation to the others.  (*Id.*, at 262, 289-90.)  Nor could he recall how many shots were fired or

the direction in which the shooter with the silver gun eventually ran.  (*Id.*, at 265-66, 295.)

Nonetheless, Soto testified that he heard gunfire come from 409 146th Street, and he also

recalled seeing Ewell, who was standing near that building, shoot west "towards the group of

strangers," although Soto could not remember at trial what Ewell had been wearing during the

incident.  (*Id.*, at 264-68, 291-95.)

  As also relevant here, Soto testified that, on the day after the shooting, September 23,

2009, he viewed a lineup at the police precinct.  (*Id.*, at 270.)  Soto recalled that it took him a

"long time" to identify anybody in the lineup, but he ultimately determined that the person in

"position two" had been the shooter carrying the silver gun.  (*Id.*, at 271-73, 276-78, 303.)

During his trial testimony, Soto was shown photographs of the lineup and again said that the

shooter was in "position two."  (*Id.*, at 274-75.)  As later explained to the jury through the

testimony of Detective Bart Snyder ("Detective Snyder"), an investigating detective in the case,

Petitioner had been in lineup position two.  (*Id.*, at 710.)  At trial, however, Soto did not directly

identify Petitioner as the shooter, and, in fact, Soto testified that he would not be able to identify

the person who had held the silver gun because he was "not good with faces after a certain

amount of years."  (*Id.*, at 268-69, 278.)  When asked by defense counsel if he had also been "not

too good with faces" on September 22, 2009 (the date of the shooting), Soto at first replied

"yes," but later said, "I don't know. . . . [W]hen everything happened that day[,] I was able to

remember what happened and saw the face, but now I don't." (*Id.*, at 295-96.)

### b.    Michael Jones's Account

Michael Jones ("Jones"), a self-described "public figure" in the "recording industry,"

who had twice been convicted of petit larceny, testified at trial that, a few minutes before the

shooting started on September 22, 2009, he had parked his car outside the Papa Johns on the

northwest corner of Willis and 146th Street. (*Id.*, at 505-06.) Jones stated that, after getting out

of his car, he had crossed the street to use an ATM, and, as he crossed back to get to Papa Johns,

he brushed up against a man wearing a red shirt. (*Id.*, at 507.) Jones recalled that, after he

bought a pizza, he got into his car and, just after he put on his seatbelt, he heard two shots ring

out. (*Id.*, at 508, 528-29, 535-36.) Jones testified that he then "laid [his] seat all the way back"

to protect himself (*id.*, at 508, 541), and, as he leaned back all the way in his seat, he looked to

the left and, with "a clear line of sight," he saw the same man he had bumped into in the street,

who was wearing a red shirt and holding a gun in front of himself with his right hand (*id.*, at

509-11, 529). At first, Jones testified that he saw this man "let[] off more shots," but later, at

trial, Jones explained that he never actually saw the man in the red shirt fire the gun; rather, he

recalled seeing the man only hold the gun in front of him. (*Id.*, at 509, 535.) Jones also recalled

hearing eight to 10 more shots while he was still in his car (*id.*, at 511, 534), and he stated that, at

one point while he was in his car, he saw the man in the red shirt hand the gun to a man wearing

a white T-shirt, who, in turn, wrapped the gun in another white T-shirt before both men ran off in

opposition directions (*id.*, at 509-10). Jones testified that he believed the shooter was firing a

.9 mm gun. (*Id.*, at 511, 541.)

Continuing with his testimony, Jones recalled that, as he emerged from his car after the gunfire, the man in the red shirt ran right past him. (*Id.*, at 511.) Jones testified that, at that point, he went into the Papa Johns, "threw" a baby and mother onto the floor, dove on top of the baby to protect it, and then told someone from Papa Johns to call 911. (*Id.*) According to Jones, he heard more shots while inside the pizza shop, but he did not know the direction from which those shots were fired. (*Id.*, at 534, 547-48.) Jones testified that, when he came out of the pizza shop, he saw the same man in the red shirt run past him again. (*Id.*, at 516.) Jones described the man as Hispanic, wearing jeans, and having a scruffy "wolfing out" beard, with a "low haircut." (*Id.*, at 515, 526-27.) Jones explained that he could tell this man had a low haircut because he was not wearing a hat. (*Id.*, at 527, 536.) Asked four different times at trial whether the man he saw wearing the red shirt was also wearing a hat, Jones was adamant that he was not. (*Id.*, at 515, 517, 526-27.) Jones, who was 5'10" tall, also noted that the man in the red shirt had been a "little taller" than he. (*Id.*, at 507-08, 526.) It was later revealed during the trial that Irrizary was 5'11" tall (*id.*, at 437-38) and that Petitioner was 6'2" tall (*see* App'x, at A1309).

During Jones's trial testimony, the prosecution played surveillance video footage that had been recovered from a camera outside Papa Johns. (*See* Trial Tr., at 512-13.) While watching that footage, Jones testified that he could see the shooter – wearing red – run by at two different points, once after the first set of shots, and again after the second set of shots. (*Id.*, at 512-14.) On cross-examination, Jones conceded that, at one point in the video, the man whom he had identified as the shooter was not wearing a hat, while, at another point, the man whom he had again identified as the shooter *was* wearing a hat. (*Id.*, at 537-39.)

Finally, Jones testified that, on September 27, 2009 (five days after the shooting), he had identified the shooter as being in position "six" in a photo array, and the prosecution then

8

introduced the photo array into evidence. (*Id.*, at 567.) While looking at the photo array, Jones confirmed at trial that it matched his earlier description of the shooter's facial hair, saying "that's what I call[ed] wolfing out." (*Id.*) Over the defense's objection, Jones also testified that he had told the police, "as soon as [Detective Snyder] put the photos . . . in front of me it was right there, I said 'That's him right there, that's the shooter.'" (*Id.*, at 565.) Later during the trial, the prosecution displayed the same photo array for the investigating detective, Detective Snyder, who testified that Petitioner had been in "position six." (*Id.*, at 713.)

### c.   Ewell's Account

Ewell briefly testified that, on September 22, 2009, someone had fired shots at him while he was standing in front of his apartment building at 409 East 146th Street. (*Id.*, at 592-96.) Ewell could not recall, however, what he saw at the corner of 146th Street and Willis Avenue. (*See id.*)[5] Ewell testified that, upon shots being fired, he had used his gun in "self-defense." (*Id.*, at 595.)

### d.   Castro's Account

Castro, who also witnessed the shootout, testified that she was standing on the stoop outside of 417 East 146th Street, waiting for her son to come home from school, when she saw Irrizary and four men who had been with him. (*Id.*, at 627-41, 663-71.) According to Castro, Irrizary had started shooting toward 409 East 146th Street, and Ewell and Vargas had fired back from that stoop. (*Id.*) Castro stated that two of Irrizary's friends, who were wearing black hooded sweatshirts, had guns as well, but she did not see them fire their weapons. (*Id.*, at 650-51, 673.) Castro testified that, during the shooting, she dove to the ground, and, when she

---

[5] In relation to the subject incident, Ewell was indicted for attempted murder, but he later pleaded guilty to possession of a weapon with the intent to use it unlawfully. (*See* Pretrial Tr., at 51; App'x, at A124.)

looked up, she saw Irrizary shooting a bit farther east, in front of building 413-415. (*Id.*, at 643-47, 675-77.) According to Castro, after the shooting stopped, the gunmen scattered. (*Id.*, at 650-54.)

Castro also testified that, after the shooting, she viewed a photo array at the police precinct and identified Irrizary as the shooter. (*Id.*, at 655-66, 668-69.) Castro stated at trial that she recognized Irrizary's face and had "no doubt" in her mind that he was the shooter. (*Id.*, at 647, 673-74.)

### e. **Irrizary's Account**

During the trial, Irrizary claimed that he had nothing to do with the shooting. (*See id.*, at 456.) Specifically, Irrizary testified that, after the verbal dispute with Gordo and his friends on September 22, Irrizary suddenly heard an unspecified number of gunshots, but could not tell the direction from which the shots had been fired. (*Id.*, at 456-57.) Irrizary recalled that he then ducked and ran between cars and that he could not recall how many – if any – more gunshots he heard after that. (*Id.*, at 457-62.) Irrizary testified that he eventually ran down East 146th Street, across Willis, and then east toward Third Avenue to make it to his apartment, and he stated that, while he was running, he did not see any individuals on the sidewalk, although he did see cars passing on 146th Street. (*Id.*, at 462-64.) He also recalled that, at some point while he was running, somebody pointed out to him that a person had been shot. (*Id.*, at 464.) It was at that time, Irrizary noted, that he "turned around" and saw his stepbrother, Anthony Pena Guzman ("Pena"), lying on the ground in front of a bodega on the corner of Willis and 146th Street, shot in the leg. (*Id.*, at 464-67.)

During his trial testimony, Irrizary denied seeing himself on the surveillance video (*see id.*, at 472-73). In addition, while Irrizary acknowledged that his stepbrother Pena was friends

with Petitioner, Irrizary testified that he, himself, had known Petitioner only casually around the neighborhood.  (*Id.*, at 467-71.)  Irrizary did testify, though, that he had visited Petitioner in jail while Petitioner was awaiting trial, and that he had put money in Petitioner's commissary as a "favor" to Pena.  (*Id.*, at 496-500.)

### f.  Anthony Flores's Account

During the shootout, the victim, Santiago, had been standing in front of her building at 445 East 146th Street, when she was struck in the chest by gunfire.  (*Id.*, at 748-50, 759-62.)  Santiago's nine-year-old son, Anthony Flores ("Flores"), testified at trial that he had been standing on the top steps of the building while his mother had been standing in the middle of the sidewalk, facing building 445 and talking to a friend.  (*See id.*, at 749-50.)  Flores recalled hearing two shots and then looking towards Willis Avenue, where he saw people scattering.  (*See id.*)  Flores testified that, when he turned back to look at his mother, he saw that she had been shot.  (*Id.*, at 750; 758-59.)

### 2.  The Police's Arrival at the Scene and Investigation

Officer Ronald Juan, who was the first officer to arrive at the scene, testified that he immediately saw "a lot of people . . . running [in] all different kinds of directions," and that people were "yelling" and "screaming."  (*Id.*, at 229.)  Detective Kathleen Evelly, who arrived soon after, testified that, within five minutes after the shooting, at 3:25p.m., there were more than 30 people milling around the northeast corner of Willis Avenue and 146th Street.  (*Id.*, at 413 14.)  Officer Juan testified that, upon arrival, he called for an ambulance and began to secure the crime scene by ordering people away from the area.  (*Id.*, at 228-29.)

At the time of the police's arrival, Santiago was found lying on the stairs of her building, at 445 East 146th Street.  (*Id.*, at 750.)  She had a gunshot wound to her chest and blood oozing

from her mouth, and she was not moving.  (*Id.*, at 49.)  The paramedic who arrived on the scene testified that he did not administer any medical care because Santiago exhibited "signs of obvious death."  (*Id.*)

### a.    The Ballistics Evidence at the Scene

Officer Juan testified that he vouchered the ballistics evidence from the scene, but did not personally recover that evidence.  (*Id.*, at 245-46.)  Rather, as was explained at trial by Detective Paul Brown, Crime Scene Unit Detective Glenn Jacklitsch, who was "[t]he lead detective in this investigation" and arrived two hours after the shootout, processed the scene and collected evidence.  (*Id.*, at 64, 192-93.)   According to Detective Brown, Detective Jacklitsch prepared the crime scene reports, took photographs, and created a diagram depicting where he had collected the 25 pieces of evidence recovered at the scene.  (*Id.*, at 64-66.)

Despite his personal involvement with the investigation, Detective Jacklitsch did not testify at trial.  (*See generally id.*)  According to the prosecution, Detective Jacklitsch was "retired" at the time of trial, so Detective Brown, also a member of the Crime Scene Unit, was called to testify in Detective Jacklitsch's stead.  (*Id.*, at 59-60.)  The substance of Detective Brown's testimony will be discussed more thoroughly below (*see* Background, *infra*, at Section B(2)(a)(i)), but this Court notes that, among other things, Detective Jacklitsch recorded that he had found .45 expelled casings at the corner of Willis Avenue and 146th Street, .9 mm casings in front of 409-411 East 146th Street, shell casings from a .22 caliber rifle or cartridge inside of a fenced area of 413 and 415 East 146th Street, and a deformed .45 caliber copper jacketed bullet inside the trunk of a car parked in front of 455 East 146th Street, which was in the relative vicinity (and east) of Santiago.

### b.    The Autopsy

Dr. Margaret Prial, the medical examiner who performed Santiago's autopsy, testified at trial that it was impossible to determine what kind of bullet had killed Santiago.  (*Id.*, at 798-800.)  Dr. Prial concluded that the person who had fired the fatal shot could have been anywhere from 10 to over 100 feet away.  (*Id.*, at 798-803, 806.)  Moreover, Dr. Prial could determine neither where the shooter had been standing, nor the direction from which the bullet had traveled.  (*See id.*)

### c.    The Police's Identification of Petitioner as the Main Suspect

After being seen by officers, Petitioner was apprehended at the scene and taken into custody on the date of the shooting, September 22, 2009 (*see* Pretrial Tr., at 105), and was then formally arrested the next day, September 23, 2009 (*id.*, at 105-06).  As discussed above, Soto (from a lineup on September 23) and Jones (from a photo array on September 27) each identified Petitioner as the shooter.  (Trial Tr., at 270-73, 567.)  In addition, Irrizary's stepbrother, Pena, who had been taken to the hospital after the shooting, stated to Detective Joseph O'Neil (another officer who testified at the pretrial proceedings), that Petitioner had been involved in the shooting.  (Pretrial Tr., at 139-40.)  According to Detective O'Neil's testimony, Pena stated to him that Petitioner had been the "big guy shooting down the street."  (*Id.*, at 140.)

Around this same time, however, Castro identified Vargas and Irrizary as the shooters.  (*See id.* at 106; *see also* Trial Tr., 655-66.)  According to Detective Snyder (another investigating detective who testified in this case), on the day after the shooting, Lopez's son, Vargas, was arrested and charged with attempted murder for "shooting into a crowd."  (Pretrial Tr., at 40-41.)  Detective Snyder also testified that, at another point in the investigation, Irrizary was taken into custody and provided a statement to detectives, although he was not arrested for Santiago's

death.  (*Id.*, at 49.)  As noted above (*see supra* n.5), Ewell was arrested in November 2009 and charged with attempted murder for his alleged role in the shootout (Pretrial Tr., at 51), but he later pleaded guilty to possession of a weapon with the intent to use it unlawfully.  Ewell had not yet been sentenced at the time of Petitioner's criminal trial.  (*See also* App'x, at A124.)

### B.    Procedural History

#### 1.    Indictment

On October 8, 2009, Petitioner was indicted on charges of second-degree intentional murder (*see* N.Y. Penal Law § 125.25(1)); second-degree depraved indifference murder (*see* N.Y. Penal Law § 125.25(2)); first-degree intentional manslaughter (*see* N.Y. Penal Law § 125.20(1)); second-degree reckless manslaughter (*see* N.Y. Penal Law § 125.15(1)); and second-degree criminal possession of a weapon (*see* N.Y. Penal Law § 265.03).  (*See* App'x, at A7-10, A31.)

#### 2.    Trial[6]

##### a.    The Prosecution's Case-In-Chief

At trial, it was the prosecution's theory that Santiago had died as a result of Petitioner's shooting a .45 caliber gun eastward, and that, based on the evidence, the only shooter who could have caused Santiago's gunshot wound was Petitioner.  (*See* Trial Tr., at 27-28.)  More particularly, according to the prosecution, Petitioner had been summoned to the scene with his

---

[6] Prior to trial, the court held *Sandoval*, *Dunaway*, *Wade*, and *Gethers* hearings, pursuant to:  (1) *People v. Sandoval*, 34 N.Y.2d 371 (1974), to determine whether evidence of Petitioner's criminal record would be admissible at trial, if he chose to testify; (2) *Dunaway v. New York*, 442 U.S. 200 (1979), to determine whether there was probable cause for Petitioner's arrest; (3) *United States v. Wade*, 388 U.S. 218 (1967), to determine whether Petitioner's pretrial identification was the result of impermissibly suggestive procedures; and (4) *People v. Gethers*, 86 N.Y.2d 159, 161 (1995), to determine whether probable cause existed to detain Petitioner pending an "on-the-scene confirmatory identification."  (*See* App'x, at A63-80.)  Petitioner has not challenged any pretrial rulings in his habeas Petition.

gun by Irrizary, who had a motive for the gunfight.  (*See id.*, at 25-27.)  The prosecution posited

that Petitioner had stood on the corner of Willis Avenue and 146th Street and had fired eastward

towards Brook Avenue, targeting Ewell and Vargas, who were standing in front of 409 East

146th Street; Ewell and Vargas fired back in self-defense at Petitioner – westward.  (*Id.*, at 27.)

As Santiago had been positioned farther east than Ewell and Vargas, at 445 East 146th Street, it

was the prosecution's theory that Petitioner's gun must have fired the fatal bullet that caused her

death.  (*Id.*, at 28-29.)  In other words, it was the prosecution's theory that Vargas and Ewell –

who were positioned west of Santiago – could not have caused her death, as they were shooting

at Petitioner in self-defense and, therefore, had no occasion to shoot in an eastward direction,

towards Santiago.  (*See id.*, at 28-30.)

i.      **Detective Brown's Testimony and
the Admission of Photographs, Crime
<u>Scene Reports, and Crime Scene Diagrams</u>**

To support this theory, during the trial, the prosecution not only relied on eyewitness

testimony (which has been summarized above), but it also relied heavily on the testimony of

Detective Brown, who had been called to testify in place of Detective Jacklitsch, the retired lead

crime scene investigator who had taken photographs of the scene and prepared crime scene

reports and a ballistics diagram.  (*See id.*, at 64.)  At the start of his testimony, Detective Brown

gave an overview of the required training for a crime scene investigator and explained that

processing a crime scene requires a crime scene investigator to follow a special step-by-step

"protocol."  (*Id.*, at 57-62.)  He stated that "all of [the] information in this case c[a]me from

[Detective] Jacklitsch's reports" (*id.*, at 59-60, 125), and that he had prepared for the trial by

reviewing Detective Jacklitsch's notes and reports and by speaking with the prosecutor (*id.*, at

64-65).  Detective Brown testified that he personally visited the crime scene three weeks before

15

trial – five years after the crime – to get a "feel of the location," so that he would "feel comfortable testifying." (*Id.*, at 65-66, 70.)  Detective Brown explained that he did not take any notes or photographs during that pretrial visit.  (*Id.*, at 70.)

During Detective Brown's testimony, the prosecution sought to introduce several exhibits as business records, including (1) photographs that Detective Jacklitsch took of the crime scene; (2) Detective Jacklitsch's crime scene reports, which were introduced collectively as a single exhibit, characterized by Detective Brown as a "combination of the reports that [were] generated by the [sic] Detective Jacklitsch in regards to this investigation" (herein, referred to as the "crime scene report" in the singular); (3) a diagram that Detective Jacklitsch prepared of the crime scene, showing where he had found each piece of evidence; and (4) a diagram that Detective Brown created that, he testified, was meant to "duplicate" Detective Jacklitsch's diagram.  (*See id.*, at 66-67, 107; *see also* App'x, at A1684-1729.)  Detective Brown testified that Detective Jacklitsch had created the original diagram, report, and photographs while working for the NYPD; that he had been under a duty to record information accurately in the report; that protocol dictated that officers generate reports contemporaneously with crime scene processing; and that Detective Jacklitsch had been the custodian of the records at issue.  (*Id.*, at 68, 100-01, 105.) Detective Brown's testimony regarding these materials may be summarized as follows:

- The photographs depicted all of the 25 pieces of evidence that Detective Jacklitsch had collected.  (*Id.*, at 87-88.)  Detective Brown did not know whether any of the evidence depicted in the photographs had been moved, or where each piece of evidence had been located before the photographs had been taken.  (*Id.*, at 85-86.)

- The crime scene report contained the same photographs in a thumbnail version, along with information about "how [each] photo[graph] was taken . . . the direction in which the photo[graph] was taken[,] and the location in question, and the brief description of what the photo[graph] is."  (*Id.*, at 88.)  The

16

crime scene report also included written descriptions of each piece of evidence, what Detective Jacklitsch had believed each piece of evidence to be, and where he had found that evidence. (*Id.* *See also* App'x, at A1684-1727.)

- Detective Brown had browsed the handwritten field report that Detective Jacklitsch prepared, which purportedly formed the basis of Detective Jacklitsch's typed report that the prosecution wanted to enter into evidence, but Detective Brown did not compare the two. (*Id.*, at 84-85.) As for the measurements included in Detective Jacklitsch's report, Detective Brown had "an idea" of who took them, but he did not know what instrument was used to take those measurements, or the accuracy of that instrument. (*Id.*, at 86, 107.) According to Detective Brown, in 2009, Crime Scene Unit investigators had access to "a tape measure, and a wheel measuring device." (*Id.*, at 107.)

- In making his own diagram of the crime scene a few weeks before trial, Detective Brown's goal had been to "duplicate" Detective Jacklitsch's diagram. (*Id.*) Detective Brown used Detective Jacklitsch's diagram as the template for where to place all 25 pieces of evidence on his own diagram, including the ballistics evidence. (*Id.*, at 122, 143.) Using Google Maps "to get that same location," Detective Brown then used Detective Jacklitsch's diagram and photographs "to duplicate what he did," and, "by looking at Detective Jacklitsch's diagram and taking measurements from his diagram," Detective Brown believed he "was able to plot the measurements of the possible evidence that was collected." (*Id.*, at 107, 143.) Detective Brown acknowledged that these plotted measurements were "not exact," but described them as "an approximate location of where all of the evidence was located." (*Id.*, at 143.)

- Lastly, Detective Brown's diagram, like Detective Jacklitsch's, showed the locations where Detective Jacklitsch found each of the 25 pieces of evidence, with small directional line markers leading to a numbered piece of evidence. (*Id.*, at 140.) Detective Brown added a color-coded key to his diagram, listing the 25 pieces of evidence, and also added a "J" in front of each number to represent that Detective Jacklitsch had collected the evidence. (*Id.*, at 140-41.) Detective Brown acknowledged that there were some differences in the diagrams. (*See id.*) For example, in Detective Jacklitsch's diagram, the distance on 146th Street from Willis Avenue to the victim was shown as 536 feet, and, in that diagram, there appeared to be a slight curve in the road. (*Id.*, at 140.) In contrast, on Detective Brown's diagram, the same

17

distance was marked as 544 feet, and the curve was less
pronounced.  (*Id.*, at 141.)  Detective Brown testified that this
discrepancy had occurred because he used measurements from a
"Google map sketching" (*id.*), and he noted that he could not be
sure how Detective Jacklitsch made his measurements, but he
assumed that they were made while "walking . . . and sketching"
(*id.*, at 141, 146).

After conducting *voir dire* with respect to Detective Jacklitsch's photographs, crime
scene report, and diagram, as well as Detective Brown's own diagram, which was created from
Detective Jacklitsch's work, Petitioner's counsel objected to the admission of all of these trial
exhibits.  (*Id.*, at 86-89, 92, 104-105, 112-13.)

Starting with the photographs and the crime scene report, Petitioner's counsel objected to
the introduction of these materials on the ground that Petitioner was being denied his "*Crawford*
right to confrontation of the individual who was there and took those photographs, [and who]
made those measurements."[7]  (*Id.*, at 89.)  Petitioner's counsel argued that he was unable to
"cross examine anybody regarding measurements, [and] regarding where anything was found."
(*Id.*)  Further, he contended that it was unclear whether Detective Jacklitsch was truly
unavailable to testify or whether "[he was] in Florida and [did not] want to pay for the trip."
(*Id.*)  Petitioner's counsel then argued that the documents at issue (the photographs and the crime
scene report) were "testimonial," given that they were not just "being introduced for [the]
purpose[] [of] establish[ing] some fact."  (*Id.*)  Rather, according to counsel, those materials were
being introduced "to establish that [Petitioner] was the shooter and this is where he was based on
what is essentially set forth in those documents; where shell casings were found, [including for a]
forty-five caliber, nine millimeter" firearm.  (*Id.*)  As stated by counsel, "those statements in
there as to measurements and where things were found [were] testimonial in nature," as they

---

[7] *See Crawford v. Washington*, 541 U.S. 36 (2004).

18

"explicitly" went "to the accusation part that it was [Petitioner] who committed the crime." (*Id.*, at 96.) Pointing out that the issue of bullet trajectory was critical to this case, defense counsel contended that, by not being able to probe about the "exact measurements," the court was denying counsel "the right to render a viable defense to this case[,] to say this couldn't have possibly happened." (*Id.*, at 90.) Ultimately, it was defense counsel's position that, by being "denied the right to cross-examine the crime scene investigator who drew up all of these documents, and who wrote it down and who did the measurements and everything else [*i.e.,* Detective Jacklitsch]," Petitioner's constitutional right of confrontation was being abridged. (*Id.*, at 89-90.)

After a recess, the trial court found that the introduction at trial of the crime scene report and the corresponding photographs did "not violate the *Crawford* rule," and noted defense counsel's exception. (*Id.*, at 96.) The court then received the documents in evidence. (*Id.*, at 96-97.)

Immediately thereafter, Petitioner's counsel objected to the introduction of both Detective Jacklitsch's and Detective Brown's diagrams. (*Id.*, at 104-05.) Counsel first argued that Detective Jacklitsch's diagram was not a business record because the Detective had not been required to prepare it, and that its admission violated Petitioner's confrontation rights. (*Id.*) Counsel also objected to the admission of Detective Brown's diagram, as well as to an enlarged, black-and-white-version of the same, "for the same reasons." (*Id.*, at 112-13.) Lastly, counsel argued that Detective Jacklitsch's diagram was not accurate, which was harmful to Petitioner, because it was "going to let the jury see that oh[,] it's possible that a bullet would have wound up over there." (*Id.*, at 104-05.)

In opposition, the prosecution contended that both Detective Jacklitsch's and Detective Brown's diagrams were not testimonial because "[Detective] Jacklitsch's diagram [just] show[ed] the location of evidence." (*Id.*, at 93.) The prosecution also argued that, at the very least, Detective Brown's diagram was accurate, stating that: "[Detective] Brown's diagram [] ha[d] the key, [and also] ha[d] more accurate building structures than [Detective] Jacklitsch's diagram. It show[ed] the location of evidence, where things were recovered, nothing more, nothing less." (*Id.*)

Upon hearing these arguments, the trial court rejected defense counsel's contentions, finding that they went "to weight [of the evidence], not admissibility." (*Id.*, at 105.)

At trial, Detective Brown went on to testify for over 100 transcript pages about the evidence that Detective Jacklitsch had collected, and the jurors were given a copy of Detective Brown's diagram, to use to follow along with his testimony. (*Id.*, at 106-28, 137-68, 192-206.) Among other things, Detective Brown provided information about each photograph taken, including where he believed Detective Jacklitsch had been standing when he took each photograph, what Detective Jacklitsch had said each photograph depicted, and where the evidence in the photograph could be found on the diagram. (*See id.*) Throughout his testimony, Detective Brown noted that he was relying on Detective Jacklitsch's report. (*See id.*, at 122-23, 125.) For example, Detective Brown testified that one photograph (photograph 22) portrayed "an overall view of some of the ballistic evidence" that Detective Jacklitsch had collected on the corner of Willis Avenue and 146th Street. (*Id.*, at 122.) Detective Brown specifically testified that, according to Detective Jacklitsch's report, Detective Jacklitsch had recovered six casings discharged from a .45 caliber Winchester at that corner, while he had also recovered discharged bullets from a .9mm firearm in front of 409 East 146th Street (*see id.*, at 122-24). At trial,

Detective Brown continued testifying in this manner, going through each entry in Detective Jacklitsch's crime scene report. (*See id.*, at 147-203.) He also stated that, based on Detective Jacklitsch's notes, there had been no test for blood evidence at the scene, nor were there tests for traces of copper, lead, or brass. (*Id.*, at 200-01.)

### ii.  Detective Fox's Testimony and the Prosecution's Continued Reliance on the Crime Scene Evidence

After Detective Brown's testimony, the prosecution continued to rely on the diagrams, as well as on Detective Jacklitsch's crime scene report, when it called Detective Jonathan Fox, a member of NYPD's Firearms Analysis Section, to testify as a ballistics expert. (*See id.*, at 320, 328.) Detective Fox, who had analyzed the ballistics evidence collected from the scene, specifically referenced both Detective Brown's diagram and Detective Jacklitsch's crime scene analysis throughout his trial testimony. (*See id.*, at 328-29, 336.) For example, Detective Fox explained that, in his report, Detective Jacklitsch had indicated that six Winchester .45 caliber cartridge casings had been found in front of the corner of Willis Avenue and 146th Street; that seven .9 mm casings had been found in front of 409-411 East 146th Street; that shell casings from a .22 caliber rifle or cartridge had been found inside of a fenced area of 413 and 415 East 146th Street; that a deformed .45 caliber copper-jacketed bullet had been found inside the trunk of a car parked in front of 455 East 146th Street; and that a possible "BIM (Ballistic Impact Mark) had been found in front of Santiago's building, 445 East 146th Street. (*See id.*, at 328-29, 334-38, 344-47). According to Detective Fox, the six .45 caliber casings – found near the corner of Willis Avenue and 146th Street – had been fired from the same firearm, and, likewise, the seven .9 mm casings – found in front of 409-411 East 146th Street – had been fired from the same gun. (*See id.*, at 336-37.) Detective Fox noted, though, on cross-examination, that, that,

while a .45 semi-automatic ejects cartridges, a .45 caliber revolver would not, so it was possible that two .45 caliber weapons were used during this incident. (*Id.*, at 356-57.)

Additionally, throughout the trial, most eyewitnesses referred to Detective Brown's diagram to illustrate their own locations during the shootout. (*See id.*, at 254-56 (Soto Testimony); 431, 457 (Irrizary Testimony); 530-32 (Jones Testimony); 623-24, 637-39, 644-45 (Castro Testimony); 751-52 (Flores Testimony).) Further, 10 days into the trial, over defense counsel's objection, the trial court allowed the jury to visit the crime scene, accepting the prosecution's contention that the diagrams and photographs "d[id] not truly [do] justice to the nature of this crime scene." (*Id.*, at 375-76.) The jurors were driven to the corner of Willis Avenue and 146th Street, as well as to 445 146th Street, where Santiago was killed, and they took Detective Brown's diagram with them for this site visit. (*Id.*, at 374-76, 386-88, 767-70.)

### b.    The Defense's Case

The defense called one witness, off-duty NYPD officer Berlinda Acevedo, who testified that, on September 22, 2009, she was sitting in the courtyard of 510 East 146th Street, across the street from 445 East 146th Street. (*Id.*, at 811-814.) Officer Acevedo testified that, at around 3:20 p.m., she heard a series of five shots, a pause, and then two more shots. (*Id.*, at 814.) Officer Acevedo stated that, after she heard the gunshots, she "saw a male black wearing a red shirt" running east from Willis Avenue towards Brook Avenue on 146th Street. (*Id.*, at 812, 814.) On cross-examination, Officer Acevedo noted that she did not see whether the man running was carrying a weapon. (*Id.*, at 815.) She testified that, after shots were fired, she called 911. (*Id.*, at 814-15.)

c.     **Summations**

On summation, defense counsel argued that the prosecution had not proven beyond a

reasonable doubt that Petitioner was the person who had fired the fatal shot, or that the fatal shot

had even come from a .45 caliber gun fired from the corner of Willis and 146th Street.  (*Id.*, at

895-97.)  In this regard, counsel noted that, based on the ballistics evidence, there might have

been two .45 caliber guns fired that afternoon, and, notably, that it could have been any of the

people shooting that day who fired the fatal shot, especially as the medical examiner could not

determine what type of bullet had, in fact, killed Santiago.  (*Id.*, at 918-19, 922-27.)  Defense

counsel further contended that both Soto's and Jones's identifications of Petitioner had not been

reliable, but that Castro's identification of Irrizary as the shooter had been.  (*See id.*, at 898-916.)

In its closing argument, the prosecution acknowledged that this was not an "easy case,"

given that the eyewitnesses "saw things differently" (*id.*, at 939-40), but nonetheless relied on the

ballistics evidence to theorize that Petitioner had stood on the northeast corner of Willis Avenue

and 146th Street, shooting a .45 caliber gun eastward, towards Vargas's building at 409 146th

Street.  (*Id.*, at 948.)  The prosecution argued that Vargas and Ewell shot back, facing west.  (*Id.*)

According to the prosecution, the bullet that struck Santiago – who had been standing east of

building 409 – must have come from Petitioner's gun because Detective Jacklitsch had found a

discharged .45 caliber bullet east of Santiago.  (*Id.*, at 947-50, 991.)  The prosecution contended

that Castro had been mistaken in her belief that Irrizary was the one shooting east, and, relying

on Detective Brown's crime scene diagram, argued that the cars on the street must have blocked

Castro's view.  (*Id.*, at 958.)  In contrast, according to the prosecution, Soto and Jones were

truthful witnesses whose identifications were accurate (*id.*, at 965-83), and Ewell had, in fact,

corroborated Soto's testimony by explaining that Ewell had fired in "self defense" in response to

Petitioner's shots (*id.*, at 949, 983-84). Ultimately, throughout its summation, the prosecution referenced the ballistics evidence located on Detective Brown's crime scene diagram, arguing that the "crime scene evidence[] speaks for itself." (*Id.*, at 950.)

### d.    The Verdict and Sentencing

The jury was charged to consider five counts in the alternative:  second-degree intentional murder, second-degree depraved indifference murder, first-degree intentional manslaughter, second-degree reckless manslaughter, and second-degree criminal possession of a weapon. (*Id.*, at 1022-38.)  During its two days of deliberations, the jury asked for (presumably Detective Brown's) crime scene diagram twice, before and in conjunction with the surveillance video. (*See, e.g., id.*, at 1081; *see also* App'x, at A25, A28 (Jury note:  "During the viewing of the video, we request to have the diagram with us.").).  Ultimately, in reaching a verdict, the jury acquitted Petitioner of both murder counts, but found him guilty of first-degree manslaughter. (*Id.*, at 1090-91.)

On December 10, 2014, the trial court sentenced Petitioner, as a second felony offender, to the maximum term of 25 years' imprisonment and five years' post-release supervision. (*See* Sentencing Tr., at 22-23.)

### 3.    Direct Appeal

#### a.    Petitioner's Appellate Argument

Petitioner, represented by appellate counsel, timely filed a direct appeal from his conviction. (*See* Pet. ¶ 9.)  In his opening brief to the Appellate Division, First Department, Petitioner argued, *inter alia*, that Detective Jacklitsch's crime scene report, photographs, and diagram, as well as Detective Brown's duplicative diagram, were "testimonial" in nature and therefore inadmissible through a surrogate witness. (*See* Declaration of Marianne Stracquadanio,

24

Esq., dated Mar. 19, 2019 ("Stracquadanio Decl.") (Dkt. 11), Ex. 1 (Brief for Defendant-

Appellant ("Pet. App. Br.")), at 45-59).)[8]  More specifically, relying on the principles set forth

by the Supreme Court in *Crawford*, 541 U.S. at 51-52, *Bullcoming v. New Mexico*, 564 U.S. 647,

657 (2011), and *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), Petitioner argued that:

> [A]ll of the documents and photographs prepared by
> [Detective] Jacklitsch, as well as the duplicative diagram prepared
> by [Detective] Brown, unquestionably qualified as testimonial.
> The photos, report, and diagrams' 'purpose,' if not 'sole purpose,'
> was to codify evidence for use in the prosecution of a homicide,
> and they were created by police officers themselves.  They
> contained 'the precise testimony [Detective Jacklitsch] would be
> expected to provide if called at trial.'  *Melendez-Diaz*, 557 U.S. at
> 310, 316 (explicitly rejecting the logic that would render 'a police
> officer's investigative report describing the crime scene admissible
> absent an opportunity to examine the officer').

(Pet. App. Br., at 47-48.)

In analyzing the specific aspects of the materials that Detective Jacklitsch prepared

during the criminal investigation, Petitioner noted that:

> The [trial] court here failed to explain why it found these
> testimonial documents admissible, but it could not have been
> because these documents were machine-generated, which have
> been found to be non-testimonial.  *See People v. Brown*, 13 N.Y.3d
> 332, 340 (2009) (non-testimonial when report 'consisted of merely
> machine-generated graphs, charts and numerical data').  On the
> contrary, the crime scene report, photographs, and diagrams all
> required skill and interpretive acumen to produce.  Based on
> [Detective] Brown's testimony, all of the documents and
> photographs [Detective] Jacklitsch created as the crime scene

---

[8]  Also on direct appeal, Petitioner argued that the verdict was against the weight of the evidence; he was deprived of a fair trial when the court permitted the prosecution to elicit certain hearsay evidence; he was denied his right to effective assistance of counsel when his attorney accidentally opened the door to the admission of identification evidence from Jones that the jury would not otherwise have heard; he was denied a fair trial where the trial court improperly required a witness (Ewell) to incriminate himself on an open criminal matter and placed significant restrictions on Petitioner's ability to question that witness; and his 25-year sentence, the maximum permitted, was unduly harsh.  (*See generally* Pet. App. Br., at 1-93.)  Petitioner has not re-asserted any of these arguments in his Habeas Petition.  (*See generally* Pet.)

detective required years of experience, specialized training and skill, and scrupulous adherence to 'protocol.' ([Trial Tr.], at 57-62.)

[Moreover, a]fter processing the crime scene, [Detective] Jacklitsch engaged in interpretive and deliberative work reflecting his impressions. According to [Detective] Brown, [Detective] Jacklitsch digitally rendered 146th Street between Willis Avenue and Brook Avenue, filling in the house numbers, and placing 43 cars on the road. He gave each piece of evidence a number from one to 25, and added the evidence to the diagram using small directional line markers, indicating where he found each piece of evidence. He also added measurements.

(*Id.*, at 48.)

Petitioner also emphasized that Detective Jacklitsch's crime scene report not only

contained descriptions of the evidence, but also contained notations regarding his beliefs about

the evidence's value in the investigation. (*See id.*, at 48-49.) Petitioner pointed out that:

The formal, labeled, and typed crime scene report included descriptions of each piece of evidence [Detective] Jacklitsch found, where he found it, and *what he believed it to be.* For example, [Detective] Jacklitsch labeled the first entry 'J1,' and wrote that he believed it was a casing from a 'Winchester 45 auto,' that it was of *"probative"* value, and included measurements of where he found it relative to Willis Avenue. The report also included thumbnail images of all of [Detective] Jacklitsch's photos introduced into evidence, and blank spaces for images that were not shown to the jury. Next to each image or redacted image, [Detective] Jacklitsch wrote a brief description of what it depicted, noted which way he directed the camera, and described the camera distance using adjectives like 'mid-range' and 'closeup.' It is clear, then, that these exhibits reflected the careful and *discretionary* steps [Detective] Jacklitsch took to measure and document evidence for prosecution.

(*Id.*, at 49 (emphasis added).)

"Thus," Petitioner contended, with respect to the diagram, photographs, and crime scene

report that were prepared by Detective Jacklitsch, "the People were required to introduce [those

materials] through the person who actually created them, in order to provide the defense with a

fair opportunity to cross-examine him regarding not only the information and interpretive data, but also his 'proficiency, the care he took in performing his work, and his veracity.'" (*Id.* (quoting *Bullcoming*, 564 U.S. at 661 n.7).)

As a final point, Petitioner emphasized that, not only did the introduction of Detective Jacklitsch's crime scene report, photos, and diagram violate his confrontation rights, but that "the introduction of [Detective] Brown's own diagram did as well." (*Id.*, at 50.) While acknowledging that Detective Brown had appeared to testify at trial, it was Petitioner's position that Detective Brown "could not be effectively cross-examined on his diagram because it was merely a duplicate of [Detective] Jacklitsch's," and, thus, the introduction of the duplicative diagram was itself a violation of the Confrontation Clause where Detective Jacklitsch was not made available to testify. (*Id.*) According to Petitioner, "[a] hypothetical the Supreme Court posed in *Bullcoming* ma[de] this plain." (*Id.*, at 51.) In *Bullcoming*, the Supreme Court had posed the following question: "[S]uppose a police report recorded an objective fact [such as] the address above the front door of a house or the read-out of a radar gun. Could an officer other than the one who saw the number on the house or gun present the information in court[?]" *Bullcoming*, 564 U.S. at 659-60. The Court, in response, answered: "As our precedent makes plain, the answer is emphatically 'No.'" *Id.* (internal citations omitted). Pointing to that discussion in *Bullcoming*, Petitioner concluded that, "[i]f it would violate the Confrontation Clause to admit a report that recorded a purely objective fact if [the] defense did not get a chance to cross-examine the person who recorded that fact, then surely it was error [in this case] to admit a 'duplicate' diagram based solely and entirely on a non-testifying officer's crime scene diagram." (Pet. App. Br., at 51.)

b.      **The People's Opposition**

In opposition, the People argued first that, in this case, the "purpose of the Confrontation

Clause was not thwarted by the admission of the crime scene report and diagrams, since the

information contained therein did not constitute 'statements' for *Crawford* purposes." (*See*

Stracquadanio Decl., Ex. 2 (Respondent's Brief ("Resp. App. Br.")), at 20-21.) Instead,

according to the People, "these items were merely an inventory of the ballistic evidence found at

the scene as well as photographs of what the evidence looked like and where [it was] located."

(*Id.*, at 21.) Nonetheless, the People maintained that, "to the extent that the information

contained within [Detective Jacklitsch's] report or [the] diagrams could be construed as

'statements,'" such statements were not testimonial, as "the actions taken by Det[ective]

Jacklitsch in collecting the evidence and memorializing this collection in his report and diagram

was mere information gathering and reporting, rather than the formation of a conclusion that

pertained to [Petitioner's] involvement in the crime." (*Id.*, at 21-22 (citing New York State

cases).) "Put differently," the People argued, "there [was] nothing testimonial about Det[ective]

Jacklitsch's report and diagram, because the information contained therein was not a substitute

for the testimony of a person who was accusing [Petitioner]; in fact, the report and diagram

reflect[ed] only an assessment of what potential evidence existed at the scene." (*Id.*, at 22.)

Indeed, according to the People:

> In this way, the crime scene report and diagram [were] similar to
> autopsy reports; like an autopsy report, which is 'concerned only
> with what happened to the victim, not with who killed [the
> victim],' *People v. Freycinet*, 11 N.Y.3d 38, 42 (2008), here, the
> crime scene report [was] concerned only with what was found at
> the scene, not with who did it.

(*Id.* (citing New York State cases).)[9]

"At best," the People contended, "the only arguable testimonial piece of evidence in this case was Det[ective] Brown's diagram" (given that it "was prepared years after the crime scene was processed"), but, according to the People, that diagram "still d[id] not accuse [Petitioner] by linking him to the scene." (*Id.*, at 25.) According to the People, even "[a]ssuming *arguendo* that Det[ective] Brown's diagram was testimonial, because it was created in preparation for [Petitioner's] prosecution," the admission of that diagram nevertheless "[did] not raise a confrontation issue, since it was introduced through the testimony of Det[ective] Brown himself, who was vigorously cross-examined." (*Id.*)

Finally, the People maintained that, "[i]f there was any error in the introduction of these items into evidence, it was harmless," as, in the People's view, there "[was] no doubt" that the "shooter was standing near the corner of Willis Avenue, shooting eastbound towards Brook Avenue, in the direction of Ewell and Vargas." (*Id.*) According to the People, "[t]here was no alternative second theory put forth by the defense" at trial with respect to the People's assertion that a shooter had been located at the northeast corner of Willis Avenue and East 146th Street. (*Id.*, at 26.) Rather, according to the People, defense counsel had focused "his summation [on] poking [other] holes in the People's case," such as by contending that it was Irrizary, not Petitioner, who had been that shooter, or that there had been two .45 caliber guns at the scene.

---

[9] In *People v. Freycinet*, quoted above by the People, the New York Court of Appeals looked to state law to fashion four factors that, in its view, were relevant to determining whether a statement was "testimonial" under *Crawford*. *See Freycinet*, 11 N.Y.3d at 41. Those factors included: (1) "the extent to which the entity conducting the procedure is an arm of law enforcement"; (2) "whether the contents of the report are a contemporaneous record of objective facts, or reflect the exercise of fallible human judgment"; (3) "whether a pro-law-enforcement bias is likely to influence the contents of the report"; and (4) "whether the report's contents are directly accusatory in the sense that they explicitly link the defendant to the crime." *Id.* (internal quotation marks and citations omitted).

(*Id.*, at 26.)  Ultimately, the People asserted, the crime scene report and diagrams "had no bearing on the defense's theory of the case," and thus "there [was] no reason to believe that the jury's verdict would have been any different had these items been excluded."  (*Id.*)

### c.    The Appellate Division's Decision

By Decision and Order dated June 8, 2017, the Appellate Division unanimously affirmed Petitioner's conviction and sentence.  *People v. Diaz*, 151 A.D.3d 502, 503-04 (1st Dep't 2017).  (*See* App'x, at A1915-18.)  As relevant here, the Appellate Division held that:

> [t]he crime scene evidence that [Petitioner] claim[ed] was admitted in violation of his right of confrontation was not testimonial, since it '[did] not link the commission of the crime to a particular person' (*People v. John*, 27 N.Y.3d 294, 315 [2016]; *see also People v. Freycinet*, 11 N.Y.3d 38, 42 [2008]; *People v. Acevedo*, 112 A.D.3d 454, 455 [1st Dept 2013], *lv denied* 23 N.Y.3d 1017 [2014]).  In any event, any error in admitting the crime scene report and diagrams prepared by a nontestifying officer was harmless under the standard for constitutional error (*see People v. Crimmins*, 36 N.Y.2d 230 [1975]), because evidence showing the locations where the officer found cartridge cases and other ballistic evidence shed little or no light on any of the disputed issues at trial, and there is no reasonable possibility that this evidence affected the verdict.

151 A.D.3d at 503-04.

### d.    Petitioner's Application For Leave
### To Appeal to the Court of Appeals

Petitioner, through appellate counsel, sought leave to appeal to the New York Court of Appeals, first by filing a letter that included copies of the appellate briefs (*see* App'x, at A1919-20), and then by supplementing that letter with one that specifically addressed certain issues (*see* Letter to the Honorable Leslie E. Stein from Rachel T. Goldberg, Esq., dated July 24, 2017 ("Goldberg 7/24/17 Ltr.") (Dkt. 11-3)).  In the supplemental letter, Petitioner's counsel argued

that the Court of Appeals should grant leave "to address two preserved issues" in the case,

which, counsel contended, were of significant import:

- Does the Confrontation Clause of the Sixth Amendment or the State Constitution apply to police-created crime reports if police have not yet identified a suspect in the crime?

- Do police crime scene reports fall under the "business records" exception to the ban on hearsay evidence?

(*Id.*, at 1-2.) In the body of the letter, counsel went on to address each question, and, as relevant

here, addressed not only state law, but also the federal Confrontation Clause issue. (*See id.*, at 6-

8 (citing, *inter alia*, U.S. Const., amend. VI; *Crawford*, 541 U.S. at 51-52; *Davis v. Washington*,

547 U.S. 813, 822 (2006); *Melendez-Diaz*, 357 U.S. at 310-11; *Bullcoming*, 564 U.S. at 664).)

On August 24, 2017, the Court of Appeals denied Petitioner leave to appeal. *People v.*

*Diaz,* 86 N.E.3d 567 (2017). (*See* Pet. ¶9(g)(4).)

## C.    **Federal Habeas Petition**

Petitioner commenced this action by filing a Petition on October 23, 2018.[10] (*See* Pet.)

Petitioner argues that the trial court violated the Confrontation Clause of the Sixth Amendment

when it permitted the prosecution to introduce Detective Jacklitsch's photographs, crime scene

---

[10] Under the so-called "prison mailbox rule," *see Noble v. Kelly*, 246 F.3d 93, 97 (2d Cir. 2001), *cert. denied*, 534 U.S. 886, a *pro se* prisoner's habeas petition is deemed "filed" on the date he gives it to prison officials for delivery to the court, *see id.*; *Houston v. Lack,* 487 U.S. 266, 270 (1988). Where a petition does not attest to the date on which the petitioner placed his petition in the prison mailing system, courts will look to the date on which the petition is signed to determine the filing date. *See, e.g., Costilo v. United States*, Nos. 13cv4298 (PGG) (JLC), 98cr0438 (PGG), 2012 WL 9500631, at *1 n.3 (S.D.N.Y. Nov. 12, 2012), *report and recommendation adopted by* 2016 WL 1610609 (Apr. 20, 2013); *Peralta v. Connelly*, No. 06cv5360 (DAB) (MHD), 2008 WL 8050791, at *4 n.6 (S.D.N.Y. Apr. 18, 2008), *report and recommendation adopted by* 2010 WL 3219326 (Aug. 11, 2010). Here, the Petition is dated October 23, 2018 and contains a statement that Petitioner provided it to prison officials on that same date for mailing; accordingly, this Court deems it to have been filed as of that date.

report, and diagram, as well as Detective Brown's duplicative diagram, without producing

Detective Jacklitsch for cross-examination, and that the First Department's affirmance of this

trial court ruling was "contrary to" and constituted an "unreasonable application of" clearly

established Supreme Court precedent.[11]  (*See* Memorandum of Law in Support of 28 U.S.C.

§ 2254 Petition, dated Nov. 1, 2018 ("Pet. Mem.") (Dkt. 1-1), at 22-48.)

Starting with the language of the Appellate Division's decision, Petitioner argues that, by

holding that evidence is not testimonial (and thus not within the Confrontation Clause guarantee)

unless it "link[s] the commission of the crime to a particular person," the Appellate Division

contradicted the Supreme Court's holding in *Melendez-Diaz*, which established that the

Confrontation Clause is not limited to evidence that identifies the defendant.  (*Id.*, at 36-37.)

Petitioner further asserts that, under the Supreme Court's rulings in *Melendez-Diaz* and other

cases, the Appellate Division was required to consider whether the primary purpose of the

documents at issue was to "establish or prove past events potentially relevant to later criminal

prosecution" (*id.*, at 37 (quoting *Davis v. Washington*, 547 U.S. at 822)), and that, by instead

focusing on whether the materials at issue directly linked Petitioner to the crime, the Appellate

Division violated clearly established Supreme Court precedent, *see id.*

Had the Appellate Division applied the proper test for determining whether the evidence

was testimonial (*i.e.*, by looking to the "primary purpose" of the documents), Petitioner contends

that all of the documents and photographs that Detective Jacklitsch prepared, as well as the

duplicative diagram that Detective Brown prepared, would have "unquestionably qualified as

---

[11] As discussed below, this language ("contrary to" or an "unreasonable application of" federal law) comes from the habeas standard of review set out in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See* 28 U.S.C. § 2254(d); *see also* Discussion, *infra*, at Section 1(C).

testimonial," as their primary purpose "was use in the prosecution of a homicide, and they were created by police officers themselves." (*Id.*, at 29.) On this point, Petitioner notes that Detective Jacklitsch's crime scene report "contained notations that the evidence was '*probative*,'" and argues that it is "hard to imagine a term more accusatory than 'probative' for evidence the police have compiled." (*Id.*, at 29-30 (noting as well that, in this case, Detective Jacklitsch's "incentive" in creating that report, as well as the diagram, was "to answer a particular question related to the issues of a particular case[] – *i.e.,* precisely what the Court held in *Melendez-Diaz* brought certificates based on laboratory reports within the Confrontation Clause's reach").) In addition, Petitioner again asserts that, "[b]ecause everything in [Detective] Brown's diagram that implicated [Petitioner] came solely and entirely from [Detective] Jacklitsch's work, defense counsel was effectively prevented from cross-examining [Detective] Brown about the information contained in the diagram." (*Id.*, at 34.) According to Petitioner, it was improper for the trial court to have allowed the prosecution to "insulate[]" itself "from the confrontation rules merely by having a testifying witness duplicate an inculpatory testimonial document prepared by a non-testifying witness." (*Id.*)

Going even deeper into the Supreme Court's analyses in *Melendez-Diaz* and its subsequent decision in *Bullcoming*, regarding the types of statements that would qualify as testimonial and thus be subject to the Confrontation Clause protections, Petitioner also asserts that all of the documents that Detective Jacklitsch had prepared, as well as the duplicative diagram that Detective Brown prepared, met the formality requirements of a testimonial document. (*See id.*, at 30 (citing *Bullcoming*, 564 U.S. at 664-65).) As argued by Petitioner:

> In *Bullcoming* and *Melendez-Diaz*, the analysts 'prepared a
> certificate concerning the result of his analysis' and 'formalized'
> the report in a 'signed document headed a 'report.'' *Bullcoming*,
> 564 U.S. at 664-65 (internal citations omitted); *Melendez-Diaz,*

> 552 U.S. at 808. Here, too, the reports contain sufficiently formal
> elements. Many of the pages contain the official NYPD seal, and
> all of Detective Jacklitsch's reports contain his badge number and
> the crime scene run number. Detective Jacklitsch appeared to have
> used NYPD computer templates for the remaining crime scene
> reports (*see* Exhibits). The 'formalities attending' the crime scene
> reports and diagram are thus similar to those attending the reports
> in *Bullcoming* and *Melendez-Diaz*.

(*Id*.) For this reason as well, Petitioner maintains that the trial court's admission of these

materials into evidence when Detective Jacklitsch was not made available for cross-examination

was a violation of the Confrontation Clause, and Petitioner further argues that the court's ruling

was not harmless error. On this final point, Petitioner contends that, where there was "no

forensic, surveillance, ballistics, or statement evidence [that] tied [Petitioner] to the shot that

killed [] Santiago, much less even placed [Petitioner] at the scene," the Appellate Division's

finding "that the crime scene reports and diagrams admitted into evidence were not harmless

because they 'shed little or no light on any of the disputed issues at trial,' was unreasonable"

under the AEDPA standard. (*Id.*, at 43 (internal citation omitted).)

   In opposition to the Petition, Respondent filed an attorney declaration on March 20, 2019

(*see* Stacquadanio Decl.), together with a memorandum of law (*see generally* Memorandum of

Law, dated Mar. 20, 2019 ("Resp. Mem.") (Dkt. 12)), and the State Court Record and transcripts

referenced above. In its opposition, Respondent argues that the Appellate Division's decision

cannot be found to have been either contrary to or an unreasonable application of Supreme Court

precedent, because the Supreme Court has not specifically "addressed the question of whether a

police crime scene report and diagram . . . is testimonial." (Resp. Mem., at 10.) Respondent

goes on to argue that, even utilizing the "primary purpose" test, as set forth by the Supreme

Court in *Melendez-Diaz* and *Bullcoming*, "it is evident that there was no Confrontation Clause

violation here, because the crime scene report and diagram[s] at issue [were] not created for the

primary purpose of being a substitute for trial testimony. Rather, they were created pursuant to

the [NYPD's] protocol in processing a crime scene." (*Id.*, at 11.) In squaring both its reasoning,

as well as the Appellate Division's decision, with the Supreme Court's holdings in *Melendez-*

*Diaz* and *Bullcoming*, Respondent argues:

> Contrary to [P]etitioner's contentions . . .[,] the [Appellate
> Division's] decision in this case squarely aligns with . . . *Melendez-*
> *Diaz* and *Bullcoming.* The main worry in those cases was that the
> substituted testimony at issue – *i.e.,* the certification stating that
> seized material was cocaine and the certification stating that [the]
> defendant's blood alcohol content was above the legal limit,
> respectively – were *per se* evidence of the defendants' culpability.
> This type of direct evidence established the elements of those
> crimes, which were required to be proved. Put differently, the
> contents of those reports could be 'nothing but testimonial' since
> they 'directly linked the accused to the charged crimes.' *See*
> *People v. Pealer*, 20 N.Y.3d 447, 454 (2013). Here, on the other
> hand, the ballistic evidence that was recovered from the scene
> was circumstantial evidence, from which the elements of
> manslaughter – and [Petitioner's] involvement in it – could be
> inferred.

(*Id.*, at 14.)

Finally, Respondent maintains (for the reasons stated in the People's appellate briefing)

that any error in admitting either Detective Jacklitsch's documents or Detective Brown's

duplicative diagram was harmless. (*See id.*, at 16-17.)

Petitioner filed a reply brief on April 15, 2019 (*see* Reply Memorandum of Law in

Support of 28 U.S.C. § 2254, dated Apr. 15, 2019 ("Pet. Reply Mem.") (Dkt. 14)), arguing two

points: First, that Respondent had misconstrued both the nature of the "primary purpose" test

and the AEDPA standard of review; and, second, that the admission of testimonial evidence that

was not subject to cross-examination was not harmless, as it had a "substantial and injurious

effect on the outcome of the case" (*id.*, at 1-9).

D.      **The Parties' Supplemental Submissions Regarding *Garlick v. Lee***

On June 3, 2020, Petitioner, through counsel, submitted a letter to this Court, writing to

"call the Court's attention to supplemental authority relevant to this case." (Letter to the Court

from Katharine Skolnick, Esq., dated June 3, 2020 ("Skolnick 6/3/20 Ltr.") (Dkt. 15), at 1.) In

particular, Petitioner informed the Court that, one day earlier, then-Chief Judge Colleen

McMahon had issued an order granting a petition for a writ of habeas corpus, finding that the

Appellate Division, First Department, had issued a decision in another criminal case, *People v.*

*Garlick*, 144 A.D.3d 605 (1st Dep't 2016), that had "unreasonably applied clearly established

[Supreme Court] law" on the Confrontation Clause. (*Id.*, at 1 (quoting *Garlick v. Lee*, 464

F. Supp. 3d 611, 618 (S.D.N.Y. 2020) (adopting in part, rejecting in part, report and

recommendation).) Petitioner pointed out that, just as it had in his case, the Appellate Division

in *Garlick* had "found there [was] a 'suspect-identity' requirement for the Confrontation Clause

to apply," which Judge McMahon, in turn, concluded was an error that departed from clearly

established Supreme Court law. (*Id.*) In highlighting Judge McMahon's reasoning and its

persuasive value here, Petitioner's counsel wrote:

> To prevail, Garlick did not have to show that there was a Supreme
> Court case involving an autopsy report – *i.e.,* an identical fact
> pattern – but simply Supreme Court law holding that a report
> 'prepared in the course of a criminal investigation and tending to
> prove the victim's cause and manner of death' is testimonial.
> Mr. Garlick had done just that. Therefore, as Judge McMahon
> correctly found, having a surrogate witness testify about
> information in a testimonial document violated Garlick's
> constitutional rights. So, too, must this Court find in [Petitioner's]
> case.

(*Id.*)

On June 9, 2020, Respondent filed a letter in opposition (*see* Letter to the Court from

Marianne Stracquadanio, Esq., dated June 8, 2020 ("Stracquadanio 6/8/20 Ltr.") (Dkt. 16)),

arguing that (1) *Garlick* was inapplicable, as it "pertain[ed] to a different type of evidence

(autopsy reports)"[12] and, in contrast, the crime scene report and diagrams at issue here did not

contain testimonial "statements," as "they merely mapped out the ballistic evidence that was

collected at the location of the shooting"; and (2) in any event, Judge McMahon's holding in

*Garlick* was erroneous in finding that the Appellate Division's decision had been an

unreasonable application of "clearly established" Supreme Court precedent, where, according to

Respondent, the Supreme Court had not "clearly established . . . that an autopsy report [was]

testimonial" (*id.*, at 1). Respondent indicated that it intended to appeal the *Garlick* decision and

requested that this Court reserve decision until the appeal was resolved. (*Id.*, at 2.)

On June 15, 2021, Petitioner's counsel submitted a second letter to this Court, seeking to

draw its attention to the Second Circuit's decision in *Garlick*, affirming the District Court's

order. (*See* Letter to the Court from Katharine Skolnick, Esq., dated June 15, 2021 ("Skolnick

6/15/21 Ltr.") (Dkt. 17), at 1-2 (citing *Garlick v. Lee*, 1 F.4th 122 (2d Cir. 2021).) As noted by

Petitioner, the Second Circuit agreed with Judge McMahon that the Appellate Division had erred

in finding that evidence is only testimonial if it links a particular suspect to a crime. (*See id.*,

at 1.) As explained by Petitioner, the Second Circuit in *Garlick* held "that a report of an autopsy,

which 'was performed in aid of an active police investigation,' was testimonial and could be

introduced only through a witness subject to confrontation." (*Id.* (quoting *Garlick*, 1 F.4th at

---

[12] It is notable that Respondent, in opposition to Petitioner's supplemental letter, took the
position that the *Garlick* case was inapplicable because it involved an autopsy report, where, as
noted above (*see* Background, *supra*, Section B(3)(b)), the People, in arguing before the
Appellate Division in this case, specifically contended that "the crime scene report and diagram
[at issue were] similar to autopsy reports" in that each involved "information gathering and
reporting." (Resp. App. Br., at 22 (noting that an autopsy report includes statements as to "what
happened to the victim" while the crime scene report and diagram at issue included statements as
to "what was found at the scene").

133).)  Given this Circuit precedent, Petitioner's counsel concluded:  "The Second Circuit's

decision [in *Garlick*] leads to the inexorable conclusion that [Petitioner's] right to confrontation

was also violated when several police-created documents were introduced through a surrogate

witness instead of the detective who had created them."  (*Id.*)[13]

On February 25, 2022, this Court received a third letter from Petitioner's counsel,

informing it that the Supreme Court had denied the People's application for a writ of certiorari in

*Garlick*.  (*See* Letter to the Court from Katharine Skolnick, Esq., dated Feb. 25, 2022 ("Skolnick

2/25/22 Ltr.") (Dkt. 18), at 1 (citing *Garlick v. Lee*, 2022 WL 516386, No. 21-637 (Feb. 22,

2022)).)

## DISCUSSION

## I.    APPLICABLE LEGAL STANDARDS

### A.    Statute of Limitations

Under AEDPA, a habeas petition must be filed within one year of the latest of four dates

specified by statute, usually "the date on which the judgment became final by the conclusion of

direct review or the expiration of the time for seeking such review."[14]  28 U.S.C.

§ 2244(d)(1)(A); *see also Williams v. Artuz*, 237 F.3d 147, 150-51 (2d Cir. 2001) (judgment

becomes "final" for purposes of Section 2244 upon "the completion of direct appellate review in

---

[13] After this Court received the Skolnick 6/15/21 Ltr., its Chambers attempted, on two occasions, to contact the Bronx District Attorney's Office to ascertain whether Respondent intended to respond.  To date, this Court has received no response from Respondent's counsel.

[14] The limitations period may alternatively begin to run on the following dates:  (1) where the petitioner was prevented from filing an application by state action, the date on which the impediment is removed; (2) where the right asserted is a newly recognized one made retroactively applicable, the date on which the constitutional right asserted was initially recognized by the Supreme Court; and (3) the date on which the factual predicate of the claim presented could have been discovered through the exercise of due diligence.  28 U.S.C. § 2244(d)(1)(B)-(D).

38

the state court system and either the completion of certiorari proceedings in the United States

Supreme Court, or – if the prisoner elects not to file a petition for certiorari – [the expiration of]

the time to seek direct review via certiorari").  The limitations period is tolled during the

pendency of any "properly filed application for State post-conviction or other collateral review

with respect to the pertinent judgment or claim."  28 U.S.C. § 2244(d)(2).

### B.       <u>Exhaustion of State Remedies</u>

As a general matter, a federal court may not consider a petition for a writ of habeas

corpus unless the petitioner has exhausted all state judicial remedies for his federal claims.

28 U.S.C. § 2254(b)(1)(A); *see also Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *Picard v. Connor*,

404 U.S. 270, 275 (1971) (exhaustion requirement, as now codified in AEDPA, "reflects a policy

of federal-state comity"); *Rhines v. Weber*, 544 U.S. 269, 273-74 (2005) ("the interests of comity

and federalism dictate that state courts must have the first opportunity to decide a petitioner's

claims" (citation omitted)).

To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented"

his claims to the state courts, thereby affording those courts the "'opportunity to pass upon and

correct' alleged violations of . . . prisoners' federal rights."  *Picard*, 404 U.S. at 275 (quoting

*Wilwording v. Swenson*, 404 U.S. 249, 250 (1971)).  A petitioner may fairly present a federal

claim in several ways, including by citing relevant provisions of the federal Constitution in his

appellate brief, *see Davis v. Strack*, 270 F.3d 111, 122 (2d Cir. 2001), or by relying on "pertinent

federal cases employing constitutional analysis" or "state cases employing constitutional analysis

in like fact situations," *see Mallet v. Miller,* 432 F. Supp. 2d 366, 374 (S.D.N.Y. 2006)

(enumerating the ways a petitioner may fairly present his federal claims in state court).

Aside from setting out the federal nature of his claims, the petitioner must also, for purposes of the exhaustion requirement, present those claims to "the highest court of the pertinent state." *Chebere v. Phillips*, No. 04cv296 (LAP), 2013 WL 5273796, at *19 (S.D.N.Y. Sept. 18, 2013) (quoting *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994)). In New York, for a claim that can be raised on direct appeal, a petitioner must first appeal his conviction to the Appellate Division and then seek "further review of that conviction by applying to the Court of Appeals for a certificate granting leave to appeal." *Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir. 2005).

### C.   Standard of Review

When this Court reviews a federal constitutional claim that has been adjudicated on the merits by the state court, the Court must accord substantial deference to the state court's decision under the standard of review dictated by AEDPA. *See* 28 U.S.C. § 2254(d); *see also Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001) (noting that "adjudicated on the merits" means "a decision finally resolving the parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground"). The relevant section of AEDPA provides that:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).[15]

Under AEDPA, a state court decision is "contrary to" clearly established federal law where the state court either applies a rule that "contradicts the governing law" set forth in Supreme Court precedent or "confronts a set of facts that are materially indistinguishable from a [Supreme Court] decision" and arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" of clearly established federal law occurs when the state court identifies the correct governing legal principle, but unreasonably applies that principle to "a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003). The state court's decision, however, "must have been more than incorrect or erroneous"; rather, "[t]he state court's application must have been 'objectively unreasonable.'" *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (quoting *Williams v. Taylor*, 529 U.S. at 409). In order to be entitled to habeas relief on this basis, the petitioner must "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

The relevant date for determining applicable "clearly established Supreme Court law" is the date of the last state court adjudication of the petitioner's claim "on the merits." *Greene v. Fisher*, 565 U.S. 34, 40 (2011).

---

[15] In addition, under AEDPA, where not manifestly unreasonable, a state court's factual findings are presumed correct, and can only be overcome by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

II. **THE PETITION SHOULD BE GRANTED.**

    A. **Timeliness of the Petition**

    As a preliminary matter, this Court notes that there is no issue as to whether Petitioner filed his federal habeas Petition within the one-year statute of limitations provided by AEDPA. On August 24, 2017, the Court of Appeals denied Petitioner's request for leave to appeal the Appellate Division's affirmance of his conviction and sentence, *see Diaz*, 86 N.E.3d at 567. For purposes of the AEDPA statute of limitations, his conviction became final 90 days thereafter, *i.e.*, on November 22, 2017, when his time to petition for certiorari expired, *see Williams v. Artuz*, 237 F.3d at 150-51. As noted above, the Petition was signed and dated as having been turned over to prison officials for mailing on October 23, 2018, within the one-year limitations period. (*See* Pet.)

    B. **Exhaustion**

    On the issue of exhaustion, this Court notes that, in his habeas submission, Petitioner has raised a Confrontation Clause claim that largely mirrors the claim that he raised on his direct appeal – *i.e.,* that the trial court's admission of the documents prepared by Detective Jacklitsch (photographs, crime scene report, and diagram), as well as the admission of Detective Brown's duplicative diagram, violated his federal constitutional rights, as he was not afforded an opportunity to cross-examine Detective Jacklitsch at trial. (*See* Pet. Mem., at 26-49; *see also* Pet. App. Br., at 45-59.) Before each level of the state courts, Petitioner consistently raised this argument in federal constitutional terms, citing not only the Sixth Amendment, but also Supreme Court precedent in *Crawford*, *Davis*, *Melendez-Diaz*, and *Bullcoming*, all of which discuss the types of "testimonial" statements that fall within the confines of the Confrontation Clause. (*See* Trial Tr., at 89; Pet. App. Br., at 45-59; Goldberg 7/24/17 Ltr., at 6-10; Pet. ¶ 9(g)(6).)

Accordingly, Petitioner's single, squarely presented claim in his habeas Petition has been fully exhausted.

### C.   Confrontation Clause Claim

As Petitioner's Confrontation Clause claim was decided on the merits by the Appellate Division (in the last reasoned opinion of the state courts), the claim is now reviewable under the AEDPA standard of review. *See* 28 U.S.C. § 2254(d). Under that standard, Petitioner argues that the Appellate Division's decision was "contrary to" and constituted an "unreasonable application" of clearly established federal law, as determined by the Supreme Court.

#### 1.   Legal Framework

In *Crawford*, the Supreme Court ruled that the Confrontation Clause prohibits the "admission of *testimonial* statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 53-54 (emphasis added).[16] The Supreme Court's modern Confrontation Clause jurisprudence has not set forth an exhaustive list of the type of evidence that would qualify as "testimonial" (such that it would give rise to the criminal defendant's right of cross-examination), but, starting with *Crawford*, the Court *has* provided parameters and guidance to enable lower courts to make this determination. As noted above (*see* Background, *supra*, at Section D), in June 2021, the Second Circuit, in *Garlick*, considered a Confrontation Clause claim similar, in many respects, to the one raised here. Before reaching its decision in that case,

---

[16] In this case, the prosecution never demonstrated that Detective Jacklitsch was unavailable to testify, and, in any event, the record provides no indication that he was ever previously subjected to cross-examination regarding his crime scene report and diagram. Hence, if the statements in the documents that he prepared are properly characterized as "testimonial," then his non-appearance at trial rendered the admission of those statements violative of Petitioner's Confrontation Clause rights.

the Circuit discussed the evolution of Supreme Court law on the question of what would

constitute "testimonial" evidence, and provided a comprehensive description of the applicable

holdings of *Crawford*, *Melendez-Diaz*, *Bullcoming,* and *Williams v. Illinois*, 567 U.S. 50 (2012).

Although this Court would not ordinarily reproduce a large portion of another court's opinion

within its own report and recommendation, it finds it appropriate to make an exception here,

where the same Supreme Court precedent is relevant to Petitioner's claim, and where the

Circuit's decision in *Garlick* presents such a thorough and helpful synthesis of Supreme Court

law.  Accordingly, and for ease of reference, the following legal-background section of the

Second Circuit's decision in *Garlick* is quoted in its entirety:

### A

In *Crawford v. Washington*, the Supreme Court considered whether the defendant's wife's tape-recorded statement to police could be entered into evidence even though the wife was exempt from cross-examination by the marital privilege.  541 U.S. 36, 40 (2004).  The Court held that regardless of its "indicia of reliability," a testimonial statement such as the tape recording is inadmissible without an opportunity for cross-examination of the declarant.  *Id.* at 68-69. The Court noted "[v]arious formulations" for defining the "core class of 'testimonial' statements":

• *ex parte* in-court testimony or its functional equivalent— that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,"

• "extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," and

• "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

*Id.* at 51-52 (alterations and citations omitted).  The Court explained that "[s]tatements taken by police officers in the course of

44

interrogations are also testimonial under even a narrow standard," *id*. at 52, and therefore the Confrontation Clause would not allow the admission of the tape recording absent "unavailability [of the declarant] and a prior opportunity for cross-examination," *id*. at 68. The reliability of a testimonial statement may be determined only "by testing in the crucible of cross-examination." *Id.* at 61.

**B**

The Supreme Court applied this holding to forensic reports in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), in which the Court concluded that certificates attesting to the laboratory analysis of a suspected controlled substance fell "within the core class of testimonial statements" that required an opportunity for cross-examination. *Id.* at 310.

*In Melendez-Diaz*, the defendant objected to the trial court's admission into evidence of three certificates that confirmed that the substance seized from his person was cocaine. *Id.* at 308-09. The defendant argued that because he had no opportunity to confront the analysts who performed the forensic tests, the admission violated his Sixth Amendment right of confrontation. *Id.* at 309. The Supreme Court agreed. *Id*. at 329.

The Court explained that the certificates were "quite plainly affidavits"; the certificates were "sworn to by the declarant before an officer authorized to administer oaths" and thus "incontrovertibly" amounted to a "'solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id.* at 310 (quoting *Crawford*, 541 U.S. at 51). The Court further noted that the certificates were "functionally identical to live, in-court testimony, doing precisely what a witness does on direct examination." *Id.* at 310-11 (internal quotation marks omitted). And the certificates were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," especially because "under Massachusetts law the sole purpose of the affidavits was to provide prima facie evidence of the composition, quality, and the net weight of the analyzed substance." *Id*. at 311 (internal quotation marks and citation omitted). For these reasons, "[a]bsent a showing that the analysts were unavailable to testify at trial and that [*Melendez-Diaz*] had a prior opportunity to cross-examine them," the certificates were inadmissible without an opportunity to cross-examine the analysts who prepared those documents. *Id.*

45

The Court addressed several arguments advanced by the State in favor of admissibility. First, the Court rejected the argument that the analysts who prepared the certificates were not subject to confrontation "because they are not 'accusatory' witnesses, in that they do not directly accuse petitioner of wrongdoing" and their "testimony is inculpatory only when taken together with other evidence linking petitioner to the contraband." *Id.* at 313. The Court explained that "the analysts were witnesses" and "provided testimony against petitioner, proving one fact necessary for his conviction—that the substance he possessed was cocaine." *Id.* There is no category of witnesses who are "helpful to the prosecution" but "somehow immune from confrontation." *Id.* at 314.

Second, the Court rejected the argument that scientific reports should be admissible based on indicia of reliability. *Id.* at 318. The Court explained that even statements which result from purportedly "neutral scientific testing" must be subject to cross-examination because such tests are not necessarily "as neutral or as reliable" as advertised and are not "uniquely immune from the risk of manipulation." *Id.* Because confrontation "is designed to weed out not only the fraudulent analyst, but the incompetent one as well . . . an analyst's lack of proper training or deficiency in judgment may be disclosed in cross-examination" and may reveal the "[s]erious deficiencies [that] have been found in the forensic evidence used in criminal trials." *Id.* at 319-20. Even scientific testing and expert analysis rely on subjective judgments about which tests to perform and how to interpret the results. *See id.* at 320. The exercise of such judgment "presents a risk of error that might be explored on cross-examination." *Id.* The Court said this is "true of many of the other types of forensic evidence commonly used in criminal prosecutions" because there is "wide variability across forensic science disciplines with regard to techniques, methodologies, reliability, types and numbers of potential errors, research, general acceptability, and published material." *Id.* at 320-21.

Third, the Court rejected the argument that the Confrontation Clause allows an exception for public or business records. *Id.* at 321. While a document kept in the regular course of business ordinarily may be admitted at trial despite its hearsay status, such a document may not be admitted without confrontation if "the regularly conducted business activity is the production of evidence for use at trial." *Id.* Similarly, public records are generally admissible unless such records reflect "matters observed by police officers and other law-enforcement personnel" in criminal cases. *Id.* at 322 (quoting Fed. R. of Evid. 803(8)). Accordingly, testimonial statements cannot be

admitted into evidence as business or public records without confrontation. *Id.* at 324.

C

In *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), the Court reaffirmed that forensic reports — even those prepared by analysts who purportedly act as "mere scrivener[s]" of machine-generated results— are testimonial statements that are inadmissible without confrontation. *Id.* at 659. The defendant was arrested on charges of driving while intoxicated, and the principal evidence against him was a laboratory report certifying that his blood-alcohol concentration was above the legal limit. *Id.* at 651. The trial court admitted the report through a surrogate witness on the ground that the analyst who prepared the report "'was a mere scrivener,' who 'simply transcribed the results generated by the gas chromatograph machine.'" *Id.* at 657.

The Supreme Court disagreed, holding that "[i]n all material respects, the laboratory report in this case resembles those in *Melendez-Diaz*." *Id.* at 664. "[A]s in *Melendez-Diaz*, a law-enforcement officer provided seized evidence to a state laboratory required by law to assist in police investigations," and in both cases an analyst "tested the evidence and prepared a certificate concerning the result of his analysis" that was "'formalized' in a signed document" and thus was an affirmation "made for the purpose of establishing or proving some fact in a criminal proceeding." *Id.* at 664-65 (internal quotation marks omitted). The Court found it "[n]oteworthy" that the laboratory report contained a legend to aid law enforcement in the admission of certified blood-alcohol analyses in municipal and magistrate courts, making clear that the report would be available for use at a later trial. *Id.* at 665; *see also Melendez-Diaz*, 557 U.S. at 311; *Crawford*, 541 U.S. at 50-52.

Again, the Court addressed several counter-arguments for admitting the report without confrontation. First, the Court rejected the argument that the laboratory report was merely the number resulting from the blood alcohol test "scrivened" by the analyst; rather, the analyst who signed the report certified that he had received the sample intact, had checked that the sample corresponded to the correct report number, and had performed a particular test following a specified protocol. *Bullcoming*, 564 U.S. at 660. The testimony of a surrogate witness could not convey what the analyst who conducted the test "knew or observed about the events his certification concerned, *i.e.*, the particular test and testing process he employed," and could not "expose any lapses or lies on the

47

certifying analyst's part." *Id.* at 661-62. Moreover, the report allowed the analyst to identify any "circumstance or condition" that "affected the integrity of the sample or the validity of the analysis." *Id.* at 660 (alterations omitted). Representations relating to the presence or absence of such circumstances relate "to past events and human actions not revealed in raw, machine-produced data" and are "meet for cross-examination." *Id.*

Second, the Court rejected the argument that forensic reports that are purely observational and that do not accuse the defendant of wrongdoing are nontestimonial and therefore not subject to confrontation. The Court explained that *Melendez-Diaz* clarified that a document created "for an evidentiary purpose," and "made in aid of a police investigation," is testimonial. *Id.* at 664 (internal quotation marks omitted). Thus, even "observations of an independent scientist made according to a non-adversarial public duty" are testimonial if made in aid of a police investigation or if it were reasonably known that the observations would be available for use at a later trial. *Id.* (internal quotation marks and alteration omitted).

Third, the Court held that the absence of notarization does not change the report's testimonial status. Otherwise, the right to confrontation would become "easily erasable" because distinguishing between reports that are notarized and those that are not would "render inadmissible only sworn *ex parte* affidavits, while leaving admission of formal, but unsworn statements, 'perfectly OK.'" *Id.* (quoting *Crawford*, 541 U.S. at 52 n.3).

**D**

In a later decision in which no opinion had the support of a majority of the Court, the Supreme Court considered whether "[o]ut-of-court statements that are related by [a testifying] expert solely for the purpose of explaining the assumptions on which [the expert's] opinion rests" are subject to the restrictions of the Confrontation Clause. *Williams v. Illinois*, 567 U.S. 50, 58 (2012) (plurality opinion). In *Williams*, a forensic expert testified at a bench trial that a DNA profile—prepared by an outside laboratory with evidence taken from the victim's body—matched another DNA profile produced by the state police from the defendant's blood. *Id.* at 56. A plurality of the Court concluded that the DNA profile prepared by the outside laboratory was not offered for its truth and therefore was not a testimonial statement subject to the Confrontation Clause. *Id*. at 57-58. The plurality reasoned that in a bench trial the judge sits as the trier of fact and will presumably "understand the limited

reason for the disclosure of the underlying inadmissible information and will not rely on that information for any improper purpose." *Id*. at 69. The Court affirmed the judgment of the trial court admitting the testimony.

The plurality suggested that even if the underlying profile had been admitted for its truth, evidence that does not serve the primary purpose of accusing a targeted individual of wrongdoing is not testimonial. *Id.* at 84-86. But five justices disagreed, noting that *Melendez-Diaz* held that the Sixth Amendment contemplates only "two classes of witnesses—those against the defendant and those in his favor," *id.* at 116 (Thomas, J., concurring in the judgment) (quoting *Melendez-Diaz*, 557 U.S. at 313), and that prior cases had not held that a testimonial statement "must be meant to accuse a previously identified individual; indeed, in *Melendez-Diaz*, we rejected a related argument that laboratory analysts are not subject to confrontation because they are not 'accusatory' witnesses," *id.* at 135 (Kagan, J., dissenting) (internal quotation marks omitted).

The plurality also suggested that the match provided "strong circumstantial evidence" that the outside laboratory's analysis was reliable and not the product of "shoddy or dishonest work." *Id.* at 76-77 (plurality opinion). But five justices objected that such evidence of reliability did not render the outside laboratory's profile admissible. *See id.* at 109 (Thomas, J., concurring in the judgment) ("The existence of other evidence corroborating the basis testimony . . . does not change the purpose of such testimony and thereby place it outside of the reach of the Confrontation Clause."); *id*. at 138 (Kagan, J., dissenting) ("It is not up to us to decide, ex ante, what evidence is trustworthy and what is not.").

Justice Thomas, concurring in the judgment, disagreed with the plurality's conclusion that the report was admissible because it was not offered for its truth. *Id.* at 106. Rather, he reasoned that the DNA profile was "not a statement by a witness within the meaning of the Confrontation Clause" because it lacked "the solemnity of an affidavit or deposition." *Id.* at 111 (internal quotation marks and alteration omitted). Justice Thomas concluded that the profile could be admitted because it was "neither a sworn nor a certified declaration of fact" and it did not "attest that its statements accurately reflect the DNA testing processes used or the results obtained." *Id.* No other justices embraced this reasoning.

Ordinarily, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those

Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (internal quotation marks omitted). That rule produces no clear answer here because neither the plurality's nor Justice Thomas's rationale is necessarily narrower than the other. We have previously concluded that "*Williams* does not . . . yield a single, useful holding relevant to the case before us." *United States v. James*, 712 F.3d 79, 95 (2d Cir. 2013). That is the case here, and we therefore rely on Supreme Court precedent predating *Williams*. *Id*. at 4.

*Garlick*, 1 F.4th at 129-33.[17]

## 2. The Appellate Division's Decision Was Not "Contrary to" Clearly Established Federal Law, as Established by the Applicable Supreme Court Precedent.

To the extent the Petition can be interpreted as raising an argument that the Appellate Division's decision "was contrary to" clearly established federal law, as determined by the Supreme Court (*see* Pet. Mem., at 26; *see also* 28 U.S.C. § 2254(d)(1)), this Court finds that argument unpersuasive. Under AEDPA, a state court decision will only be considered contrary to Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "confront[s] a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and arrives at a different result from [that] precedent." *Williams v. Taylor*, 529 U.S. at 405-06. Neither circumstance is present here. First, the Appellate Division located the correct rule: Out-of-court statements are only subject to confrontation to the extent that they are testimonial. Second, although falling under the same legal rule that was

---

[17] In its recitation of the Supreme Court's Confrontation Clause guidance, the Second Circuit in *Garlick* did not address *Davis* (cited in Pet. Mem., at 32), a decision that was issued by the Supreme Court after *Crawford* but before *Melendez-Diaz*, *Bullcoming*, and *Williams*. The central holding of *Davis* is not directly applicable here, as the Court held that hearsay statements made in a 911 call asking for aid were not "testimonial" in nature and thus their introduction at trial did not violate the Confrontation Clause, *see* 547 U.S. at 822; it is plain, from the record before this Court that there was no "ongoing emergency" at the time Detective Jacklitsch prepared his crime scene report and diagram.

addressed in *Crawford*, *Melendez-Diaz*, and *Bullcoming* (a rule discussed and analyzed in greater detail below), the factual circumstances giving rise to the out-of-court statements at issue in this case are not "materially indistinguishable" from those underlying the statements considered by the Supreme Court in those cases.

Thus, because the Appellate Division identified the correct rule and applied it to facts distinguishable from the Supreme Court's prior decisions, the Appellate Division's decision was not "contrary to" Supreme Court precedent. Accordingly, I do not recommend granting habeas relief on this basis.

### 3. The Appellate Division's Decision *Did* Represent an Unreasonable Application of Clearly Established Federal Law.

On the other hand, this Court finds that the Appellate Division's decision, which was the last reasoned state-court adjudication of Petitioner's claim, constituted an "unreasonable application of" clearly established federal law, within the meaning of Section 2254(d)(1) of AEDPA, and that Petitioner is entitled to relief on that ground.

#### a. The Trial Court Erroneously Admitted Testimonial Evidence Without Affording Petitioner the Opportunity For Cross-Examination, in Violation of the Confrontation Clause.

As an initial matter, contrary to Respondent's contention (*see* Resp. Mem., at 10), Petitioner is not required to identify a Supreme Court opinion holding that a police investigator's crime scene report and diagram (such as those specifically at issue here) are testimonial in nature, in order to prevail on a claim that "clearly established law" mandated a different result in this case. The "unreasonable application" prong of the federal habeas statute does not demand "an identical factual pattern before a legal rule must be applied." *White v. Woodall*, 572 U.S. 415, 427 (2014). Rather, as long as the Supreme Court has clearly set out a legal rule for when the Confrontation Clause will be considered violated, and has both explained the parameters of

that rule and provided guidance for its application, the proper question before this Court is whether the state court's application of that rule was unreasonable, on the facts presented. In this case, accepting as "clearly established" the Supreme Court rule first set out in *Crawford*, that a criminal defendant must be given an opportunity to cross-examine when the evidence presented against him is "testimonial," and considering the guidance that has been provided by the Supreme Court with respect to determining whether a statement should, in fact, be considered testimonial, this Court concludes that Petitioner was denied his constitutional right to cross examine Detective Jacklitsch regarding both his crime scene report and ballistics diagram, as well as Detective Brown's duplicative diagram, the substance of which was entirely derived from Detective Jacklitsch's work.[18]

To start, this Court again notes that the circumstances presented here are similar, in many respects, to those presented in *Garlick*. As discussed above (*see* Background, *supra*, at Section D), the Second Circuit, in *Garlick*, held that an autopsy report, which "was performed in aid of an active police investigation," was testimonial and could be introduced only through a witness subject to confrontation. *See Garlick*, 1 F.4th at 134. In reaching that conclusion, the Second Circuit analyzed the autopsy report at issue by considering the various factors that had been highlighted by the Supreme Court in its Confrontation Clause cases. In *Garlick*, those

---

[18] With respect to Detective Jacklitsch's photographs, it appears that Petitioner – in crafting his Confrontation Clause claim – has grouped those materials with the crime scene report and diagrams because thumbnail copies of the photographs were included within the crime scene report. (*See* App'x, at A1686-1700.) In his memorandum of law in support of the Petition, Petitioner principally focuses his argument on the trial court's purportedly improper "admission into evidence of the crime scene report or the diagram[s]," as he argues that those documents contained testimonial statements, which needed to be subject to cross-examination. (Pet. Mem., at 26.) This Court does not construe Petitioner's submissions as making the same argument with respect to the photographs, standing alone, and thus will not consider any such argument here.

factors – including that the autopsy had been performed in aid of an active police investigation and that the circumstances under which the report were created would have led any objective witness to believe that it would be available for use in a later prosecution; that the report was formalized in a signed document; and that the report had been used extensively at trial for the purpose of proving key facts – all weighed in favor of concluding that the autopsy report was "testimonial." *See id.*, at 133-36. Tracking the Second Circuit's reasoning here, this Court likewise finds that the crime scene report and two diagrams that were placed in evidence at Petitioner's trial constituted testimonial evidence that could only have been introduced through the testimony of their original creator, Detective Jacklitsch.

First, this Court looks to whether the documents at issue were created "in aid of a police investigation" and had an "evidentiary purpose." *Bullcoming*, 564 U.S. at 664. In this case, there is little question that Detective Jacklitsch, as the assigned lead crime scene investigator, created his crime scene report, as well as his ballistics diagram, in aid of the police investigation of the shootout, and with an anticipated evidentiary purpose. Indeed, on September 22, 2009, Detective Jacklitsch reported to the scene only two hours after the shootout (*see* App'x, at A1715), and his identification of the ballistics evidence, as well as his measurements and efforts to retrieve such evidence, were all part of the ongoing criminal investigation in which information was being shared among officers and suspects were being identified. The timeline indicates that, at the same time he was gathering evidence at the scene, Pena (one of the shooting victims) was identifying Petitioner as a suspect to Detective O'Neil, another investigator assigned to the case. (*See* Pretrial Tr., at 139-40.) Also, many of the documents contained in Detective Jacklitsch's crime scene report were date- and time-stamped September 23, 2009 (*see, e.g.,* App'x, at A1715, A1726), and, on that same date, Petitioner was identified in a lineup by

53

Soto and then formally arrested on charges relating to the shootout (*see* Trial Tr., at 270-73). Further, at least a few of the pages contained in Detective Jacklitsch's crime scene report appear to have been completed on October 9, 2009, by which time Petitioner had been indicted. (*See, e.g.,* App'x, at A1724, A1727 (listing "report date" as "October 9, 2009").) The circumstances under which Detective Jacklitsch's crime scene report and diagram were created would thus lead any objective witness to "believe that [those documents] would be available for use at a later trial," *Crawford*, 541 U.S. at 52 (internal quotation marks and citation omitted); *Melendez-Diaz*, 557 U.S. at 310; *Bullcoming*, 564 U.S. at 664, and to expect that the statements contained therein would be used in a criminal prosecution, *see Crawford*, 541 U.S. at 51-52; *Melendez-Diaz*, 557 U.S. at 310.

Second, this Court considers the level of "formality" of the documents at issue. *See Bullcoming*, 564 U.S. at 671 (Sotomayor, J., concurring in part) (noting that, while "[f]ormality is not the sole touchstone of our primary purpose inquiry, a statement's formality or informality can shed light on whether a particular statement has a primary purpose of use at trial" (internal quotation marks and citation omitted)). In this instance, Detective Jacklitsch's crime scene report and diagram bear multiple indications that his findings were "formalized" in those documents. The statements made by Detective Jacklitsch were apparently prepared in a systematic and careful fashion, and consistently referenced a "crime scene run number," which, according to Detective Brown, was "unique only for that particular job." (Trial Tr., at 678.) Each of the documents that Detective Jacklitsch prepared also listed the specific crimes that he was investigating, *i.e.,* "homicide and a felonious assault." (*Id.*, at 679.) Most notably, Detective Jacklitsch included his name and put his shield number on each of the documents (*see id.*), and many pages of the crime scene report contain the official NYPD seal as well as headers that

identify the document as a "Crime Scene Unit Report" (*see* App'x, at A1715-27; *see also* App'x, at A1729 (Jacklitsch diagram, which contains the creator's name and badge number, the crime scene run number, the precinct number, the crimes being investigated, and the date)).  Such indicia of formality can suggest that a statement is testimonial.  *See Bullcoming*, 564 U.S. at 664-65 (pointing to formal quality of a document headed a "report" and signed, and noting that "[t]he absence of notarization would not remove [a] certification from Confrontation Clause governance").

Third, a statement is more likely testimonial when it effectively provides testimony against the defendant, and tends to "prov[e] [a] fact necessary for his conviction." *Melendez-Diaz*, 557 U.S. at 314.  This fact, too, is suggestive of the testimonial quality of the crime scene report and diagrams, as the statements contained in those documents were used, at Petitioner's trial, to support the prosecution's theory of Petitioner's culpability for the death of Santiago.  During the investigation, Detective Jacklitsch gave each piece of ballistics evidence a number from one to 25; he added the evidence to the diagram using small directional line markers; he included descriptions and indicated where he found each piece of evidence; he indicated what he believed each piece of evidence to be; and he added measurements throughout the diagram.  (*See* App'x, at A1684-1727, A1729.)  Of particular significance, Detective Jacklitsch labeled his very first entry in the section of his crime scene report focused on the collected "evidence" as "J1"; he wrote that he believed J1 was a casing from a "Winchester 45 auto"; he added that it was of "probative" value; and he included measurements showing where he found it in relation to Willis Avenue.  (*See id.*, at A1702.)

As reflected by the trial transcript, this was critical factual evidence in the People's case-in-chief.  (*See, e.g.,* Trial Tr., at 947-50.)  The transcript reflects that Detective Jacklitsch's crime

scene report and diagram, as well as Detective Brown's duplicative diagram, were used

extensively to prove the location of the individual who allegedly shot Santiago, and to support

that it was Petitioner who was that individual, rather than any other shooter, such as Ewell (who

admitted to having used a gun in self-defense) or Vargas (who was also charged with having

used a gun during the subject incident). *See Bullcoming*, 564 U.S. at 655-66 (noting how the

testimonial statement (a forensic report) concerning the defendant's blood alcohol level had

"supported a prosecution for aggravated DWI"). Further, the prosecution used the information

contained in, or derived from, Detective Jacklitsch's crime scene report and diagram (1) in its

questioning of key eyewitnesses (*see* Trial Tr., at 254-56, 431, 457, 530-32, 623-24, 637-39,

644-45, 751-52); (2) in aiding the jury upon a visit to the scene (*see id.*, at 767-70); and (3) in

framing its closing statement, in which it described the scene in presenting its arguments as to

why Petitioner should be found guilty of the charges against him (*see id.*, at 947-50). *See*

*Crawford*, 541 U.S. at 40-41 (noting how the prosecution had relied on the testimonial statement

at issue and, in closing, described it as "damning evidence"). The fact that, during its

deliberations, the jury twice asked to review Detective Brown's diagram – which Detective

Brown admitted was intended to be a "duplicate" of Detective Jacklitsch's original diagram –

drives home just how central to the prosecution's case this evidence was. (*See* App'x, at A25,

A28.)

Overall, it is abundantly apparent that the statements contained within Detective

Jacklitsch's crime scene report and diagram constituted "an out-of-court substitute for trial

testimony," *Bullcoming*, 564 U.S. at 669 (Sotomayor, J., concurring in part) (internal quotation

marks and citation omitted), regarding, in this instance, the location of ballistics evidence and the

likely direction of its travel, posing a "risk of error" that could not be explored through cross-examination," *Melendez-Diaz*, 557 U.S. at 320.

     Ultimately, although Detective Brown prepared his own diagram and was available to testify at the trial, those efforts could not have served as a a sufficient substitute for Detective Jacklitsch's testimony. As Detective Brown noted throughout the trial, it was his goal to "duplicate" Detective Jacklitsch's diagram, so as to show where *Detective Jacklitsch* had recovered evidence, in order to present *Detective Jacklitsch's* findings at Petitioner's trial. (Trial Tr., at 107.) Detective Brown essentially testified that he deduced where to place all 25 pieces of evidence in the diagram from "looking at Detective Jacklitsch's diagram and taking measurements from his diagram" and by looking at Detective Jacklitsch's photographs. (*Id.*, at 107, 143.) In fact, as the testimony reveals, all of the "pieces of evidence" in Detective Brown's diagram were "lifted directly from [Detective] Jacklitsch's diagram." (*Id.*, at 143.) As Detective Brown did not supervise, participate in, or observe Detective Jacklitsch's collection and assessment of the evidence, or the creation of his report and diagram, Detective Brown could not have been meaningfully cross-examined regarding any potential flaws in Detective Jacklisch's crime scene investigation or in his deductions.

     On this point, it is important to note, as Petitioner rightly argues, that there appears to have been some level of interpretive and deliberative work reflected in Detective Jacklitsch's documents, especially where the word "probative" was used. Detective Brown even testified that the crime scene report and diagram required skill and interpretive acumen to produce. (*See id*, at 57-62.) Detective Brown's testimony strongly suggested that the creation of Detective Jacklisch's report and diagram required specialized training and adherence to a "precise protocol." *Bullcoming*, 564 U.S. at 660. Where Detective Brown did no independent

57

analysis and was not in a position to agree or disagree with Detective Jacklitsch's findings, the prosecution should have been required to introduce Detective Jacklitsch's crime scene report and diagram through the person who actually created them, in order to provide the defense with a fair opportunity to cross-examine him regarding not only the information and interpretive data, but also his "proficiency, the care he took in performing his work, and his veracity." *Bullcoming*, 564 U.S. at 661 n.7.

Had Petitioner been able to cross-examine Detective Jacklitsch at trial, Petitioner could have challenged the reliability of both the crime scene report and diagram by asking him about, *inter alia*, his training and qualifications; the specific steps he used to collect the ballistics evidence at the scene; whether any other person helped him collect and measure the location of the ballistics evidence; what equipment he or someone else used to measure the relative locations of the ballistics evidence; whether he moved any of the evidence before photographing or measuring it; how he knew whether the instruments he used were accurate at the time; what steps he took when translating his written field notes into typed reports; whether and how he made contemporaneous notes about the location of the ballistics or whether he relied on memory when he later prepared his report; whether he edited his photographs, which were included as thumbnails within the crime scene report; and whether he omitted any information from the crime scene report or diagram. These are all fundamental questions that Detective Brown was unable to answer. (*See* Trial Tr., at 84-88, 107 (Detective Brown admitting that he did not know what instrument Detective Jacklitsch used to take the measurements or the accuracy of that instrument, and that he did not know whether any of the evidence had been moved, or where each piece of evidence had been located before the photographs were taken).

Accordingly, under applicable Supreme Court precedent, this Court finds that Petitioner's Sixth Amendment right to confrontation was violated when Detective Jacklitsch's crime scene report and diagram (along with Detective Brown's duplicative diagram) were admitted into evidence at Petitioner's trial without his being afforded an opportunity for cross-examination.

> **b.** **The Appellate Division's Decision Was Not Only Erroneous, But Also an "Unreasonable" Application of Federal Law.**

Under AEDPA, the court's inquiry does not end with the conclusion that the admission of the above-described ballistics evidence was erroneous. *See Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007). The relevant question for this Court is not whether the state court's determination was incorrect, but rather "whether that determination was unreasonable," which is "a substantially higher threshold." *Id.* at 473.

Here, in affirming Petitioner's conviction, the Appellate Division – just as it had in *Garlick* – explicitly rested its analysis as to whether the crime scene report and diagrams were "testimonial" on the reasoning of *People v. Freycinet*, 11 N.Y.3d 38 (2008) (*see supra*, n.12). In *Freycinet*, which was decided after *Crawford*, but before *Melendez-Diaz* and *Bullcoming*, the New York Court of Appeals held that statements that do not "directly link" the defendant to the crime are not testimonial. *Freycinet*, 11 N.Y.3d at 42 (finding report non-testimonial where it was "concerned only with what happened to the victim, not with who killed her"). Like in *Garlick*, the Appellate Division here relied on *Freycinet* to conclude that Petitioner's right of confrontation was not violated because the crime scene evidence "did not link the commission of the crime to a particular person." *See Diaz*, 151 A.D.3d at 503; *see also People v. Garlick*, 144 A.D.3d 605, 606 (1st Dep't 2016) (using the exact same reasoning and case authority to reject the appellant's Confrontation Clause claim).

This reasoning was in direct conflict with clearly established Supreme Court precedent. In *Melendez-Diaz*, a case decided nearly eight years before the Appellate Division's decision here, the Supreme Court definitively rejected the accusatory/non-accusatory distinction. *See Melendez Diaz*, 557 U.S. at 313-14. Indeed, Justice Scalia, writing for the majority in *Melendez Diaz*, made clear that the Constitution "contemplates two classes of witnesses – those against the defendant and those in his favor . . . there is not a third category of witnesses, helpful to the prosecution, but somehow immune from confrontation." *Id*. Nonetheless, the Appellate Division's decision in this case, in identical fashion to *Garlick*, relied on the existence of just such a third category. Upon a review of the controlling Supreme Court law that was in existence at the time of Petitioner's direct appeal, no fair-minded jurist could have concluded that the Appellate Division's reasoning – or its decision, based on that reasoning – was justified under federal law. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). In other words, even if, as Respondent contended before the Appellate Division (*see* Resp. App. Br., at 24), the ballistics evidence at issue contained only a contemporaneous, "objective account[] of observable facts" that did not accuse Petitioner (or any other potential suspect), the purportedly "non-accusatory" nature of the documents could not have afforded the court a basis, under established federal law, for finding the statements therein non-testimonial. *See Melendez-Diaz*, 557 U.S. at 318-21; *Bullcoming*, 564 U.S. at 661-62; *Crawford*, 541 U.S. at 68-69.

For all of these reasons, this Court finds that the Appellate Division's rejection of Petitioner's federal Confrontation Clause claim was not only erroneous, but an unreasonable application of federal law, warranting habeas belief under Section 2254(d).

### 4.     **The Trial Court's Error in This Case Was Not Harmless.**

Contrary to Respondent's assertions (*see* Resp. Mem., at 16-18), the deprivation of Petitioner's Confrontation Clause rights was not harmless, especially as (1) the medical examiner could not determine what type of bullet killed Santiago, how far away the shooter was standing, or from what direction the fatal shot had been fired (*see* Trial Tr., at 796-803, 806); and (2) the various eyewitnesses gave inconsistent accounts as to who had been a shooter and did not provide clarity on the types of guns the shooters had used (*see id.*, at 263, 290, 294-95, 511, 541).

As evidenced by the trial transcript, establishing – through ballistics evidence – the location of the shooter who killed Santiago, and what kind of gun he fired, were critical to the prosecution's case. Yet this information appears to have come only from the crime scene report, the diagrams, and the testimony of Detectives Brown and Fox, each of whom admittedly relied on Detective Jacklitsch's findings. The prosecution's theory was clear:  as Petitioner was allegedly on the northeast corner of Willis Avenue and 146th Street at the time of the shootout, and as, based on Detective Jacklitsch's crime scene report and diagram, bullet casings were found at that corner, Petitioner was likely one of the shooters. (*See id.*, at 948.) Further, the prosecution reasoned – again based on the diagram of the scene and where recovered ballistics evidence was located on that diagram, that the fatal shot to Santiago would not logically have come from the other shooters, in light of where they were purportedly positioned vis-à-vis Santiago, and the directions in which each of the shooters would presumably have been aiming. (*See id.*, at 947, 950, 991.)  Moreover, Detective Fox, the ballistics expert for the prosecution, relied on Detective Jacklitsch's crime scene analysis to opine on which bullet fragments or casings had come from which firearms. (*See id.*, at 328-29, 336.)  This evidence was used by the

prosecution not only to tie Petitioner to a type of gun (a .45 caliber firearm, based on the type of casings reportedly found at the corner), but also to the type of bullet – never identified by the medical examiner – that most likely struck and killed Santiago (a .45 caliber bullet, based, again, on ballistics evidence found at the scene, in Santiago's general vicinity). In other words, the prosecution's case against Petitioner was largely constructed from the information contained in Detective Jacklitsch's crime scene report and diagram.

It is true, as Respondent points out (*see* Resp. Mem., at 16-17), that there were eyewitness accounts of the shootout and that two witnesses identified Petitioner as having been in possession of a gun at the scene. That testimony, however, did not answer the question of which bullet – of the many fired by more than one participant in the shootout – killed Santiago. Notably, Jones testified that the person standing at the corner of Willis and 146th Street was shooting a 9mm firearm (*see* Trial Tr., at 511, 541), but this evidence was contradicted by Detective Jacklitsch's diagram and crime scene report, which suggested that someone at that corner was shooting a .45 caliber gun. Thus, Jones's testimony did not support the prosecution's theory that Santiago had been killed by a .45 caliber bullet, and that someone on that corner had fired the fatal shot. (*See id.*) In addition, the various witnesses gave inconsistent testimony on a number of details, such as the clothing that the shooter was wearing (*compare id.*, at 515, 517, 526-27 (Jones testifying that the shooter was not wearing a hat) *with* 263, 290, 294-95 (Soto testifying that the shooter was wearing a baseball cap); *compare also id*. at 263, 507-09, 535 (Jones and Soto testifying that the shooter was wearing a red shirt) *with id.*, at 643-54, 675-77 (Castro not identifying anyone at the scene as wearing red)). Furthermore, while each of the eyewitnesses testified that at least three shooters were involved in the shootout, no witness

testified to having seen the entire event.  It was the evidence supplied by Detective Jacklitsch that enabled the prosecution to fill in any evidentiary gaps in the eyewitnesses' testimony.

Finally, it should be emphasized that the prosecution made significant use of the ballistics evidence in summation, which again reflects how critical it perceived that evidence to be.  More particularly, acknowledging that witnesses "saw things differently" and that "no one [could] say" which bullet killed Santiago (*id.*, at 939-40), the prosecution leaned heavily on Detective Jacklitsch's work to try to persuade the jury of Petitioner's guilt.  In substance, the prosecution's argument was that, because a .45 caliber bullet fragment was found east of Santiago and because ballistics suggested that the two other shooters were shooting west using 9mm and .22-caliber firearms, someone from Irrizary's group (particularly, Petitioner), standing at Willis and 146th Street, must have fired a .45 caliber gun, and a bullet from that gun must have killed Santiago. (*See id.*, at 28-29, 947-50, 991.)

Ultimately, even if the jury believed Soto and Jones that Petitioner was present at the scene, it is apparent that Detective Jacklitsch's crime scene analysis served to link him to the fatal shot.  Because the Confrontation Clause required the trial court to allow Petitioner to probe Detective Jacklitsch's qualifications, methodology, and credibility, but Petitioner was not afforded such an opportunity, his rights were violated.  *See Bullcoming*, 564 U.S. 647; *Melendez-Diaz*, 558 U.S. 305.  The Appellate Division's affirmance of Petitioner's conviction was both erroneous and an unreasonable application of clearly established Supreme Court law, *see* 28 U.S.C. § 2254(d), and the error was not harmless.  Accordingly, I recommend Petitioner be afforded habeas relief.

## CONCLUSION

For all of the foregoing reasons, I respectfully recommend that Petitioner's Petition for a Writ of Habeas Corpus (Dkt. 1) be granted and that Respondent be directed to release Petitioner from custody unless the People of the State of New York decide to re-try him within the next ninety (90) days. Given that this Court recommends that the Petition be granted, there is no need to issue a Certificate of Appealability for purposes of appeal. If, however, the District Court does not adopt this Report and Recommendation and denies the Petition, I would further recommend that, because Petitioner has made a substantial showing of the denial of a constitutional right, a certificate of appealability issue on the questions of (1) whether the Supreme Court's Confrontation Clause precedent clearly established that the statements at issue were testimonial, and (2) if so, whether the Appellate Division's decision denying Petitioner's Confrontation Clause claim involved an unreasonable application of, that precedent. *See* 28 U.S.C. § 2254(d).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Analisa Torres, United States Courthouse, 500 Pearl Street, New York, New York 10007, Room 2210, if required by Judge Torres's Individual Practices. Any requests for an extension of time for filing objections must be directed to Judge Torres. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension*

*Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d

Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714

F.2d 234, 237-38 (2d Cir. 1983).

Dated:  New York, New York
        April 14, 2022

                                        Respectfully submitted,

                                        _____
                                        DEBRA FREEMAN
                                        United States Magistrate Judge

Copies to:

All counsel (via ECF)

65

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
JOSEPH DIAZ,

                Petitioner,

                                RESPONDENT'S
                                DECLARATION IN
                                SUPPORT OF
                                THE STATE'S OBJECTIONS
                                TO THE MAGISTRATE'S
                                REPORT &
                                RECOMMENDATION
          -against-                18 Civ. 10121 (AT)(VF)


EARL BELL, Superintendent, Clinton
Correctional Facility,

                Respondent.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


     JOSHUA P. WEISS, an attorney admitted to practice in the State of New York,

and before this Court, declares under penalty of perjury, pursuant to 28 U.S.C. § 1746,

that the following statements are true, except those made upon information and belief,

which he believes to be true:

1.     I am an Assistant District Attorney in the Office of DARCEL D. CLARK, the

District Attorney of Bronx County. I submit this declaration pursuant to 28 U.S.C. §

636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure in support of the

State's objections to the Report and Recommendation (R&R) submitted this Court by

U.S. Magistrate Judge Debra Freeman, dated April 14, 2022, recommending that

petitioner's petition for a writ of habeas corpus be granted.

2.      The State objects to the Magistrate's Report and Recommendation on two grounds:

- The Magistrate erroneously found the Appellate Division's decision that the crime scene evidence was non-testimonial was in "direct conflict" with "clearly established" federal law as determined by the Supreme Court of the United States. *See* 18 USC § 2254(d)(1); R&R, p. 60.

- The Magistrate did not afford the deference owed to the state court's finding in analyzing that the alleged error was harmless and, moreover, misapprehended the trial record. *See Brown v. Davenport*, No. 20-826, 2022 WL 1177498 (U.S. Apr. 21, 2022).

3.      As to the first ground, the State lodges the following two objections:

**A. The State objects to the Magistrate's conclusion that the Supreme Court's fractured opinion in *Williams v. Illinois*, 567 U.S. 50 (2012), may be cast aside to find that the federal confrontation law governing criminal forensic reports, "as determined by the Supreme Court of the United States is "clearly established." R&R, pp. 51-61.**

The Magistrate mistakenly believed that Supreme Court precedent addressing the intersection of the Confrontation Clause and forensic reports was settled in 2017 when the Appellate Division considered and rejected petitioner's argument. Specifically, the Magistrate expressly disregarded the Supreme Court's fractured decision in *Williams v. Illinois*, 567 U.S. 50 (2012), and the ongoing uncertainty it has created in this area of the law. In a plurality opinion, the Supreme Court in *Williams* concluded that an expert's reliance on a DNA forensic report at the defendant's criminal trial did not violate the

Confrontation Clause. However, no one rationale, or rule, garnered the support of a majority of the Justices. The broad ranging views and reasoning propounded revealed deep-seated disagreements among the Justices about the test be applied in determining whether the contents of a forensic report are testimonial. *See Williams*, 567 U.S. at 86 (Breyer, J., concurring) (observing that the plurality and dissent did not answer how "the Confrontation Clause appl[ies] to the panoply of crime laboratory reports and underlying technical statements written by (or otherwise made by) laboratory technicians."); *see also id.* at 141 (Kagan, J., dissenting) (stating that the prior "clear rule is clear no longer" and that the varying opinions "have left significant confusion in their wake").

In concluding the testimonial nature of the crime scene evidence was "clearly established," the Magistrate misapprehended the state of the Supreme Court's Confrontation Clause jurisprudence. On federal habeas review, a federal court must "as a threshold matter… first decide what constitutes clearly established Federal law, as determined by the Supreme Court of the United States." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (internal quotations and citations omitted). Supreme Court precedent is not clearly established law under § 2254(d)(1) unless it squarely addresses the issue in the case before the state court or establishes a legal principle that "clearly extends" to the issue. *Wright v. Van Patten*, 552 U.S. 120, 123-25 (2008). While AEDPA does not require a "nearly identical factual pattern before a legal rule must be applied" *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007), the legal rule must be "squarely established" by

the Supreme Court. *Knowles v. Mirzayance*, 556, U.S. 111, 122 (2009). The necessity of applying a prior Supreme Court holding to a new factual permutation must be "beyond doubt." *See Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004).

In discounting that the fractured opinion in *Williams* remains an intractable source of fair-minded disagreement among jurists, the Magistrate relied upon the flawed reasoning of *Garlick v. Lee*, 1 F.4th 122 (2d Cir. 2021), *cert denied* 142 S.Ct. 1189 (2022), a recent AEDPA decision where the Second Circuit cast aside *Williams* to conclude that Supreme Court precedent had clearly established that an autopsy prepared under the circumstances presented in that case was testimonial (R&R, pp. 44-50, 52-54, 59-60). Eschewing *Williams*, the Second Circuit invoked the rule announced in *Marks v. United States*, 430 U.S. 188, 193 (1977), that where a majority of the Court fails to unite behind a single rationale, the "holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." Citing its own prior decision in *United States v. James*, 12 F.3d 79, 95 (2d Cir. 2013), which involved an application of *Marks* to a case on direct appeal from a federal conviction, the Second Circuit relied on Supreme Court precedent predating *Williams* to find the law was clearly established. Yet § 2254(d)(1) expressly states that it is the precedents of *only* the Supreme Court that drive this threshold determination. *See Williams v. Taylor*, 529 U.S. 362, 381 (2000).

Indeed, no other Circuit has countenanced the analytical framework for AEDPA review that the Second Circuit endorsed in *Garlick* — that an AEDPA court can cast

aside *Williams* as irrelevant to the evaluation of whether the law addressing the application of the Confrontation Clause to forensic reports is clearly established. The Fifth, Sixth, Ninth, and Eleventh Circuits have all evaluated AEDPA petitions predicated on Confrontation Clause claims involving the States' introduction of forensic reports at trial. Citing the Supreme Court's plurality decision in *Williams,* those courts found that the law governing the application of Confrontation Clause principles to forensic reports was *not* clearly established. *See Mills v. Comm'r, Alabama Dep't of Corr.*, No. 21-11534, 2021 WL 5107477, at *4 (11th Cir. Aug. 12, 2021) (denying certificate of appealability); *Garrett v. Madden*, 859 F. App'x 156, 158 (9th Cir. 2021) (denying certificate of appealability); *King v. Brown*, No. 20-2074, 2021 WL 3417921, at *2 (6th Cir. Apr. 20, 2021) (denying certificate of appealability), *cert. denied,* 142 S. Ct. 294, (2021); *Jenkins v. Hall*, 910 F.3d 828, 835 (5th Cir. 2018).[1] While the state court decisions addressed by the Fifth and Sixth Circuits predated this Court's holding in *Williams*, they are nonetheless suggestive of a widening circuit split. In contrast to the Second Circuit's conclusion in *Garlick*, these Circuits found that the fragmented nature of the Supreme Court's decision in *Williams* was indispensable to the determination of whether an area of the law is clearly established.

---

[1] When asked to address the issue, the Tenth Circuit "express[ed] no view as to whether the plurality opinion should be treated as controlling." *Jimenez v. Allbaugh*, 702 F. App'x 685, 688 (10th Cir. 2017) (denying certificate of appealability).

Notably, in a case that concerned the admissibility of gang intelligence reports that did not accuse a specific individual of wrongdoing, the Ninth Circuit declined to grant habeas relief based on a Confrontation Clause violation because "the substantial ambiguity in this area" created by *Williams* prevented a finding that the law is clearly established within the meaning of § 2254(d)(1). *Garrett*, 859 F. App'x at 158. Relying on the plurality opinion in *Williams*, the Ninth Circuit explained that "fair-minded jurists could disagree whether admitting the challenged evidence violated clearly established federal law." *Id.* at 157.

The Magistrate here found that no fair-minded jurist could have concluded that the reasoning on which the Appellate Division based its rejection of petitioner's claim was "justified under federal law" (R&R, p. 60). While the Magistrate invoked several factors that the Supreme Court identified as salient in its prior decisions (R&R, pp. 52-56), nowhere in the 65-page Report and Recommendation did the Magistrate articulate a governing Supreme Court test that would compel a finding that the evidence was testimonial.

Instead, the Magistrate cobbled together a rule from legal principles articulated in *Melendez-Diaz* and *Bullcoming*.[2] Yet, as the Supreme Court recently cautioned, "a federal court may not use an AEDPA case as an opportunity to pass on the wisdom of extending old precedents in new ways. AEDPA permits relief only when a state court

---

[2] *Melendez-Diaz v. Massachusetts* (557 U.S. 305 (2009); *Bullcoming v. New Mexico* (564 U.S. 647 (2011)).

acts contrary to or unreasonably applies this Court's preexisting and clearly established rules." *Brown v. Davenport*, No. 20-826, 2022 WL 1177498, at \*23-24 (U.S. Apr. 21, 2022) (citing *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) (per curiam); *Woodall*, 572 U. S. at 424-26; *Lopez v. Smith*, 574 U.S 1, 6 (2014)).

### B. The State objects to the Magistrate's conclusion that the Appellate Division "explicitly rested" its analysis on the reasoning set forth by the Court of Appeals in *People v. Freycinet*, 11 N.Y.3d 38 (2008). R&R, p. 60.

The Magistrate minimized the state court's efforts to grapple with the lack of clarity in the state of the law in 2017. On petitioner's direct appeal, the Appellate Division held that the challenged crime scene evidence was non-testimonial because it did not "link the commission of a crime to a particular person." *People v. Diaz*, 151 A.D.3d 502, 503 (1st Dept. 2017). Contrary to the Magistrate's finding, this reasoning did not derive from *Freycinet*. Rather, the quotation was from the Court of Appeals' subsequent opinion in *People v. John,* (27 N.Y.3d 294 [2016]), rendered several years after the Supreme Court's fractured decision in *Williams*. In *John*, New York's highest court assessed *Crawford*[3], *Melendez-Diaz*, *Bullcoming,* and *Williams* to adjudicate the defendant's claim that lab reports setting forth DNA profile analyses evidence were testimonial. The court acknowledged that the applicable rule was the primary purpose test and that the report was testimonial. *Id.* at 323-24. Still, the court in *John* observed that existing Supreme Court precedent had not abrogated the New York rule originally articulated

---

[3] *Crawford v. Washington*, 541 U.S 36 (2004).

in *Freyincet*. Accordingly, on an issue where the Supreme Court has repeatedly eschewed providing definitive guidance in favor hewing to a case-by-case approach (*see James*, 712 F.3d at 97*(*citing *U.S. v. Burden*, 600 F.3d 204, 224 (2d Cir. 2010) ("It is unwise to read *Crawford*'s catalog of the "core class of testimonial statements" as more than a set of guideposts…[N]o court can say whether a particular kind of statement is testimonial until it has considered that kind of statement in an actual case."))), the Appellate Division drew upon the reasoning in *John*, which had just recently reaffirmed the continued applicability of the New York rule.

4.  As to the second ground, the State lodges the following six objections:

> **A. Respondent objects to the Magistrate's failure to give any deference to the State Court's finding that the alleged error was "harmless under the standard for constitutional error." *People v. Diaz*, 151 A.D.3d 502, 503, (2017).**

In the three pages spent analyzing the perceived confrontation error's effect, the Report and Recommendation does not even acknowledge the state court's express finding on the merits that the error was harmless. R&R, pp. 61-63. Beyond that, the Magistrate cited to no authority addressing how a habeas court is to evaluate the propriety of a state court's determination of harmless error, much less any authority that would have permitted it to disregard the Appellate Division's finding altogether.

Clearly, the Magistrate reviewed the Appellate Division's harmless error determination *de novo*. At the time respondent filed its opposition, there was no question that substantial deference was owed to the state court's harmlessness finding. *See Brecht*

*v. Abrahamson*, 507 U.S. 619, 638 (1993) (observing that habeas relief is unwarranted unless "in light of the record as a whole, [the constitutional violation] had a substantial and injurious effect or influence" on the jury's verdict); *Wood v. Ercole*, 644 F.3d 83, 93 (2d Cir 2011) (explaining that the harmless error standard to be applied on habeas review is "less stringent" than that applied on direct review and discussing the "uncertainty" about whether the applicable standard when a state court has made an express finding of harmlessness is that articulated in *Brecht* or the one spelled out in 18 USC § 2254, to wit, whether the state court's adjudication involved an unreasonable application of *Chapman v. California*, 386 U.S. 18, (1967). Yet, until recently the precise level of deference had long been unsettled by the United States Supreme Court.

On April 21, 2022, the Supreme Court resolved this question. It held that "a federal court must *deny* relief to a state habeas petitioner who fails to satisfy either this Court's equitable precedents or AEDPA. But to *grant* relief, a court must find that the petitioner has cleared both tests." *Brown v. Davenport*, No. 20-826, 2022 WL 1177498, at *14 (U.S. Apr. 21, 2022). The Court clarified that "[w]hen a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without applying both the test outlined in *Brecht* and the one prescribed by Congress in AEDPA." *Id.* at *3. Thus, a federal court conducting habeas review must first determine whether the error had a "substantial and injurious error or effect on the verdict" and then apply AEDPA by considering whether the state court's harmlessness finding was (1) contrary to, or an unreasonable application of, clearly established law as determined by the

Supreme Court or (2) based on an "unreasonable determination of the facts. *Id.* at *7; *see* 28 U.S.C. § 2254(d). As the Court explained, *Chapman* "merely announced the burden of proof for harmless error review on direct appeal" — a constitutional error will not require reversal of a criminal conviction when the prosecution has proven the error was harmless beyond a reasonable doubt — and state courts enjoy "more leeway…in reaching outcomes in case-by case determinations." *Id.* at *24 (quoting *Renico v. Lett*, 559 U.S. 766, 776 (2010)).

Both parties flagged the deference requirement for the Magistrate. Petitioner's opening papers stated, "a finding of harmlessness will not be found unreasonable 'if fair-minded jurists could disagree on its correctness.'" Memorandum of Law in Support, p. 42, (quoting *Davis v. Ayala*, 576 U.S. 257, 269 (2015)). The State argued that the State Court's "decision did not rest on any unreasonable factual determinations." Memorandum of Law in Opposition, p. 15. In reply, petitioner argued that the Appellate Division's conclusion was "plainly unreasonable." Reply Memorandum of Law, p. 9. Accordingly, even prior to the Supreme Court's most recent decision*, both parties* expected the Magistrate to give some deference to the state court's harmlessness determination. Instead, no deference was given. This Court should reject the Report and Recommendation's conclusion and ensure that "AEDPA's terms are satisfied" by evaluating whether the Appellate Division's application of *Chapman* was unreasonable

(*Davenport,* 2022 WL 1177498, at *14).[4] Applying the proper, highly deferential standard of review, any constitutional violation was harmless beyond a reasonable doubt.

**B. Respondent objects to the Report's conclusion that the "location of the shooter who killed Santiago . . . appear[ed] to come only from the crime scene report." R&R, p. 61.**

The testimonies of Soto, Castro, and Jones established that petitioner was on the corner of Willis Avenue and 146th Street and fired towards Brooks Avenue, *i.e.,* eastward, in the direction of a group of three individuals, Rob Gordo, Fifty, and LaTroy Ewell, who were in front of 409 146th Street. T.256-65 (Soto); T.620-30 (Castro); T.506-09 (Jones). Two of those individuals, Gordo and Ewell, returned fire towards Willis Avenue, *i.e.,* westward, in the direction of petitioner. T.264-65 (Soto); T.628 (Castro).

There was never any dispute that when the gunfight began, the victim, Santiago, was standing directly in front of 445 East 146th Street, east of 409, behind Gordo, Fifty, and Ewell. Flores, Santiago's son, likewise testified that was where she was (T.748-51), Similarly, police officer Juan recalled that he found Santiago in that vicinity when he arrived on scene. T.239-41.

These consistent accounts explaining the relative positions of the shooters, *and that they were facing each other*, were far more probative that petitioner had been the one to

---

[4]As will be discussed in the remaining objections, the Magistrate's application of *Brecht v. Abrahamson* 507 U.S. 619 (1993), was flawed because it rested on a misapprehension of the relevant trial evidence.

fire the deadly shots than were the locations where various shell casings were recovered. It would make little sense for Gordo and Ewell to have turned away from the threat of petitioner, who was shooting at them from Willis Avenue, and to have fired their weapons in the opposite direction, towards Brooks Avenue and Santiago. The caliber of each shooter's gun did not matter nearly as much the directions they were facing while they were shooting. The eyewitnesses provided those crucial details, and their uncontradicted accounts of petitioner's location while shooting withstood thorough cross-examination. *See generally Delaware v. Van Arsdall*, 475 U.S. 673, 683 (1986) (harmlessness test, as applied to Confrontation Clause violations, relies "upon a host of factors, all readily accessible to reviewing courts," including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case").

**C. Respondent objects to the conclusion that the perceived error could not be harmless because "the medical examiner could not determine what type of bullet killed Santiago, how far away the shooter was standing, or from what direction the fatal shot had been fired." R&R, p. 61.**

Petitioner has never claimed that the bullet that killed Santiago was unrelated to the shootout. The eyewitnesses consistently testified that all the shooters — petitioner, Gordo, and Ewell — were west of Santiago. Accordingly, the medical examiner's

inability to determine the direction from which fatal shot emanated was inconsequential.

Further, if Detective Jacklitsch's report and diagram of where recovered the spent casings was erroneously admitted into evidence, any conclusions the medical examiner may have drawn as to the type of bullet that killed Santiago would only have amplified the potential for prejudice to petitioner. Had the examiner concluded that Santiago was killed by a .45 caliber bullet, Detective's Jacklitsch's report detailing the location of the casings would have irrefutably linked petitioner to her death. The examiner's inability to determine the caliber of bullet that caused Santiago's wounds thus further ensured that any confrontation error was harmless rather than harmful.

Lastly, the distance from where the fatal bullet could have been fired is of no moment. As noted, only one shooter was facing east — towards Santiago. That person was petitioner.

### D. Respondent objects to the Magistrate's failure to give any consideration to the surveillance footage in the harmlessness analysis. R&R, pp. 61-63.

Surveillance footage showed petitioner passing the gun to Irrizary (T.513-14; Exhibit 64), demonstrating not only petitioner's consciousness of guilt in seeking to dispose of the weapon, but also that only petitioner, not Irrizary, had a firearm during the shootout. Had Irrizary also been armed and fired the fatal shots, he would likely have avoided the possibility of being caught with an additional firearm. This narrative is also corroborated by the backstory, given by both Irrizary and Castro, of the dispute

leading to the shooting. As the prosecutor argued, Irrizary's statement that he was going to "clear the block" meant that he would return with petitioner, who was carrying a gun. Moreover, the gunfire broke out only after Irrizary had summoned petitioner. If Irrizary himself had a gun, he would not have had to leave the scene and return, because he would have been able to fire at Gordo before Gordo had the chance to cut him. *See* T.620 (Castro); 954-55 [summation].

### E. Respondent objects to the Report's determination that Jones' identification of the shooter's gun as a 9-millimeter was "contradicted by Detective Jacklitsch's diagram." R&R, pp. 7, 62.

Jones testified only that petitioner possessed a semi-automatic gun capable of "eight to ten" "repetitive" shots. He did not say what caliber the gun was. *Compare* R&R, p. 62 *with* T.511. Jones explained to the jury that he assumed "it was a nine" because "[i]t was repetitive, the shots were repetitive." T.511. Again, on cross-examination it was defense counsel who asked whether it was a "9 millimeter gun, correct?" and Jones clarified, "*[o]nly* due to the repetitive shots." T.541 (emphasis added). Jones was plainly using the term "nine" as a catchall label for a semiautomatic weapon, and not testifying as an expert who could have identified the weapon's caliber from hearing the pattern of the gunfire. The Magistrate's Report did not point to anything in Jones' version of events that otherwise contradicted Detective Jacklitsch's report or diagram.

### F. Respondent objects to the Magistrate's amplification of the minor inconsistencies in the eyewitness descriptions of the shooter's clothing. R&R, p. 62.

The minor inconsistences as to the color of the shooter's shirt and whether he wore a baseball cap should be attributed to the witnesses' different vantage points, the questions presented to the witnesses at trial, and the amount of detail they chose to include in their responses. *See Michigan v. Payne*, 412 U.S. 47, 57 (1973) (commenting that "witnesses in criminal trials[] lack infallible memories"); *United States v. Persico*, No. S 84 CR. 809 (JFK), 1990 WL 3218, at *8 (SDNY Jan. 5, 1990) ("inconsistencies in the [witnesses] testimony . . . developed because the witnesses were fallible people with human memories who were testifying based on their recollection of events past."). For instance, Castro was not asked during trial whether the shooter wore a hat. Moreover, both Soto and Jones testified that the shooter wore a red shirt. T.260, 294-95, 509-10, 513-14. Police officer Berlinda Acevedo, who testified that she observed an individual wearing a red shirt running from the scene, corroborated this detail. T.812-815. To the extent Castro identified the shooter's shirt as white, this minor discrepancy did not undermine the compelling evidence of guilt supporting the jury's verdict.

WHEREFORE, respondent respectfully requests that the foregoing objections be sustained, the Magistrate's Report and Recommendation be rejected, the petition for habeas corpus be denied in all respects, and no certificate of appealability issue.

Dated:     Bronx, New York
           April 28, 2022

                                        Respectfully submitted,

                                        _____/S/_____
                                        JOSHUA P. WEISS (JD-2336)
                                        ASSISTANT DISTRICT ATTORNEY

YAEL L. LEVY
JOSHUA P. WEISS
PAUL A. ANDERSEN
Assistant District Attorneys
        *of Counsel*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
JOSEPH DIAZ,                                                :
                                                            :
                          Petitioner,                       :
                                                            :        1:18-Civ.-10121-AT-VF
                          v.                                :
                                                            :
EARL BELL, Superintendent,                                  :
Clinton Correctional Facility,[1]                           :
                                                            :
                          Respondent.                       :
                                                            :
------------------------------------------------------------X

## PETITIONER'S RESPONSE TO THE STATE'S OBJECTIONS TO THE MAGISTRATE'S REPORT AND RECOMMENDATION

Magistrate Judge Freeman correctly held that Joseph Diaz's confrontation rights were violated when a surrogate police witness was allowed to present a crime scene report, diagram, and photographs the surrogate had not prepared; and that the Appellate Division, First Department, "unreasonably applied" clearly established Supreme Court law in finding no Confrontation Clause violation. Magistrate Judge Freeman was also correct that this serious error was not harmless under any standard. Accordingly, her Report recommending that the writ issue should be adopted.

Respondent's objections are meritless. First, the State objects that the Magistrate erroneously concluded that the Appellate Division's decision was in direct conflict with clearly established Federal law, but this objection ignores not only clear pronouncements of the Supreme Court but also recent binding precedent from the Second Circuit. Second, Respondent contends

---

[1] As Mr. Diaz has recently been transferred to Green Haven Correctional Facility (Dutchess County, New York), this Court should modify the caption to read that the Respondent is "Mark Miller, Superintendent of Green Haven Correctional Facility." E.g., Maples v. Phelps, 2008 WL 1743400, n.1 (D. Del. 2008); **Error! Main Document Only.**Fed. R. Civ. P. 25(d).

that Judge Freeman's harmless error analysis was flawed and not properly deferential, but this overlooks not only the careful parsing of the evidence that she conducted but also that the Appellate Division incorrectly applied constitutional harmless error analysis. Thus, each objection should be overruled.

## STATEMENT OF THE CASE

Joseph Diaz was tried for homicide after a bystander, Aisha Santiago, was hit with a stray bullet during a gunfight that occurred on East 146th Street in the Bronx on September 22, 2009. Tensions had escalated between two neighborhood groups—one led by Mr. Diaz's acquaintance Jason Irrizary—during which several individuals from both groups fired guns.

Mr. Diaz incorporates by reference the facts as stated in his Memorandum in Support of 28 U.S.C § 2254 Petition (Mem. at 2–22) and mentions below only those facts relevant to the instant response.

## ARGUMENT

## THE WRIT SHOULD ISSUE.

A. For Years and Without Alteration, Confrontation Clause Law Has "Clearly Established" that the Police-Created Documents Here Were Testimonial (Responding to Objections 1 and 2).

In objecting that the Magistrate erred in concluding that the law was clearly established, and that the Appellate Division "unreasonably applied" it (State's R&R Obj., 2–8), Respondent encourages this Court to disregard the Second Circuit's recent, binding decision in Garlick v. Lee, 1 F.4th 122 (2d Cir. 2021). There, the Circuit court discussed in detail the very line of state cases on which the Appellate Division expressly relied—People v. Freycinet, 11 N.Y.3d 38 (N.Y. Ct. App. 2008), and People v. John, 27 N.Y.3d 294 (N.Y. Ct. App. 2016), among them—

and further discussed why <u>Williams v. Illinois</u>, 567 U.S. 50 (2012), did not alter the clearly established nature of confrontation doctrine.

In <u>Garlick</u>, the Second Circuit said in no uncertain terms that the Appellate Division had erred in finding an autopsy report nontestimonial because it "did not link the commission of the crime to Garlick." 1 F.4th at 125. Identical reasoning supported the Appellate Division's conclusion in Mr. Diaz's case, where that court found that the police-created diagrams and report were nontestimonial because they did not link Mr. Diaz to the crime.[2] In both cases, the Appellate Division did not even consider whether the "primary purpose" of the crime scene diagram and reports was to prove past events potentially relevant to later prosecution. <u>Diaz</u>, 151 A.D.3d 502; <u>Garlick</u>, 144 A.D.3d 605.

Here, the Magistrate, relying on <u>Garlick</u> (R&R, 43–50, 52–53), found that the crime scene report and diagrams (one prepared by the investigating detective, and one derived from that diagram that the testifying detective created as he was preparing to testify) were testimonial. As the <u>Garlick</u> court found and the Magistrate adopted, the proper analysis is whether "the documents at issue were created 'in aid of a police investigation' and had an 'evidentiary purpose'" against a defendant (R&R, 53 (citing <u>Bullcoming v. New Mexico</u>, 564 U.S. 647, 664 (2011)); 55 (citing <u>Melendez-Diaz v. Massachusetts</u>, 557 U.S. 305, 314 (2009))). Here, they

---

[2] <u>Compare</u> <u>People v. Garlick</u>, 144 A.D.3d 605, 606 (N.Y. App. Div. 2016) ("'Defendant's right of confrontation was not violated when an autopsy report prepared by a former medical examiner, who did not testify, was introduced through the testimony of another medical examiner' (<u>People v. Acevedo</u>, 112 A.D.3d 454, 455 (1st Dept. 2013), <u>lv. denied</u> 23 N.Y.3d 1017 (2014), since the report, which 'd[id] not link the commission of the crime to a particular person,' was not testimonial (<u>People v. John</u>, 27 N.Y.3d 294 (2016)). Defendant's contention that <u>People v. Freycinet</u>, 11 N.Y.3d 38 (2008), has been undermined by subsequent decisions of the United States Supreme Court is unavailing (<u>see</u> <u>Acevedo</u>, 112 A.D.3d at 455)"), <u>with</u> <u>People v. Diaz</u>, 151 A.D.3d 502, 502–03 (N.Y. App. Div. 2017) ("The crime scene evidence that defendant claims was admitted in violation of his right of confrontation was not testimonial, since it '[did] not link the commission of the crime to a particular person' (<u>People v. John</u>, 27 N.Y.3d 294, 315 (2016); <u>see also</u> <u>People v. Freycinet</u>, 11 N.Y.3d 38, 42 (2008); <u>People v. Acevedo</u>, 112 A.D.3d 454 (1st Dept. 2013), <u>lv. denied</u> 23 N.Y.3d 1017 (2014))").

undisputedly were and did. Further, they were "formal[]" (R&R, 54 (adopting discussion in Bullcoming on the relevance of "formality" to the primary-purpose test)).

The Circuit court also examined the Supreme Court's fractured decision in Williams v. Illinois, 567 U.S. 50 (2012), finding it did nothing to alter the clearly established rules of the cases predating it, while finding in the alternative that under either the plurality opinion or the concurrence by Justice Thomas, the conclusion that the autopsy report there was testimonial would be the same. Garlick, 1 F.4th at 133 n.4,135 n.6. Indeed, nothing in Williams altered the basic rule about what constitutes testimonial evidence that is subject to confrontation: that which has an "evidentiary purpose" and is admitted against a defendant.[3] Just as the court concluded in Garlick, the Magistrate here properly found that the law was clearly established that these police-created documents—inarguably made in aid of potential prosecution, tending to prove facts against Mr. Diaz, and bearing indicia of formality—were testimonial.

Similarly, the Magistrate correctly concluded that the Appellate Division's decision to the contrary was an "unreasonable application" of that clearly established Supreme Court law (R&R, 59–60). As noted above, in finding no confrontation violation, the Appellate Division relied on an identical rule in both Garlick and Diaz: "the existence of . . . a category" of "witnesses who are 'helpful to the prosecution' but 'somehow immune from confrontation,'" in contravention of Melendez-Diaz. Garlick, 1 F.4th at 136. The State's protests to the contrary rely on a nonexistent

---

[3] The State attempts to point to other circuits to expose a supposed split. Initially, it is of course the law of the Second Circuit that binds this Court. And, the Supreme Court has counseled that it is the "holdings, as opposed to the dicta" that determine whether the law is "clearly established." Williams v. Taylor, 529 U.S. 362, 412 (2000). In any event, Respondent inflates the seriousness of the supposed split among circuits. Mills v. Comm'r, Alabama Dep't of Corr., No. 21-11534, 2021 WL 5107477, at *4 (11th Cir. Aug. 12, 2021), to which Respondent cites, deals with DNA evidence, exactly the sort at issue in Williams. Garrett v. Madden, 859 Fed.Appx. 156 (9th Cir. 2021), is an unpublished memorandum decision that appears to rest primarily on harmlessness grounds. Finally, as Respondent concedes, the Fifth and Sixth Circuit decisions on which the State relies pre-date Williams.

distinction between how the Appellate Division approached both Mr. Garlick's and Mr. Diaz's cases—both discussed the state courts' erroneous conclusion in John, contrary to what the State suggests (State's R&R Obj., 7)—and which the Second Circuit has since condemned.

Accordingly, the Court should overrule the State's objection to the Magistrate's finding that the Appellate Division unreasonably applied clearly established Supreme Court law in concluding that the police-created documents here were nontestimonial.

B. Under any Standard, the Error in Admitting Those Documents Was not Harmless (Responding to Objections 3 Through 8).

Through a cluster of objections relating to the evidence and how the state court weighed it, as assessed by the Magistrate, Respondent claims that the Magistrate did not accord enough deference to the state court. But, in doing so, Respondent reveals just how thin the State's case was. There was simply no way that the error in admitting the crime scene diagrams and report was harmless.

Initially, the standard that should apply is the one under Brecht v. Abramson, 507 U.S. 619 (1993).[4] Moreover, the State did not request that any other standard govern such that its request to apply a different rule now is waived. See, e.g., United States v. Gladden, 394 F.Supp.3d 465, 480 (S.D.N.Y. 2019) ("[I]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal citations omitted). To

---

[4] Brown v. Davenport, __ S.Ct. __, 2022 WL 1177498 (Apr. 21, 2022), had not been announced at the time of the R&R. Because this case is not pending on direct appeal but rather collateral review, and the new rule is not retroactive, Brecht continues to govern. See generally Teague v. Lane, 489 U.S. 288, 310 (1989); Lindh v. Murphy, 521 U.S. 320, 336–37 (1997) (finding that amendments to the Antiterrorism and Effective Death Penalty Act ("AEDPA") applied only to cases filed after AEDPA's effective date, not retroactively).

the contrary, in the State's underlying response memorandum, it expressly invited the habeas court to apply <u>Brecht</u> (Resp. Mem. at 15–16).[5]

But, even under the newly announced rule in <u>Brown</u>, which requires both that a petitioner satisfy <u>Brecht</u> as well as AEDPA's standard, 2022 WL 1177498, *3, Mr. Diaz prevails. Initially, under <u>Brecht</u>, the rule is that the petitioner must show the error "had substantial and injurious effect or influence in determining the jury's verdict," or "actual prejudice." 507 U.S. at 637 (internal citation omitted). Relevant to the habeas court's determination of whether the error was harmless under that standard are the following factors: (1) strength of the prosecution's case, (2) the prosecutor's conduct vis-à-vis the improperly admitted evidence, (3) the importance of the erroneously admitted evidence, and (4) whether the improper evidence was cumulative. <u>Zappulla v. New York</u>, 391 F.3d 462, 468 (2d Cir. 2004). Here, all four factors counsel in favor of finding the evidence was harmful. In this case where no forensic, surveillance, ballistics, or statement evidence tied Mr. Diaz to the shot that killed Aisha Santiago, much less even placed him at the scene, the state court's finding that the crime scene reports and diagrams admitted into evidence were not harmless because they "shed little or no light on any of the disputed issues at trial," Diaz, 151 A.D.3d 502, was unreasonable.

First, the prosecution's case was weak and based heavily on speculation. Of the eyewitnesses, only two identified Mr. Diaz as the shooter (though one of those later could not identify him at trial), and one identified <u>Irrizary</u>; further, their testimony was incomplete and inconsistent, with one stating that the shooter had in fact fired a gun different than a .45, and one testifying to seeing <u>three</u> people in Irrizary's group with guns—a fact that Respondent does not

---

[5] Though Respondent makes a passing reference to the decision "not rest[ing] on any unreasonable factual determinations," this standard alludes to 28 U.S.C. § 2254(d)*(2)*, whereas Mr. Diaz has always claimed that the writ should issue under 28 U.S.C. § 2254(d)*(1)*, which provides that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law."

mention (A1236, A1260). The medical examiner could not say what type of bullet had killed Ms. Santiago, such that the jury was left to rely on the theory put forward through Detective Jacklitsch's report (A1386–91, 1394).

Respondent's attempt to discount the importance of the medical examiner's omission—by arguing that had she said the bullet was from a .45-caliber weapon, it would have heightened the importance of Jacklitsch's finding—is backwards (State's R&R Obj. 13); this argument is counter-factual, with the actual evidence she proffered demonstrating that <u>any</u> gun at the scene that day could have caused Santiago's death. And, contrary to what Respondent now speculates (State's R&R Obj., 13–14), the grainy surveillance footage in no way rules out Irrizary as the shooter or adds much beyond weak consciousness-of-guilt evidence, see <u>People v. Bennett</u>, 79 N.Y.2d 464 (N.Y. Ct. App. 1992), to the minimal quantum of reliable proof against Mr. Diaz. There was little consistent evidence of what happened during this gun battle, with Jacklitsch's documents supplying the only evidence supporting the prosecution's theory that Mr. Diaz had stood on the corner of Willis and East 146th, firing the .45-caliber gun that killed the victim. Moreover, though Respondent attempts to downplay the significance of inconsistencies in the eyewitness testimony (State's R&R Obj., 14–15), those variations heightened the importance of the crime scene documents. The Magistrate correctly concluded that the error here was not harmless.

Second, the prosecution heavily relied on the crime scene report and diagrams as a critical part of its case. At trial, the surrogate detective testified for over 100 transcript pages about the evidence that Jacklitsch collected and its import. This included locations from which Jacklitsch had supposedly recovered bullet casings, and information about a car that had a bullet hole in its trunk east of where Santiago had been shot (A702–03, 722, 729–30, 732, 775, 780–

81). During summation, the prosecutor relied on the ballistics evidence and the diagram to advance the theory that Mr. Diaz had been near Willis Avenue and East 146th Street with other members of Irrizary's group, shooting a .45-caliber weapon eastward. Because Jacklitsch had found a .45 bullet east of Ms. Santiago, the prosecutor argued it had been Mr. Diaz who had fired the fatal shot (A1535–38). This supposed finding had not been subject to adversarial testing, though. Moreover, even the ballistics expert, relying on Jacklitsch's diagram, had testified that there could have been <u>two</u> .45-caliber firearms used during the incident (A939–40). The jurors asked on two occasions to view the crime scene diagram, further supporting that it impacted their deliberations. As the Magistrate correctly found and Respondent cannot now meaningfully dispute, the "prosecution's case against Petitioner was largely constructed from the information contained in Detective Jacklitsch's crime scene report and diagram" (R&R, 62).

Finally, the report and diagrams were not even remotely cumulative, as they furnished the only evidence linking the fatal shot to the shooter who had been standing on the corner of E. 146th Street and Willis Avenue. Neither whether that was Mr. Diaz nor whether that came from the gun the eyewitnesses believed had fired the shot that struck Santiago was established without the offending evidence. Respondent objects that eyewitness testimony placed the shooter on the corner of East 146th Street and Willis Avenue (State's R&R Obj., 11–12). While it is true that three witnesses said there was a person standing there shooting, this evidence did not make a critical link that only the crime scene diagram did: that there were no <u>other</u> shooters firing east (and, indeed, one eyewitness said there were three in Irrizary's group with guns), nor whether the bullet the police believed had hit Santiago matched the caliber of the gun the person they saw was wielding. To the contrary, that evidence was furnished exclusively by what Jacklitsch had supposedly collected and documented in his diagram and report.

The error was also not harmless under the AEDPA standard that the Brown Court now requires a petitioner to also establish: specifically, that a state court that has applied Chapman v. California, 386 U.S. 987 (1966), has done so unreasonably in that "no fairminded jurist" could draw the same conclusion. Brown, 2022 WL 1177498, *9. Here, the Appellate Division's analysis under Chapman was woefully perfunctory. It simply held without discussion that any error in admitting the crime scene report and diagrams was harmless under the standard for constitutional error. Diaz, 151 A.D.3d at 503. While it correctly identified that the constitutional harmless-error standard applied, it did not properly apply that rule. Instead, it held, "evidence showing the locations where the officer found cartridge cases and other ballistic evidence shed little or no light on any of the disputed issues at trial." Id.

But, this was plainly not true. Initially, the evidence that Mr. Diaz was even present at the scene was weak and conflicting. Only two of the eyewitnesses identified Mr. Diaz, and, as his attorney pointed out in summation, he shared a height, build, hairstyle, and facial hair with the other person identified as a shooter, Irrizary, who had a motive to be there firing a gun; and no witness noted a prominent neck tattoo, which Mr. Diaz had at the time (A1500). But, more to the point, assuming Mr. Diaz was present, the nontestifying detective's crime scene reports and diagram constituted the only way he could be linked to the bullet that supposedly killed Santiago, as the eyewitness testimony did not establish that just one shooter was firing east, nor that Mr. Diaz had been that shooter. Thus, there is simply no way that the error in admitting this proof was "harmless beyond a reasonable doubt" under Chapman or People v. Crimmins, the New York case incorporating the Chapman standard. 36 N.Y.2d 230 (N.Y. Ct App. 1975). Accordingly, the Appellate Division did not reasonably apply Chapman.

Furthermore, even if the Magistrate did not explicitly state the harmlessness standard she was applying, the error here plainly met no possible standard of harmlessness, be it under <u>Brown</u>, 2022 WL 1177498, or <u>Brecht</u>, 507 U.S. 619. Thus, the Magistrate correctly concluded that the Confrontation Clause error here was not harmless.

CONCLUSION

As Magistrate Judge Freeman correctly found, petitioner Joseph Diaz suffered a violation of his confrontation rights that was not harmless; accordingly, her conclusions should be adopted in full, and the writ should issue. As the Magistrate found, if the Court grants the petition on any ground, there is no need for a certificate of appealability (R&R, 64). However, if this Court does not adopt the R&R, it should issue a certificate of appealability under 28 U.S.C. § 2253(c).

Respectfully submitted,

ROBERT S. DEAN (RD-0772)
Attorney for Petitioner

BY:
_____
KATHARINE SKOLNICK (KS-1123)
Of Counsel

May 10, 2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH DIAZ,

                Petitioner,

      -against-

SUPERINTENDENT EARL BELL,

                Respondent.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __8/16/2022__

18 Civ. 10121 (AT) (DF)

**<u>ORDER</u>**

ANALISA TORRES, District Judge:

Petitioner, Joseph Diaz, filed an application under 28 U.S.C. § 2254 challenging his New York state court conviction for manslaughter in the first degree. Pet., ECF No. 1. Before the Court are Respondent's objections to the report and recommendation of the Honorable Deborah C. Freeman (the "R&R") recommending that the petition be granted. *See* R&R, ECF No. 19; Resp. Obj., ECF No. 24. For the reasons stated below, the R&R is ADOPTED in part, and REJECTED in part, and the petition is DENIED.

## BACKGROUND[1]

Petitioner was convicted in the New York Supreme Court, Bronx County, of manslaughter in the first degree, for the 2009 shooting of Aisha Santiago, who was killed during a shooting that involved multiple participants. R&R at 2. At trial, the prosecution presented the testimony of several witnesses, including eyewitnesses, a paramedic, a medical examiner, a ballistics expert, and New York City Police Department ("NYPD") officers. *Id*. at 3. The

---

[1] The Court presumes familiarity with the facts, which are set forth in the R&R, and, therefore, only briefly summarizes them here. *See* R&R at 2–14. Where Respondent has raised specific objections to the R&R's characterization of the facts, the Court has conducted a *de novo* review of the trial court record. And, where Respondent has not raised specific objections to the R&R's characterization of the facts, the Court has taken the facts set forth therein as true. *See Roberts ex rel. Phillip v. Happiness Is Camping, Inc.*, No. 10 Civ. 4548, 2012 WL 844331, at *1 (S.D.N.Y. Mar. 13, 2012). The Court has also included additional details from the trial court record as it deems necessary.

defense called one witness, an off-duty police officer who was in the neighborhood at the time of the shooting.  *Id*.

I.     Eyewitnesses

Orlando Soto testified at trial that the shooting involved two groups of men: one group, which included three or four black and Hispanic men, facing west, towards Willis Avenue, and another group, which included four or five Hispanic men, facing east, towards Brook Avenue. *See id*. at 5; *see also* Trial Tr. II at 257–59, ECF No. 13-5.  Soto stated that he saw a Hispanic man from the east-facing group, who was wearing a red shirt, blue jeans, and a baseball cap, shooting a silver gun east, towards Brook Avenue.  *See* Trial Tr. II at 252, 260–63, 269.  Soto also recalled a member of the west-facing group shooting towards Willis Avenue from 409 East 146th Street.  *See id*. at 252, 264–65, 267.  The day after the shooting, Soto viewed a lineup and identified Petitioner as the shooter.  *See id*. at 270, 273; Trial Tr. IV at 710, ECF No. 13-7.  At trial, Soto claimed that he could not identify Petitioner as the shooter because he was "not good with faces after a certain amount of years," but he testified that he "was certain" Petitioner was the shooter when he made his initial identification.  Trial Tr. II at 268–69, 278.

Another witness, Michael Jones, testified that at the time of the shooting he saw a Hispanic man wearing a red shirt, but no hat, holding a gun at the corner near Willis Avenue and 146th Street.  *See* Trial Tr. III at 509–10, 515–16, ECF No. 13-6; Trial Tr. IV at 534.  Jones, who is 5'10", described the man as a "little taller than [him]."  Trial Tr. IV at 526; *see also* Trial Tr. III at 507–08.  Petitioner is 6'2".  R&R at 8.  Jones testified that he heard gun shots and saw the man pointing the gun down the street away from Willis Avenue.  *See* Trial Tr. III at 509; Trial Tr. IV at 534.  He also described the man in the red shirt passing a gun to a man in a white shirt after the shooting concluded.  *See* Trial Tr. III at 509–10.  The hand-off of the gun was captured

by surveillance video footage. *See id*. at 513–14. Five days after the shooting, Jones reviewed a photo array and identified Petitioner as the man in the red shirt who was holding the gun during the shooting. *See* Trial Tr. IV at 521, 565–67. At trial, Jones also identified Petitioner as the man in the red shirt with the gun. *See id*. at 516–17.

A third witness, Susana Castro, testified that she saw a different man shooting from Willis Avenue towards a group of men standing at 409 East 146th Street, in the direction of Brook Avenue. *See* Trial Tr. IV at 621, 625, 627, 655, 663–75. She stated that the shooter was standing with a group of four other Hispanic men. *See id*. at 621, 634. Castro also stated that two of the other men in the group had guns. *See id*. at 650.

Witnesses testified that, during the shooting, Santiago, the victim, had been standing in front of her building at 445 East 146th Street near the corner of Brook Avenue. *See* Trial Tr. II at 266–67; Trial Tr. V at 748–49, ECF No. 13-8. Her son, Anthony Flores, testified that he heard shots and looked towards Willis Avenue, where he saw people scattering. *See* Trial Tr. V at 748–50. He then looked back towards his mother, who had collapsed. *See id*.

Witnesses testified that other shots were fired from 409 East 146th Street towards Willis Avenue. *See*, *e.g.*, Trial Tr. II at 252, 264–65, 267–68; Trial Tr. IV at 591, 594–96, 628–30. 409 East 146th Street sits between the corner of Willis Avenue and 445 East 146th Street. *See* R&R at 5.

II.     The Admission of the Disputed Documents

Detective Paul Brown testified that the lead detective in the investigation, Detective Glenn Jacklitsch, arrived at the scene two hours after the shooting, processed the scene, and collected evidence according to protocol. *See* Trial Tr. I at 63–69, 88, 100, ECF No. 13-4; Trial Tr. II at 193. Brown stated that Jacklitsch was the one who prepared the crime scene reports,

took photographs, and created a diagram depicting where he had collected the evidence that was recovered at the scene. *See* Trial Tr. I at 63–69, 88, 100. During his testimony, Brown explained that "all of [the] information in the case c[a]me from Jacklitsch's reports." Trial Tr. II at 125. Jacklitsch did not testify at trial because he had retired. R&R at 12. Brown testified in his place. *See* Trial Tr. I at 64.

During Brown's testimony, several exhibits were admitted as business records. These included (1) the crime scene photographs Jacklitsch took, (2) Jacklitsch's crime scene reports, which included descriptions of the evidence, where he found it, and what he believed it to be, (3) the diagram Jacklitsch prepared that showed where he found the evidence, and (4) a diagram Brown created that was intended to duplicate and correct errors in Jacklitsch's diagram. *See, e.g.*, *id*. at 65, 97–101, 103–04, 106–09, 112.

In addition to forming the basis for Brown's testimony, these documents were also used during the testimony of the ballistics expert, Detective Jonathan Fox, who specifically referenced them when discussing how a .45 caliber cartridge casing was found on the corner of Willis Avenue, and a .45 caliber copper-jacketed bullet was found in a car near Santiago's building. *See* Trial Tr. III at 328–29, 334–38, 344–47. Numerous eyewitnesses also referenced Brown's diagram to illustrate their locations during the shooting, and, during the trial, the court allowed the jury to visit the crime scene and bring Brown's diagram. *See, e.g.*, Trial Tr. II at 254–56; Trial Tr. III at 374–76, 457; Trial Tr. IV at 530–32. Furthermore, during its summation, the prosecution relied on the ballistics evidence as described in Brown's diagram to urge the jury that Petitioner was the shooter who killed Santiago. *See* Trial Tr. VI at 947–50, 958, 990–91, ECF No. 13–9.

At trial, Petitioner objected to the introduction of the exhibits and argued that he was being denied his "right to confrontation of the individual who was there and took those photographs, [and who] made those measurements" under *Crawford v. Washington*, 541 U.S. 36 (2004). Trial Tr. I at 89, 92. He argued that the exhibits were testimonial and were being introduced to show that he was the shooter because they purport to establish where he was at the time of the shooting. *See id.* And, Petitioner contended that because the issue of bullet trajectory was critical to the prosecution's case, he was being denied the ability to present a viable defense. *See id.* at 93.

III.    Verdict, Sentencing, Direct Appeal, and Habeas

After two days of deliberations, the jury found Petitioner guilty of first-degree manslaughter. R&R at 24. During deliberations, the jury asked for Brown's crime scene diagram twice. *Id.* Then, at sentencing, the trial court sentenced Petitioner to 25 years' imprisonment and five years' post-release supervision. *Id.*

On appeal before the Appellate Division, First Department, Petitioner argued, *inter alia*, that the documents, photographs, and diagrams should not have been admitted through Brown because they were testimonial in nature. *Id.* at 24–25. He contended that their purpose was to "codify evidence for use in the prosecution of a homicide," and that they contained "the precise testimony [Jacklitsch] would be expected to provide if called at trial." *Id.* at 25 (quoting Pet. App. Br. at 47–48, ECF No. 11-1 (quotation marks and citations omitted)). The Appellate Division affirmed Petitioner's conviction and sentence, finding that the crime scene evidence was not testimonial because it "[did] not link the commission of the crime to a particular person." *People v. Diaz*, 151 A.D.3d 502, 503–04 (1st Dep't 2017) (citation omitted) (alteration in original). It also found that, even if it was error to admit the documents, such error was

harmless because "evidence showing the locations where the officer found cartridge cases and other ballistic evidence shed little or no light on any of the disputed issues at trial, and there is no reasonable possibility that this evidence affected the verdict." *Id*. at 503.  Petitioner then sought leave to appeal to the New York Court of Appeals, but this request was denied.  R&R at 30–31.

On October 23, 2018, Petitioner filed the instant petition.  *See* Pet.  And, on April 14, 2022, Judge Freeman issued the R&R finding that "the Appellate Division's rejection of Petitioner's federal Confrontation Clause claim was not only erroneous, but an unreasonable application of federal law, warranting habeas relief under Section 2254(d)," R&R at 60, and that the error was not harmless, *id*. at 63.  Respondent timely filed objections, *see* Resp. Obj., and Petitioner timely filed a response, Pet. Res., ECF No. 25.

## DISCUSSION

### I.  Standard of Review

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C).  When a party makes specific objections, the court reviews *de novo* those portions of the report and recommendation to which objection is made.  *See id.*; Fed. R. Civ. P. 72(b)(3).  However, "when a party makes only conclusory or general objections, or simply reiterates his original arguments," the court reviews the report and recommendation strictly for clear error.  *Wallace v. Superintendent of Clinton Corr. Facility*, No. 13 Civ. 3989, 2014 WL 2854631, at *1 (S.D.N.Y. June 20, 2014); *see also Bailey v. U.S. Citizenship & Immigr. Serv.*, No. 13 Civ. 1064, 2014 WL 2855041, at *1 (S.D.N.Y. June 20, 2014) ("[O]bjections that are not clearly aimed at particular findings in the [report and recommendation] do not trigger *de novo* review.").  In addition, "new arguments and factual assertions cannot properly be raised for the first time in objections to the

report and recommendation, and indeed may not be deemed objections at all." *Razzoli v. Fed. Bureau of Prisons*, No. 12 Civ. 3774, 2014 WL 2440771, at *5 (S.D.N.Y. May 30, 2014). The court may adopt those portions of the report and recommendation to which no objection is made "as long as no clear error is apparent from the face of the record." *Oquendo v. Colvin*, No. 12 Civ. 4527, 2014 WL 4160222, at *2 (S.D.N.Y. Aug. 19, 2014) (quotation marks and citation omitted).

II.     Respondent's Objections

    A.     AEDPA

Petitioner's claims are governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See* 28 U.S.C. § 2254. Under AEDPA, if a petitioner's claims were adjudicated on the merits in state court, a district court may grant relief only, as relevant here, when the state court's decision "was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000), or when it "was based on an unreasonable determination of the facts in light of evidence presented in the [s]tate court proceeding," 28 U.S.C. § 2254(d)(2); *see also Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022).

A state court decision is contrary to federal law if the state court reaches "a conclusion opposite to that reached by [the Supreme] Court on a question of law or if [it] decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. A federal court may overrule a state court decision as an "unreasonable application" of federal law under Section 2254(d)(1) only if the federal court finds the decision to be "objectively unreasonable." *Id.* at 409. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair[-]minded jurists could disagree

on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)

(quotation marks and citation omitted). And, when assessing whether a state court's

determination of facts is unreasonable, courts cannot grant relief if they determine that

"[r]easonable minds reviewing the record might disagree about the finding in question."

*Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (quotation marks and citation omitted).

Moreover, when reviewing a state court's determination that an error at trial was

harmless, a federal court can overturn a state court conviction only when the federal court finds

(1) that the error had a "'substantial and injurious effect or influence' on the verdict," *Brown*,

142 S. Ct. at 1523 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)), and (2) that the

state court's decision that the error was harmless was contrary to law or involved an

unreasonable determination of law or fact, *id*. at 1525, 1528. In sum, a court must decide

whether it "harbors grave doubt about the petitioner's verdict," and whether "every fair[-]minded

jurist would agree that an error was prejudicial." *Id*. at 1525.

## B.     Confrontation Clause Violation

Petitioner argues that the trial court erred by admitting Jacklitsch's crime scene reports

and diagram, as well as Brown's diagram based on Jacklitsch's materials, without producing

Jacklitsch for cross-examination, and that the Appellate Division's affirmance of this trial court

ruling was "contrary to" and constituted an "unreasonable application of" clearly established

Supreme Court precedent.[2] *See* Pet. Mem. at 22–48, ECF No. 4.

The R&R recommends finding that the Appellate Division's decision represented an

unreasonable application of clearly established federal law because the materials were

---

[2] Although Petitioner also appears to object to the admission of the photograph Jacklitsch took, his memorandum of law focuses entirely on the crime scene reports and diagrams, and, therefore, the R&R did not consider any arguments as they related to the photographs. *See* R&R at 52 n.18.

testimonial under the applicable Supreme Court precedent.  R&R at 53.  It determined that,
because these materials were created "in aid of a police investigation" and had an "evidentiary
purpose," R&R at 53 (quoting *Bullcoming v. New Mexico*, 564 U.S. 647, 664 (2011)), any
objective witness would "believe that [those documents] would be available for use at a later
trial" and would "expect that the statements contained therein would be used in a criminal
prosecution," *id*. at 54 (quoting *Crawford*, 541 U.S. at 52) (alteration in original).  The R&R also
found that the materials were formal, *id*. at 54–55, and that they tended to "prov[e] [a] fact
necessary for [Petitioner's] conviction," *id*. at 55 (quoting *Melendez-Diaz v. Massachusetts*, 557
U.S. 305, 313 (2009)), both of which suggest that they were testimonial.  The R&R's findings
relied heavily on the Second Circuit's recent decision in *Garlick v. Lee*, 1 F.4th 122 (2d Cir.
2021), *cert. denied*, 142 S. Ct. 1189 (2022), which granted a habeas petition based on a state
court erroneously deciding that an autopsy report was not testimonial.

   In his objections, Respondent argued that the R&R erred because it (1) "mistakenly
believed that Supreme Court precedent addressing the intersection of the Confrontation Clause
and forensic reports was settled in 2017," and (2) incorrectly determined that the Appellate
Division relied on *People v. Freycinet*, 11 N.Y.3d 38 (2008), a New York Court of Appeals case
decided before *Melendez-Diaz* and *Bullcoming*, when it actually relied on *People v. John*, 27
N.Y.3d 294 (2016), a Court of Appeals case decided after those cases and *Williams v. Illinois*,
567 U.S. 50 (2012), the last Supreme Court case relevant to the analysis of the Confrontation
Clause issue.  Resp. Obj. at 2–8.  Respondent's objections also criticized the R&R's reliance on
*Garlick*, referring to the Second Circuit's "flawed reasoning" in that case.  *Id*. at 4–6.

Under the relevant Supreme Court precedent,[3] statements are considered testimonial if they are "extrajudicial statements contained in formalized testimonial material, such as affidavits, depositions, prior testimony, or confessions," or are "made under circumstances which would lead an objective witness reasonably to believe that the statements would be available for use at a later trial." *Garlick*, 1 F.4th at 129 (quoting *Crawford*, 541 U.S. at 51–52). The Supreme Court has also explained that statements are more likely to be testimonial when they are "made for the purpose of establishing or proving some fact," *id.* at 130 (quoting *Melendez-Diaz*, 557 U.S. at 310 (quotation marks omitted)), or are formal documents made in the context of a criminal investigation, *id.* at 131 (quoting *Bullcoming*, 564 U.S. at 664–65). And, it has specifically rejected the argument that documents are testimonial only when they "directly accuse" someone of wrongdoing, and explained that "even statements which result from purportedly 'neutral scientific testing' must be subject to cross-examination because such tests are not necessarily 'as neutral or as reliable' as advertised and are not 'uniquely immune from the risk of manipulation.'" *Id.* at 130 (quoting *Melendez-Diaz*, 557 U.S. at 313, 318); *see also id.* at 132 (explaining that, in *Bullcoming* and *Melendez-Diaz*, the Supreme Court "rejected the argument that forensic reports that are purely observational and that do not accuse the defendant of wrongdoing are nontestimonial and therefore not subject to confrontation").

The Court agrees with the R&R that the trial court erred in admitting the challenged exhibits, and that the Appellate Division's assessment of this issue was an unreasonable application of established Supreme Court precedent. The Appellate Division rejected Petitioner's Confrontation Clause challenge because it determined that the "crime scene evidence

---

[3] Like the Second Circuit in *Garlick*, this Court concludes that the plurality opinion in *Williams*, "does not . . . yield a single, useful holding relevant to the case before us." *Garlick*, 1 F.4th at 133 (citation omitted) (alteration in original).

that defendant claims was admitted in violation of his right of confrontation was not testimonial,
since it [did] not link the commission of the crime to a particular person." *Diaz*, 151 A.D.3d at
502–03 (quotation marks and citation omitted) (alteration in original).  As the Second Circuit
found when reviewing identical reasoning in *Garlick*, "[t]his conclusion contradicts clearly
established Supreme Court precedent," *Garlick*, 1 F.4th at 136 (discussing *People v. Garlick*, 144
A.D.3d 605, 606 (2016)), because it ignored Supreme Court cases rejecting this position, *id*.
(quoting *Melendez-Diaz*, 557 U.S. at 313–14) (alteration in original).

The Court also finds that the R&R correctly identified that the exhibits were testimonial.
Like the autopsy report at issue in *Garlick*, the crime scene documents were made "in aid of an
active police investigation," and were clearly intended for use in a future trial, as they catalogued
evidence of a shooting that occurred only two hours earlier, listed the crimes under investigation,
and even indicated that a specific piece of evidence was of probative value.  *See id*. at 134; *see
also* R&R at 53–54.  Moreover, the documents were similarly formalized, *see Garlick*, 1 F.4th at
134, in that they contained a unique identifying number, Jacklitsch's shield number, and, on
some pages, an official NYPD seal, R&R at 54–55.  Finally, this evidence was used to support
the prosecution's theory of the case because it corroborated witness testimony about the location
of the shooter.  *See Garlick*, 1 F.4th at 134–35; R&R at 55–56.  Although Respondent
characterizes the R&R's assessment as improperly "cobbl[ing] together a rule from legal
principles articulated in *Melendez-Diaz* and *Bullcoming*," Resp. Obj. at 6, its approach mirrored
that taken by the Second Circuit in *Garlick*, and the Court rejects Respondent's contention that
*Garlick*'s reasoning was flawed.

Moreover, the Court is not persuaded that the R&R's analysis should be rejected because
it characterized the Appellate Division's analysis as resting on *Freycinet* instead of *John*.  Resp.

Obj. at 7–8.  First, the Appellate Division cited both *John* and *Freycinet* for the proposition that statements are testimonial only if they "link the commission of the crime to a particular person." *Diaz*, 151 A.D.3d at 503 (citing *John*, 27 N.Y.3d at 315 and *Freycinet*, 11 N.Y.3d at 42).  And, *John* clearly states that it is "not retreating from [the Court of Appeals'] prior decision[]" in *Freycinet*.  *John*, 27 N.Y.3d at 315.  Thus, the Court does not consider the R&R's characterization an error.  Additionally, even if the R&R did err in its assessment of the Appellate Division's decision, the Court does not find that this error calls into question the R&R's determination that the Appellate Division's conclusion represented an unreasonable application of Supreme Court precedent.

Accordingly, the Court ADOPTS the portion of the R&R that concludes that the Appellate Division's finding that Petitioner's Confrontation Clause rights were not violated is an unreasonable application of Supreme Court precedent.

C.  Harmless Error

Petitioner contends that the Appellate Division's finding that the admission of the challenged documents was harmless is objectively unreasonable because "no other evidence connected [him] to the fatal bullet."  Pet. Mem. at 42.

When assessing this question, the R&R determined that the admission of the documents was not harmless because, in light of the other evidence presented, "establishing—through ballistic evidence—the location of the shooter who killed Santiago, and what kind of gun he fired, were critical to the prosecution's case," and "this information appears to have come only from the crime scene report, the diagrams, and the testimony of [detectives] . . . who[] admittedly relied on . . . Jacklitsch's findings."  R&R at 61.  Respondent objects to the R&R's analysis on the ground that the R&R applied the wrong standard when considering whether any

Confrontation Clause violation was a harmless error and drew improper conclusions with respect to the importance of the challenged documents. Resp. Obj. at 8–15.

As discussed above, the Supreme Court has recently clarified that federal courts reviewing state court harmless error determinations can grant relief only if they determine (1) that the error had a "'substantial and injurious effect or influence' on the verdict," *Brown*, 142 S. Ct. at 1523 (quoting *Brecht*, 507 U.S. at 637), and (2) that the state court's determination was contrary to law or involved an unreasonable determination of law or fact, *id*. at 1525. But, as Respondent notes, rather than apply either of these standards, the R&R engaged in a *de novo* review of the evidence in Petitioner's case and determined, based on this review, that the error was not harmless. The Court, therefore, finds that the R&R erred in its assessment of the Appellate Division's harmless error finding, and shall conduct its own assessment.

Even assuming, *arguendo*, that the admission of the documents had a "substantial and injurious effect or influence" upon the verdict, *Brecht*, 507 U.S. at 637, the Appellate Division's finding otherwise does not constitute an unreasonable determination of law or fact, *see Brown*, 142 S. Ct. at 1525. In reaching its conclusion, the Appellate Division properly applied the New York Court of Appeals' articulation of the Supreme Court's holding and found that there was "no reasonable possibility that this evidence affected the verdict." *Diaz*, 151 A.D.3d at 503 (citing *People v. Crimmins*, 36 N.Y.2d 230, 237 (1975) (finding that errors are considered harmless only when "there is no reasonable possibility that the error might have contributed to defendant's conviction and that it was thus harmless beyond a reasonable doubt")); *Chapman v. California*, 386 U.S. 18, 24 (1967) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.").

And, although reasonable minds could disagree about the weight of the evidence supporting Petitioner's guilt, the Court does not find that "every fair[-]minded jurist would agree that [the] error was prejudicial." *Brown*, 142 S. Ct. at 1525 (emphasis omitted). Multiple eyewitnesses named Petitioner as a shooter and placed him, Santiago, and the other shooting participants in locations that logically connect Petitioner's shooting to Santiago's death. *See* Trial Tr. II at 252, 260–63, 266–67, 269, 270, 273; Trial Tr. III at 509, 516–17; Trial Tr. IV at 521, 534, 591, 595–96, 710. Surveillance video footage also shows someone who appeared to be Petitioner passing a gun to another person following the shooting. *See* Trial Tr. III at 513–14. Even though the Court may not have found the admission of the documents to be harmless in light of the apparent contradictions and inconsistencies in some of the eyewitnesses' testimony and the prosecution's seeming reliance on the documents, the Court recognizes that a reasonable jurist may have reached that determination. Accordingly, the Court REJECTS the R&R with respect to its analysis of the Appellate Division's harmless error finding and DENIES the petition.

## III.    Certificate of Appealability

A petitioner may appeal the denial of a § 2254 application only if the district court or the court of appeals issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c). To obtain a COA, a petitioner must "show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quotation marks, alterations, and citation omitted). Petitioner requested that the Court issue a COA if it did not adopt the R&R's recommendation that his petition be granted. Pet. Res. at 10. Because the Court finds that reasonable jurists could debate

whether the Appellate Division's harmless error finding was unreasonable, Petitioner is entitled to a COA.

Accordingly, Petitioner's request for a COA is GRANTED.

## CONCLUSION

The Court has reviewed *de novo* those portions of the R&R to which Respondent specifically objects and has reviewed the remainder of the R&R for clear error.[4] For the reasons stated above, the Court ADOPTS the R&R with respect to its analysis of the Confrontation Clause violation, and REJECTS the R&R with respect to its analysis of the harmless error issue. Petitioner's application for a writ of habeas corpus under § 2254 is DENIED and his request for a COA is GRANTED.

The Clerk of Court is directed to close the case.

SO ORDERED.

Dated: August 16, 2022
New York, New York

_____
ANALISA TORRES
United States District Judge

---

[4] To the extent not discussed above, the Court finds the unchallenged portions of the R&R to be free of clear error.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JOSEPH DIAZ, Petitioner
_____

_____
(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

SUPERINTENDENT EARL BELL, Respondent
_____

_____
(List the full name(s) of the defendant(s)/respondent(s).)

__18_ CV _10121_ ( AT )( DF )

**NOTICE OF APPEAL**

Notice is hereby given that the following parties:

Petitioner Joseph Diaz
_____

_____

_____
(list the names of all parties who are filing an appeal)

in the above-named case appeal to the United States Court of Appeals for the Second Circuit

from the ☐ judgment ☒ order entered on:     August 16, 2022

                                        (date that judgment or order was entered on docket)

that:    denied his petition, pursuant to 28 U.S.C. Sec. 2254, for a writ of habeas corpus
_____

_____
(If the appeal is from an order, provide a brief description above of the decision in the order.)

August 23, 2022
_____
Dated

_____
Signature*

Skolnick, Katharine, R (KS-1123), Attorney for Petitioner, Center for Appellate Litigation
_____
Name (Last, First, MI)

120 Wall Street, 28th Fl., New York, NY 10005
_____
Address            City            State            Zip Code

212-577-2523 x 501
_____
Telephone Number

kskolnick@cfal.org
_____
E-mail Address (if available)

_____

* Each party filing the appeal must date and sign the Notice of Appeal and provide his or her mailing address and telephone number, EXCEPT that a signer of a pro se notice of appeal may sign for his or her spouse and minor children if they are parties to the case. Fed. R. App. P. 3(c)(2). Attach additional sheets of paper as necessary.

Rev. 12/23/13

*To be argued by*
**RACHEL T. GOLDBERG**

# New York Supreme Court

## Appellate Division -- First Department

**THE PEOPLE OF THE STATE OF NEW YORK**,

Respondent,

- against -

Bronx County
Ind. No. 3971/09

**JOSEPH DIAZ**,

Defendant-Appellant.

## BRIEF FOR DEFENDANT-APPELLANT

**ROBERT S. DEAN**
**Attorney for Defendant-Appellant**
**Center for Appellate Litigation**
**120 Wall Street, 28th Floor**
**New York, NY 10005**
**rgoldberg@cfal.org**
**Phone: (212) 577-2523 ext. 529**
**Fax: (212) 577-2523**

**RACHEL T. GOLDBERG**
*Of Counsel*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

QUESTIONS PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    The People's Case at Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        Jason Irrizary is slashed and issues a threat. . . . . . . . . . . . . . . . . . . 6

        The shooting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            Orlando Soto's account. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            Michael Jones's account. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

               Defense counsel opens the door to Jones's otherwise
               inadmissible photo identification. . . . . . . . . . . . . . . 13

            Latroy Ewell's account. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            Susana Castro's account. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

               Over objection, the court admits testimony that, after
               talking to Castro and Irrizary, police did not arrest
               Irrizary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

            Jason Irrizary's account. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

            The police investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

i

Even though the crime scene detective did not testify, the court allows the prosecutor to admit his diagram, photographs, and crime scene report; and a duplicate diagram copied by the testifying detective. . . . . . . . . . 23

Defense Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Summations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Verdict. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Sentencing.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

POINT I
THE VERDICT CONVICTING APPELLANT OF FIRST-DEGREE MANSLAUGHTER WAS AGAINST THE WEIGHT OF THE EVIDENCE WHERE NO PHYSICAL EVIDENCE TIED APPELLANT TO THE CRIME, ONE OF THE EYEWITNESSES IDENTIFIED SOMEONE ELSE AS THE SHOOTER, TWO EYEWITNESSES DID NOT IDENTIFY APPELLANT, AND THE TWO WHO DID OFFERED PROBLEMATIC IDENTIFICATIONS. U.S. CONST. AMEND. XIV; N.Y. CONST. ART. 1 § 6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

POINT II
THE TRIAL COURT ERRED IN ADMITTING THE NONTESTIFYING CRIME SCENE DETECTIVE'S CRIME SCENE REPORT, PHOTOGRAPHS, AND DIAGRAM, AS WELL AS THE TESTIFYING DETECTIVE'S DUPLICATE DIAGRAM, VIOLATING APPELLANT'S STATE AND FEDERAL CONFRONTATION RIGHTS. U.S. CONST. AMENDS. VI, XIV; N.Y. CONST. ART. I, § 6. . . . . . . . . . . . . . . . 45

POINT III
APPELLANT WAS DEPRIVED OF A FAIR TRIAL WHEN THE COURT PERMITTED THE PROSECUTION TO ELICIT HEARSAY EVIDENCE THAT POLICE DID NOT BELIEVE A PROSECUTION EYEWITNESS'S EXCULPATORY

ii

IDENTIFICATION. U.S. CONST. AMEND. XIV; N.Y. CONST. ART. I, § 6.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

A. The testimony constituted inadmissible, inferential hearsay evidence implying that police disbelieved Castro. . . . . . . . . . . . . . . 60

B. The improper opinion testimony usurped the jury's fact-finding role. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

POINT IV
APPELLANT WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY ACCIDENTALLY OPENED THE DOOR TO THE ADMISSION OF IDENTIFICATION EVIDENCE THE JURY WOULD NOT OTHERWISE HAVE HEARD. U.S. CONST. AMENDS. VI, XIV; N.Y. CONST. ART. 1, § 6. . . . . . . 68

POINT V
APPELLANT WAS DENIED A FAIR TRIAL WHERE THE COURT IMPROPERLY REQUIRED A WITNESS TO INCRIMINATE HIMSELF ON AN OPEN CRIMINAL MATTER AND PLACED SIGNIFICANT RESTRICTIONS ON APPELLANT'S ABILITY TO QUESTION THAT WITNESS. U.S. CONST. AMENDS. VI, XIV; N.Y. CONST. ART. I, §6.. . . 74

POINT VI
APPELLANT'S 25-YEAR SENTENCE, THE MAXIMUM PERMITTED, IS UNDULY HARSH.. . . . . . . . . . . . . . . . . . . . . . 89

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

STATEMENT PURSUANT TO RULE 5531. . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

PRINTING SPECIFICATIONS STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . A-2

iii

TABLE OF AUTHORITIES

FEDERAL CASES

Bagby v. Kuhlman, 932 F.2d 131 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Berger v. California, 393 U.S. 314 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Bullcoming v. New Mexico, 564 U.S. 647 (2011). . . . . . . . . . . . . . 46, 47, 49, 50, 51

United States v. Cardillo, 316 F.2d 606 (2d Cir. 1963). . . . . . . . . . . . . . . . . . . . . 84

Chapman v. California, 386 U.S. 18 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Chambers v. Mississippi, 410 U.S. 284 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Crawford v. Washington, 541 U.S. 36 (2004). . . . . . . . . . . . . . . . . . . . . . . . passim

Davis v. Alaska, 415 U.S. 308 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Klein v. Harris, 667 F.2d 274 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Mason v. Scully, 16 F.3d 38 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009). . . . . . . . . . . . . 47, 49, 51, 55

Mitchell v. United States, 526 U.S. 314 (1999). . . . . . . . . . . . . . . . . . . . . . . . 80, 86

Strickland v. Washington, 466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . . . . . 69, 89

NEW YORK STATE CASES

National States Elec. Corporation v. LFO Construction Corporation, 203 A.D.2d
     49 (1st Dept. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

People v. Baldi, 54 N.Y.2d 137 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 89

People v. Barnes, 70 A.D.2d 882 (2d Dept. 1979). . . . . . . . . . . . . . . . . . . . . . . . . 70

iv

People v. Barone, 101 A.D.3d 585 (1st Dept. 2012)......................... 90

People v. Bleakley, 69 N.Y.2d 490 (1987)............................... 38

People v. Brensic, 70 N.Y.2d 9 (1987)................................. 60

People v. Brown, 13 N.Y.3d 332 (2009)..................... 48, 51, 52, 91

People v. Cantave, 21 N.Y.3d 374 (2013)..................... 75, 80, 87, 88

People v. Caserta, 19 N.Y.2d 18 (1966)................................. 70

People v. Chin, 67 N.Y.2d 22 (1986)............................... passim

People v. Christman, 23 N.Y.2d 429 (1969)............................. 69

People v. Ciaccio, 47 N.Y.2d 431 (1979)............................... 64

People v. Colon, 133 A.D.3d 532 (1st Dept. 2015)....................... 91

People v. Cowell, 170 A.D.2d 343 (1st Dept. 1991)...................... 92

People v. Crimmins, 36 N.Y.2d 230 (1975)............................. 57

People v. Cyrus, 48 A.D.3d 150 (1st Dept. 2007)........................ 73

People v. Danielson, 9 N.Y.3d 342 (2007)............................. 38

People v. Delgado, 80 N.Y.2d 780 (1992)........................... 90, 91

People v. Droz, 39 N.Y.2d 457 (1976)................................. 69

People v. Echavarria, 167 A.D.2d 138 (1st Dept. 1990).................. 70

People v. Edwards, 37 A.D.3d 289 (1st Dept. 2007)..................... 90

People v. Finch, 23 N.Y.3d 408 (2014)................................. 88

People v. Foy, 32 N.Y.2d 473 (1973)................................. 86

v

People v. Garcia, 25 N.Y.3d 77 (2015)................................. 60, 62

People v. Grant, 161 A.D.2d 664 (2d Dept. 1990). ........................ 70

People v. Hewitt, 95 A.D.3d 1358 (2d Dept. 2012)......................... 70

People v. Hobot, 84 N.Y.2d 1021 (1995).................................. 69

People v. Huertas, 75 N.Y.2d 487 (1990)................................. 60

People v. Inoa, 25 N.Y.3d 466 (2015). .................................. 64

People v. Jackson, 25 A. D.3d (2d Dept. 2006)........................... 74

People v. John, 27 N.Y.3d 294 (2016). ...................... 47, 50, 51, 52, 54

People v. Kennedy, 68 N.Y.2d 569 (1986)................................. 57

People v. Lindsay, 42 N.Y.2d 9 (1977)................................... 69

People v. Maher, 89 N.Y.2d 456 (1997).................................. 61

People v. Marshall, 106 A.D.3d 1 (1st Dept. 2013)........................ 38

People v. McArthur, 101 A.D.3d 752 (2d Dept. 2012). ..................... 73

People v. McLeod, 122 A.D.3d 16 (1st Dept. 2014). .............. 82, 85, 86, 87

People v. Mehmood, 112 A.D.3d 850 (2d Dept. 2013)....................... 72

People v. Melendez, 55 N.Y.2d 445 (1982). .............................. 73

People v. Morales, 104 A.D.3d 560 (1st Dept. 2013). ..................... 91

People v. Morris, 21 N.Y.3d 588 (2013)................................. 62, 67

People v. Mosley, 296 A.D.2d 595 (3d Dept. 2002). ...................... 70

vi

People v. Nieves, 67 N.Y.2d 125 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 61

People v. Notey, 72 A.D.2d 279 (2d Dept. 1980). . . . . . . . . . . . . . . . . . . . . . . 90

People v. Pabon, 28 N.Y.3d 147 (2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

People v. Pacer, 27 N.Y.2d 47 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

People v. Page, 63 A.D.3d 506 (1st Dept. 2009). . . . . . . . . . . . . . . . . . . . . . . . 91

People v. Pennington, 27 A.D.3d 269 (1st Dept. 2006). . . . . . . . . . . . . . . . . . . 71

People v. Polenca, 204 A.D.2d 911 (3d Dept. 1994). . . . . . . . . . . . . . . . . . . . . 70

People v. Resek, 3 N.Y.3d 385 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

People v. Rivera, 96 N.Y.2d 749 (2001 ). . . . . . . . . . . . . . . . . . . . . . . . 62, 63, 67

People v. Rosenthal, 305 A.D.2d 327 (1st Dept. 2003). . . . . . . . . . . . . . . . . . . 90

People v. Santana, 191 A.D.2d 174 (1st Dept. 1994). . . . . . . . . . . . . . . . . . . . 70

People v. Shinebarger, 110 A.D.3d 1478 (4th Dept. 2013). . . . . . . . . . . . . . . . 60

People v. Siegel, 87 N.Y.2d 536 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . 84, 87

People v. Wilson, 195 A.D.2d 493 (2d Dept. 1993). . . . . . . . . . . . . . . . . . . . . . 74

People v. Zaborski, 59 N.Y.2d 863 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

## FEDERAL STATUTES

U.S. Const. Amend. XIV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

U.S. Const. Amend. VI,. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

vii

## NEW YORK STATE STATUTES

C.P.L. § 470.05................................................... 59, 67, 88

C.P.L. § 470.15..................................................... 38, 90

C.P.L. § 470.20(5)...................................................... 38

Penal Law § 70.06(6)................................................... 90

Penal Law § 125.20(1)................................................... 1

N.Y. Const. Art. I, § 6........................................... passim

viii

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: FIRST DEPARTMENT
-----------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,  :

                    Respondent,  :

                    -against-  :

JOSEPH DIAZ,  :

                    Defendant-Appellant.  :
-----------------------------------------------------------------------x

## PRELIMINARY STATEMENT

This is an appeal from a judgment of the Supreme Court, Bronx County, rendered December 10, 2014, convicting appellant Joseph Diaz, after trial, of first-degree manslaughter (Penal Law § 125.20(1)), and sentencing him, as a second felony offender, to 25 years' imprisonment, to be followed by five years' post-release supervision (Newman, J., at trial and sentence).

Timely notice of appeal was filed. On February 26, 2015, this Court granted Diaz leave to appeal as a poor person on the original record and typewritten briefs, and assigned Robert S. Dean, Center for Appellate Litigation, as counsel.

No application for a stay of execution has been made, and Diaz is currently confined pursuant to the judgment. Diaz was not tried with his co-defendants, Robert Vargas and Latroy Ewell, both of whom pleaded guilty.[1] Only Diaz is a

---

[1] Ewell testified against Diaz. He pleaded to second-degree criminal possession of a
(continued...)

party to this appeal.

## QUESTIONS PRESENTED

1. Whether the verdict convicting appellant of first-degree manslaughter was against the weight of the evidence where no physical evidence tied appellant to the crime, one of the eyewitnesses identified someone else as the shooter, two eyewitnesses did not identify appellant, and the two who did offered problematic identifications.

2. Whether the court erred in admitting the nontestifying crime scene detective's crime scene report, photographs, and diagram, as well as the testifying detective's duplicate diagram, violating appellant's state and federal confrontation rights.

3. Whether appellant was deprived of a fair trial when the court permitted the prosecution to elicit hearsay evidence that police did not believe a prosecution eyewitness's exculpatory identification.

4. Whether appellant was denied his right to the effective assistance of counsel when his attorney accidentally opened the door to the admission of identification evidence the jury would not otherwise have heard.

5. Whether appellant was denied a fair trial where the court improperly required a witness to incriminate himself on an open criminal matter and placed significant restrictions on appellant's ability to question that witness.

---

[1](...continued)
weapon and was sentenced to ten years' incarceration, plus five years' post-release supervision. Vargas pleaded to second-degree criminal possession of a weapon and was sentenced to six years' incarceration, plus five years' post-release supervision.

2

6. Whether appellant's 25-year sentence, the maximum permitted, is excessive.

## INTRODUCTION

Aisha Santiago was shot and killed outside of her apartment building at 3:20pm on September 22, 2009, the innocent victim of a gun battle that took place on East 146th Street in the Bronx. The shootout was the culmination of rising tensions between Jason Irrizary—the nephew of "Red," a "loanshark" in the neighborhood—and Robert Vargas, the son of Barbara Lopez, a woman who owed Red money. The day of the shooting, Red brought Irrizary to the area to confront Lopez and her family. Irrizary's verbal threats soon escalated into a physical brawl in which Irrizary was slashed on the hand. He left to tend to his wound, but not before issuing a threat to "clear the fucking block because I'm coming back." And, 30 minutes later, he returned with a crew including his brother, stepbrother, and cousin. Moments later, a gun battle began. Someone from Irrizary's crew fired shots towards Lopez's building; at least two people fired back. Santiago, who was standing east of the gunfight in front of her apartment building, was struck and killed by an errant bullet.

The prosecution alleged that appellant Joseph Diaz, who was only a casual acquaintance of Irrizary, fired the shot that struck Santiago. No forensic, surveillance, ballistics, or statement evidence tied Diaz to the crime. A bystander witness identified Irrizary, not Diaz, as the shooter. The only evidence against

3

Diaz was the problematic identification evidence of two eyewitnesses. First, Orlando Soto, who was friends with Irrizary's rivals, identified Diaz in a lineup but could not identify him at trial. Second, Michael Jones identified Diaz before and during trial, but offered inconsistent testimony about what unfolded during the chaotic scene. Under these circumstances, the verdict was against the weight of the evidence (see Point I).

Seeking to bolster its woefully deficient proof, the prosecution introduced reams of inadmissible evidence. Most disturbingly, and over defense counsel's repeated protestations on confrontation grounds, the prosecutor was improperly permitted to introduce a nontestifying detective's crime scene reports, photographs, and diagram of where he recovered evidence at the scene (see Point II).

One of the eyewitnesses was Susana Castro, who identified Irrizary—not Diaz—as the shooter. Castro's exculpatory identification might have given the jurors reasonable doubt about Diaz, particularly because she testified for the prosecution. However, over objection, the court erroneously allowed the prosecutor to elicit inadmissible hearsay telling the jurors that the police had not credited Castro's account (see Point III).

The prosecutor was also erroneously allowed to question Latroy Ewell, who was initially Diaz's co-defendant, to testify about Ewell's role in the incident even

though the case against him was still open. Ewell had pleaded guilty to criminal possession of a weapon, but had not yet been sentenced, so the court's requirement that he testify was improper. The court forced Ewell to answer some questions, but placed prospective restrictions on defense counsel's ability to cross examine Ewell about his true role in the incident or about his motive to lie. Doing so, and denying counsel's reasonable request to strike Ewell's testimony or offer curative instructions, deprived Diaz of his constitutional right to confront witnesses against him (see Point IV).

It was not just the prosecution that introduced inadmissible and prejudicial evidence. Diaz's own attorney himself did the same when he accidentally opened the door to otherwise inadmissible testimony about Jones's photo identification. Counsel thus deprived Diaz of effective representation by bolstering the prosecution's most important eyewitness identification (see Point V), which otherwise would have suffered from the weaknesses discussed in Point I.

Finally, while the nature of the crime was tragic, the circumstances here did not warrant imposition of the maximum possible sentence (see Point VI).

STATEMENT OF FACTS

The People's Case at Trial[2]

Jason Irrizary is slashed and issues a threat

Elizabeth Thomas, also known as "Red," was a small-time "loanshark" who had lent money to Barbara Lopez (Jason Irrizary 421; Susana Castro 616-17).[3] On September 21, 2009, Red approached Lopez on the stoop of her apartment building at 409 East 146th Street between Willis and Brook Avenue to demand that Lopez repay her loan (Castro 616-17). In response, Lopez's teenaged son Robert Vargas threatened to "shoot [Red] in the face" (Irrizary 425, 429, 431; Castro 617-19). Red parted with the words, "Oh, you want to disrespect me. Okay." (Castro 620). She then reported the threat to her nephew Jason Irrizary (Irrizary 424).

The next afternoon, Irrizary, who lived a few blocks away, went with his brother Raul and cousin Manuel to see Red at East 146th Street and Willis Avenue. As they were talking to Red, they saw a young man they thought was Vargas, who had said he wanted to shoot Red in the face. Irrizary threatened this 16-year-old Hispanic man, "if anything happen[s] to my aunt there's going to be

---

[2] Appellant raises no legal issue with respect to the pretrial suppression hearing.

[3] Parenthetical citations to the trial minutes are preceded by the testifying witness's name, or by "P" if the citation is to general proceedings. Parenthetical citations to the sentencing minutes are preceded by "S".

problems" (Irrizary 433). The young man said he had nothing to do with Red, and Irrizary walked away (Irrizary 433-34).

It turned out that the person whom Irrizary thought was Vargas was actually "Gordo," another young man from the block (Irrizary 439).

A couple of minutes later, Red saw and confronted Lopez, because "it wasn't really about the money any more, it was about someone that disrespect[ed] her" (Irrizary 428). As Irrizary and his family walked down the block, he again passed Gordo, and this time—still believing that Gordo was Vargas—started a fight with Gordo by telling him to get out of his face (Irrizary 438-39).

The two began brawling, and Gordo sliced Irrizary on the hand with a knife (Irrizary 440-41, 453; Castro 661-62). At trial, Irrizary claimed that only he fought Gordo (Irrizary 429).

However, Gordo's friend <u>Latroy Ewell</u>, who witnessed the fight, said that Irrizary, Raul, and Manuel were <u>all</u> beating up Gordo (Ewell 587). Ewell tried to break up the fight while Red yelled at Irrizary that he was fighting Gordo, not Vargas (Irrizary 439, Ewell 588-89).

Susana Castro, who lived on the block, corroborated Ewell's account; she saw Irrizary and four other tall, slim Hispanic men fighting with Gordo (Castro 621-22). Three of the men wore white T-shirts and two wore black hooded sweatshirts (Castro 621-22).

7

After the men stopped brawling, Irrizary shouted a threat: "Clear the fucking block because I'm coming back" (Castro 620, 624, 662).

Irrizary, bleeding heavily, wrapped his hand inside the white T-shirt he was wearing, and returned home to clean his wound (Irrizary 441-42, 462). He denied seeing or talking to anybody but Red on the phone, and denied getting a weapon (Irrizary 443-44, 452).

<u>The shooting</u>

Irrizary, "angry" about getting slashed by Gordo, returned to the area of East 146th Street and Willis Avenue 15 to 30 minutes later (Irrizary 444-46). Irrizary claimed that he did not see any family members in the area, and went into the store on the northeast corner of Willis and East 146th Street to buy a water bottle (Irrizary 444-49). When he exited the store and started walking east down 146th Street, he once again encountered Gordo and Ewell (Irrizary 453-456). Ewell tried to convince Irrizary to make peace, but Irrizary refused (Irrizary 453-56; Ewell 589-91).

<u>Orlando Soto</u>, who was coming out of the laundromat at 420 East 146th Street, on the south side of the street, witnessed this argument from a car-length's distance (Soto 281-82). He saw that three or four people from the neighborhood—including his friends Ewell, Gordo, and another man named Fifty—were arguing with a group of four or five Hispanic men he did not

8

recognize (Soto 251-55, 257-59, 281, 285). He thought there might be a physical fight, so he stopped to watch the argument (Soto 255, 260, 286-87). Soto's friends faced west, towards Willis Avenue, and the other men faced east (Soto 285).

Soon after this third verbal dispute, in which Irrizary refused the peace offer, a gun fight broke out. Several eyewitnesses, whose accounts of the incident varied, testified at Diaz's trial.

### Orlando Soto's account

According to Soto, his friends began walking east down the north side of 146th Street towards Brook Avenue (Soto 287-88). Just then, he heard several gunshots. He saw one of the men from the group he did not know, standing on the sidewalk at the northeast corner of 146th and Willis, holding a large silver gun straight ahead, pointing east (Soto 262-64, 269, 289, 306). The man was Hispanic, and Soto was "sure" that he was wearing a red shirt and blue jeans (Soto 263, 294-95). He also wore a baseball cap. At trial, Soto said that the hat was red, but acknowledged that he was "not too sure" about the color (Soto 263, 294-95). He only had a "side view of a portion of his face" (Soto 290, 307).

Soto could not see the whole group of people on the corner, and could not be certain where the shooter was standing in relation to the others (Soto 262, 289-90). He heard return gunfire coming from 409 146th Street, and saw Ewell shooting "towards the group of strangers." Soto dropped to the ground (Soto 264,

9

267-68, 291). He heard "a lot of guns firing" from 409 146th Street (Soto 265,

293). Soto could not remember at trial what Ewell was wearing during the incident

(Soto 294-95). He "d[idn]t know" how many shots were fired (Soto 265, 266,

295).

On September 23, 2009, Soto viewed a lineup at the precinct (Soto 270). It

took him a "long time" to identify anybody, but he ultimately became confident

that the person in position two was the shooter (Soto 271-73, 276-78, 303). At

trial, Soto was shown photographs of the lineup and again said that the shooter

was in position two (274-75). Diaz was in lineup position two (Detective Bart

Snyder 710).

At trial, Soto did not identify Diaz (Soto 268, 274-77). He said that he

would not be able to identify the person with the silver gun because he was "not

good with faces after a certain amount of years" (Soto 268-69, 278). When asked

by defense counsel if he was also "not too good with faces" on September 22,

2009, Soto at first replied "yes," but then later said, "I don't know . . . . [W]hen

everything happened that day I was able to remember what happened and saw the

face, but now I don't" (Soto 295-96).

Michael Jones's account

A few minutes before the shooting started, Michael Jones, a self-described

"public figure . . . in the recording industry, entertainment," who had been

10

convicted of petit larceny in 2003 and 2008, had stopped his car outside the Papa Johns on the northwest corner of Willis and 146th street (Jones 505-506). He crossed the street to use an ATM, and as he crossed back to the Papa Johns, he brushed against a man in a red shirt (Jones 507). After buying pizza, he got into his car, and, just after he put on his seatbelt, heard two shots ring out near his car (Jones 508, 528-29, 535-36). He "laid [his] seat all the way back" to protect himself, but said that he was not nervous (Jones 508, 541).

As he leaned back all the way in his seat, he looked to the left and, with "a clear line of sight," saw the same man he had bumped into in the street, wearing a red shirt and holding the gun in front of him with his right hand (Jones 509-11, 529).

Jones at first claimed at trial that he saw this man "let[] off more shots," but later clarified that he never actually saw the man in the red shirt fire the gun, just hold the gun in front of him (Jones 509, 535). He testified that he heard eight to ten more shots while still in his car (Jones 511, 534). He then saw the man in the red shirt hand the gun to a man wearing a white T-shirt who in turn wrapped the gun in another white T-shirt; the men ran off in opposite directions (Jones 309-10). Jones testified in the Grand Jury that he believed the shooter was firing a .9 mm, and repeated this conclusion at trial (Jones 511, 541).

Jones said that, as he emerged from his car after the gunfire, the same man

11

in the red shirt—the shooter—ran right past him (Jones 511). Jones went into the Papa Johns, "threw" a baby and mother onto the floor, "dived" on top of the baby to protect it, and told someone from Papa Johns to call 911 (Jones 511). He heard more shots while inside the pizza shop, but did not know from which direction the shots were being fired (Jones 534, 547-548). He then came out of the pizza shop and saw the same man in the red shirt run past him again (Jones 516). He checked his car for bullet holes (534).

Jones testified that the man in the red shirt was Hispanic, wearing jeans, and had a scruffy "wolfing out" beard, with a "low haircut" (Jones 515, 526-27). He could tell that the shooter had a low haircut because he was not wearing a hat (Jones 527, 536). Asked four different times whether the man he saw shooting was wearing a hat, Jones was adamant that he was not (Jones 515, 517, 526-27). He testified in the Grand Jury that he was not sure whether the shooter was wearing a red shirt or a red sweatshirt (Jones 539).

Jones, who is 5'10", said that the man in the red shirt was a "little taller" than him (Jones 507-08, 526). Irrizary is 5'11" (Irrizary 437-38) and Diaz is 6'2" (Defense Exhibit A). Jones did not say anything about seeing a tattoo, but at the time of the incident, Diaz had a "fairly large" neck tattoo that said "Loyalty" (Snyder 707).

Police recovered surveillance video from a camera outside the Papa Johns,

and the prosecutor played it for Jones at trial (People's Exhibit 63; <u>Sergeant Daniel Pannisidi</u> 212-13). While watching the video, Jones claimed that he could see the shooter—wearing red—run by at two different points, once after the first series of shots, and once after the second series of shots (Jones 512-14). On cross-examination, Jones was forced to concede that at one point in the video, the person he identified as the shooter was not wearing a hat, and at another point, the supposed same person was wearing a hat (Jones 537, 539).

<u>Defense counsel opens the door to Jones's otherwise inadmissible photo identification</u>

At trial, Jones identified Diaz as the shooter (Jones 516, 521-22). He also said that he viewed a lineup in April 2010, and "immediately" recognized the shooter in position five (Jones 520-24).

On cross-examination, counsel attempted to impeach Jones with his October 1, 2009 Grand Jury testimony about Jones's lineup viewing. Counsel first asked Jones if he remembered viewing a lineup on September 27, 2009, and Jones responded that he could not remember (Jones 545). Defense counsel then asked Jones if he remembered being asked and answering the following during his Grand Jury testimony: "'Question: In what position was the person whom you recognized? Answer: He was the last gentleman on the right-hand corner.'" Jones did not remember that question or answer. Counsel then asked if Jones remembered being asked two questions in the Grand Jury about identifying the

13

shooter as being in position number six, which Jones recalled (Jones 545-46).

During the next recess, the prosecutor pointed out that defense counsel had erroneously asked Jones about a <u>photo array</u> shown to Jones on September 27, 2009, not the <u>lineup</u> conducted in April 2010 (P 549). The prosecutor argued that, by asking Jones about the photo array, defense counsel opened the door to that identification coming into evidence on the People's direct case, and that he needed to introduce the photo array to correct the mistaken assumption that Jones viewed a lineup on September 27 (P 549-51).

Defense counsel asserted that this was a "mistake", and that he had "thought" he was referring to Jones's Grand Jury testimony about the lineup, not the photo array (P 549-50). The prosecutor pointed out that this mistake was unreasonable, because his attorney was present at the lineup (P 551). He also provided the "lineup reports which list the date of the lineup. I put the array into evidence, which was the date of the array. I elicited testimony at the hearing on which the date, the lineup occurred. . . . [I]nnocent mistake maybe so [but] . . . . [t]hese items have been in [counsel's] possession for years" (P 551).

Defense counsel suggested that the parties enter a stipulation that Jones actually identified the person in position five in the lineup, not position six as his cross-examination implied (P 549). Counsel argued that his "honest mistake" could be "easily remedied" by "say[ing]" on cross-examination that he got the

dates mixed up, "and it was person number five that you selected and that I was in error" (P 558). He asked to be able to tell the jury that "I made a mistake" (P 558). The prosecutor noted that defense counsel "misstated the [Grand Jury] minutes entirely. The minutes say nothing about number five" (P 558).

The court found counsel had "opened the door" (P 558). It allowed the prosecutor to rehabilitate Jones by introducing the photo array, and issued a curative instruction explaining that the prosecution had not been permitted to do so on its direct case (P 559).

Thereafter, Jones testified that on September 27, 2009, he had identified the shooter as being in position six in a photo array, and the People introduced that photo array into evidence. While looking at the photo, Jones confirmed that it matched his earlier description of the shooter's facial hair, saying "that's what I call[ed] wolfing out" (Jones 567).

Over defense objection, Jones also testified that he told police, "as soon as [Detective Snyder] put the photos . . . in front of me it was right there, I said 'That's him right there, that's the shooter'" (Jones 565).

The People displayed the photo array again for investigating detective Snyder, who testified that Diaz was in position six (Snyder 713).

### Latroy Ewell's account

Ewell also testified against Diaz. He had been indicted for attempted

15

murder, but he pleaded guilty to possession of a weapon with the intent to use it

unlawfully. He testified that someone fired at him while he was standing in front

of his apartment building at 409 146th Street, but could not remember what he

saw at the corner of 146th Street and Willis Avenue (Ewell 592-93, 595-96).[4]

<u>Susana Castro's account</u>

Susana Castro also witnessed the shootout and identified <u>Irrizary</u>, not Diaz,

as the one firing from Willis and 146th Street. Castro was standing on the stoop

outside of 417 East 146th Street waiting for her son to come home from school,

and saw Irrizary and the four men who had been with him during the fight with

Gordo. Irrizary started shooting toward 409 East 146th Street, and Ewell and

Vargas fired back from that stoop (Castro 627-41, 663-671). Two of Irrizary's

friends wearing black hooded sweatshirts had guns as well, but Castro did not see

them fire (Castro 650, 673). Castro dove to the ground, and when she looked up,

she saw Irrizary shooting a bit further east, in front of building 413-415, still

shooting (Castro 643-47, 675-77). After the shooting stopped, the gunmen

scattered (Castro 650-54).

After the shooting, Castro viewed a photographic array and identified

Irrizary as the person shooting at 409 East 146th Street (Castro 655-66, 668-69;

People's Exhibit 70). She recognized Irrizary's face, and had no doubt in her mind

---

[4] The pertinent facts relating to the legal error occasioned by Ewell's testimony are set forth in Point V, <u>infra</u>.

16

that he was the one who was shooting (Castro 647, 673-74). In court, Castro continued to maintain that Irrizary, not Diaz, was the shooter (Castro 658).

<u>Over objection, the court admits testimony that, after talking to Castro and Irrizary, police did not arrest Irrizary</u>

During Detective Snyder's testimony, the prosecutor elicited that, in the course of canvassing for witnesses, he spoke to Castro (Snyder 691). After Snyder testified that he showed Castro a photo array with Irrizary in position one, and that soon after that he "spoke to Mr. Irrizary" and "took him back to the precinct" (Snyder 693), defense counsel asked to approach.

Defense counsel moved to preclude the prosecutor from asking whether Irrizary was initially arrested for the killing of Santiago but then let go; counsel argued that this would unfairly bolster the prosecution's theory that Diaz was the perpetrator, and it would undermine Castro's testimony that Irrizary was the perpetrator (P 694). Defense counsel argued that this information was "irrelevant" to any material issue, and that the point of this line of questioning would only be to show that the police "no longer believe[d] [Irrizary] was the shooter," and thus "dropped the charges against him" (P 695, 697). With this line of questioning, "in effect [Snyder]'s saying, we believe Castro was wrong" (P 695, 697). Doing so would take out of the hands of the jury the matter of deciding who was the perpetrator: "it's not what the detective believes, it's what the jury has to believe" (P 694, 695, 697). Counsel also objected that the information would be coming

17

from Snyder "in the form of hearsay because they are relying on . . . the conversation going on by the police and the district attorney's office" (P 695).

The prosecutor said that he was going to ask Snyder, "once he talks about speaking to Jason Irrizary, was Mr. Irrizary charged with the murder of Aisha Santiago after he was identified by Ms. Castro," but argued that his planned line of questioning did not qualify as impeachment because "impeaching a witness via cross-examination is different" than "making an argument to the jury" that a witness is unreliable (P 696).

The court acknowledged that it was important to preclude questions that would substitute police judgment for the jury's (P 697). "On the other hand," it noted, the jury was presented with Castro's testimony identifying Irrizary as the shooter, but "we are here with the <u>defendant</u> charged with murder" (P 698) (emphasis added). Because "the People have to be protected against ambiguity that creates an unfair inference that the police were in some way cavalier about what they did," the court allowed the prosecutor to question Snyder about the actions he took (P 698). The court specifically forbade eliciting that information by asking if the police took actions "based on what Irrizary said and based on what Castro said" (P 698).

Instead, the court told the prosecutor "you can ask him did you conduct an investigation and among the people you spoke to is Irrizary, Jason and Ms. Castro.

18

[Snyder will say] yeah. And at the conclusion of the investigation what official action did you take? [Snyder will say] I arrested the defendant" (P 699).

The prosecutor proceeded to ask several questions about the conversations Snyder had with Irrizary and Castro. He asked where Snyder first spoke to Irrizary, when he spoke to him, how long he spoke to him (Snyder 700). He also asked about Snyder's initial conversations with Castro, including when and where he spoke to her, and whether she made a statement (Snyder 701). The prosecutor followed up by asking the precise question the court precluded him from asking: "And based upon the conversations with Ms. Castro and the statement made by Jason Irrizary, was Jason Irrizary arrested and charged with the murder of Aisha Santiago?" (Snyder 701). Counsel immediately objected, and, at the bench, asked for a mistrial, "for all of the reasons stated before," plus the fact that the prosecutor asked if Irrizary was arrested for this crime, "which is specifically what you said not to do" (P 701-02). Counsel argued that this line of questioning told the jury that "based on their investigation [police] decided not even to arrest Jason Irrizary and it's putting their belief above what the jury is supposed to decide" (P 702).

The prosecutor claimed that he "misheard" the court, and that he thought "that's the exact question I thought I could ask. . . . I didn't say what anyone said or anyone's opinion. Was he arrested for this based on the investigation at this

19

time" (P 702). The court denied the mistrial (P 701).

The prosecutor then asked, "Based on the investigation, at this date, at this time . . . was Irrizary arrested for the murder of Aisha Santiago?" (P 703). Over defense counsel's objection, Snyder answered, "no" (P 703).

### Jason Irrizary's account

Irrizary claimed that he had nothing to do with the shooting. He testified that, after the final verbal dispute with Gordo and his friends, he suddenly heard an unspecified number of gunshots, but could not tell from what direction they came (Irrizary 456-57). He ran between cars, and could not recall how many—if any—more gunshots he heard (Irrizary 457-62). Irrizary claimed that while he was running down East 146th Street, crossing Willis, running east toward Third Avenue and eventually to his apartment, he did not see any person on the sidewalk, only cars driving by (Irrizary 462-64). At some point while he was running, somebody pointed out to him that a person had been shot; he "turned around" and saw his stepbrother, Anthony Pena Guzman, lying on the ground in front of a bodega on the corner of Willis and 146th, shot in the leg (Irrizary 463-67).

Irrizary denied seeing himself on the surveillance video (Irrizary 472-73).[5]

---

[5] Outside the presence of the jury, the prosecutor expressed his intention to impeach Irrizary with several prior inconsistent statements. Specifically, he sought to ask Irrizary about a statement he made to police in which he acknowledged seeing his brother Pena at home when

(continued...)

Irrizary said that his stepbrother Pena was friends with Diaz, but that he himself knew Diaz only casually (Irrizary 467-71). Despite not being friends, Irrizary visited Diaz in jail awaiting trial and put money in his commissary as a "favor" to Pena (Irrizary 496-500).[6]

The police investigation

Aisha Santiago, standing in front of her building at 445 East 146th Street, was struck in the chest during the gunfight. Anthony Flores, Santiago's nine year-old son, stood on the top steps of the building while his mother stood in the middle of the sidewalk, facing building 445, talking to a friend. Flores heard two shots and looked towards Willis Avenue, where he saw people scattering (Flores 748-49, 759-62). He turned back to look at his mother and saw she had been shot (Flores 758-59).

Officer Ronald Juan, the first to arrive, saw "a lot of people . . . running all different kinds of directions. People yelling, screaming" (Juan 229). Soto, too,

---

[5](...continued)
Irrizary went back to wash his wound, and that he thereafter walked back to Willis and 146th Street with Pena and several other men, including "Izzy" and a man whose name started with the letter "K" (P 483-85). Irrizary also told police that Pena had urged Irrizary to come out of the store when he was inside buying water (P 485). This conflicted with Irrizary's trial testimony, in which he claimed that he did not speak to anybody when he returned home to tend to his wound, that he returned to the scene of the knife fight alone, and that he hadn't seen Pena until someone noted he was shot (P 484-486). The court refused to allow the prosecutor to impeach his own witness on collateral matters (P 486-89).

[6] According to the pretrial hearing, Diaz became a suspect because Pena named him as the shooter during police questioning at the hospital the night of the incident. See Hearing Minutes, Vol. I, at 138-40.

noticed "a lot" of people screaming and running toward Brook Avenue (Soto 266-67). Five minutes after the shooting, at 3:25, there were over 30 people milling around the northeast corner of Willis Avenue and 146th Street (Detective Kathleen Evelly 413-14). Juan called for an ambulance and began securing the crime scene by ordering people away from the area (Juan 228-29).

Police saw Irrizary, wearing a bloody white T-shirt, standing over his injured stepbrother (Brandon Chin 381; Evelly 406).

When the paramedics arrived, Santiago had already died, killed by a bullet that passed through her chest (Sebastian Williams 49, 52).

The medical examiner who performed Santiago's autopsy said that it was impossible to determine what kind of bullet killed Santiago (Dr. Margaret Prial 798-800). She concluded that person who fired the fatal shot could have been anywhere from 10 to over 100 feet away, but could not determine where he was standing or from what direction the bullet came (Prial 798-803, 806).

Although police cars and at least 20 officers arrived at the scene, Soto did not tell any of them that he saw the shooting, nor did he mention his observations to police for the next nine hours while milling around and watching them work the scene (Soto 297-300).

That evening, when Detective O'Neil was canvassing his apartment building, Soto finally mentioned to authorities that he witnessed the incident (Soto

270). The only specific characteristic Soto mentioned about the shooter was that

he wore a "red shirt" (Soto 304-05).

> Even though the crime scene detective did not testify, the
> court allows the prosecutor to admit his diagram,
> photographs, and crime scene report; and a duplicate diagram
> copied by the testifying detective

Juan, the first officer on the scene, vouchered the ballistics evidence but did

not recover any evidence himself (Juan 245-46).

Instead, Crime Scene Unit Detective Glenn Jacklitsch arrived two hours

later to process the scene and collect evidence (Brown 192-93). He prepared the

crime scene reports, took photographs, and created a diagram depicting where he

collected evidence at the scene. According to the prosecutor, Jacklitsch was

"retired" at the time of Diaz's trial, so the prosecutor called Detective Paul Brown,

also a member of the Crime Scene Unit, to testify in his stead (Brown 59-60; P 6).

Brown was not assigned to this investigation, but was merely called to

testify on Jacklitsch's behalf. He began by giving an overview of the required

training for a crime scene investigator, and explained that processing a crime scene

requires a crime scene investigator to follow special step-by-step "protocol[s]"

(Brown 57-63).

Brown said that "all of [the] information in this case c[a]me from

Jacklitsch's reports" (Brown 59-60, 125). Brown had prepared for Diaz's trial by

reviewing Jacklitsch's notes and reports, and by speaking with the prosecutor

23

(Brown 64-65). He visited the crime scene three weeks before trial—five years after the crime—to get a "feel of the location" so he would "feel comfortable testifying" (Brown 65-66, 70). He did not take any notes or photographs (Brown 70).

During Brown's testimony, the prosecutor sought to introduce several exhibits as business records: photographs Jacklitsch took of the crime scene (Exhibits 1-56); Jacklitsch's crime scene reports (Exhibit 57), which Brown characterized as "combination of the reports that was generated by the [sic] Detective Jacklitsch in regards to this investigation" (Brown 66-67); a diagram Jacklitsch prepared of the crime scene and where he found each piece of evidence (Exhibit 62); and a diagram Brown created (Exhibit 58A) that was meant to "duplicate" Jacklitsch's diagram (Brown 107).[7]

Brown testified that Jacklitsch created the diagram, reports, and photos while working for the NYPD, he was under a duty to accurately record the information in the reports, protocol dictated that officers generate reports contemporaneously with crime scene processing, and Jacklitsch was a custodian of the records (Brown 68, 100-01, 105).

The photographs in Exhibits 1-57 depicted all of the evidence Jacklitsch collected, and the crime scene report contained those same photographs in a

---

[7] Appellate counsel, who received copies of the exhibits at issue from the People, is providing this Court with those copies under separate cover.

24

thumbnail version, along with information about "how the photo was taken . . . the direction in which the photo was taken and the location in question, and the brief description of what the photo is" (Brown 88). The crime scene report also included written descriptions of each piece of evidence, what Jacklitsch believed it to be, and where he found it (see Exhibit 57 (crime scene reports)).

Brown had browsed the handwritten field report Jacklitsch made, which purportedly formed the basis of Jacklitsch's typed report entered into evidence, but did not compare the two (Brown 84-85). Brown did not know whether any of the evidence depicted in the photographs had been moved, or where it was located before photos were taken (Brown 85-86). As for the measurements included in Jacklitsch's report, Brown had "an idea" of who took them, but did not know what instrument was used to take those measurements, or the accuracy of the unknown instrument (Brown 85-86). He said that in 2009, crime scene unit investigators had access to "a tape measure, and a wheel measuring device" (Brown 107).

Brown testified that, when making his own diagram of the crime scene a few weeks before trial, his goal was to "duplicate" Jacklitsch's (Brown 107). Brown used Jacklitsch's diagram as the template for where to place all 25 pieces of evidence on his own diagram, including where the ballistics evidence was found (Brown 122, 143). Using Google Maps "to get that same location," Brown then

25

used Jacklitsch's diagram and photographs "to duplicate what he did" (Brown 107). He testified that "by looking at Detective Jacklitsch's diagram and taking measurements from his diagram . . . I was able to plot the measurements of the possible evidence that was collected. They are not exact but there is an approximate location of where all of the evidence was located" (Brown 143). He also used Jacklitsch's diagram to figure out where to place all of the cars in his own diagram (Brown 144, 197).[8]

Brown's diagram, like Jacklitsch's, shows the location where Jacklitsch found each of the 25 pieces of evidence, with small directional line markers leading to a numbered piece of evidence. Brown added a color-coded key to his diagram, listing the 25 pieces of evidence; the key added a "J" in front of each number to represent that Jacklitsch had collected the evidence.[9]

After conducting voir dire on Jacklitsch's photos, crime scene report, diagram, and the diagram Brown created from Jacklitsch's work, defense counsel

---

[8] There were some superficial differences in the diagrams. For example, in Jacklitsch's diagram, the distance on 146th Street from Willis Avenue to the victim is 536 feet, and there appears to be a slight curve in the road (Brown 140). However, on Brown's diagram, the distance is 544 feet, and the curve is less pronounced (Brown 141). Brown said this discrepancy was because he got his measurements from a "Google map sketching" (Brown 141). He could not be sure how Jacklitsch made his measurements but assumed he made them while "walking . . . and sketching" (Brown 141, 147). Brown added four addresses that did not appear in Jacklitsch's initial map, and added or removed some trees based on what he remembered from his walk-through of the scene a few weeks before trial (Brown 108-12).

[9] For example, in both Jacklitsch's and Brown's diagrams a cluster of numbers, 1 through 6, appear on the corner of Willis Avenue and 146th Street. In Brown's diagram, these numbers appear in red. There is a key noting that "J1 thru J6"—highlighted with a red dot— are "Win[chester] .45 Auto D/S/Casings" (see Exhibits 58A and 62 (diagrams)).

26

objected to their admission (P 86-89, 92, 104-05, 112-13).

Counsel first objected to the photos in exhibits 1-56, and the crime scene report in Exhibit 57, on the ground that Diaz was denied his "Crawford right to confrontation of the individual who was there and took those photographs, made those measurements and he's not here" (P 89, 92). Counsel was unable to "cross examine anybody regarding measurements, regarding where anything was found" (P 89). He argued that it was unclear whether Jacklitsch was truly unavailable to testify or whether "he's in Florida and doesn't want to pay for the trip" (P 89).

Moreover, counsel argued the documents were testimonial, pointing out that they were not just "being introduced for purposes to establish some fact. These are to establish that my client was the shooter and this is where he was based on what is essentially set forth in those documents; where shell casings were found, forty-five caliber, nine millimeter" (P 89). Specifically, "those statements in there as to measurements and where things were found are testimonial in nature and they explicitly go to the accusation part that it was my client who committed the crime" (P 96). He noted that bullet trajectory was critical to the case, and that by not being able to probe about "exact measurements" the court was "denying me the right to render a viable defense to this case to say this couldn't have possibly happened" (P 90). By being "denied the right to cross-examine the crime scene investigator who drew up all of these documents, and who wrote it down

and who did the measurements and everything else," Diaz's right of confrontation was abridged (P 89-90).[10]

After a recess, the court found that Exhibit 57 and the corresponding photographs in Exhibits 1-56 do "not violate the <u>Crawford</u> rule," and noted counsel's exception (96). The court allowed them into evidence (P 97-98).

Defense counsel also objected to both Jacklitsch's and Brown's diagrams. He argued that Jacklitsch's diagram was not a business record because he was not required to prepare it, and that its admission violated his client's rights under "<u>Crawford</u>" (P 104-5). Counsel objected to the admission of Brown's diagram, as well as to an enlarged, black-and-white version (Exhibit 58B) "for the same reasons expressed before, and based on my voir dire" (P 112-13). He also argued that Jacklitsch's diagram was not accurate, which was harmful because "it's going to let the jury see that oh it's possible that a bullet would have wound up over there" (P 104-05).

The prosecutor argued that Jacklitsch's and Brown's diagrams were not testimonial because "Jacklitsch's diagram [just] shows the location of evidence" (P 93). He also argued for their accuracy: "Brown's diagram which has the key, which has more accurate building structures than Jacklitsch's diagram. It shows the

---

[10] In addition, counsel argued, the documents are "technically hearsay" (P 93). The prosecutor responded that the crime scene report and photos were business records (P 94-95). The Court agreed, finding that "these are business records and there's no doubt about it" but "[t]he question is, under these circumstances is <u>Crawford</u> violated by this admission" (P 95-96).

location of evidence, where things were recovered, nothing more, nothing less" (P 93). The prosecutor noted that Brown created his own diagram using Google to "correct[] what is not as accurate as one might like as far as the bend in the road" and that Brown used Jacklitsch's diagram " as a template as far as where the evidence was recovered, where the cars, were, where the trees were" (P 105).

The court rejected defense counsel's arguments, finding they "go to weight, not admissibility" (P 105, 112-13).

Brown testified for over 100 transcript pages about the evidence Jacklitsch collected, and the jurors were given a copy of Brown's diagram to follow along during his testimony (Brown 66-71, 87-88, 98-104, 106-28, 113-14, 137-68, 192-206). He provided information about each of the 57 photographs Jacklitsch took, explaining where he believed Jacklitsch was standing when he took the photograph, what Jacklitsch said it depicted, and where it could be found on his diagram. Brown said repeatedly that he was relying entirely on Jacklitsch's report for this information (Brown 122-23, 125).

For instance, Brown testified that Exhibit 17 (Photograph 22) portrayed "an overall view of some of the ballistic evidence" Jacklitsch collected on the corner of Willis Avenue and 146th Street. According to Jacklitsch's reports, he recovered six casings discharged from a.45 caliber Winchester at this corner, which were designated as evidence numbers 1 through 6 on the diagrams (Brown

29

122-23). Also according to his reports, Jacklitsch recovered three discharged casings from a .9mm Luger in front of 409 East 146th Street (Brown 124).[11]

Brown also testified that Jacklitsch found a bullet impact mark in front of building 445, and a bullet hole in the trunk of a Nissan parked on the north side of 146th Street, in front of building 455, east of where Santiago was shot, and about two football fields away from the corner of Willis and 146th (Brown 152, 195). There was a .45 slug inside the trunk (Brown 142, 149-50, 195, 200-01).

Brown continued testifying in this manner, going through each entry in Jacklitsch's crime scene report. He testified that, based on Jacklitsch's notes, there was no test for blood evidence at the scene or the bullet found in the trunk of the car (Brown 200). Nor were there tests for traces of copper, lead, or brass (Brown 201).

Detective Jonathan Fox, a member of the New York City Police Department's Firearms Analysis Section, analyzed the ballistics collected from the scene and testified at trial as a ballistics expert (Fox 320). Referencing Brown's diagram and Jacklitsch's crime scene report for illustration throughout his testimony, Fox explained that the ballistics Jacklitsch had labeled J1 to J6 were .45 auto cartridge casings all ejected from the same firearm (Fox 328-29, 336). The

---

[11] For economy's sake, appellant will not detail all of Brown's testimony related to each photograph and piece of evidence, including all ballistics, that Jacklitsch's recovered. Appellant urges this Court to review pages 114-206 of Brown's testimony for the full scope of these descriptions.

seven cartridge casings, marked by Jacklitsch as J7 to J12, and J15 and so marked on Brown's diagram, were .9mm Luger cartridge casings all fired from the same gun (Fox 329, 333, 336-37). According to Jacklitsch's reports, these were found in front of 413-415 East 146th Street (Exhibits 58A, 62; Fox 344-47). Fox identified the evidence Jacklitsch labeled J19 and J20 as .22 casings fired from the same gun (Fox 334-36). There were several other ballistics fragments that were too small for Fox to identify (337-41). Fox identified crime scene evidence number J22 as a .45 bullet (Fox 342). Evidence numbers J18 and J14 in the diagram were deformed jackets, and J22 was a deformed .45 bullet; all were fired from the same gun (Fox 340-44) Fox used Brown's diagram to testify that J14 was found in front of building 409, J22 was found in the car, and J18 was found in the fence outside of 413-415 East 146th Street (Fox 344-47).

Fox testified that a .45 semi-automatic ejects cartridges, but that a .45 caliber revolver would not, so it was possible that two .45 caliber weapons were used during this incident (Fox 356-57).

Throughout the trial, all eyewitnesses referred to Brown's diagram to illustrate their own locations during the incident (Soto 254-56, 259; Irrizary 431, 457; Jones 530-32; Castro 623-24, 637-39, 644-45; Flores 751-52).

Ten days into the trial, over defense objection, the court allowed the jury to visit the crime scene, assenting to the prosecutor's argument that the diagrams and

31

photographs "do not truly to justice to the nature of this crime scene" (P 375-76). The jurors, who took Brown's diagram with them, were driven to the corner of Willis Avenue and 146th Street, and to 445 146th Street, where Santiago was struck (P 374-76, 386-88, 767-69).

Defense Case

On September 22, 2009, off-duty police officer <u>Berlinda Acevedo</u> sat in the courtyard of 510 East 146th Street, across the street from 445 East 146th Street. Around 3:20 p.m., she heard a series of five shots, a pause, then two more shots (Acevedo 811-814). After she heard the gunshots, she saw "a male black wearing a red shirt" running east on 146th Street (Acevedo 812-13).[12] Acevedo called 911 to report the gunfire (Acevedo 814-15).

At the close of both the People's and the defense cases, counsel moved for a trial order of dismissal. Counsel argued that the People had not proved that Diaz was the one who fired the fatal shot. Further, he argued that the shooter was supposedly wearing a red hat, but Jones said that the shooter did not have a hat on, and Soto could not identify Diaz in court (P 809, 818, 843). The court denied both of counsel's motions (P 821-22, 844)

Summations

On summation, defense counsel argued that the prosecution had not

---

[12] Diaz is a Hispanic man.

proved that Diaz was the person who fired the fatal shot, or that the fatal shot came from a .45 shot at the corner of Willis and 146th Street (P 895-97). He argued that Soto and Jones's identifications were not reliable, but that Castro's was (P 898-916). He maintained that there might have been two .45-caliber guns fired that afternoon, and that any of the people shooting that day could have fired the fatal shot, given that the medical examiner could not determine what type of bullet killed Santiago (P 919, 922-27)

The prosecutor acknowledged that this was not an "easy case," given that the eyewitnesses "saw things differently" (P 939-40). He theorized that Diaz stood on the northeast corner of Willis Avenue and 146th Street, shooting east, towards Vargas's building at 409 146th Street. Vargas and Ewell shot back, facing west. The bullet that struck Santiago—who had been standing east of building 409—came from Diaz's gun. He repeatedly referenced the ballistics located on the crime scene diagram, arguing that the "crime scene evidence speaks for itself" (P 947-50, 991).

He argued that Castro was mistaken in her belief that Irrizary was the one shooting east, and, relying on the diagram, argued that the cars must have blocked her view (P 958). By contrast, he contended that Soto and Jones were truthful witnesses whose identifications were accurate (P 965-83). He argued that counsel's attempt to impeach Jones "could have been the biggest gotchya [sic] moment in

33

the whole trial" but that "the truth came out" (P 969). The prosecutor went on to emphasize that Jones was able to identify Diaz three different times, including just days after the incident when Diaz looked similar to how he appeared on the day of the shooting (P 984-86). He also argued that Ewell corroborated Soto's testimony by explaining that Ewell fired in "self defense" in response to Diaz's shots (P 949, 983-84).

Verdict

The jury was charged to consider five counts in the alternative: second-degree intentional murder, second-degree depraved indifference murder, first-degree intentional manslaughter, second-degree reckless manslaughter, and second-degree criminal possession of a weapon (P 1022-1038). The jury acquitted Diaz of both murder counts but convicted him of first-degree manslaughter (P 1090-91).

Sentencing

Prior to sentencing, The Osborne Association submitted a presentence memorandum (hereinafter "Memo" (in record on appeal)). Osborne recommended that Diaz be sentenced leniently, and that this case was a "startling outlier," given Diaz's non-violent history (Memo 2-3). Diaz, who was 25 years old at the time of the incident, had an "extremely difficult" childhood (Memo 3). His father was often incarcerated, and his mother was a drug addict who neglected

34

him; the Administration of Child Services repeatedly removed Diaz and his

brothers from the home (Memo 3).[13] Because of this instability, Diaz rarely

attended school, and learned to read and write from his cousins (Memo 3). By the

time he was 15, Diaz had begun regularly abusing alcohol and drugs, and worked

for neighborhood drug dealers for money (Memo 4). Starting at 17, he was

arrested several times for drug-related offenses (Memo 5).

   In 2006, Diaz had a daughter, Anastasia (Memo 5). Two years later, he was

convicted of his first felony, attempted third-degree criminal possession of a

controlled substance, and served a year in jail (Memo 5). When he was released in

early 2009, he moved in with his daughter's mother, eager to start a new life

together, but was arrested on the instant case just a few months later (Memo 5).

   Osborne found that Diaz's difficult youth led him to self-medicate with

drugs and alcohol and to associate with drug dealers in his neighborhood (Memo

6-7). They concluded that his current conviction "is very uncharacteristic of and

inconsistent with who we believe he is" (Memo 7). Osborne wrote that Diaz "has

the potential and capability to redirect his life and achieve his goals of earning his

GED, obtaining viable employment and more importantly be a good father . . .

eventually becoming a success story" (Memo 7).

   At sentencing, the prosecutor asked that Diaz be sentenced to the

---

[13] This information is not included in Diaz's Presentence Investigation Report (in record on appeal).

maximum term of 25 years, citing the tragic nature of Santiago's death and Diaz's criminal history (S 9-10). Santiago's mother made a statement to the court, and the prosecutor read statements prepared by Santiago's twin sister, older sister, and son (S 13-19). Counsel, referencing the Osborne report and the reckless nature of the crime, argued that a fair sentence would be between 10 and 15 years (S 20-21).

Diaz made a statement conveying his sorrow for Santiago's family; he also repeatedly said that he was innocent of the crime (P 21).

The court found that Diaz's "unfortunate history" "shed[s] little light" on his behavior on the instant case (S 22). Concluding that Diaz's "senseless conduct" demonstrated that he is a "dangerous, violent person," it sentenced Diaz, as a second felony offender, to the maximum possible term of 25 years' incarceration, to be followed by five years' post-release supervision (S 22-23; Predicate Felony Statement).

ARGUMENT

POINT I

THE VERDICT CONVICTING APPELLANT OF
FIRST-DEGREE MANSLAUGHTER WAS
AGAINST THE WEIGHT OF THE EVIDENCE
WHERE NO PHYSICAL EVIDENCE TIED
APPELLANT TO THE CRIME, ONE OF THE
EYEWITNESSES IDENTIFIED SOMEONE ELSE
AS THE SHOOTER, TWO EYEWITNESSES DID
NOT IDENTIFY APPELLANT, AND THE TWO
WHO DID OFFERED PROBLEMATIC
IDENTIFICATIONS. U.S. CONST. AMEND. XIV;
N.Y. CONST. ART. 1 § 6

No forensic, surveillance, ballistics or statement evidence tied Joseph Diaz

to the shot that killed Aisha Santiago, much less placed him at the scene of the

gunfight. And, despite presenting the testimony of five eyewitnesses, the People

could not present one who could identify Joseph Diaz as the person who shot

Aisha Santiago without serious reliability questions. One of the witnesses

identified Irrizary as the shooter, two did not identify Diaz at any point, one could

not identify him at trial, and the one who did provided vague and inconsistent

descriptions of the shooter. Nobody could provide anything but a far-fetched

reason why Diaz, whom Jason Irrizary hardly knew, would have killed somebody

on his behalf. Moreover, at least two other people were shooting weapons that

could have struck Santiago. Because a dispassionate view of the evidence reveals it

cannot sustain Diaz's manslaughter conviction, the verdict must be overturned

37

and the indictment dismissed.

Where it appears that the trier of fact failed to give the evidence the appropriate weight, the verdict must be set aside as against the weight of the evidence. See People v. Bleakley, 69 N.Y.2d 490, 495 (1987); C.P.L. §§ 470.15(5), 470.20(5). This result is mandated even if the evidence is legally sufficient. See People v. Marshall, 106 A.D.3d 1 (1st Dept. 2013) (finding a conviction legally sufficient, but against the weight of the evidence). When performing a weight of the evidence review, "[this Court] sits as a thirteenth juror and decides which facts were proven at trial." People v. Danielson, 9 N.Y.3d 342, 348 (2007). Here, multiple factors cast serious doubt on the reliability of the verdict and trigger this Court's duty to take a second look at the evidence. Upon that second look, this Court should vacate Diaz's conviction.

To begin, no ballistics evidence tied Diaz to the shooting, and the little ballistics evidence introduced at trial was inconclusive at best, and suspect at worst. No guns were recovered, but Detective Jacklitsch purportedly found discharged casings from a .45 at the corner of Willis and East 146th Street, and a deformed .45 slug in the trunk of a car on the east end of 146th Street. Jacklitsch claimed he found discharged casings from a .22 and a .9mm in front of building 409. Because Santiago was killed east of building 409, the People's theory was that Santiago was killed by a .45 caliber gun, shot by someone in Irrizary's crew.

38

This theory is not borne out by the evidence. The medical examiner could not determine what caliber gun killed Santiago, how far away that person was standing, or from what direction they were shooting. Moreover, Jacklitsch, the detective who processed the crime scene and gathered all of this information did not testify, and was never cross-examined. Further, the crime scene was likely contaminated. All eyewitnesses testified that the scene after the shooting was crowded and chaotic. At least 30 people milled around the corner of Willis and 146th Street five minutes after the shooting (Evelly 413-14), and by the time Detective Snyder arrived on the scene 15 minutes after the incident, there were "people every[]where," making it highly probable that some of the ballistics evidence was moved in the chaos (Snyder 688). Moreover, police found several ballistics items that were too small to identify or match to a particular weapon (Fox 337-41). Therefore, a bullet from any of the three weapons could have struck Santiago, and there might have been more guns fired that afternoon. In addition, the bullet impact mark and .45-caliber bullet were found nearly 600 feet away from the corner of Willis and 146th street. It is unlikely that a bullet fired from that corner could go such a distance, raising the distinct possibility that at least one person in front of building 409 was firing east, whether intentionally or not. Such unreliable evidence cannot serve as a basis for Diaz's manslaughter conviction.

39

To the extent the ballistics evidence implicated Irrizary and his crew, it did not—in any way, shape or form—implicate Diaz. Nor did any statements or surveillance video. Instead, the prosecution offered identification testimony that failed to fill the evidentiary gap.

To begin, Susanna Castro, a neutral bystander, exculpated Diaz. She identified Irrizary as the shooter of the group, which made eminent sense, given the circumstances. By all accounts, including his own, Irrizary was violent and aggressive. After he got sliced on the hand, he escalated the fight into an all-out war, warning people to "clear the block" because he was coming back for revenge.[14]

Significantly, Irrizary implicated himself. Appearing without an attorney, Irrizary provided his own motive for shooting down East 146th Street that day: he was called in by his aunt Red to confront the people who threatened her, but Irrizary did more than that. He not only issued verbal threats but also, along with several others, attacked a teenager. Notably, the young man Irrizary attacked was not even the person he meant to confront. Under those circumstances, it makes

---

[14] Notably, the prosecutor put Irrizary on the stand despite his belief that Irrizary would lie about the incident (P 483-89). Irrizary had originally acknowledged to police that he recruited Pena to come back to the block to exact his revenge, but protected his brother in open court at Diaz's trial when Irrizary claimed he did not speak to his brother about the incident. Moreover, Irrizary claimed he was the only person feuding with Gordo, but other eyewitnesses said Irrizary and his family members all fought with him. Irrizary's willingness to lie to the court, along with his acknowledged violence, raises serious questions about his culpability.

more sense that Irrizary or one of his three family members fired the fatal shot, than that Diaz—whom Irrizary hardly knew—had done so.

The only evidence connecting Diaz to the scene was two identifications. However, these two eyewitnesses offered highly assailable identifications. Soto's identification of Diaz in the lineup was unreliable. His true role in the incident, like so many others', remains obscure, but raises serious questions about his impartiality, particularly coupled with his actions after the incident. Soto was friends with Gordo, Ewell, and Fifty, so had good reason to protect them from a murder charge. He claimed he watched the argument between his friends and the group of Hispanic strangers unfold before him for several minutes, and that, while he dropped to the ground when he heard gunfire, he did not attempt to flee the scene like so many others did (Soto 266-67). Instead, he lurked around for nine hours, not mentioning to any of the dozens of police officers on the scene what he had supposedly seen, raising questions about his biases and motives (Soto 298-300).

In any case, Soto only viewed the perpetrator—whose face was obscured by a hat—for a few seconds after he heard gunfire, and he never saw the perpetrator's face head-on (Soto 262-63, 285, 290). It took him a "long time" to identify anybody in the lineup, but even his ultimate identification was suspect (Soto 303). As Soto admitted, he "d[id]n't know" whether he was "good with

41

recognizing faces" at the time of the incident (Soto 296). He was also unable to identify Diaz at trial as the shooter (Soto 268, 274-77).

Soto's inability to describe anything else with specificity highlights his scant opportunity to view. After the shooting, Soto only described the shooter as wearing a "red shirt;" he gave no other descriptive characteristics, including ethnicity, age, or any distinguishing features such as a neck tattoo (Soto 304-05). Soto could not give any sort of description of the other men standing with the shooter, other than that they were Hispanic. He could not see the whole group of Hispanic men even when he was looking right at them (Soto 262, 289-90), so it is possible that more than one person was shooting from that group. Indeed, casings from several guns were found.

For his part, Jones provided testimony that was both internally inconsistent and contradicted other eyewitness testimony. He claimed that the shooter, in a red shirt and no hat, walked past him, alone, while crossing the street before the shooting. He then claimed that this same shooter handed the gun off to a man in a white shirt, and then ran away, past his car. Jones continued to hear shooting from inside the pizza shop and then saw the same man run past him again. According to all other witnesses, Irrizary arrived at the scene with a group of friends, which purportedly included Diaz. If that were true, Diaz would not have been crossing the street by himself. It also does not make sense that the shooter would flee the

42

scene and then double back while guns were still firing.

Jones's description of what occurred puts his identification in doubt. He believed both immediately after the incident and at trial that the person he saw shooting was not wearing a hat (Jones 515, 517, 526-27; Snyder 712). However, Jones was forced to admit, when confronted with the surveillance video, that the person he claimed was Diaz—the shooter—was, in fact, wearing a hat at one point in the video (Jones 537, 39). He also never mentioned that the person he saw running by twice had any tattoos, but Diaz has a prominent neck tattoo. That Jones could be so mistaken about what he saw casts doubt on his identification.

Other aspects of Jones's testimony suggest he exaggerated his testimony. Jones at first claimed that he said he saw the shooter "let[] off more shots," but later clarified that he never actually saw anybody fire a gun (Jones 509, 535). He did not call 911 himself but rather called his brother, a police officer, to ask for advice after the incident. Jones claimed that he could see the shooter despite leaning his seat all the way back, but his view was likely obstructed given that he angled himself low to avoid the gunfire.

Based on the foregoing, the verdict finding that Diaz fired the fatal shot is against the weight of the evidence. Even if Diaz was present at the scene, nothing definitively tied him to the shot that killed Santiago. Equally, if not more, logical and credible alternative scenarios are apparent. For instance, Irrizary could have

43

been the shooter, as Castro testified. Or, it could have been Pena, whom Irrizary was trying to protect. Or, it could have been one of the other four to five young men in Irrizary's crew—including his brother Raul or cousin Manuel—standing on the corner of Willis Avenue. Or, the shot that hit Santiago may have come from Ewell or Vargas, both of whom were firing guns that afternoon. Or, it could have come from any one of the multiple, unidentified people wearing red shirts that afternoon, including the two men wearing red tops in the surveillance video, or the black man wearing red whom Officer Acevedo saw running east on 146th Street.

Evidence also suggests there might have been multiple people firing from Irrizary's crew. Even if Diaz had been shooting a gun, a second shooter might have fired the fatal shot—and such a scenario would explain the mountains of conflicting eyewitness testimony. After all, Castro testified that she saw two other Hispanic men with guns standing with Irrizary. Jones repeatedly testified that the shooter was not wearing a hat, but Soto said that the shooter wore a baseball cap. Jones believed the person he saw was shooting a .9 mm gun, but the People argued that Santiago was shot with a .45mm weapon. Moreover, as the ballistics expert testified, while at least one .45 auto was used, someone could have been shooting a .45 revolver, which would have ejected .45-caliber bullets but no casings. Jones and Soto said that the shooter was wearing a red top, but Castro did

44

not identify any of Irrizary's crew as wearing red. And, while Diaz is Hispanic,
Officer Acevedo who heard the shooting said that she saw a black man wearing a
red shirt running east from Willis Avenue. Given the number of equally likely
scenarios and the paucity of evidence implicating Diaz, the verdict that he fired
the fatal shot is against the weight of the evidence.

The jury was likely led into convicting Diaz because of the numerous legal
errors detailed below, as well as the tragic nature of the shooting. However, a
dispassionate view of the evidence reveals that it cannot support Diaz's
conviction. Therefore, the verdict must be overturned and the indictment
dismissed.

## POINT II

THE TRIAL COURT ERRED IN ADMITTING
THE NONTESTIFYING CRIME SCENE
DETECTIVE'S CRIME SCENE REPORT,
PHOTOGRAPHS, AND DIAGRAM, AS WELL AS
THE TESTIFYING DETECTIVE'S DUPLICATE
DIAGRAM, VIOLATING APPELLANT'S STATE
AND FEDERAL CONFRONTATION RIGHTS.
U.S. CONST. AMENDS. VI, XIV; N.Y. CONST.
ART. I, § 6.

Counsel protested the admission into evidence of Detective Jacklitsch's
crime scene report, the photos contained in that report, the diagram showing the
location of the ballistics evidence collected at the crime scene, and the diagram
Detective Brown duplicated from Jacklitsch's original. Their introduction, counsel

45

contended, violated Diaz's "<u>Crawford</u> right to confrontation" because they were testimonial statements created by Jacklitsch, who did not testify. These documents—prepared by law enforcement for use at trial—were critical to the People's case, as the prosecutor claimed they proved that Diaz, who was purportedly shooting a .45 Winchester at the corner of Willis and 146th, fired the shot that struck and killed Santiago. The court's erroneous admission of these documents violated Diaz's state and federal Confrontation Clause rights and compels reversal. <u>See</u> U.S. Const. Amends. VI, XIV; N.Y. Const. art. I. § 6.

A defendant has the right to be confronted with the witnesses "who bear testimony against him." <u>Crawford v. Washington</u>, 541 U.S. 36, 51 (2004). Therefore, "if an out-of-court statement is testimonial in nature, it may not be introduced against the accused at trial unless the witness who made the statement is unavailable and the accused has had a prior opportunity to confront that witness." <u>Bullcoming v. New Mexico</u>, 564 U.S. 647, 657 (2011).

The Supreme Court has described a "core class" of testimonial statements, including "pretrial statements that declarants would reasonably expect to be used prosecutorially;" and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." <u>Crawford</u>, 541 U.S. at 51-52. Where the "sole purpose" of a document is evidentiary in nature, then the document is

46

"functionally identical to live, in-court testimony" subject to cross-examination. Melendez-Diaz v. Massachusetts, 557 U.S. 305, 310-11 (2009).

The Supreme Court has specifically ruled that police-created documents are testimonial: "A document created solely for an 'evidentiary purpose,' . . . made in aid of a police investigation, ranks as testimonial." Bullcoming, 564 U.S. at 664. This rule reflects concerns about the "unique potential for abuse" arising from the "(i)nvolvement of government officers in the production of testimony." Crawford, 547 U.S. at 54 n. 7.

Under state law as well, if the statement's "primary purpose" is prosecution, then the statement is testimonial: "For our part, we have deemed the primary purpose test essential to determining whether particular evidence is testimonial hearsay requiring the declarant to be a live witness at trial." People v. John, 27 N.Y.3d 294, 307 (2016) (internal quotations and citations omitted).

Measured by these principles, all of the documents and photographs prepared by Jacklitsch, as well as the duplicative diagram prepared by Brown, unquestionably qualified as testimonial. The photos, report, and diagrams' "purpose," if not "sole purpose," was to codify evidence for use in the prosecution of a homicide, and they were created by police officers themselves. They contained "the precise testimony [Jacklitsch] would be expected to provide if called at trial." Melendez-Diaz, 557 U.S. at 310, 316 (explicitly rejecting the logic

47

that would render "a police officer's investigative report describing the crime scene admissible absent an opportunity to examine the officer").

The court here failed to explain why it found these testimonial documents admissible, but it could not have been because these documents were machine-generated, which have been found to be non-testimonial. See People v. Brown, 13 N.Y.3d 332, 340 (2009) (non-testimonial when report "consisted of merely machine-generated graphs, charts and numerical data"). On the contrary, the crime scene report, photographs, and diagrams all required skill and interpretive acumen to produce. Based on Brown's testimony, all of the documents and photographs Jacklitsch created as the crime scene detective required years of experience, specialized training and skill, and scrupulous adherence to "protocol" (Brown 57-62).

After processing the crime scene, Jacklitsch engaged in interpretive and deliberative work reflecting his impressions. According to Brown, Jacklitsch digitally rendered 146th Street between Willis Avenue and Brook Avenue, filling in the house numbers, and placing 43 cars on the road.[15] He gave each piece of evidence a number from one to 25, and added the evidence to the diagram using small directional line markers, indicating where he found each piece of evidence. He also added measurements.

---

[15] Appellant urges this Court to reference these exhibits, provided by Appellate Counsel under separate cover, as it considers his arguments.

48

The formal, labeled, and typed crime scene report included descriptions of each piece of evidence Jacklitsch found, where he found it, and what he believed it to be. For example, Jacklitsch labeled the first entry "J1," and wrote that he believed it was a casing from a "Winchester 45 auto", that it was of "probative" value, and included measurements of where he found it relative to Willis Avenue. The report also included thumbnail images of all of Jacklitsch's photos introduced into evidence, and blank spaces for images that were not shown to the jury. Next to each image or redacted image, Jacklitsch wrote a brief description of what it depicted, noted which way he directed the camera, and described the camera distance using adjectives like "mid-range" and "closeup." It is clear, then, that these exhibits reflected the careful and discretionary steps Jacklitsch took to measure and document evidence for prosecution.

Thus, the People were required to introduce the diagram, photos, and report through the person who actually created them, in order to provide the defense with a fair opportunity to cross-examine him regarding not only the information and interpretive data, but also his "proficiency, the care he took in performing his work, and his veracity." Bullcoming, 564 U.S. at 661 n.7. After all, "[c]onfrontation is designed to weed out not only the [expert], but the incompetent one as well." Melendez-Diaz, 557 U.S. at 319. The People failed to do so.

49

Instead, the People called Brown. Brown's testimony about Jacklitsch's work and process—in which he spent 100 pages of testimony detailing what evidence Jacklitsch claimed he found at the scene, where he purportedly found this evidence, what measuring devices Jacklitsch might have used, where Jacklitsch might have been standing when he took the photographs, what might have been depicted in the photographs, and what tests Jacklitsch might have run—did not satisfy the requirements of the Confrontation Clause (Brown 66-71, 87-88, 98-104, 106-28, 137-68, 192-206). The Constitution "does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination." <u>Bullcoming</u>, 564 U.S. at 662. Because Brown did not supervise, conduct, or observe Jacklitsch's collection and assessment of the evidence, or the creation of his report or diagram, Brown's testimony was not an adequate substitute for Jacklitsch's. <u>See John</u>, 27 N.Y.3d at 304 (finding reversal on confrontation grounds is required where "a witness who never tested the . . . evidence that incriminated an accused defendant [asserts] that the nontestifying analysts' results were truthful").

Not only did introducing Jacklitsch's crime scene report, photos, and diagram violate Diaz's confrontation rights, but the introduction of Brown's own diagram did as well. It is true that Brown testified, but he could not be effectively

50

cross-examined on his diagram because it was merely a duplicate of Jacklitsch's.

Unless a witness has supervised, conducted, or observed the data on which he or she relies, his or her conclusions are inadmissible. See id. at 310. A hypothetical the Supreme Court posed in Bullcoming makes this plain: "[S]uppose a police report recorded an objective fact [such as] the address above the front door of a house or the read-out of a radar gun. Could an officer other than the one who saw the number on the house or gun present the information in court[?]" The Court answered: "As our precedent makes plain, the answer is emphatically 'No.'" Bullcoming 564 U.S. at 659-60 (internal citations omitted); accord, Melendez-Diaz, 557 U.S. at 315-16. If it would violate the Confrontation Clause to admit a report that recorded a purely objective fact if defense did not get a chance to cross-examine the person who recorded that fact, then surely it was error to admit a "duplicate" diagram based solely and entirely on a non-testifying officer's crime scene diagram.

As the Court of Appeals made clear in John, "a testifying [expert] functioning as a conduit for the conclusions of others" was not sufficient to satisfy the Confrontation Clause requirements. 27 N.Y.3d at 306. In explaining its rule, the Court compared the facts of John with those of Brown, 13 N.Y.3d 322. The contrast is illuminating. The Court noted that in Brown, an analyst's interpretation of machine-generated graphs did not violate the defendant's

51

confrontation rights because the analyst "had personally examined and independently interpreted the data. <u>Determinatively</u>, the expert testified that any conclusions or opinions she reached from the raw data supplied by the outside laboratory <u>were her own and were not contained in any reports</u>." 27 N.Y.3d at 310 (citing <u>Brown</u>, 13 N.Y.3d at 33) (emphasis added). In <u>John</u>, by contrast, the testifying criminalist made no such claims; she merely reviewed the reports made by others "to make sure that everything looked ok," and agreed with their conclusions. <u>John</u>, 27 N.Y.3d at 310.

The admission of Brown's diagram in Diaz's case is even more egregious than what happened in <u>John</u>, and compels reversal. Unlike the expert in <u>Brown</u>—who merely used machine-generated data to come to her own conclusions not found in any report—or the criminalist in <u>John</u>—who at least reviewed reports made by others and agreed with their conclusions without conducting independent analysis—the witness here did <u>no</u> independent analysis, and was not even in a position to agree or disagree with Jacklitsch's findings. Instead, Brown merely transcribed Jacklitsch's work. He repeatedly testified that "<u>all</u> [the] information in this case come from Jacklitsch's reports" (emphasis added), including the location of all evidence recovered and where all of the cars were parked (Brown 107, 122-23, 125, 143-44). Brown's goal was to "duplicate" Jacklitsch's diagram of where the evidence was recovered, in order to present it at

52

Diaz's trial (P 6; Brown 107). Brown knew where to place all 25 pieces of evidence in the diagram only "by looking at Detective Jacklitsch's diagram and taking measurements from his diagram," as well as by looking at Jacklitsch's photos (Brown 107, 145). In fact, all of the "pieces of evidence" in Brown's diagram were "lifted directly from Jacklitsch's diagram" (Brown 143).

And, indeed, a cursory comparison of the two diagrams makes it crystal clear that Brown's diagram was merely a duplicate of Jacklitsch's, save for a few trees and buildings and the color-coded key Brown added—using Jacklitsch's report—at the bottom left to identify each of the 25 pieces of evidence.

The prosecutor never argued that Brown's diagram served any different function or was materially different than Jacklitsch's; in fact the prosecutor said that Brown's diagram just "has the key . . [and] more accurate building structures than Jacklitsch's" but was introduced to "show[] the location of evidence, where things were recovered, nothing more, nothing less" (P 93). Because everything in Brown's diagram that implicated Diaz came solely and entirely from Jacklitsch's work, defense counsel was effectively prevented from cross-examining Brown about the information contained in the diagram. The prosecution cannot be insulated from the confrontation rules merely by having a testifying witness duplicate an inculpatory testimonial document prepared by a non-testifying witness.

53

While Brown did a "walk-through" of the crime scene five years after the crime, it was not to check the accuracy of any of the initial interpretations or to gather information so he could draw his own conclusions about the evidence. Instead, he walked through the scene to get a "feel" for it so he would be more comfortable testifying (Brown 65-66, 70).

Brown used Google Maps to ensure the accuracy of the building addresses and curvature of the street, but conducted no independent analysis or interpretation of the testimonial evidence contained in Jacklitsch's diagram, which Brown lifted directly from Jacklitsch's work. He used Google Maps only "as my means of illustration to place the items in question that [Jacklitsch] has on his diagram" (Brown 107, 110). Thus, while Brown may have independently checked Google Maps to confirm the bird's eye view of immoveable objects like the street and buildings, the critical and inculpatory elements of this exhibit—the pieces of evidence collected and where they were found—came from Jacklitsch, who was not subject to cross-examination. As the Court of Appeals emphasized in John, this is a determinative test. Because defense counsel had no opportunity to cross-examine Jacklitsch, who supplied all of the incriminating information that Brown included on his own diagram, Diaz was denied his confrontation rights.

Given that the documents were testimonial, they should not have been introduced unless prosecutor could show that (1) the declarant was unavailable

54

and (2) the defendant had a prior opportunity to cross-examine the declarant.

Crawford, 541 U.S. at 68. Here, the People met neither condition. Counsel had no

chance to cross-examine Jacklitsch about these documents, and the People, whose

burden it was, failed to show that he was unavailable. See Crawford, 541 U.S. at 57

(referencing the confrontation rule that "exclude[s] testimony where the

government ha[s] not established unavailability of the witness"). The prosecutor

claimed that Jacklitsch was unavailable to testify because he was retired, but, as

defense counsel noted, the prosecution failed to demonstrate whether he was truly

unavailable—because of death, infirmity, or mental illness—or because it was

merely inconvenient to procure his presence (P 89). Under these circumstances,

Jacklitsch's failure to testify violated Diaz's confrontation rights.[16]

It was critical for counsel to be able to cross-examine Jacklitsch. Brown

---

[16] The documents also comprised inadmissible hearsay. The court erroneously found that these documents fell under the business records exception to the hearsay rule (P 95). However, it is beyond doubt that under both federal and state law, police reports and other documents created for the purpose of prosecution do not qualify as a business records exception to the hearsay rule. See Melendez-Diaz, 557 U.S. at 321-22 (documents inadmissable "if the regularly conducted business activity is the production of evidence for use at trial. . . . [such as] police reports generated by law enforcement officials") (citing Federal Rule 803(8) defining public records as "'excluding . . . in criminal cases matters observed by police officers and other law enforcement personnel'"). Under state law, too, "records prepared solely for the purpose of litigation should be excluded" from the business records exception. People v. Pacer, 27 N.Y.2d 47, 52 (1970); see Nat'l States Elec. Corp. v. LFO Constr. Corp., 203 A.D.2d 49, 49 (1st Dept. 1994) (holding that a one-page summary of damages was not prepared in regular course of business but in anticipation of litigation). In addition to his objection to their admission on constitutional grounds, defense counsel specifically objected to the introduction of Jacklitsch's report and Brown's diagram as inadmissible hearsay on evidentiary grounds (P 93, 105, 112-13). The court should not have admitted these documents into evidence, and doing so deprived Diaz a fair trial, independent of the constitutional error committed by their admission.

could not answer any questions about the equipment or procedures used to generate the reports, photos, or diagrams. As defense counsel argued to the court, he was prevented from cross-examining anybody about "measurements, regarding where anything was found" or "how it was found" (P 89-93).

For instance, Brown testified that did not know whether Jacklitsch moved any evidence before he photographed it, who took the measurements Jacklitsch used in diagram, what instruments were used to take those measurements, whether those instruments were accurate, or the steps Jacklitsch took when he translated his written field notes to a typed field report (Brown 85-86). Had Jacklitsch testified, he could have answered those questions, plus many more, including whether he edited his photographs, the specific steps he used to collect the ballistics evidence, whether or how he made contemporaneous notes about the location of the ballistics, or whether he relied on his memory. Moreover, as the prosecutor himself complained when arguing for the crime scene visit, the diagrams and photographs "do not truly do justice to the nature of this crime scene," a problem that Jacklitsch could have addressed had he testified (P 375-76). Given that defense counsel engaged in extensive cross-examination of all testifying police officers in this case, there is no doubt that counsel would have held Jacklitsch to equal, if not higher, standards of accuracy, memory, and competence, had he the opportunity to question him.

56

In sum, the admission of Jacklitsch's photographs, reports, and diagram, as well as Brown's diagram, violated Diaz's state and federal confrontation rights.

This constitutional error cannot be considered harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18 (1967); People v. Crimmins, 36 N.Y.2d 230 (1975). In the first instance, as discussed in Point I, supra, the evidence was far from overwhelming. Beyond the weakness in the evidence, the erroneous admission of this proof had a significant impact on the verdict. Additionally, "[t]he particular force of documents which are not subject to cross-examination, and which may be taken into the jury room . . . [also] cannot be ignored. People v. Kennedy, 68 N.Y.2d 569, 579 (1986).

Most importantly, the prosecutor used this evidence to tie Diaz to the shot that killed Santiago. The prosecutor's theory was that the fatal shot must have come from a person standing on the northeast corner of Willis Avenue and 146th Street, since the .45 expelled casings were found at that corner. Deformed jackets from two .45 caliber bullets were found east of that corner in front of building 409, and a .45 bullet was found in the car at the far east end of 146th Street—all expelled from the same gun (Fox 328-47). Because Diaz was purportedly the only shooter standing on that corner, he was the only person who could have fired the fatal shot. This crucial evidence about the location of the ballistics came solely and directly from the improperly admitted evidence. On summation, the prosecutor

used the crime scene diagram to make this argument explicit, pointing out where each of the bullet fragments and the deformed bullet were found in relation to Santiago, arguing that Diaz was the one shooting towards building 409 but hitting Santiago (P 947-50, 991).

The prosecutor also used the crime scene diagram to argue Diaz's identity. Both witnesses who identified Diaz relied on the diagram to explain their vantage points, demonstrating their ability to identify Diaz accurately (Jones 530-32, Soto 254-56, 259; P 973). By contrast, the prosecutor used the diagram to undercut Castro's testimony by arguing that her vantage point made her exculpatory identification of Irrizary inaccurate (Castro 623-24, 637-39, 644-45; P 958).

Notably, the jurors were allowed to take a copy of Brown's diagram with them to the crime scene visit (P 376), and asked for the diagram for use during deliberations (Deliberations 1051-52, 1055). Ultimately, the crime scene diagrams and Jacklitsch's photos and report not only contributed to the verdict, but were crucial for it.

This issue is preserved for appellate review. First, counsel argued that the People did not prove that Jacklitsch was unavailable to testify at trial (P 89). Second, counsel specifically and repeatedly objected to the introduction of the photos Jacklitsch took, the crime scene report, and the two diagrams (Exhibits 1-58 and 62) on Crawford grounds (P 89-90, 92-93, 104-05, 112-13). He argued that,

58

because he was unable to question Jacklitsch, he was "denied my right, <u>Crawford</u> right to confrontation of the individual who was there and took those photographs, made those measurements and he's not here" (P 89, 92). He argued that these exhibits were "testimonial" statements central to the prosecutor's case, because they were specifically being introduced to prove that "it was my client who committed the crime" (P 96). The court recognized counsel's objections on <u>Crawford</u> grounds, and ruled against counsel, preserving the issue for review (P 91, 95-96, 112-13). <u>See</u> C.P.L. § 470.05.

Accordingly, the conviction must be reversed and a new trial ordered.

<u>POINT III</u>

> APPELLANT WAS DEPRIVED OF A FAIR TRIAL WHEN THE COURT PERMITTED THE PROSECUTION TO ELICIT HEARSAY EVIDENCE THAT POLICE DID NOT BELIEVE A PROSECUTION EYEWITNESS'S EXCULPATORY IDENTIFICATION. U.S. CONST. AMEND. XIV; N.Y. CONST. ART. I, § 6.

After hearing Susana Castro's testimony, in which she vehemently insisted that Irrizary—not Diaz—was the shooter, the court allowed the lead detective to imply that police did not believe Castro's exculpatory identification. Although it was the prosecutor, not the defense, who called Castro, the court admitted this damaging hearsay testimony to prevent any inference that the police were "cavalier" in their investigation. This was error. As defense counsel argued to no

59

avail, the testimony should have been precluded as both improper hearsay

testimony and opinion evidence that unfairly buttressed the prosecution's case.

The erroneous admission of this evidence deprived Diaz of his due process right

to a fair trial. U.S. Const. Amend. XIV; N.Y. Const. art. I § 6.

### A. The testimony constituted inadmissible, inferential hearsay evidence implying that police disbelieved Castro.

Any out-of-court statement offered in court to establish the truth of the

facts asserted constitutes hearsay. Richardson, Evidence, § 8-101 (Farrell. 11th ed.

1995); see also People v. Huertas, 75 N.Y.2d 487, 491-92 (1990); People v. Nieves,

67 N.Y.2d 125, 131 (1986). Testimony that does not directly quote the out-of-

court statement, but implies its contents, nonetheless constitutes hearsay. See

Mason v. Scully, 16 F.3d 38 (2d Cir. 1994) (where content of out-of-court

statement was not revealed, statement nonetheless improper where it implied that

the conversation led police to focus on suspect); People v. Garcia, 25 N.Y.3d 77

(2015) (recognizing indirect hearsay); People v. Shinebarger, 110 A.D.3d 1478 (4th

Dept. 2013) (same).

Further, without a demonstrated applicable exception, hearsay is

inadmissible. People v. Brensic, 70 N.Y.2d 9, 14 (1987); Nieves, 67 N.Y.2d at 131.

The burden is on the proponent of the evidence to establish that the statement

falls within one of the exceptions to the hearsay rule, and that it is reliable.

Brensic, 70 N.Y.2d at 14; Nieves, 67 N.Y.2d at 131. In the context of criminal

60

cases, New York has a strong policy favoring the narrow treatment of exceptions against hearsay. People v. Maher, 89 N.Y.2d 456, 461 (1997); Nieves, 67 N.Y.2d at 131.

Here, over objection, Detective Snyder was allowed to testify that, after speaking to Castro and Irrizary, he declined to arrest Irrizary. However, his testimony constituted inadmissible, indirect hearsay. While the precise content of the conversations was not revealed, the clear implication the prosecutor sought to elicit was that whatever Castro and Irrizary said led police to believe that Irrizary was not the shooter.

The prosecutor started by asking several questions about each of the specific conversations Snyder had with Irrizary and Castro, such as where, when, and for how long the detective spoke to each of them (Snyder 700-01). Having set up these conversations, the prosecutor immediately followed up by asking if, based on this investigation, the police arrested Irrizary (Snyder 701). The obvious import—as evident in the court's stated rationale for allowing the testimony in the first place—was that the police did not believe Castro was credible, and that they had arrested the right man.

The court permitted this line of questioning on the ground that it completed an otherwise "ambigu[ous]" narrative, but what the prosecutor elicited far exceeded the scope of this narrow hearsay exception. New York courts have

61

the discretion to admit otherwise inadmissible evidence if will "help a jury understand a case in context," provided the testimony does not "exceed the bounds" of providing the requisite background information, as long as "'the evidence's probative value . . . outweighs any undue prejudice to the defendant," <u>and</u> if the evidence is accompanied by a "'proper limiting instruction.'" <u>People v. Garcia</u>, 25 N.Y.3d 77 (2015) (citations omitted); <u>see</u> <u>People v. Rivera</u>, 96 N.Y.2d 749, 751 (2001 )(recognizing that inferential hearsay testimony was properly admitted but that "under certain circumstances, introduction of such testimony may be improper"); <u>People v. Morris</u>, 21 N.Y.3d 588, 596 (2013) (noting that even if the background evidence meets the relevancy threshold, it is still only admitted if its probative value outweighs the risk of undue prejudice); <u>People v. Resek</u>, 3 N.Y.3d 385, 390 (2004) (finding that the prejudicial value of such testimony, admitted with inadequate jury instructions, exceeded its probative worth).[17] Because Snyder's testimony was more than was necessary to explain police actions, because its prejudicial effect far outweighed any purported probative value, and because the court did not deliver a limiting instruction, the testimony failed to meet any of the criteria required by <u>Garcia</u>, <u>Morris</u>, and <u>Resek</u>.

The hearsay testimony was not required to fill any confusing holes in the

---

[17] In <u>Garcia</u>, the Court reversed on constitutional confrontation grounds, but noted that it would have come to the same result based on "state evidentiary hearsay rules." 25 N.Y.3d at n.2.

prosecution's case. As defense counsel argued, that the police chose not to arrest Irrizary was completely "irrelevant" to any material issues (P 695). This information was not required to prove the People's case, nor would the case otherwise be too confusing. Without it, the average juror with any common sense was more than capable of interpreting this evidence and assessing whether Diaz was the shooter regardless of whether police arrested Irrizary after interviewing Castro.

The court found that, if Snyder were not allowed to testify that the police declined to arrest Irrizary after interviewing him and Castro, the jury might conclude that the police were "cavalier" in their investigation because Castro had identified Irrizary, but "<u>defendant</u> [was] charged with murder" (P 698) (emphasis added). However, as counsel correctly and repeatedly pointed out, it was the <u>prosecutor</u> who called Castro to testify that she identified Irrizary as the shooter. If any ambiguity existed, it was because the prosecutor chose to inject it into the case. It was extremely unfair for the prosecutor to create the purported "ambiguity" by calling Castro to testify that she identified Irrizary as the shooter, and then be allowed to elicit prejudicial testimony to clarify any confusion it sowed. <u>Cf</u>. <u>Rivera</u>, 96 N.Y.2d at 751(bolstering testimony allowed where defendant opened the door to it by his "selective portrayal" of events).

In any case, assuming, <u>arguendo</u>, that the jury did need to hear that police

63

declined to arrest Irrizary, there was a far less prejudicial way to convey the information. All the jury needed to know was the bare fact that Irrizary was not arrested for the crime, which could have been conveyed by a single question. That would have cleared up any ambiguity without unfairly buttressing the prosecution's case by casting doubt on an exculpatory identification's reliability. Alternatively, the court could have simply instructed the jury not to speculate about police actions. Instead, the prosecutor yoked the non-arrest to Snyder's interviews with Castro and Irrizary, making it clear that the police did not believe Castro's identification of Irrizary was accurate.

B. The improper opinion testimony usurped the jury's fact-finding role.

As counsel also argued, Snyder's testimony implying that law enforcement disbelieved Castro constituted inadmissible opinion testimony. While police opinion testimony may be admitted to help a jury understand an issue that would otherwise be beyond the average juror's understanding or comprehension, "[t]he situation is very different where a police officer . . . has participated in the investigation of the matter being tried and, with the mantle of an expert steeped in the particulars of the case, gives seemingly authoritative testimony directly instructive of what facts the jury should find." People v. Inoa, 25 N.Y.3d 466, 472 (2015). Generally, an officer may not testify about the credibility of a witness; doing so constitutes "usurpation of the function of the jury." People v. Ciaccio, 47

64

N.Y.2d 431, 439 (1979) ("It is always within the sole province of the jury to decide whether the testimony of any witness is truthful or not. . . . [A] detective's testimony [regarding credibility] was improper and indeed constituted usurpation of the function of the jury."); accord, People v. Pabon, 28 N.Y.3d 147, 157 (2016) (agreeing with Appellate Division that court should not have admitted opinion testimony that defendant was not credible).

Here, Snyder's testimony constituted irrelevant and unfair opinion testimony that usurped the jury's role. To begin, as argued above in Part A, his opinion about Castro's identification was not necessary to clear up any ambiguity; the jurors all knew that Diaz, not Irrizary, was on trial. Moreover, as the detective who questioned both Irrizary and Castro, he telegraphed to the jury that he did not believe Castro's exculpatory identification and version of events—and, by extension, that the jury should not either. It thus constituted impermissible opinion testimony on an issue of fact that the jury was tasked with determining: namely, whether someone other than Diaz was the shooter. As counsel rightly argued, the line of questioning "put[s] [law enforcement's] belief above what the jury is supposed to decide" (P 702).

By testifying that the police decided not to arrest Irrizary, Snyder communicated that police did not believe Irrizary had committed the crime—and that Diaz had. The court itself acknowledged this is what the testimony stood for

65

when it weighed the testimony's prejudicial impact against its probative value. The court said that Diaz had to be "protected" from "questions . . . which substitute or seeks to substitute the judgment of the police in who to arrest [f]or the judgment of the jury as to who has been proven guilty or not" (P 697-98). Nonetheless, the court improperly calibrated the scope of questioning by finding that the risk of ambiguity outweighed the fundamental right of the jurors to serve as the fact-finders.

Thus, the court was wrong to allow Snyder to give law enforcement's opinion about Castro's credibility, an issue that was well within the grasp of lay jurors.

***

The error admitting this prejudicial hearsay and improper opinion testimony evidence was not harmless. For the reasons sent forth in Point I, <u>supra</u>, the evidence against Diaz was not overwhelming. Given that the case came down to the reliability of eyewitness identification, this inadmissible testimony likely affected the verdict. Castro witnessed the shooting, but identified Irrizary, not Diaz, as the perpetrator. The two men who did identify Diaz gave problematic testimony; one could not identify Diaz in court, and the other provided inconsistent descriptions of the perpetrator—raising legitimate questions about the shooter's identity, given how many people might have been involved in the

66

gunfight. Without Snyder's inadmissible testimony, the jury might have had reasonable doubts about Diaz. They might have believed, as Castro testified, that Irrizary was the shooter. Or, they might have believed that the shooter's identity was at least ambiguous. However, hearing that the police doubted Castro's exculpatory identification made the jurors more likely to doubt it as well, and helped ease any doubts the jurors might have had about the shooter's identity.

Even though the jurors were instructed that the determination of Diaz's guilt was their own, there is a significant risk that they deferred to the opinions of the police regarding any questions about Diaz's identity or Castro's identification. This is especially so where the court did not provide limiting instructions regarding Snyder's testimony. Cf. People v. Morris, 21 N.Y.3d 588, 590 (2013) (holding that a trial court may admit otherwise inadmissible evidence to provide background if "the evidence is admitted with proper limiting instructions"); Rivera, 96 N.Y.2d at 751 ("[A]ny possible prejudice arising from [the hearsay] testimony was averted by the court's comprehensive limiting instructions.").

These arguments are preserved as a matter of law. See C.P.L. §470.05(2). Defense counsel moved to preclude this testimony on the grounds that it was "irrelevant" and "hearsay" (P 695). He argued that the only objective for presenting it was to convey to the jury that the police did not believe Castro, and that the evidence would take the fact-finding function from the jury's hands (P

695, 697, 702). After the prosecutor asked whether Irrizary was arrested, defense counsel asked for a mistrial, reiterating his initial argument (P 702). The court denied his motion, and counsel objected again (P 703).

Should this Court find the issue unpreserved, we ask that it reach the issue in the interest of justice given how unfair it was for the prosecutor to call Castro and then be allowed to undermine her exculpatory testimony by eliciting indirect hearsay and improper opinion testimony.

In light of the above, the court's admission of Snyder's hearsay and opinion testimony deprived Diaz of a fair trial. Accordingly, this Court should reverse the judgment and order a new trial.

<u>POINT IV</u>

APPELLANT WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY ACCIDENTALLY OPENED THE DOOR TO THE ADMISSION OF IDENTIFICATION EVIDENCE THE JURY WOULD NOT OTHERWISE HAVE HEARD. U.S. CONST. AMENDS. VI, XIV; N.Y. CONST. ART. 1, § 6.

In this case, where identification was the critical issue, defense counsel committed a devastating error. By mixing up Michael Jones's lineup and photographic identification procedures, counsel opened the door to extensive testimony about the photo identification. This error, which strengthened Jones's otherwise weak testimony, severely prejudiced Diaz. Counsel's grave

68

mistake—which he acknowledged and attempted to mitigate to no

avail—deprived Diaz the effective assistance of counsel. His conviction must

therefore be reversed and a new trial ordered. U.S. Const. Amends. VI, XIV; N.Y.

Const. art. 1, § 6.

The right to counsel guaranteed by the Federal and State constitutions

includes the right to effective assistance of counsel. See Strickland v. Washington,

466 U.S. 668, 686 (1984); People v. Baldi, 54 N.Y.2d 137, 146 (1981). A defendant

is denied effective assistance if "the evidence, the law, and the circumstances of a

particular case, viewed in totality and as of the time of the representation" show

that his attorney failed to provide "meaningful representation," under the state

standard, Baldi, 54 N.Y.2d at 147, or if the representation fell below an "objective

standard of reasonableness," under the federal standard. Strickland, 466 U.S. at

687-88. An attorney's representation can be found less than meaningful as the

result of the cumulative effect of several errors, see People v. Droz, 39 N.Y.2d

457, 462 (1976), or as the result of a single, substantial error that compromises

defendant's right to a fair trial. See People v. Hobot, 84 N.Y.2d 1021, 1022 (1995).

Generally, testimony regarding pretrial out-of-court photographic

identification of a defendant is inadmissible on the People's direct case. See

People v. Lindsay, 42 N.Y.2d 9, 12 (1977); People v. Christman, 23 N.Y.2d 429,

433 (1969); People v. Santana, 191 A.D.2d 174, 175 (1st Dept. 1994). Improper

69

admission of such evidence is so prejudicial that it is harmless only where there is no substantial issue as to the defendant's identification. See People v. Caserta, 19 N.Y.2d 18, 21 (1966); People v. Mosley, 296 A.D.2d 595, 596-97 (3d Dept. 2002); People v. Polenca, 204 A.D.2d 911, 911 (3d Dept. 1994); People v. Grant, 161 A.D.2d 664, 664 (2d Dept. 1990).

Where, as here, identification is the primary issue at trial, defense counsel's introduction of testimony about a pretrial photo identification has been found to constitute ineffective assistance of counsel. For instance, in People v. Hewitt, 95 A.D.3d 1358 (2d Dept. 2012), counsel opened door to testimony about a photo array, and had no strategic reason for doing so. The Second Department found that counsel's single error, which bolstered the reliability of the in-court identification by the People's witness, deprived the defendant of his Sixth Amendment right to competent counsel. Diaz's case presents facts similar to those compelling reversal in Hewitt, and should have the same result. See also People v. Echavarria, 167 A.D.2d 138, 139-40 (1st Dept. 1990) (defense counsel was ineffective for, among other things, failing to object to pretrial photo identification evidence); People v. Barnes, 70 A.D.2d 882, 883 (2d Dept. 1979) (counsel ineffective for opening door to otherwise inadmissible photographic identification evidence).

By counsel's own admission, opening the door to this evidence was a

70

"mistake." Counsel clearly did not want this damaging evidence, which undermined Diaz's misidentification defense, in front of the jury. He repeatedly asked the court to allow him to explain his mistake to the jury, rather than allowing the photographic identification evidence to come in. The prosecutor argued that counsel's mistake was unreasonable, as counsel had the photographic and lineup evidence in his possession for well over a year, so should have been familiar with the material. The prosecutor was right: counsel's mistake was inexcusable. Because there was no strategic or other reasonable rationale for opening the door to Jones's harmful photo array testimony, counsel was ineffective. Cf. People v. Pennington, 27 A.D.3d 269, 270 (1st Dept. 2006) (not ineffective to open the door to otherwise inadmissible photographic identification where doing so was strategic).

Because the blunder strengthened Jones's identification testimony, it is no wonder that counsel was desperate to keep this photographic identification out of the trial—and that the prosecutor was so keen to exploit it. As detailed in Point I, supra, Jones's identification testimony was assailable, and would have been more so without the photo identification evidence. For example, Jones was sure that the person shooting in Santiago's direction had not been wearing a hat, and that he could see the shooter's haircut, but Soto said that shooter was wearing a hat. Jones claimed he could see the shooter twice on the surveillance video, but later

essentially admitted that it was likely two different people. He also said that he saw the perpetrator shooting the gun, but retracted that claim later, revealing his willingness to exaggerate.

Had defense counsel not opened the door to testimony that Jones identified Diaz in a photo array five days after the incident, counsel could have seized on the length of time between the incident and his lineup identification—which occurred seven months later. But, instead of exploiting this weakness in the People's case, defense counsel squandered the opportunity by shoring up Jones's identification.

On summation, the prosecutor capitalized on counsel's mistake. He argued that counsel's impeachment attempt could have been the high point of the trial for the defense, but instead "the truth came out" (P 969). The prosecutor went on to emphasize that Jones was able to identify Diaz just days after the incident, so his identification must be reliable (P 984-86).

Thus, defense counsel prejudiced Diaz by opening the door to this highly damaging evidence, rendering ineffective assistance of counsel. See People v. Zaborski, 59 N.Y.2d 863, 865 (1982) (finding counsel ineffective when he, inter alia, opened the door to prejudicial evidence); People v. Mehmood, 112 A.D.3d 850, 854-55 (2d Dept. 2013) (finding counsel ineffective when he, inter alia, intentionally elicited inadmissible and unduly prejudicial testimony during

72

cross-examination); People v. McArthur, 101 A.D.3d 752 (2d Dept. 2012)

(defendant denied effective assistance of counsel when defense counsel opened

door to prejudicial testimony the jury would otherwise not have learned); People

v. Cyrus, 48 A.D.3d 150, 157-58 (1st Dept. 2007) (finding counsel ineffective for

opening the door to admission of damaging videotape evidence).

Furthermore, the court compounded counsel's error and caused even more

prejudice by refusing to limit the testimony. The court allowed Jones to offer

hearsay evidence—over objection—that he told police that he immediately

recognized Diaz as the shooter (Jones 565). Moreover, the court allowed the

prosecution to introduce the prejudicial array itself. Jones was able to use that

photograph to bolster his own description of what the shooter's facial hair looked

like at the time (Jones 567).

Even though counsel opened the door to the fact that Jones identified Diaz

in a photo array, the court should have cabined the prejudice by limiting it to that

fact alone. By also admitting into evidence the photo array and Jones's

inadmissible hearsay testimony that he told police that he recognized Diaz

immediately, the court made counsel's error worse. See People v. Melendez, 55

N.Y.2d 445, 452 (1982) (where a party opens the door to evidence on cross-

examination, "the court should only allow so much additional evidence to be

introduced on redirect as is necessary to meet what has been brought out in the

meantime") (internal citations omitted); <u>People v. Jackson</u>, 25 A. D.3d 808, 809

(2d Dept. 2006) (where photo array testimony was introduced to clarify the

confusion created by cross-examination, photo array itself should not have been

admitted into evidence); <u>People v. Wilson</u>, 195 A.D.2d 493, 494 (2d Dept. 1993)

(where defense opened door to witness testimony that he had previously

identified defendant in photo array, it was improper to introduce photo array itself

into evidence).

In sum, because counsel's actions fell well below prevailing professional

norms and severely prejudiced Diaz, his conviction should be vacated and a new

trial ordered.

## POINT V

APPELLANT WAS DENIED A FAIR TRIAL
WHERE THE COURT IMPROPERLY REQUIRED
A WITNESS TO INCRIMINATE HIMSELF ON AN
OPEN CRIMINAL MATTER AND PLACED
SIGNIFICANT RESTRICTIONS ON
APPELLANT'S ABILITY TO QUESTION THAT
WITNESS. U.S. CONST. AMENDS. VI, XIV; N.Y.
CONST. ART. I, §6.

Latroy Ewell had yet to be sentenced for his role in the incident that

resulted in Santiago's death, but the prosecution called him to testify. In an

apparent attempt to protect some of Ewell's Fifth Amendment rights, the court

crafted a prospective ruling that forced him to answer certain questions but

allowed him to invoke his Fifth Amendment privilege in response to others. This

74

ruling deprived defense counsel of the chance to elicit material facts about the crime. Further, the court's refusal to strike Ewell's testimony or issue a curative instruction violated Diaz's Sixth Amendment rights and requires reversal. U.S. Const. Amends. VI, XIV; N.Y. Const., art. I, §6.

Facts Relevant to the Issue

Before Ewell was called to testify, the prosecutor and Ewell's defense attorney told the court that Ewell would assert his Fifth Amendment privilege "on every single question that is posed to him with regard to this case" (P 568, 576). Citing People v. Cantave, 21 N.Y.3d 374 (2013), Ewell's attorney, Steven Kessler, argued that Ewell should not have to answer any questions about the incident because his case was still pending; he had pleaded guilty, but had not been sentenced. Furthermore, Kessler told that court that because Ewell intended to appeal—and, indeed, Kessler had already drafted a notice of appeal for his client—Ewell "remains at risk of self-incrimination until he's exhausted his right to appeal" (P 569-71, 576). Additionally, Kessler noted that the gun Ewell pled guilty to possessing "may turn out to have been used or maybe tied to a homicide case down the road" (P 572), exposing Ewell to harm in a future case.

The prosecutor answered that he intended to ask Ewell about "the fight he saw . . . . The discussion he had and then the shooting and it ends there" (P 577).

Despite the judge not having sentenced Ewell yet, she found that Ewell's

75

case was "not . . . open" (P 571). Therefore, the court would require Ewell to answer questions about what occurred on September 22, 2009—specifically, questions about "what he admitted in the plea allocution" (P 577-78). However, Ewell could not be asked about any other "criminal conduct" and could invoke his Fifth Amendment privilege if asked any questions that were "inculpatory" (P 579-80).

Diaz's defense attorney noted that "until Mr. Ewell testifies at trial we don't know what he is going to say . . . and how he is going to say it," so asked for a hearing to determine which questions Mr. Ewell would answer (P 580). The court denied counsel's request, assuring him that "there is no question that the People will ask him that will elicit inculpatory [sic], and if he asserts the fifth then he will assert the fifth" (P 580).

Ewell started by testifying that he did not appear voluntarily, but that he was not "here to get a better deal" and was not a "cooperating witness" (Ewell 584-85). Ewell attempted to invoke his Fifth Amendment right seven times, but the court rejected the request and forced Ewell to answer questions recounting the following: on the day of the incident, Ewell lived at 409 146th Street (Ewell 585). That day, he saw Gordo—with whom he had been friends for seven years—in a fight with three "Spanish" men Ewell had never seen before; the three men were "beating" Gordo (Ewell 586-88). Ewell intervened as a "peacemaker" in the fight

76

when he "grabbed" Gordo (Ewell 588). After the fight, Ewell did not see where
Gordo or the three men went, but Ewell went into the bodega on the corner of
146th St. (Ewell 588-89). About 15 to 30 minutes later, he saw one of the men
who had been fighting Gordo standing on the corner of 146th and Willis, and
asked the man what happened (Ewell 589-90). Ewell attempted to make peace
again, but the man "didn't accept my peace offer" and Ewell returned home
(Ewell 590-91). He then heard more than one gunshot, and his brother, who
apparently was standing nearby, pushed him to the ground (Ewell 591-92). He
looked toward 146th and Willis when the gunfire stopped but could not recall
what he saw (Ewell 592).

 The prosecutor asked what Ewell did at that point, but Ewell successfully
invoked his right against self-incrimination and did not answer the question. He
was forced to admit that he pled guilty to criminal possession of a weapon with
the intent to use unlawfully, but was repeatedly allowed to refuse to answer what
kind of gun he possessed (Ewell 592-93). He was allowed to assert his right not to
answer whom he was going to use his gun against, and whether he discharged his
gun (Ewell 593-94).

 When the prosecutor asked whether Ewell intended to use his gun against
another person, Ewell attempted to invoke his privilege, but the court forced him
to answer, and Ewell said, "I used my firearm in self defense," but could not recall

77

how (Ewell 595). When the prosecutor asked Ewell what he "mean[t] by 'self-defense'" the court allowed him to invoke his right against self-incrimination. The prosecutor then asked if somebody fired at Ewell before he committed his crime. Diaz's attorney objected, but the court allowed him to answer "yes." Ewell then testified that he was set to receive a 10-year sentence for his crime (Ewell 595-96).

Defense counsel did not cross-examine Ewell, and the jury was excused for the day.

The next morning, before the jury returned, counsel argued that the court's prospective ruling "precluded [him] from going into the self defense issue" (P 609). Counsel said that, because the court had ruled that Ewell would not be required to answer any questions regarding what happened "after the event . . . other than possessing the weapon," defense counsel was precluded from "questioning him further" on the self-defense claim (P 609, 611). He also argued that the court's ruling constituted a "Crawford" error. As for remedy, defense counsel said that the "first thing I'm asking for is a curative instruction to the jury. I would make a mistrial application but I doubt the court would grant that" (P 609-10). Specifically, counsel asked that the jury be charged that, because Ewell asserted his Fifth Amendment right, counsel "was prevented from going any further." As an alternative, counsel requested that Ewell's testimony be struck (P 609-11).

The prosecutor responded that counsel had the chance to question Ewell but chose not to, so no violation occurred (P 610). Moreover, he argued that Ewell's Fifth Amendment right "applies to his own conduct not his observation of what others did," so the court rightfully forced Ewell to answer questions about what he saw others do.

In response, defense counsel noted that when Ewell asserted self-defense, he was talking about his own actions (P 611). He also reminded the court that it had initially ruled that Ewell would not be asked or forced to answer questions about using the gun (P 611).

The court denied counsel's application. First, it said that counsel declined to cross-examine Ewell and "didn't raise this issue when it was an easy matter if it was an error to fix" (P 611). In any case, the court said that Ewell "blurted out self-defense" and that "there was nothing that implicated your client, there was nothing that he said that in any way implicated your client directly" (P 612). The court believed that the ruling benefitted Diaz: "the self-defense and being precluded from being asked about the details of that protected" him (P 612). The court noted counsel's exception to the ruling (P 612).

Legal Argument

As a threshold matter, the court should not have forced Ewell to answer any questions about the shooting, as he had not even been sentenced for his role

79

in the incident. Because Ewell had not been sentenced—much less exhausted his appeal—any questions he was forced to answer about the incident violated his right against self-incrimination and should not have been introduced at Diaz's trial. As the Court of Appeals has unambiguously held, a defendant's Fifth Amendment right not to incriminate himself extends to post-conviction proceedings, and, as a categorical matter, a person cannot be questioned on a criminal matter if that questioning risks exposure or further incrimination. People v. Cantave, 21 N.Y.3d 374, 379-81 (2013); accord Mitchell v. United States, 526 U.S. 314, 326 (1999) (holding the Fifth Amendment privilege extends to sentencing even after a guilty plea because "[w]here the sentence has not yet been imposed a defendant may have a legitimate fear of adverse consequences from further testimony.") The logic animating the Court in Cantave applied with even more force here. Ewell's attorney told the court that Ewell was going to appeal his guilty plea, so anything that Ewell said could be used against him were he to receive a new trial, just as in Cantave. More immediately risky for Ewell was that he had not even been sentenced on the instant case. As his attorney pointed out, any testimony Ewell gave—or refused to give—at Diaz's trial could affect his pending sentencing.

In an apparent compromise, the court ruled that Ewell must answer questions about facts he had already pleaded guilty to, but permitted him to

invoke his Fifth Amendment right with regards to any other "criminal conduct."
The court believed that all other questions about the incident were not
"inculpatory." The court was wrong to parse Ewell's testimony into such fine
categories. Any and all testimony that Ewell gave regarding the
incident—including that he was at the scene, knew Gordo, intervened in the fight
between Gordo and Irrizary, and possessed a gun and intended to use it—can
later be used against him at a new trial.

Instead of precluding Ewell from answering any questions about the
incident as it should have, the court prospectively and selectively limited his
testimony in a way that violated Diaz's confrontation rights because it prevented
defense counsel from asking Ewell about material issues. At the very least, the
court should have granted counsel's request for a hearing to determine which
questions Ewell would be asked and which he would answer, to avoid prejudicial
testimony unfolding before the jury. Doing so could have avoided the error that
now requires reversal.

A defendant is entitled to an "adequate opportunity" to cross-examine
witnesses, Crawford, 541 U.S. 36, and a defendant has been deprived of such an
"adequate" opportunity when "the witness invokes his Fifth Amendment privilege
on material matters", such as bias, interest, or substantive testimony relating to the
crime in question. People v. Chin, 67 N.Y.2d 22, 28 (1986); accord Bagby v.

Kuhlman, 932 F.2d 131, 135 (2d Cir. 1991) (a defendant's confrontation rights are violated where witness's invocation of the Fifth Amendment privilege "precludes inquiry into the details of his or her direct testimony"); People v. McLeod, 122 A.D.3d 16, 19 (1st Dept. 2014). After all, "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." Davis v. Alaska, 415 U.S. 308, 316 (1974). Cross-examination is so important that the absence of proper confrontation at trial calls into question the ultimate integrity of the fact-finding process. Chambers v. Mississippi, 410 U.S. 284 (1973) (quoting Crawford, 541 U.S. 36; and Berger v. California, 393 U.S. 314, 315 (1969)).

The court's prospective ruling created a patchwork of evidence that prejudiced Diaz because it precluded counsel from following up on certain information elicited during Ewell's direct testimony. For example, even though Ewell was forced to testify that he intended to use his gun unlawfully, he was allowed to invoke his right not to answer questions about what kind of gun he used or what kind of bullets were in his gun. Without being able to question Ewell about this issue, counsel was unable to tie Ewell's weapon—whether it was a .9 mm, .22 mm, or .45 mm—to any ballistics found at the scene, or to the shot that killed Santiago. Defense counsel was thus precluded from eliciting information that might have implicated Ewell in Santiago's killing, shielding Ewell from further

82

prosecution but disallowing Diaz to benefit from potentially exculpatory evidence.

Even more damaging, the court allowed Ewell to invoke his right against self-incrimination when asked what he meant by "self-defense," but, over counsel's objection, forced Ewell to answer whether somebody fired at Ewell before he committed his crime. The clear implication of Ewell's testimony was that he had fired back at somebody who had fired at him first. But because of the court's prospective ruling barring any question about his own criminal conduct beyond the facts he pleaded to, counsel was precluded from probing further into Ewell's claim of self-defense. Counsel was thus unable to elicit potentially helpful facts, such as the fact that Ewell might have intended to use the gun against a person other than Diaz—such as Irrizary, Pena-Guzman, or Manuel or Raul Irrizary—who was shooting at him, and by extension, at Santiago.

Moreover, the court's prospective ruling also precluded counsel from impeaching Ewell with the fact that his self-defense claim—which would have made his intent to use his gun lawful—conflicted with his guilty plea, in which he admitted using the gun illegally. In this way, counsel could not explore Ewell's truthfulness, or whether he was offering a self-serving account of the crime designed to target others in order to minimize his own role. Compounding the unfairness, the prosecution fully exploited this "self-defense" claim for its own benefit, by repeatedly arguing in summation that Ewell shot back at Diaz in "self

defense", even though the prosecution knew that Ewell had pleaded guilty to using the gun <u>unlawfully</u> (P 949, 983-84).

The court further harmed Diaz by refusing counsel's request to issue a curative instruction or strike Ewell's testimony. It is well established that when a witness asserts his Fifth Amendment privilege to avoid answering questions on material matters, the appropriate course is for the trial court to strike the testimony. <u>See</u> <u>Chin</u>, 67 N.Y.2d at 22 (appropriate remedy where witness invokes privilege with respect to material matters is striking the testimony); <u>People v. Siegel</u>, 87 N.Y.2d 536, 543-44 (1995) (the entire testimony of a witness should be struck when he refuses to testify on questions of matters "closely related to the commission of the crime") (citing <u>United States v. Cardillo</u>, 316 F.2d 606 (2d Cir. 1963)).

Because Ewell refused to answer questions about the incident, the court should have struck his testimony or, at the least, issued a curative instruction. Both of the court's rationales for denying counsel's requests were inapt. First, the court said that Ewell "blurted out self-defense." However, the court's surprise at Ewell's answer does not insulate or cure its error. In fact, it highlights why the court's attempts to prospectively circumscribe Ewell's testimony were so unjust. Had the court granted defense counsel's request for a hearing to review the scope of Ewell's testimony, his answer would not have been a surprise to anybody. In

84

any case, it was the court's doubly unfair ruling—allowing Ewell to answer some inculpatory questions but not potentially exculpatory ones—that created the conditions for Ewell to answer that he fired the gun in self-defense. The court should not have thereafter denied Diaz an opportunity to minimize the damage.

Second, the court reasoned that "there was nothing that implicated your client, there was nothing that he said that in any way implicated your client directly" (P 612). But this misapprehends the scope and rationale of Diaz's Sixth Amendment right to confrontation. The confrontation right is meant to ensure a defendant's right to cross-examine witnesses who offer <u>any</u> testimony against him. <u>See</u> <u>Crawford</u>, 451 U.S. at 51 (reaffirming that the Confrontation Clause "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.'") (citing 2 N. Webster, <u>An American Dictionary of the English Language</u> (1828)). At the very least, a defendant is entitled to cross-examine a witness about material issues, including bias, motive to lie, and material factual issues discussed on direct examination. <u>See</u> <u>Delaware v. Van Arsdall</u>, 475 U.S.673, 678-79 (1986); <u>Chin</u>, 67 N.Y.2d at 28; <u>McLeod</u>, 122 A.D.3d at 19. This right is not bounded by a trial court's view about whether the witness's testimony "directly" implicates the defendant. The court was thus wrong to refuse to issue a curative instruction or to strike Ewell's testimony based on its assessment that Ewell's testimony for the People was somehow not incriminating. In any case, the court was wrong: Ewell's

self-defense claim <u>was</u> damaging. The clear implication was that someone had fired at Ewell first, thereby supporting the prosecution's theory that Diaz fired the first shots from the corner of 146th and Willis.

Ultimately, Ewell's testimony, and defense counsel's effective inability to cross-examine Ewell on crucial material issues because of the court's prospective ruling, so distorted the fact-finding process that it deprived Diaz a fair trial. <u>See</u> <u>Mitchell</u>, 526 U.S. at 322 (the privilege against self-incrimination may not be used to leave the fact-finder with a distorted version of the truth); <u>Klein v. Harris</u>, 667 F.2d 274 (1981); <u>Chin</u>, 67 N.Y.2d 22; 35A Carmody-Wait 2d § 195:97 ("The ultimate question is whether the defendant's inability to test the accuracy of the witness's direct examination has been such to create a substantial risk of prejudice"). As this Court has noted, while courts are accorded discretion in determining which evidence to admit, "a trial court's discretion should be narrowly construed when a defendant's fundamental rights are at issue, and the confrontation right is perhaps as fundamental as any other." <u>McLeod</u>, 122 A.D.3d at 19 (citing <u>People v. Foy</u>, 32 N.Y.2d 473, 476–77, (1973)).

Diaz was especially harmed because, as set forth in Point I, <u>supra</u>, the proof of Diaz's guilt was far from overwhelming, and was in fact against the weight of the evidence. The court's rulings curtailing legitimate lines of cross-examination prevented the defense from developing a clear picture of Ewell's true character

86

and motivations, as well as material factual issues related to the shooting that might have helped Diaz's defense. See McLeod, 122 A.D.3d at 21 (not harmless where court curtailed cross-examination that could have revealed witness's bias and motive to fabricate testimony).

This claim is preserved for appellate review. Ewell's attorney argued that he should not be forced to testify, citing Cantave. Diaz's attorney then took exception to the court's requirement that he testify by asking the court to hold a hearing to determine the scope of Ewell's testimony. The court denied counsel's request. During Ewell's testimony, counsel objected to Ewell answering whether somebody shot at him before he fired his gun, on the heels of being allowed to assert his privilege when asked other questions about his self-defense claim. After Ewell testified, counsel noted that it had relied on the court's prospective ruling curbing the scope of Ewell's testimony, and asked the court for a limiting instruction or to strike Ewell's testimony, the proper remedy when a witness provides some testimony on direct examination but refuses to answer questions related to a material issue. See Chin, 67 N.Y.2d at 22; Siegel, 87 N.Y.2d at 543-44.

The court was wrong to admonish defense counsel for not raising this issue "when it was easy to fix" (P 611-12). The jury was excused for the day as soon as Ewell finished testifying; counsel asked for the court to issue a curative instruction or strike the testimony the next morning, before the jury had been called in. See

87

Cantave, 21 N.Y.3d at 378-379 (finding counsel's request that the court reconsider its Sandoval ruling preserved where the request was made before closing statements). Nor would it have been fair to expect counsel to ask Ewell questions on cross-examination despite the court's clear prospective ruling. After all, a "lawyer is not required, in order to preserve a point, to repeat an argument that the court has definitively rejected." People v. Finch, 23 N.Y.3d 408, 413 (2014). In any case, such attempts would have been pointless. The court acknowledged it would have precluded defense counsel from eliciting further testimony from Ewell about his self-defense claim even if he had attempted to ask such questions (P 612). Finally, even though it admonished counsel for not raising the issue earlier and questioning Ewell on the matter, the court considered defense counsel's arguments, rejected them, and told counsel that it "ha[d] an exception" to its ruling, preserving the issue (P 612). See C.P.L. § 470.05.

Should this Court find the claim unpreserved, it should review it in the interest of justice, as the errors were obvious. In the alternative, if this Court rejects the argument that the court's prospective ruling rendered futile any attempts by counsel to question Ewell on his self-defense claim, it should find that counsel's failure to raise the issue before Ewell's testimony concluded amounted to ineffective assistance of counsel under federal and state standards. See Strickland, 466 U.S. at 688, 694; Benevento, 91 N.Y.2d at 712; Baldi, 54 N.Y.2d at

88

147. Counsel's decision to wait until the next day to protest the court's limitation on cross-examination did not serve any strategy, in light of his efforts to strike Ewell's testimony the next day.

In sum, the court's ruling forcing Ewell to testify about some inculpatory facts but not others, prejudiced Diaz in front of the jurors, and denied him the right to confront this witness against him. The conviction should be reversed and a new trial ordered.

## POINT VI

### APPELLANT'S 25-YEAR SENTENCE, THE MAXIMUM PERMITTED, IS UNDULY HARSH.

At sentencing, the court heard starkly conflicting and heartfelt pleas: from Santiago's family and the prosecutor, that Diaz should receive the harshest possible punishment; and from Diaz—though he sympathized with the family's pain—one of his innocence. The court also heard counsel's measured request—premised on his client's background and the recklessness of the shooting—for a sentence of between 10 and 15 years. A sentence that was less than the maximum would have respected the family's loss while appropriately accounting for other factors, including Diaz's personal history and New York's penal goals. Because the maximum allowable sentence of 25 year's imprisonment

was excessively harsh, we respectfully ask this Court to reduce it.[18]

This Court has "broad, plenary power to modify a sentence that is unduly harsh or severe under the circumstances, even though the sentence may be within the permissible statutory range." People v. Delgado, 80 N.Y.2d 780, 783 (1992); see C.P.L. § 470.15(6)(b); People v. Rosenthal, 305 A.D.2d 327, 329 (1st Dept. 2003). "This power may be exercised in the interest of justice and without deference to the sentencing court . . . 'even where a trial court has not abused its discretion.'" People v. Barone, 101 A.D.3d 585 (1st Dept. 2012) (quoting People v. Edwards, 37 A.D.3d 289, 290 (1st Dept. 2007)).

The sentencing court must be guided by the overriding principle that a minimum sentence should be imposed consistent with the public's protection, the offense's gravity, and the defendant's rehabilitative needs. People v. Notey, 72 A.D.2d 279, 282-83 (2d Dept. 1980). The American Bar Association standards for sentencing echo New York's holdings, noting that sentences "should be no more severe than necessary," and "in each case should be the minimum sanction that is consistent with the gravity of the offense, the culpability of the offender, the offender's criminal history, and the personal characteristics of an individual offender." ABA Standards for Sentencing, General Principles, Standard 18-6.1(a) (3d ed. 1994) (emphasis added). A reduced sentence for Diaz would be consistent

---

[18] The sentencing range for a second felony offender convicted of first-degree manslaughter, a B felony, is eight to 25 years. Penal Law § 70.06(6).

90

with the above goals.

This Court has in the past relied on its discretionary power to reduce sentences of first-degree manslaughter. See, e.g., People v. Delgado, 116 A.D.3d 541 (1st Dept. 2014) (reducing sentence from 25 to 20 years); People v. Morales, 104 A.D.3d 560 (1st Dept. 2013) (reducing sentence from 25 to 20 years); People v. Brown, 67 A.D.3d 523 (1st Dept. 2009) (reducing from 22 years to 20 years). Accordingly, there is ample precedence for a discretionary sentence reduction for a first-degree manslaughter conviction.

This Court has also exercised mercy even in more serious and violent crimes, including those where the defendant harmed more than one person. See, e.g., People v. Colon, 133 A.D.3d 532 (1st Dept. 2015) (consecutive sentences, for first- and second-degree murder and first-degree robbery and related crimes, aggregating to 40 years to life, reduced to an aggregate term of 25 years to life); People v. Page, 63 A.D.3d 506, 507 (1st Dept. 2009) (consecutive sentences, for murder and attempted murder and related crimes, aggregating to 60 years to life, reduced to a "new aggregate term of 25 years to life"); People v. Chin, 3 A.D.3d 427, 427 (1st Dept. 2004) (reducing minimum sentence for second-degree murder from 25 to 15 years).

We respectfully request that this Court exercise its mercy in this case. Diaz does not deny the gravity of the crime and its devastating impact on Santiago's

family and friends. Nor, for the purposes of this argument, can he contest the jury's judgment holding him responsible for the reckless behavior that resulted in Santiago's death. But the verdict—rejecting the prosecutor's argument that Diaz intended to kill anybody—supported counsel's plea for leniency. After all, the reckless nature of first-degree manslaughter is accounted for by the sentencing range set by the legislature, and there are no aggravating factors to suggest that the maximum sentence was appropriate here.

Instead, the Osborne Association found that, far from a hardened criminal, Diaz has the potential to become a "success story." Facing an extraordinarily difficult home life, he turned to drugs and alcohol as a way to self-medicate, and to drug dealers for protection. He was arrested several times because of his involvement with drugs, and has been convicted of one drug-related felony, but never exhibited violent behavior. This Court has seen fit to reduce sentences for offenders with much more extensive criminal histories than Diaz's. See, e.g., People v. Cowell, 170 A.D.2d 343, 344 (1st Dept. 1991) (reducing sentences for predicate felony offender whose 22 prior convictions were mostly larceny or drug-related). Ultimately, Diaz's personal history and potential for rehabilitation suggests a lower sentence would be more appropriate.

In sum, Santiago's death called for substantial punishment. But Diaz's sentence is excessively harsh. We ask that this Court reduce it.

<u>CONCLUSION</u>

FOR THE REASONS STATED IN: POINT I, THE
CONVICTION SHOULD BE REVERSED AND
THE INDICTMENT DISMISSED; POINTS II-V,
APPELLANT'S CONVICTION SHOULD BE
REVERSED AND A NEW TRIAL ORDERED; IN
POINT VI, APPELLANT'S SENTENCE SHOULD
BE REDUCED.

Respectfully submitted,

ROBERT S. DEAN
Attorney for Defendant-Appellant.

Rachel T. Goldberg
Of Counsel
January 2017

93

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: FIRST DEPARTMENT
-----------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,     :

               Respondent,           :

               -against-            :

JOSEPH DIAZ                       :

               Defendant-Appellant.     :
-----------------------------------------------------------------------x

STATEMENT PURSUANT TO RULE 5531

1.     The indictment number in the court below was 3971/09.

2.     The full names of the original parties were People of the State of New York against Robert Vargas, Joseph Diaz a/k/a Fire, and Latroy Ewell a/k/a Mac a/k/a Troy. This appeal is for Joseph Diaz only.

3.     This action was commenced in Supreme Court, Bronx County.

4.     This action was commenced by the filing of an indictment.

5.     This is an appeal from a judgment of the Supreme Court, Bronx County, convicting appellant, after trial, of first-degree manslaughter (Penal Law § 125.20(01)), and sentencing him, as a second felony offender, to 25 years' imprisonment, to be followed by 5 years' post-release supervision (Newman, J., at trial and sentence).

6.     This is an appeal from a judgment of conviction rendered December 10, 2014.

7.     Appellant has been granted permission to appeal as a poor person on the original record. The appendix method is not being used.

A-1

<u>PRINTING SPECIFICATIONS STATEMENT</u>

This brief was prepared in WordPerfect 6, using a 14-point Garamond font in the text and headings, and 12-point Garamond font in the footnotes. The word count is 22,146, excluding the Table of Contents and Table of Authorities.

*To be argued by*:
**MARIANNE STRACQUADANIO**

## NEW YORK SUPREME COURT

# APPELLATE DIVISION — FIRST DEPARTMENT

### THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

-against-

### JOSEPH DIAZ,

Defendant-Appellant.

## RESPONDENT'S BRIEF

**DARCEL D. CLARK**
*District Attorney*
Bronx County
Attorney for Respondent
Bronx, New York 10451
718-838-6103
stracquadaniom@bronxda.nyc.gov

**PETER D. CODDINGTON**
**MARIANNE STRACQUADANIO**
Assistant District Attorneys
Of Counsel

### PRINTED ON RECYCLED PAPER

## <u>TABLE OF CONTENTS</u>

**RESPONDENT'S BRIEF**.................................................................**1**

**STATEMENT**.................................................................................**1**

**QUESTIONS PRESENTED**..........................................................**2**

**THE FACTS** ..................................................................................**3**

**ARGUMENT** ...............................................................................**11**

    POINT ONE:

        DEFENDANT'S GUILT WAS PROVEN BEYOND A
        REASONABLE DOUBT BY OVERWHELMING
        CREDIBLE EVIDENCE. ...........................................................11

    POINT TWO:

        DEFENDANT'S CONFRONTATION RIGHTS WERE
        NOT VIOLATED BY THE ADMISSION OF THE
        CRIME SCENE REPORT AND DIAGRAMS, SINCE
        DET. JACKLITSCH'S CRIME SCENE REPORT AND
        DIAGRAM WERE NOT TESTIMONIAL, AND SINCE
        DET. BROWN WAS CROSS-EXAMINED ABOUT
        THE CREATION OF HIS OWN CRIME SCENE
        DIAGRAM. ................................................................................16

    POINT THREE:

        THE TRIAL COURT PROPERLY PERMITTED
        TESTIMONY THAT JASON IRRIZARY WAS NOT
        ARRESTED TO COMPLETE THE NARRATIVE
        THAT LED TO DEFENDANT'S ARREST. ........................................27

    POINT FOUR:

        DEFENDANT RECEIVED EFFECTIVE
        ASSISTANCE OF COUNSEL. ..................................................36

    POINT FIVE:

        DEFENDANT'S CONFRONTATION RIGHTS WERE
        NOT VIOLATED, SINCE DEFENDANT HAD THE
        OPPORTUNITY TO CROSS-EXAMINE LATROY
        EWELL. ....................................................................................42

i

POINT SIX:

DEFENDANT'S SENTENCE IS FAIR AND PROPER. .................. 50

**CONCLUSION**.....................................................................................**52**

**PRINTING SPECIFICATIONS STATEMENT** ...........................................**53**

# TABLE OF AUTHORITIES

## Federal Cases

*Bagby v. Kuhlman*, 932 F.2d 131 (2d Cir. 1991)..................................................... 48

*California v. Green*, 399 U.S. 149 (1970)........................................................... 48

*Crawford v. Washington*, 541 U.S. 36 (2004) ...............................................passim

*Davis v. Washington*, 547 U.S. 813 (2006) ........................................................ 20

*Hill v. Lockhart*, 474 U.S. 52 (1985).................................................................. 37

*Kimmelman v. Morrison*, 477 U.S. 365 (1986) ................................................... 37

*Lindstadt v. Keane*, 239 F.3d 191 2d Cir. 2001) ............................................... 37

*Mason v. Scully,* 16 F.3d 38 (1994)..................................................................... 32

*Michigan v. Bryant*, 562 U.S. 344 (2011) ........................................................... 20

*Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001) ................................................... 37

*Ryan v. Miller*, 303 F.3d 231 (2d Cir 2002) ....................................................... 33

*Strickland v. Washington*, 466 U.S. 668 (1984) ................................................. 37

*United States v. James*, 712 F.3d 79, 99 [2d Cir.2013]...................................... 24

*United States v. Owens*, 484 U.S. 554  (1988)................................................... 47

*United States v. Wilmore*, 381 F.3d 868 (9th Cir. 2004)..................................... 48

## State Cases

*In re Umer K.*, 257 A.D.2d 195, 196 (1st Dept. 1999) ........................................ 51

*People v. Baldi*, 54 N.Y.2d 137 (1981) ............................................................... 38

*People v. Benevento*, 91 N.Y.2d 708 (1998) ...................................................... 37

*People v. Bleakley*, 69 N.Y.2d 490 (1987)......................................................... 12

*People v. Brady*, 97 N.Y.2d 233 (2002) ............................................................. 43

*People v. Brown,* 13 N.Y.3d 332 (2009)...................................................18, 22, 23

*People v. Brown*, 278 A.D.2d 177 (1st Dept. 2000) ........................................... 12

*People v. Buie*, 86 N.Y.2d 501 (1995)................................................................ 31

iii

*People v. Caban*, 5 N.Y.3d 143 (2005) ....................................................................38, 39, 41

*People v. Cantave,* 21 N.Y.3d 374 (2013) ....................................................................... 42, 43

*People v. Cantres*, 238 A.D.2d 56 (1st Dept. 1997)............................................................ 12

*People v. Cardona,* 243 A.D.2d 267 (1st Dept. 1997) ........................................................ 47

*People v. Ciaccio*, 47 N.Y.2d 431 (1979)............................................................................. 35

*People v. Cintron*, 95 N.Y.2d 329 (2000)............................................................................. 12

*People v. Crimmins*, 36 N.Y.2d 230 (1976) ................................................................... 36, 50

*People v. Danielson*, 9 N.Y.3d 342 (2007)........................................................................... 11

*People v. Delgado*, 80 N.Y.2d 780 (1992) ........................................................................... 50

*People v. Demand*, 268 A.D.2d 901 (3d Dept. 2000) .......................................................... 15

*People v. Dorcinvil*, 122 A.D.3d 874 (2d Dept. 2014) .................................................... 33, 34

*People v. Encarnacion*, 87 A.D.3d 81 (1st Dept. 2011) ...................................................... 47

*People v. Farruggia*, 77 AD2d 447 (4th Dept 1980)........................................................... 48

*People v. Freycinet,* 11 N.Y.3d 38 (2008) .................................................................18, 20, 24

*People v. Garcia*, 19 A.D.3d 215 (1st Dept. 2005).............................................................. 35

*People v. Garcia*, 25 N.Y.3d 77 (2015)........................................................................... 32, 33

*People v. Harris*, 98 N.Y.2d 452, 492 (2002)...................................................................... 47

*People v. Hull,* 84 A.D.3d 79 (3d Dept. 2011)..................................................................... 18

*People v. Iglesias*, 47 A.D.3d 593 (1st Dept. 2008)............................................................. 40

*People v. Iiori*, 52 A.D.3d 419 (1st Dept. 2008).................................................................. 39

*People v. Inoa*, 25 N.Y.3d 466 (2015).................................................................................. 35

*People v. John*, 27 N.Y.3d 294, (2016)........................................................................20, 21, 24

*People v. Johnson*, 7 A.D.3d 395 (1st Dept. 2004)............................................................. 46

*People v. Marshall*, 106 A.D.3d 1, 10 (1st Dept. 2013) ...................................................... 50

*People v. McManus*, 67 N.Y.2d 541 (1986) ........................................................................ 44

*People v. Medina*, 93 A.D.3d 459 (1st Dept. 2012)............................................................. 31

*People v. Mendoza*, 35 A.D.3d 507 (2d Dept.2006) ............................................................ 36

iv

*People v. Moore*, 216 A.D.2d 218 (1st Dept. 1995) ................................................ 36

*People v. Pabon*, 28 N.Y.3d 147 (2016) ................................................ 35

*People v. Pealer*, 20 N.Y.3d at 447 (2013) ................................................ 20, 21, 23, 24

*People v. Pennington*, 27 A.D.3d 269 (1st Dept. 2006) ................................................ 40

*People v. Perez*, 47 A.D.3d 409 (1st Dept. 2008) ................................................ 34

*People v. Polidore*, 181 A.D.2d 835 (2d Dept. 1992) ................................................ 32

*People v. Rawlins*, 10 N.Y.3d 135 (2008) ................................................ 21, 23, 26

*People v. Reid*, 298 A.D.2d 191 (1st Dept. 2002) ................................................ 31

*People v. Rivera*, 234 A.D.2d 148 (1st Dept. 1996) ................................................ 32

*People v. Rivera*, 71 N.Y.2d 705 (1988) ................................................ 39

*People v. Robinson*, 36 N.Y.2d 224 (1975) ................................................ 46

*People v. Sanchez*, 40 A.D.3d 468 (1st Dept. 2007) ................................................ 31

*People v. Satterfield*, 66 N.Y.2d 796 (1985) ................................................ 38

*People v. Silvestre*, 279 A.D.2d 364 (1st Dept. 2001) ................................................ 40

*People v. Sobotker*, 61 N.Y.2d 44 ................................................ 43

*People v. Stulz*, 2 N.Y.3d 277 (2004) ................................................ 39

*People v. Tosca*, 98 N.Y.2d 660 (2002) ................................................ 34

*People v. Turner*, 5 N.Y.3d 476 (2005) ................................................ 38, 41

*People v. Vera*, 194 A.D.2d 404 (1st Dept. 1993) ................................................ 50

*People v. Webster*, 139 N.Y. 73 (1893) ................................................ 49

*People v. Wright*, 283 A.D.2d 712 (3d Dept. 2001) ................................................ 36

v

## State Statutes

Article I, §6 of the New York Constitution ................................................................. 17, 20

CPL § 440.10 .................................................................................................................... 40

CPL § 470.05 .................................................................................................................... 31

CPL § 470.15 .................................................................................................................... 50

Penal Law § 125.20 ................................................................................................... 1, 3, 50

Penal Law § 125.25 ............................................................................................................ 3

Penal Law § 265.03 ............................................................................................................ 3

Penal Law § 70.06 ............................................................................................................ 51

## Constitutional Authority

Amendment VI to the United States Constitution ...................................................... 17, 20

Article I, §6 of the New York Constitution ................................................................. 17, 20

## Other Authorities

Richardson, Evidence § 6-415 (Farrell 11th ed.) ........................................................... 49

Richardson, Evidence § 8-104 (Farrell 11th ed.) ........................................................... 33

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: FIRST DEPARTMENT
------------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

                    Respondent,

       -against-

JOSEPH DIAZ,

                  Defendant-Appellant.
------------------------------------------------------------------------X

## RESPONDENT'S BRIEF

## STATEMENT

    Defendant appeals from a judgment of the Supreme Court, Bronx County, rendered December 10, 2014, convicting him, by jury verdict, of first-degree manslaughter (Penal Law § 125.20 [1]), and sentencing him, as a second felony offender, to a determinate term of 25 years' incarceration and five years' post-release supervision (Newman, J.). Defendant is incarcerated.

## QUESTIONS PRESENTED

1. Whether the weight of the evidence established beyond a reasonable doubt that defendant caused the death of Aisha Santiago.

      The jury so found.

2. Whether the court's rulings admitting a non-testifying detective's crime scene report and diagram, as well as a testifying detective's diagram, afforded defendant a fair trial.

      The court ruled that the admission of the non-testifying detective's crime scene report, and the photographs within it did not violate defendant's *Crawford*[1] rights, and that counsel's objections regarding the crime scene diagrams went to their weight, not their admissibility (T.96-97,105).[2]

3. Whether the court's evidentiary rulings admitting testimony that another individual was not arrested for this crime was improper hearsay or opinion evidence.

      The court below did not have the opportunity to rule on this issue below, since counsel did not fully develop the rational that defendant now adopts. In any event, the court's ruling demonstrated that it was this evidence was admitted in order to complete the narrative (*see* T.698).

4. Whether defendant was afforded meaningful representation.

5. Whether defendant's confrontation rights were violated when the court ruled that the People's witness could invoke the Fifth Amendment during direct examination on inculpatory matters, and when, in response, defense counsel declined to cross-examine that witness.

      The court below found that defendant waived this claim when he elected not to cross-examine the witness (T.611).

6. Whether defendant's sentence is fair and proper.

---

[1] *Crawford v. Washington*, 541 U.S. 36 (2004)
[2] Numerals preceded by "T.," and "S.," refer to minutes from defendant's jury trial beginning on September 23, 2014, and sentencing minutes on December 10, 2014, respectively.

# THE FACTS

## The Indictment

By Indictment Number 4208,[3] filed October 27, 2009, the Bronx County Grand Jury charged defendant with second-degree murder (Penal Law § 125.25 [1] and [2]), first-degree manslaughter (Penal Law § 125.20 [1]), and second-degree criminal possession of a weapon (Penal Law § 265.03 [1][b] and [3]).

## The People's Case

## The Trial

The Events leading up to the Shooting

On September 21, 2009, Susanna Castro saw Elizabeth Thomas, also known as "Red," a local loan shark, come to 409 East 146th Street to speak with Barbara Lopez about money owed to her. Lopez's son, Rob Vargas, told Red that Lopez was not going to give her money, and told her to move because he was going to "put a bullet up her ass." Red told her nephew, Jason Irrizary, what had transpired—that somebody owed her money, and that when Red asked for her money back, her

---

[3] The indictments separately charging defendant, Robert Vargas, and Latroy Ewell were consolidated under Indictment Number 3971/2009, and the three defendants were joined for trial on October 14, 2011 (*see* Record on Appeal: Consolidation Decision and Order dated October 14, 2011). On September 8, 2014, Latroy Ewell pleaded guilty to second-degree criminal possession of a weapon (Penal Law § 265.03[1][b]) under the instant indictment, and on October 09, 2014, he was sentenced to ten years' imprisonment and five years of post-release supervision. On September 23, 2014, Robert Vargas pleaded guilty to second-degree criminal possession of a weapon (Penal Law § 265.03[1][b]) under the instant indictment, and on October 09, 2014, he was sentenced to five years' imprisonment and five years of post-release supervision.

debtor's son threatened to shoot her in the face (Castro:T.617-618; Irrizary:T.421-425).

The next day, Red, Irrizary, Irrizary's brother (Raul Irrizary) and Irrizary's cousin (Manuel Irrizary) went to 146th Street. Red saw Lopez and approached her about the money. Castro was with her friend and her friend's son, "Gordo," who was mistakenly thought to be Vargas. The men got into a "scuffle" when they thought they saw Vargas. Gordo was attacked by Irrizary and the others, and Irrizary was cut in the scuffle (Irrizary:T.427-429,431;Castro:T.620-621). Latroy Ewell observed Gordo fighting with the others, and was able to stop the fight by acting as peacemaker, and by pulling Gordo away (Ewell:T.587-588). When Irrizary left to tend to his wound, he exclaimed, "Clear the fucking block because I'm coming back." (Castro:T.620).

The Shooting and the Death of Aisha Santiago

The shooting occurred a few minutes after Irrizary's warning (Castro:T.625). Aisha Santiago's nine-year old son, Anthony Flores, was on his way to the laundromat with Aisha and Aisha's friend when the gunfight began. Aisha was standing directly in front of Flores in front of their building, 445 East 146th Street (Flores:T.748-751).

Michael Jones, an entertainer in the recording industry, had just left the Papa John's on 146th Street and Willis Avenue in order to get cash at an ATM, when he

4

brushed defendant[4] on the street and told him "my bad" (Jones:T.507). After he got his food and entered his vehicle, he heard shots ring out, and reclined his seat so that he would not get caught in the cross-fire. As he was leaning back in his seat, he could see defendant across the street, "letting off like it was nothing." Defendant was wearing a red shirt, and Jones recognized him since it was the same individual he had just seen in the street (Jones:T.509).

<u>Orlando Soto</u> and Castro—who were both standing on 146th Street—saw the shooter,[5] along with a group of other individuals, come from Willis Avenue onto 146th Street, and begin shooting towards Brook Avenue. Soto noticed that the shooter[6] was wearing a red shirt, red cap, and blue jeans, and was using a big silver gun (Soto:T.251-252,256,260-265;Castro:T.627-630). Soto observed Ewell fire in response to the shooter, towards Willis Avenue, and Castro observed Vargas and Ewell—who Castro knew from her building—fire in response to the shooter, towards Willis Avenue (Soto:T.264-265;Castro:T.628). Castro had been facing down because she

---

[4] Jones identified defendant in court as the shooter (Jones:T.516-517).

[5] Castro identified Irrizary in a photo array both as the person who attacked Gordo and as the person who was the shooter (Castro:T.655-66; *see also* Exhibit 70). In court, Castro maintained that Irrizary was the shooter (Castro:T.658). Notably, Castro had been scared to testify. Castro was a "no-show" on the morning of October 6, 2014. The prosecutor informed the court that she was afraid because people from her neighborhood were telling her that investigators were asking about the case. The prosecutor drafted a material witness order, but Castro appeared to testify on October 8, 2014 (*see* T.394).

[6] Although Soto had positively identified defendant as the shooter in a lineup in 2009, Soto was unable to identify defendant—number two in the lineup—in the courtroom (Soto:T.268,273,276; *see* Exhibits 65a,b,c). Soto confirmed that he was able to pick out number two in the lineup on the day after the shooting, but he could not explain why he could not identify defendant during trial. When the prosecutor asked him why he could not identify anyone in the courtroom, and if he could put this reason into words, Soto answered, "I really can't" (Soto:T.278).

5

threw herself to the ground (Castro:T.627-630,635-637-638,641,647). Ewell, who had been walking back to his building from a nearby store following his encounter during Gordo's "scuffle," described that he used his gun in "self-defense" (Ewell:T.589-590,594-595). Once Ewell began firing, Soto "threw himself on the floor" (Soto:T.252,265).

Several more gunshots were exchanged (Soto:T.266-268;Jones:T.505-509). Soto observed the shooter run back towards Willis Avenue. Meanwhile, Jones observed that after defendant let off more shots, defendant turned around and "gave his pistol to a kid in a white t-shirt." Defendant ran in one direction, and the man in the white t-shirt ran in a different direction (Jones:T.505-509,515,532). Jones ran into Papa John's to tell those inside to call 911, and when he came back out from Papa John's, defendant ran past him again. (Jones:T.510-511).

After the shooting, Flores looked towards his mother to see if everything was alright, but she was already collapsed on the stairs (Flores:T.748-751,758). Soto got up from the ground, started walking towards his building, and heard people running towards Brook Avenue. They were running towards Aisha. Soto saw one of his friends holding her, but she was lying with blood coming out of her mouth and chest, with her "mouth open, doing nothing." (Soto:T.266-268).

When paramedic Sebastian Williams arrived at the scene, he observed Aisha lying on the ground, not moving, with blood oozing from her mouth and a shot in her chest. He did not administer any medical care to her because she exhibited "signs of

6

obvious death." Williams did not think that she was viable, since her lung or heart might have been punctured (Williams:T.49-50).

Yvette Montanez, Aisha's mother, identified Aisha's body at the morgue (T.Montanez:44). Dr. Margaret Prial, from the Office of the Chief Medical Examiner, performed Aisha's autopsy. She determined that the manner of death was homicide, and the cause of death was a gunshot wound of the chest. The bullet's path led from the middle of Aisha's chest through her heart, aorta, and left lung. The bullet's exit wound was on the right side of Aisha's back (Prial:T.790,792-793; *see* Exhibits 75,76). In this case, there were no gunpowder markings, making it a "distant gunshot wound" (Prial:T.797-798).

Dr. Prial also explained that it was impossible to determine the caliber of bullet that killed Aisha; this is because human skin is elastic, and so when a bullet enters the skin, it stretches the skin, and a result, the bullet hole looks smaller than the size of the bullet (T.Prial:799).

The Police Investigation

Police Officer Ronald Juan saw Aisha lying on the staircase, not moving. He remained at the location, "looking over the shoulder" of the Crime Scene Unit detectives until they located all of the evidence; after the Crime Scene Unit was done, he vouchered the evidence (T.Juan:225-227,230-234). Emergency Medical Technician Brandon Chin and Detective Kathleen Evelly encountered Irrizary's brother, Anthony

7

Pena, who had been shot in the leg during the gunfight (Chin:T.381;Evelly:T.406; *see* Irrizary:T.464-465). Irrizary was standing with Pena (Evelly:T.406).

Detective <u>Paul Brown</u> testified that Crime Scene Unit Detective Glenn Jacklitsch, was retired by the time of trial; Det. Jacklitsch generated the Crime Scene Unit report and a Crime Scene Unit diagram (Exhibits 57 and 62, respectively). Det. Brown visited the crime scene and generated his own computerized diagram based on Det. Jacklitsch's diagram (Brown:T.64-65,107-108; *see also* Exhibits 58a,58b).

Detective <u>Jonathan Fox</u>, a ballistics expert, analyzed the ballistic evidence that was collected from the scene—namely .45 caliber casings, 9 mm casings, .22 caliber casings, and a .45 caliber bullet. In front of the corner of Willis Avenue and 146th Street, six Winchester .45 caliber auto cartridge casings were found (Brown:T.122-125; Fox:T.328-329; *see* Exhibits 57,58a,58b,62). Seven 9 mm discharged Winchester Luger cartridge casings were found in front of 409 to 411 East 146th Street (Brown:T.124-126;Fox:T.328,333; *see* Exhibits 57,58a,58b,62).[7] Shell casings from a .22 caliber rifle or cartridge were found inside of a fenced area of 413 and 415 East 146th Street (Brown:T.128;Fox:T.334; *see* Exhibits 57,58a,58b,62).

Finally, a deformed copper jacketed bullet was found inside of the trunk of a car parked in front of 455 East 146th Street. Det. Fox determined that it was a .45 caliber copper jacket bullet by weighing it and measuring its base (Brown:T.145,196;

---

[7] Also in front of 409 to 411 East 146th Street, a lead fragment, a deformed bullet, and a bullet fragment were found, but were too deformed or "unsuitable" for analysis (Brown:T.126-128,160; Fox:T.338-341; *see* Exhibits 57,58a,58b,62).

8

Fox:T.341-342; *see* Exhibits 57,58a,58b,62). Additionally, a possible "BIM," (Ballistic Impact Mark) was found in front of 445 East 146th Street (Brown:T.153; *see* Exhibit 29).

Det. Fox explained that all six of the .45 caliber casings were fired from the same firearm, and that all seven of the 9 mm casings were fired from the same firearm. He also explained that bullets cannot be compared with casings to see if a particular bullet came from a particular casing, unless the firing weapon is recovered. Det. Fox also emphasized that a firearm with a particular caliber can only fire that particular bullet, *i.e.*, a 9 mm or .22 caliber bullet could not be fired from a .45 caliber firearm (Fox:T.336-337).

Detective <u>Daniel Pannisiti</u> obtained video surveillance footage from 477 Willis Avenue (Pannisiti:T.209-214; *see* Exhibit 63). Similarly, Detective <u>Carlos Infante</u> retrieved additional video surveillance footage at the location next door, 475 Willis Avenue, a Papa John's restaurant (T.365; Infante:T216; *see* Exhibit 64). According to Jones, the video surveillance depicted defendant handing his gun to Irrizary, who was wearing a white shirt, while the two were running away from the incident location (Jones:T.513-514; *see* Exhibit 64). Both videos were played numerous times for the jury (*see*, *e.g.*, T.213,385,410-41,512,537-539).

Detective <u>Bart Snyder</u> spoke with Castro in her apartment. Based on their conversation, he began to look for Vargas, who was later arrested. After Castro positively identified Vargas, he was charged with attempted murder. (Snyder:T.690-

9

691,704-705). Castro also identified Irrizary as the shooter (Castro:T.655-658; Snyder:T.692-693). Det. Snyder spoke with Irrizary, who gave a statement. Irrizary was not arrested for Aisha's murder; instead, defendant was arrested on September 23, 2009, after a detective spotted him on the street (Snyder:T.700-702,706-707).

Soto viewed a lineup with Detective Joseph O'Neil on September 23, 2009 (*see* Exhibits 65a,b,c), in which he positively identified defendant in position number two as the shooter (Snyder:T.710;Soto:T.273). On September 27, 2007, Jones identified defendant in a photo array (*see* Exhibit 69)—since defendant had already been in custody in the Department of Corrections—in photograph number six (Snyder:T.713; Jones:T.565). On April 29, 2010, Jones viewed a court-ordered post-arrest lineup (*see* Exhibits 68a,b,c,72), in which he positively identified defendant in position number five as the shooter (Snyder:T.712-716;Jones:T.521).

While defendant was incarcerated, Irrizary visited him in prison and put money in his commissary on behalf of Irrizary's brother, Pena (Irrizary:T.500).

The Visit to the Crime Scene

Almost immediately prior to the close of the People's case, on October 10, 2014, the jury visited the crime scene (T.768-772).

**The Defense**

Police Officer <u>Berlinda Acevedo</u> was sitting in the courtyard of 510 East 146th

10

Street, which is across the street from 445 East 146th Street, when she heard a series of gunshots, after which she observed a lot of people—including a black male wearing a red shirt—running from Willis Avenue towards Brook Avenue (Acevedo:T.812-815).

## ARGUMENT

### POINT ONE

**DEFENDANT'S GUILT WAS PROVEN BEYOND A REASONABLE DOUBT BY OVERWHELMING EVIDENCE.**

Despite being the only person seen—by two independent, impartial eyewitnesses—shooting towards Brook Avenue, in Aisha Santiago's direction, defendant now claims that the evidence was insufficient to establish that defendant was the person who shot Aisha, and that his manslaughter conviction was against the weight of the evidence. Defendant boldly claims that no evidence tied him to the incident, despite video surveillance which depicted defendant running from the scene and passing a gun to Irrizary. Defendant is incorrect; there was never any doubt that defendant was correctly identified as the shooter.

"A verdict is legally sufficient when, viewing the facts in a light most favorable to the People, 'there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt.'" *People v. Danielson*, 9 N.Y.3d 342, 349 (2007)(internal citations

11

omitted). The conviction should be upheld so long as there is "any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury…" *People v. Bleakley*, 69 N.Y.2d 490, 495 (1987). To determine whether a guilty verdict is against the weight of the evidence, this Court must examine all the credible evidence to determine whether a different finding would have been reasonable. *See id.*; *see also People v. Cantres*, 238 A.D.2d 56, 60 (1st Dept. 1997). If so, then this Court must "weigh the relative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony." *Bleakley*, 69 N.Y.2d at 495. The Court must give great deference to the fact-finder's opportunity to view the witnesses, hear the testimony, and observe demeanor, and must be careful not to substitute its judgment for that of the jury. *Id.* Questions regarding evidentiary weight and legal sufficiency may be resolved through common-sense inferences. *See People v. Brown*, 278 A.D.2d 177 (1st Dept. 2000)(*citing People v. Cintron*, 95 N.Y.2d 329 [2000]).

Defendant's conviction was proven beyond a reasonable doubt. Here, there was ample evidence that defendant's conscious objective was to cause serious physical injury to Vargas or Ewell. To begin with, defendant returned with Irrizary and Pena— his friends from the nearby Patterson houses—to exact revenge for Irrizary's disrespected aunt. Certainly, Vargas may have threatened "Red" in the first place, but when defendant first walked to 146th Street, he did so with a gun—a clear indication that his conscious objective was to cause bodily harm to another person.

12

Defendant's intent was clear. His actions demonstrated that he sought to get into a firefight, since he went to 146th Street—which was not his neighborhood—with his gun and his friends. This was corroborated by Soto's and Jones's testimony and the video surveillance, which revealed that when defendant and Irrizary were running from the scene, defendant passed his gun to Irrizary. This was also corroborated by the backstory, given by both Irrizary and Castro, of the dispute leading up to the shooting. Clearly, as the prosecutor argued, Irrizary's statement that he was going to "clear the block," meant that he would return with defendant, who had a gun. Irrizary must have summoned defendant; if Irrizary himself had a gun, he would not have had to return, because he would have fired at Gordo before Gordo had the chance to cut him (*see* T.31,954-955).

Finally, the evidence established that Aisha died as a result of defendant's shooting. Flores's and Soto's testimony established that immediately after the first shots were fired, Aisha was laying with blood coming out of her mouth and chest; according to Dr. Prial, she sustained a gunshot wound to her chest with perforation of heart, aorta and lung, which caused her death. Although there was no bullet recovered from Aisha's body, a .45 caliber bullet was found in the trunk of a car close to where she was standing, and a possible BIM was found in front of her building. Based on the evidence, the only shooter that could have caused her gunshot wound was defendant, who was firing eastbound towards Brook Avenue, in order to get Ewell and Vargas, who were standing in front of 409 East 146th Street—east of defendant at

13

146th Street and Willis Avenue. This is what caused Vargas and Ewell to fire back "in self-defense."

This scenario is further supported by the ballistic evidence; .45 caliber shell casings were found almost immediately east of Willis Avenue, where defendant was standing, while the .22 caliber and 9 mm casings were found almost immediately in front of 409 East 146th Street—Vargas and Ewell's building (*see, e.g.*, Exhibits 58a and 62). Accordingly, defendant was the one who was firing his .45 caliber weapon eastbound, while Ewell and Vargas were firing their .22 caliber and 9 mm weapons westbound. There is no plausible way that a .22 caliber or 9 mm bullet could have caused the death of Aisha, since Ewell and Vargas had no reason to shoot in an eastward direction. Additionally, a .45 caliber bullet was found in the trunk of a vehicle in the vicinity of Aisha's body, and no .22 or 9 mm bullet fragments were found near Aisha.

This evidence, coupled with the .45 caliber bullet that was found in the trunk of the vehicle by Aisha's body signified that either: (1) at most, this was the bullet that caused the BIM, caused Aisha's gunshot wound, and exited her body, or, (2) at least, that defendant's weapon was capable of firing a bullet over that distance. Therefore, the only reasonable conclusion for the jury to make was that defendant was the one firing the .45 caliber weapon, and that one of the bullets from that gun—conceivably the bullet that was found in the trunk, right by her body—caused Aisha's death.

Defendant's argument that Castro's identification of Irrizary as the shooter

14

inculpates Irrizary, and not defendant, does not persuade. First, Castro's account was uncorroborated by any other evidence; Castro's account does not explain why Irrizary would need to return with his friends after his altercation with Gordo. Put differently, if Irrizary had access to a gun, he would have used it immediately. Second, although she was the People's witness, Castro's account is colored by the fact that she was afraid to give testimony in this case, perhaps because she did not want to implicate defendant for fear of retaliation. Third, as the prosecutor argued, because she threw herself on the ground in between two cars with her head down, Castro likely did not actually see anyone fire a gun, and instead assumed that Irrizary was the shooter since she had just heard that he would be coming back (*see* T.30,953-960). This false memory is the most plausible explanation for her identification, given the anxiety she had about this case and the people in her neighborhood. Crucially, the jury was able to view Castro's demeanor and body language while she was testifying.

This, together with the fact that the accounts of Soto, Jones, and Ewell were corroborated by each other and by the video surveillance footage, demonstrates that there was no reasonable possibility that Irrizary was the shooter. *See People v. Demand*, 268 A.D.2d 901, 903-904 (3d Dept. 2000)(murder conviction was not against the weight of the evidence where three witnesses testified that they observed defendant pull a gun from his clothing and fire it in the direction of men with whom defendant had been fighting, which was also the direction of the bystander-victim—although five other witnesses failed to link defendant to the possession of a gun).

15

The People's burden was to prove beyond a reasonable doubt that defendant intended to cause serious physical injury to a person, and that in doing so, he caused Aisha's death. Defendant fails to establish why, although he was the only one seen by two reliable and independent witnesses firing in Aisha's direction with a gun, it was reasonable to believe that Aisha was shot by another. He does not discuss why the other shooters would have turned around to start shooting in Aisha's direction. Defendant's unsupported speculation cannot overcome the evidence that, after his friend shouted to "clear the block" because he would be coming back, defendant came to the scene purposely with a gun, and that he used it in order to exact revenge in defense of his friend's aunt.

In sum, the evidence established that defendant intended to cause serious physical injury to a person, and that in doing so, he caused the death of Aisha.

## POINT TWO

**DEFENDANT'S CONFRONTATION RIGHTS WERE NOT VIOLATED BY THE ADMISSION OF THE CRIME SCENE REPORT AND DIAGRAMS, SINCE DET. JACKLITSCH'S CRIME SCENE REPORT AND DIAGRAM WERE NOT TESTIMONIAL, AND DET. BROWN WAS CROSS-EXAMINED ABOUT THE CREATION OF HIS OWN CRIME SCENE DIAGRAM.**

Detective Glenn Jacklitsch of the Crime Scene Unit was the lead detective in this investigation, and he authored the crime scene report and diagram. Since he was

16

retired by the time of trial, Detective Paul Brown testified instead. Based on his familiarity with the work of the Crime Scene Unit, he laid the foundation for the admission of Det. Jacklitsch's report and diagram (Exhibits 57 and 62). In addition, on the basis of his own independent review and assessment of the relevant materials, he generated his own diagram (Exhibit 58a). On appeal, defendant contends that his rights under the Sixth Amendment of the United States Constitution and Article I, §6 of the New York Constitution were violated when the court received these items into evidence. However, Det Jacklitsch's report—which consisted primarily of photographs—and his diagram, were not testimonial, and their admission into evidence, as well as the admission of Det. Brown's subsequent diagram, did not violate defendant's confrontation rights.

A. <u>The Admission of the Crime Scene Report and Diagrams</u>

The prosecutor sought to introduce into evidence the crime scene report (Exhibit 57) and diagram generated by Det. Jacklitsch. Regarding the crime scene report, after Det. Brown laid out the foundation—that the report was maintained by the NYPD in the normal course of business, and that it was prepared by Det. Jacklitsch himself contemporaneously with the processing of the crime scene, while he was under a duty to accurately record the information contained therein—counsel offered a general objection to its admission (Brown:T.67-68,86). When the prosecutor sought to admit into evidence the duplicative equivalents of photographs depicted within the crime scene report (Exhibits 1 through 56), counsel then objected on

17

*Crawford* grounds, noting that Det. Jacklitsch's unavailability denied defendant the right to cross-examine the crime scene investigator who drew up the documents, took the photographs, and "did the measurements" (T.88-90).

The prosecutor responded that counsel had the opportunity to effectively cross-examine Det. Brown about how the measurements were approximations, and that the crime scene photographs would show how the crime scene appeared when the detectives arrived, not necessarily "how things appeared at the exact moment that a crime occurred" (T.90). He explained that his reason for seeking the admission of this evidence was to allow for the admission of the photographs, and the location of the evidence, and he cited to *People v. Hull,* 84 A.D.3d 79 (3d Dept. 2011)[8], *People v. Freycinet,* 11 N.Y.3d 38 (2008), and *People v. Brown,* 13 N.Y.3d 332 (2009) for the proposition that the crime scene report was a business record (T.93-95). Defense counsel argued that defendant was denied the right to cross-examine regarding the "measurements" in the crime scene report, and stated that the measurements and "where things were found" were testimonial in nature (T.93,96). The court ruled that the crime scene report and the photographs within it did not violate *Crawford* (T.96).

Next, regarding Det. Jacklitsch's crime scene diagram (Exhibit 62), after it was established that that the diagram was created in accordance with NYPD protocol, and that it was maintained in the normal course of business, counsel posited that the angle in the diagram was "exaggerated," and that if the diagram were to be introduced into

---

[8] Transcribed below as "*People v. Paul.*"

18

evidence, it would "let the jury see that oh it's possible that a bullet would have wound up over there." He conjectured that the reason for its admission into evidence was to show the possibility that a bullet shot from a certain location could have entered the car (Brown:T.100,104-105).

In response, the prosecutor stated that he would also be seeking to have Det. Brown's crime scene diagram admitted into evidence as a business record, whereby Det. Brown could explain how he used Det. Jacklitsch's diagram "as a template as far as where evidence was recovered, where the cars were, where the trees were," and how he corrected its inaccuracies. Again, counsel objected that Det. Brown's diagram was "a business record that was not required to be prepared," and was definitely in his opinion a *Crawford* issue. The court held that counsel's arguments go towards the weight of the evidence, not the admissibility (T.105).

Ultimately, Det. Brown explained how he visited the crime scene and looked over Det. Jacklitsch's diagram, then used Google Maps to match the scene with Det. Jacklitsch's diagram. He also added an additional four addresses that were not in the original diagram—460, 463, 473, and 475 Willis Avenue (Brown:T.107-108). Det. Brown placed evidence items 1-25 in his diagram by looking at Det. Jacklitsch's diagram and plotting the approximate location of where the evidence was collected. In addition to different measurements between the two diagrams, Det. Jacklitsch's diagram and Det. Brown's diagram had differences due to the fact that the software program that Det. Jacklitsch used was five to six years old, Home 3D Architect, while

19

Det. Brown used the more modern CAD-Zone program. The CAD-Zone program allowed Det. Brown to use Google Maps to get a true bird's eye view of the scene, rather than a "box diagram" (Brown:T.141,143-146).

Based on Google mapping, the structures in the area were the same when the crime occurred in 2009 and at the time that Det. Brown visited the scene himself prior to trial (Brown:T.199)

B. <u>The crime scene report and diagrams were not testimonial statements, and, in any event, their admission was harmless.</u>

The Sixth Amendment of the United States Constitution guarantees a defendant the right to confront the witnesses "who bear testimony against him." *People v. John*, 27 N.Y.3d 294, 303 (2016); *see also* N.Y. Const., Art I, § 6. This means that, with certain limited exceptions not applicable in this case, testimonial statements may not be introduced against a defendant at trial to establish the truth of the matter asserted. *Id. See Crawford v. Washington*, 541 U.S. 36, 42 (2004); *Davis v. Washington*, 547 U.S. 813 (2006); *Freycinet*, 11 N.Y.3d at 41. This rule does not bar the use of out-of-court statements by declarants who are not "witnesses"—that is, those who do not "bear testimony." *Freycinet*, 11 N.Y.3d at 41.

"[T]he basic objective of the Confrontation Clause is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial." *Michigan v. Bryant*, 562 U.S. 344, 358 (2011), quoted in *People v. Pealer*, 20 N.Y.3d 447, 453 (2013). That purpose of the Confrontation

Clause was not thwarted by the admission of the crime scene report and diagrams, since the information contained therein did not constitute "statements" for *Crawford* purposes. Instead, these items were merely an inventory of the ballistic evidence found at the scene as well as photographs of what the evidence looked like and where they were located.

Nonetheless, to the extent that the information contained within the report or diagrams could be construed as "statements," such statements were not testimonial. "[A] statement will be treated as testimonial only if it was 'procured with a primary purpose of creating an out-of-court substitute for trial testimony.'" *Pealer*, 20 N.Y.3d at 453. Recently, in *John*, 27 N.Y.3d at 307, the Court of Appeals adhered to this rationale, and explained that it had "deemed the primary purpose test essential to determining whether particular evidence is testimonial." The Court acknowledged that there is no "ironclad" definition of testimonial evidence, and noted that two factors are of particular importance: "first, whether the statement was prepared in a manner resembling ex parte examination and second, whether the statement accuses defendant of criminal wrongdoing." *Id.* at 307. Furthermore, these two "interrelated touchstone" considerations are informed by the "purpose of making or generating the statement, and the declarant's motive for doing so." *Id.* (*quoting Pealer*, 20 N.Y.3d at 453, and *People v. Rawlins*, 10 N.Y.3d 135, 156 [2008]).

Here, the actions taken by Det. Jacklitsch in collecting the evidence and memorializing this collection in his report and diagram was mere information

21

gathering and reporting, rather than the formation of a conclusion that pertained to defendant's involvement in the crime. Put differently, there is nothing testimonial about Det. Jacklitsch's report and diagram, because the information contained therein was not a substitute for the testimony of a person who was accusing the defendant; in fact, the report and diagram reflect only an assessment of what potential evidence existed at the scene. In this way, the crime scene report and diagram are similar to autopsy reports; like an autopsy report, which is "concerned only with what happened to the victim, not with who killed [the victim]," (*Freycinet*, 11 N.Y.3d at 42), here, the crime scene report is concerned only with what was found at the scene, not with who did it.

The Court of Appeals has routinely held that autopsy reports, as well as other kinds of reports that convey the results of information gathering rather than accusatory conclusions, are not testimonial. In *Freycinet*, 11 N.Y.3d at 42, the Court concluded that because the medical examiner's autopsy report did not directly link defendant to the crime, the report was non-testimonial, and the examiner's unavailability at the time of trial was not a violation of the defendant's confrontation rights; crucially, the Court emphasized that a person accused should have the right to face his or her "accuser," and that the medical examiner "was not defendant's 'accuser' in any but the most attenuated sense." *Id.* Similarly, in *Brown*, 13 N.Y.3d at 340–341, the Court of Appeals found that a laboratory report that isolated a male DNA specimen from the victim's rape kit and generated a DNA report containing

22

machine-generated raw data, graphs and charts of the male specimen's DNA characteristics was non-testimonial because there were no "conclusions, interpretations, or comparisons apparent in the report." It was the forensic biologist who conducted the analysis that *linked* the defendant's DNA to the DNA in the laboratory report that raised a confrontation issue. *See id.*

Along these lines, in *Rawlins*, 10 N.Y.3d at 157, the Court held that it was the *comparison* of unknown latent fingerprint reports lifted from the crime scene with defendant's fingerprints that was testimonial. The Court was silent with regards to whether the unknown latent fingerprint reports lifted from the crime scene were testimonial in and of themselves; however, the Court's observation that the comparison reports were "inherently accusatory and offered to prove an essential element of the crimes charged" is instructive. The Court identified the comparison reports as "a weaker substitute for live testimony," and concluded that the officer who compared the latent report with defendant's fingerprints was "'testifying' through his reports that, in his opinion, defendant is the same person who committed the burglaries." *Id.*

In *Pealer*, 20 N.Y.3d at 453, the Court examined whether the introduction of records reporting on the calibration and maintenance of a breathalyzer without the opportunity to cross-examine the person who performed the testing violated the defendant's confrontation rights. The Court held that the primary purpose for examining the breathalyzer was to ensure that the machine was adequately calibrated

23

and operating properly, and noted that "as with an autopsy report or a graphical DNA report...the breathalyzer testing certificates do not directly inculpate defendant or prove an essential element of the charges against him." *Id.* at 455. Consequently, the Court held that these documents were non-testimonial under *Crawford. Id.* Finally, most recently in *John*, 27 N.Y.3d at 315, the Court of Appeals reiterated its position that these types of "objective accounts of observable facts that [do] not link the commission of the crime to a particular person" are not testimonial (*quoting Pealer,* 20 N.Y.3d at 454; *citing Freycinet,* 11 N.Y.3d at 42; *United States v. James*, 712 F.3d 79, 99 [2d Cir.2013]).

Here, Det. Jacklitsch's scene report and diagram is no different from an autopsy report, an initial DNA report from a rape kit, a calibration report, or an unknown latent fingerprint report—all of which are "objective account[s] of observable facts that [do] not link the commission of the crime to a particular person." *John*, 27 N.Y.3d at 315. The assessment of the crime scene and the evidence that it contained was not for the primary purpose of furthering a particular prosecution or to accuse a targeted individual of wrongdoing. The primary purpose of the processing of the crime scene was not to make conclusions, but, rather, to determine where evidence was found. As such, Det. Jacklitsch's report and diagram document the location of the evidence at the scene, and is no different in this respect from the documentation of the wounds and injuries that a medical examiner would transcribe in an autopsy report.

24

At best, the only arguable testimonial piece of evidence in this case was Det. Brown's diagram, which was prepared years after the crime scene was processed. To be clear, the diagram still does not accuse the defendant by linking him to the scene; aside from corrections to Det. Jacklitsch's diagram due to new Google mapping technology, there is nothing different between Det. Jacklitsch's diagram and Det. Brown's. Assuming *arguendo* that Det. Brown's diagram was testimonial, because it was created in preparation for defendant's prosecution, nonetheless its admission would not raise a confrontation issue, since it was introduced through the testimony of Det. Brown himself, who was vigorously cross-examined.

If there was any error in the introduction of these items into evidence, it was harmless. There is no doubt—and defendant barely disputed—that Aisha's shooter was standing near the corner of Willis Avenue, shooting eastbound towards Brook Avenue, in the direction of Ewell and Vargas. Indeed, the main theory of the defense was one of misidentification; defendant concedes as much now by stating that identification was the primary issue at trial (*see* Def.br.,p.70).

Counsel's main defense was that it was not defendant but Irrizary who shot eastbound towards Brook Avenue (*see, e.g.*, T.895-912). Taking advantage of Castro's misidentification of Irrizary as the shooter, defense counsel even posited that Irrizary and defendant look similar (T.912). There was no alternative second theory put forth by the defense, and instead, defense counsel spent the remainder of his summation poking holes in the People's case. For example, he proposed that there were two .45

25

caliber guns that night (*see* T.919), that the gun that caused Aisha's fatal gunshot wound must have been fired in the middle of the street, since it was "impossible" for a bullet to travel that far down from Willis Avenue (*see* T.923-929), and that the crime scene was "tainted" since there were a lot of people in the area (*see* T.930).

These claims were a long shot; as discussed *supra (see* Point I), based on the eyewitnesses and the surveillance video of defendant's "hand-off" of his gun to Irrizary, there was no question that defendant was the shooter who was shooting eastbound. Most importantly however, these claims—that the crime scene was tainted and that there were multiple people shooting .45 calibers, etc.—could be advanced irrespective of the admission of the crime scene report and diagram; there was nothing in the report or diagrams that hindered the defense's ability to explore these areas, and, in fact, defense counsel spent significant time questioning the People's witnesses with regard to whether the evidence could have been moved before crime scene was secured (*see, e.g.,* Brown:T.85,204-205;Juan:T.236-237,239,244-245), and whether the .45 caliber bullets and casings could have been fired from two separate guns (*see* Fox:T.355-357).

The crime scene report and diagrams, therefore, had no bearing on the defense's theory of the case. Accordingly, there is no reason to believe that the jury's verdict would have been any different had these items been excluded. *See Rawlins*, 10 N.Y.3d at 158 (Court found that the improper introduction of fingerprint reports used to establish defendant's identify "did not influence the outcome" when the

reports were introduced through another detective who analyzed the data himself and who was cross-examined).

## POINT THREE

### THE TRIAL COURT PROPERLY PERMITTED TESTIMONY THAT JASON IRRIZARY WAS NOT ARRESTED TO COMPLETE THE NARRATIVE THAT LED TO DEFENDANT'S ARREST.

Defendant asserts that the court improperly admitted hearsay in the form of an implication, made by Det. Snyder, that police investigators did not believe Castro's exculpatory identification (*see* Def.br.,p.60). He further asserts that this testimony constituted opinion testimony (*see* Def.br.,p.66), which "usurped" the jury's fact-finding role. Defendant argues that this testimony was so prejudicial that a new trial should be ordered. These claims are unpreserved and meritless.

A. Defense Counsel's objections during the direct examination of Det. Snyder.

During Det. Snyder's direct examination, counsel expressed his concern that the prosecutor was about to elicit testimony that Irrizary was arrested for Aisha's murder, and that Irrizary's charges were subsequently dropped. Counsel believed that this testimony would bolster the prosecutor's position that Castro's identification was mistaken. He explained that this would constitute the prosecutor impeaching his own witness (T.694-695). Counsel was concerned that this would show that defendant's arrest "mean[t] something" because the police no longer believed Irrizary was the shooter, that this was the reason they dropped the charges against him, and that the

27

question of whether Irrizary was the shooter was for the jury to decide. He noted that, "[t]his also then is in the form of hearsay because they are relying on their own beliefs and what they had, the conversation going on by the police and the district attorney's office." (T.695).

In response, the prosecutor emphasized that Irrizary was never arrested for or formally charged with Aisha's murder. He also stated that impeaching a witness *via* cross-examination is different than making an argument to the jury that a witness is unreliable. He proposed that he would ask Det. Snyder about whether, after Castro identified Irrizary as the shooter, Irrizary was charged with Aisha's murder, and if he was not, why not. He elaborated that Det. Snyder would explain that based upon Castro and Irrizary's statements, Irrizary was not arrested (T.696-697).

Counsel emphasized that the prosecutor would be saying "they believe Irrizary over Ms. Castro," and that he would later request a ruling that, on summation, the prosecutor be precluded from "saying anything that would impeach Ms. Castro since it was his witness." He repeated that this testimony served to demonstrate that the police did not believe Irrizary was the shooter, and therefore, that Castro was mistaken (T.697).

Ultimately, the court noted that questions should not be asked that substitute or seeks to "substitute the judgment of the police in who to arrest or the judgment of the jury as to who has been proven guilty...." The court held:

> ...we have a witness who testified here and presumably said

28

the same thing to the detective who identified a person
other than the defendant, and we are here with the
defendant charged with murder. So the jury, the People
have to be protected against ambiguity that creates an
unfair inference that the police were in some way cavalier
about what they did and how they did it. So, the People can
ask whether, and you can lead here if you need to speak to
him in light of this, *what you can't ask is why they substituted…*

(T.698)(emphasis added). The court clarified that the prosecutor could ask Det.

Snyder whether he conducted an investigation, whether the people he spoke with

included Irrizary and Castro, and what official action was taken at the end of the

investigation (T.699).

During direct examination, the prosecutor asked:

Q. And based upon the conversations with Ms. Castro and
the statement made by Jason Irizarry, was Jason Irizarry
arrested and charged with the murder of Aisha Santiago?

(T.701). To this, counsel objected on the ground that the prosecutor had asked

whether Irrizary was arrested for Aisha's murder, which, according to counsel, was

what the court had instructed not to do. Counsel moved for a mistrial (T.701-702).

The prosecutor replied that he thought he could ask these questions without going

into specifics, and specifically, that he could ask about whether Irrizary was arrested

for Aisha's murder based on the investigation at the time. The court instructed the

prosecutor to "Just ask it that way," and denied defendant's motion for mistrial

(T.702).

Ultimately, the prosecutor asked whether, "[b]ased on the investigation, at this

29

date, at this time, in the early morning hours of September 23, 2009…Irizarry [was] arrested for the murder of Aisha Santiago," to which Det. Snyder answered "no," over counsel's objection (T.702-703).

###### B. The Court Properly Allowed Det. Snyder to testify that Irrizary was not arrested for Aisha's murder.

As a threshold matter, defendant's argument regarding implied or indirect hearsay is unpreserved. Below, defense counsel did not clearly delineate his objection to Det. Snyder's testimony in this manner. To be clear, early in the court's discussion of whether this testimony was permissible, counsel claimed that testimony as to whether Irrizary was arrested was irrelevant, and that this testimony was "in the form of hearsay because they are relying on their own beliefs and what they had" (T.695).

Counsel may have used the term hearsay, but it is unclear what he meant by this; counsel never stated below, as defendant does now, that the prosecutor was seeking to elicit that the content of Det. Snyder's conversations with Castro and Irrizary led police to believe that Irrizary was not the shooter (*see* Def.br.,p.61). Rather, counsel's objections were solely related to impeachment; mainly that testimony regarding Irrizary's non-arrest would leave the jury to conclude that the police did not believe Castro (*see, e.g.*, T.694-695,697,702).

Accordingly, defendant's argument that the "implication" that whatever Castro and Irrizary said led police to believe that Irrizary was not the shooter is unpreserved. Since it was never raised by defendant, and never "expressly decided" by the trial

court, it is unpreserved for appellate review. *See* CPL § 470.05(2); *People v. Sanchez*, 40 A.D.3d 468 (1st Dept. 2007); *c.f. People v. Reid*, 298 A.D.2d 191 (1st Dept. 2002)("Since defendant's objections to the prosecutor's impeachment of his own witness by prior contradictory statements were made on different grounds from those raised on appeal, his claim that the witness's testimony did not meet the statutory requirement of tending to disprove the People's case [citations omitted] is unpreserved and we decline to review it in the interest of justice").

Similarly, defendant's claim that Det. Snyder's implication that law enforcement did not believe Castro was inadmissible opinion testimony (*see* Def.br.,p.64) was underdeveloped and, therefore, unpreserved for appellate review. As with defendant's implied hearsay argument, although counsel stated below that Det. Snyder's testimony regarding Irrizary's non-arrest was "putting their belief above what the jury is supposed to decide" (T.702), he never connected the dots to argue in a clear fashion what he meant by this. *See* CPL § 470.05(2); *People v. Medina*, 93 A.D.3d 459 (1st Dept. 2012)(suppression claim not preserved because defendant made different arguments below which were "inadequate to raise the specific claim he makes on appeal").

Even if this Court should choose to reach these unpreserved claims, it should find that they are meritless. First, there was no hearsay offered in the testimony of Det. Snyder. It is well-settled that hearsay is "an out-of-court statement admitted for the truth of the matter asserted (citation omitted)." *People v. Buie*, 86 N.Y.2d 501, 505 (1995). As the record shows, Det. Snyder did not testify to the actual substance of any

31

statements made to him by Castro or Irizary. The detective testified only as to whether he spoke with these individuals, and what he did after speaking with them.

In fact, the court explicitly explained that the prosecutor could ask Det. Snyder if he conducted an investigation, if he spoke to Irizarry and Castro, and, at the conclusion of the investigation, what official action he took (T.699), and this is precisely what was asked. Because the detective's testimony did not reveal the content of the conversations, it did not contain any hearsay, *i.e.*, any out-of-court statements. *See People v. Polidore*, 181 A.D.2d 835, 837 (2d Dept. 1992)(where a police officer does not actually reveal the content of a witness's statement, no "out-of-court statement made by a hearsay declarant was admitted into evidence"); *see also People v. Rivera*, 234 A.D.2d 148 (1st Dept. 1996)(arresting officer's testimony that two witnesses provided descriptions of the shooter, and that the officer proceeded to arrest the defendant, was admissible and did not constitute hearsay).

Defendant's reliance on *People v. Garcia*, 25 N.Y.3d 77 (2015) and *Mason v. Scully,* 16 F.3d 38 (1994) for the proposition that hearsay can be implied is misplaced. First, defendant does not state clearly what "implication" he currently protests. If the implication was that the police believed Castro to be unreliable, this is not a statement for hearsay purposes. If the implication was that Castro or Irizary said something that caused the police "to believe that Irizary was not the shooter" (*see* Def.br.,p.61), the mere fact that Castro or Irizary may have said something is also not a statement for hearsay purposes; implied hearsay entails the statement that was actually uttered, and

who uttered it—either Castro, or Irrizary, or both. *See Garcia (DeJesus)*, 25 N.Y.3d at 88 (citing Second Circuit test announced in *Ryan v. Miller*, 303 F.3d 231, 250 [2d Cir 2002] for determining whether testimony contains an implicit accusation, which is whether the source and content of the conversation was made clear by the prosecutor's questioning). Accordingly, the implication here is vague, and, at best, even if the "clear implication" was that Irrizary or Castro said something that led police to pursue defendant rather than Irrizary, such an implication is speculative. *See Garcia (DeJesus)*, 25 N.Y.3d at 88 ("Defense counsel's point at trial that the disputed testimony gave the 'clear implication' that 'some unknown anonymous caller said [defendant] must have been the suspect' is mere supposition").

Instead, as stated, Det. Snyder's statement that Irrizary was not arrested was not hearsay. To the extent that this testimony led to the "implication" that whatever Irrizary or Castro said to the police led to defendant's arrest, this too was proper, for it was not offered to establish the truth of the matter that defendant caused Aisha's death, but rather, in order to help complete the narrative of police events. Richardson, Evidence § 8-104 (Farrell 11th ed.)(hearsay rule inapplicable to the mere fact that a statement is made, as distinguished from its truth or falsity, because the statement is not offered for the truth of the fact asserted in it). Notably, in a case with circumstances similar to the one at hand, *People v. Dorcinvil*, 122 A.D.3d 874, 875–76 (2d Dept. 2014), the Second Department declined to find that an inference constituted improper hearsay testimony. There, the court noted that the jury could

33

have inferred that a non-testifying detective made a statement to the testifying detective that the victim's 12-year-old son had identified the defendant, and that this led the police to consider defendant a suspect; the 12-year-old son, however, testified at trial and was subjected to cross-examination. *Id.* Therefore, the court found that the testifying detective did not offer impermissible hearsay or bolster the son's identification of the defendant. *Id.* at 875. The court concluded that the testimony was "properly admitted to complete the narrative and explain the sequence of events leading to the defendant's arrest." *Id.* at 876. Here, like *Dorcinvil*, any inference that Irrizary made a statement to Det. Snyder that led to defendant's arrest rather than Irrizary's was not impermissible hearsay, since Irrizary was available for cross-examination. And, in any event, as stated, such a statement completed the narrative of the police investigation.

Plainly, the court's reasoning for permitting this testimony was to explain the sequence of events that led to defendant's arrest when it noted that Castro's identification of Irrizary and defendant's subsequent arrest necessitated that "the People…be protected against ambiguity that creates an unfair inference that the police were in some way cavalier about what they did and how they did it" (T.698). *See People v. Tosca*, 98 N.Y.2d 660, 661 (2002); *People v. Perez*, 47 A.D.3d 409, 411 (1st Dept. 2008)("The court properly admitted evidence concerning a statement to the police by a nontestifying declarant…since this evidence was not received for its truth, but for the legitimate, nonhearsay purpose of completing the narrative of events and

34

explaining police actions…"); *People v. Garcia*, 19 A.D.3d 215, 216 (1st Dept. 2005)("the testimony challenged as hearsay was not received for its truth, but as proper background material to assist the jury in understanding the events leading up to defendant's arrest [citations omitted]").

Det. Snyder also did not give improper "opinion testimony." He was a fact witness who explained why he acted as he did; the testimony that Irrizary was not arrested was relevant because it established the course of the police investigation. The cases defendant relies on are inapposite because they concern expert witnesses who answered hypothetical questions. *See, e.g., People v. Inoa*, 25 N.Y.3d 466, 471 (2015)(the detective was "essentially a summation witness, put on the stand to tie together all the strands of the prosecution's case for the jury much as a prosecutor would in summing up, but performing that task as a purveyor of case-specific expertise rather than as an advocate"); *People v. Ciaccio*, 47 N.Y.2d 431, 439 (1979)(error to receive expert testimony of detective, in response to hypothetical question, that it was not unusual for hijackers to offer truck driver money for cooperation, because sole purpose was to explain why another witness was more believable than defendant); *People v. Pabon*, 28 N.Y.3d 147, 157 (2016)(investigator offered his opinion that defendant lied to him during interview).

The purpose behind Det. Snyder's testimony was not to convey his opinion that defendant was guilty. Rather, he only explained the series of steps taken by police officers. This was not improper opinion testimony. *c.f. People v. Moore*, 216 A.D.2d 218

35

(1st Dept. 1995)(defendant was deprived of a fair trial when hypothetical posed by the people to their expert served as a "mid-trial summation," which had "little to do with analysis of the ballistics evidence"); *see also People v. Mendoza*, 35 A.D.3d 507 (2d Dept.2006)(police officer's testimony that he conducted a witness identification and arrested the defendant after asking the complainant if 'that was him' was offered for the relevant purpose of establishing the reasons behind the officer's actions and explaining the events which precipitated the defendant's arrest).

Finally, even had there been error, it was harmless; for the reasons discussed *supra* (*see* Point I), the People's proof was overwhelming. Therefore, any possible error in Det. Snyder's admitted testimony was harmless. *See People v. Crimmins*, 36 N.Y.2d 230 (1976); *People v. Wright*, 283 A.D.2d 712, 714 (3d Dept. 2001)(in light of the strength of the evidence of defendant's guilt, the introduction of improper opinion testimony did not warrant reversal).

## POINT FOUR

### DEFENDANT RECEIVED EFFECTIVE ASSISTANCE OF COUNSEL.

Notwithstanding counsel's vigorous representation of defendant, which resulted in defendant's acquittal on the most serious charges, defendant alleges that he received ineffective assistance of counsel. This claim should be rejected because defendant cannot demonstrate that he received less than meaningful representation.

Under the federal constitutional standard, a claim of ineffective assistance of

counsel is evaluated under the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 687-88, 693 (1984); *see Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985). To prevail, defendant must (1) show that his counsel's performance fell below "an objective standard of reasonableness" judged by "prevailing professional norms" (the performance prong); and (2) "affirmatively prove prejudice" by demonstrating that, but for counsel's unprofessional errors, the result of the proceeding would have been different (the prejudice prong). *Strickland*, 466 U.S. at 687-88, 693-94. Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.

To demonstrate that counsel's performance was deficient, defendant must show that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001). This standard is "rigorous," *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001), and "highly demanding," *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986).

Under New York law, "[t]o prevail on a claim of ineffective assistance, defendant[] must demonstrate that [he was] deprived of a fair trial by less than meaningful representation." *People v. Benevento*, 91 N.Y.2d 708, 713 (1998)(citation omitted). "So long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation, the constitutional requirement will have been

37

met." *People v. Baldi*, 54 N.Y.2d 137, 147 (1981). This protection does not guarantee perfect representation, but does ensure that defendant received a fair trial. *See People v. Turner*, 5 N.Y.3d 476, 480 (2005). In reviewing claims of ineffective assistance, "care must be taken to 'avoid both confusing true ineffectiveness [of counsel] with mere losing tactics, and according undue significance to retrospective analysis'" *People v. Satterfield*, 66 N.Y.2d 796, 798 (1985)(*citing Baldi*, 54 N.Y.2d at 146). A "defendant's showing of prejudice [is] a significant but not indispensable element in assessing meaningful representation." *People v. Caban*, 5 N.Y.3d 143, 155-156 (2005).

Viewing counsel's performance in totality, defendant has failed to show that he received less than meaningful representation. Prior to trial, during trial, and post-trial, counsel aggressively litigated defendant's case; for example, pursuant to counsel's motion, a *Wade/Dunaway* hearing was granted. Counsel cross-examined and re-cross-examined almost all of the People's witnesses, argued for suppression, and put on a defense case. He also asked for mistrials throughout trial, moved for trial orders of dismissal, and moved to set aside the verdict (*see, e.g.*, T.609,702,809,842-843,1093). Counsel persuaded the jury that the prosecution had not sustained its burden as to second-degree murder, a class A-I violent felony, for which defendant faced life imprisonment. Based on the existing record, counsel's diligent representation, when viewed in totality, did not deprive defendant of "meaningful representation" *See Baldi*, 54 N.Y.2d at 146-147.

"To prevail on a claim of ineffective assistance of counsel, it is incumbent on

defendant to demonstrate the absence of strategic or other legitimate explanations"
for counsel's alleged deficient conduct, and "[a]bsent such a showing, it will be
presumed that counsel acted in a competent manner and exercised professional
judgment in not pursuing" a particular course of conduct. *People v. Rivera*, 71 N.Y.2d
705, 709 (1988); *see also Caban*, 5 N.Y.3d at 152 (same).

Often, a "[d]efendant's ineffective assistance of counsel claims are
unreviewable on direct appeal [when] they primarily involve matters outside the
record concerning trial counsel's investigation, preparation and strategy." *People v. Iiori*,
52 A.D.3d 419, 420 (1st Dept. 2008)(*citing Rivera*, 71 N.Y.2d at 709-10); *People v. Stulz*,
2 N.Y.3d 277, 284 (2004)(trial record often does not reveal what reasons counsel had
for pursuing certain tactics, some of which may have been very good reasons, known
only to defense).

Here, it is evident that counsel was originally attempting to discredit Jones's
testimony when he began questioning him about the lineup. This was sound trial
strategy. However, once counsel had blundered, it was also sound trial strategy for
him to have consented to the introduction of the photo array into evidence. To be
clear, counsel described his own confusion about the photo array and lineup as a
mistake (*see* T.558). However, after his explanation that he erred, he abandoned any
argument that the photo array should not be admitted into evidence (*see* T.558-566),
and he did not object when it was received into evidence, or when the Court read its
curative instruction (*see* T.564). This is likely because the introduction of the photo

array, coupled with the lineup identification, served counsel's theory that defendant was not the shooter, since none of the witnesses—included Jones—described the shooter as having had a tattoo on his neck (*see* T.904-906,908,911). Indeed, the photo array clearly shows a blacked-out splotch on defendant's neck (*see* Exhibit 69), which would have solidified counsel's misidentification theory that defendant was clearly not the shooter since no one commented on his tattoo—as was evident from the very first day he was identified in an array.

Accordingly, defendant's claim of ineffective assistance is unreviewable on direct appeal because it involves questions of strategy that fall outside the scope of the trial record. *See People v. Silvestre*, 279 A.D.2d 364, 365 (1st Dept. 2001)(counsel provided meaningful representation where his "elicitation of a photographic identification and related evidence was clearly part of a legitimate strategy aimed at establishing that the victim's identification of defendant was unreliable"); *People v. Pennington*, 27 A.D.3d 269, 270 (1st Dept. 2006)(no ineffective assistance when counsel was pursuing a legitimate strategy, "the advantages of which outweighed the risks involved in permitting the photo identification to be revealed"); *People v. Iglesias*, 47 A.D.3d 593, 594 (1st Dept. 2008)(counsel's decision to permit photographic identification testimony appeared to be part of a legitimate strategy to establish that the identification testimony was unreliable and the product of police suggestion). Defendant has failed to meet this burden because the record has not been expanded, through a CPL § 440.10 motion, showing counsel's reasons for pursuing certain

40

strategies. Accordingly, these claims should be rejected because they fall outside the scope of the trial record.

Even if the record were sufficient to rule on defendant's ineffective assistance claim, he has failed to show that he received less than meaningful representation. It could not be said that counsel's single "error" of mistaking the photo array for the lineup deprived defendant of a fair trial. It is well-settled that for a single error to constitute ineffective assistance of counsel, the failing must be "clear-cut and completely dispositive." *Turner*, 5 N.Y.3d at 481. "A single error can be ineffective assistance only when the error is sufficiently egregious and prejudicial as to compromise a defendant's right to a fair trial." *Caban*, 5 N.Y.3d at 152. As stated, contrary to defendant's claim that counsel "shored up" Jones's identification for the prosecution (*see* Def.br.,p.72), counsel's error also contributed to defendant's theory of misidentification.

In sum, defendant received effective assistance of counsel and his claim should be rejected.

## POINT FIVE

## DEFENDANT'S CONFRONTATION RIGHTS WERE NOT VIOLATED, SINCE DEFENDANT HAD THE OPPORTUNITY TO CROSS-EXAMINE LATROY EWELL.

Defendant claims that the testimony of Ewell violated the rights guaranteed to him under the Confrontation Clause, since Ewell invoked the Fifth Amendment regarding his criminal conduct in this incident, which precluded counsel from "the chance to elicit material facts about the crime" (Def.br.,p.75). He is mistaken. Defense counsel declined to cross-examine Ewell, without objecting or offering any explanation regarding this decision, and defendant's claim is therefore unpreserved. In any event, defendant was not deprived of the opportunity to cross-examine Ewell, and the testimony provided by Ewell was cumulative of other evidence, thereby rendering any error in its admission harmless.

A. Ewell's trial testimony

Immediately prior to Ewell's testimony, Ewell's attorney announced that Ewell would be invoking the Fifth Amendment. Referring to *People v. Cantave,* 21 N.Y.3d 374 (2013)[9], he noted that Ewell would be invoking his right "on every single question that is posed to him with regard to this case, because Ewell would be filing a notice of appeal upon sentencing (T.569-570,576).

The prosecutor responded that the *Cantave's* holding was narrower than

---

[9] Transcribed below as "*Contavi.*"

42

construed by Ewell's counsel, Steven Kessler, and that there was a factual distinction between defendant's case and *Cantave*, since in *People v. Brady*, 97 N.Y.2d 233 (2002)—a case that was referred to in the second footnote of *Cantave*—the Court of Appeals allowed for cross-examination and found no self-incrimination right for a defendant like Ewell, who had pleaded guilty but who had not yet been sentenced (T.572-573).

The court, looking to *People v. Sobotker*, 61 N.Y.2d 44, noted that in that case, a defendant who was on trial in one case and who had pled guilty but not yet been sentenced on another could invoke the Fifth Amendment regarding the crime that was awaiting sentence, and that in *Brady*, "the trial court avoided this danger by adjudging the prosecutor from asking defendant anything beyond the words of his guilty plea thus foreclosing any incriminating inquiry." The court concluded that Ewell would not be able to "take the fifth" with regard to "what he saw up to that point that inculpates him relating to his alleged conduct for which he might be criminally liable" (T.577-579).

Notably, defense counsel did not object to the court's proposed questioning, although he suggested a hearing to determine whether Ewell would "assert his fifth." Immediately prior to Ewell's testimony, the court concluded that all he could be asked about was his possession of a gun (T.580-581).

At various times throughout Ewell's direct examination, he attempted to invoke the Fifth Amendment, to which the court instructed him that he had no right not to answer the proposed questions (*see. e.g.,* T.585-595). He testified about the

43

leadup to witnessing the gunshots, and that he had pleaded guilty to second-degree criminal possession of a weapon for his possession of a gun (Ewell:T.592-593). When asked by the prosecutor whether he intended to use his firearm against another person, Ewell answered that he used his firearm in self-defense (Ewell:T.594-595).[10] In that moment, defense counsel neither objected to the question, nor asked that Ewell's response be stricken. The prosecutor asked Ewell if someone fired at him before he committed the crime for which he was "doing time," and the court overruled counsel's single word objection. Ewell answered, "Yes," and the prosecutor had no further questions. Prior to cross-examination, defense counsel asked to go outside for a minute, and after returning, he elected not to cross-examine Ewell (T.595-597).

The day after, counsel expressed, for the first time, his concern with Ewell's testimony (*see* T.606-607). Citing to lines from Ewell's direct examination, counsel argued that he was "precluded from going into the self-defense issue." He asked for a curative instruction indicating defense counsel himself was "prevented" from going any further. Defense counsel stated that he thought there was a *Crawford* violation based on the court's rulings, since Ewell could not be questioned because of his invocation. He stated, "I would make a mistrial application but I doubt that the court would grant that" (T.609).

---

[10] It should be noted that using a firearm in self-defense is not a crime (*see People v. McManus*, 67 N.Y.2d 541, 546 [1986]), and, therefore, Ewell did not have a privilege against self-incrimination in this statement.

44

The prosecutor opposed any curative instruction, arguing that counsel had the opportunity to cross-examine Ewell and declined. He explained that the self-defense claim referred to someone else, and that counsel could have asked about what Ewell observed, which would not have infringed on his rights. The prosecutor exclaimed, "There's no *Crawford* issue, the witness was here, he didn't cross him" (T.610).

The court denied counsel's application for a curative instruction, and counsel asked that Ewell's testimony by stricken. The court noted:

> THE COURT: Let me give you my reasoning, there was no limitation on your right to cross-examine. First of all, the most obvious thing, the elephant in the room, you didn't ask to cross-examine...you didn't raise this issue when it was an easy matter if it was an error to fix. You took quite a considerable time to confer, and after you conferred out in the hall, you came in here and I saw that you conferred with your client. I don't know what you were speaking to him about, but after that you got up and said that you had no questions, no cross-examination.
>
> Mr. Ewell took a plea under oath, and he pled to possession with intent to use...
>
> And he couldn't, my ruling was that he couldn't be asked about his conduct after that. The answer to that I expected, consistent with his plea, was he intended to use it against another person. But he blurted out a self-defense. And there was nothing that implicated your client, there was nothing that he said that in any way implicated your client directly. If anything, the self-defense and being precluded from being asked about the details of that protected your client. It was my goal specifically to make sure that your rights to cross-examination were not hampered and Mr. Ewell's right against self-incrimination was respected. So you have an exception.

(T.611-612).

45

B. <u>Defendant's claim is unpreserved, and, in any event, defendant's *Crawford* rights were not violated by Ewell's testimony.</u>

Defendant's instant claim is unpreserved due to counsel's failure to object in a timely manner to Ewell's testimony on *Crawford* grounds. It is well-settled that a party's failure to object or to request further clarifications at a time when the court below could have readily addressed an issue renders it unpreserved. *See People v. Robinson*, 36 N.Y.2d 224, 228 (1975)(because the defendant failed to bring alleged errors to the court's attention "at a time when such errors [we]re correctible," those claims were unpreserved as a matter of law); *see also People v. Johnson*, 7 A.D.3d 395, 396 (1st Dept. 2004)("Defendant received a full opportunity to inquire into all matters relevant to the officer's credibility," and to the extent that the defendant raised a constitutional right to question him, such claim was unpreserved).

Here, as the court remarked, counsel declined to cross-examine Ewell, and, therefore, he did not even attempt to see how far he could get in questioning Ewell. Any hesitation counsel may have felt because he thought the court would have granted Ewell the opportunity to claim his privilege against self-incrimination during cross-examination was premature and unwarranted, because counsel did not even try to see how the questioning would play out. Counsel should have taken the opportunity to cross-examine Ewell, and, if he found that his ability to cross-examine him was being restricted, he could have, at that point, moved to strike testimony or brought to the court's attention his concerns regarding defendant's ability to confront

46

Ewell. As the court found, counsel "didn't raise this issue when it was an easy matter if it was an error to fix" (*see* T.612).

Additionally, counsel's singular "objection" (*see* T.596) to the prosecutor's question about whether someone had fired at Ewell before he committed the crime for which he was "doing time" also renders defendant's claim unpreserved, since the court was not apprised of the basis of counsel's objection. *See People v. Harris*, 98 N.Y.2d 452, 492 (2002)(single-word objections do not preserve constitutional claims, and a defendant's motion to set aside the verdict based on this conduct does not cure his failure to register a specific objection); *see also People v. Cardona,* 243 A.D.2d 267 (1st Dept. 1997)(holding that, "By making only a general objection to the introduction of a severed, nontestifying codefendant's statement during the People's cross-examination of defendant, defendant failed to preserve for appellate review his claim that his right of confrontation was violated," and declining to review claim in the interest of justice); *People v. Encarnacion* (Catterson, J., concurring), 87 A.D.3d 81, 98 (1st Dept. 2011)("As the objection defendant voiced did not alert the trial court to any constitutional claim, especially given the context of the unobjected-to testimony that preceded the objection, it is unpreserved").

Even if this court were to review the merits of defendant's claim, it should find that defendant's confrontation rights were not violated. The Confrontation Clause "has long been read as securing an adequate opportunity to cross-examine adverse witnesses." *United States v. Owens*, 484 U.S. 554, 557 (1988). As such, it prohibits the

47

admission of testimonial statements made by a witness who does not appear at trial, unless that witness is unavailable and, when the statements were made, the defendant had the opportunity to cross-examine him. *Crawford*, 541 U.S. at 53–54 (2004). A witness who invokes the Fifth Amendment in response to substantive questions may impede cross-examination to such a degree that there is a Confrontation Clause violation. *See People v. Farruggia*, 77 A.D.2d 447, 452 (4th Dept 1980); *United States v. Wilmore*, 381 F.3d 868, 871–73 (9th Cir. 2004). However, not every invocation by a witness of the privilege against self-incrimination gives rise to a Confrontation Clause violation. *See Bagby v. Kuhlman*, 932 F.2d 131, 135 (2d Cir. 1991).

What the Confrontation Clause demands is "*an opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Owens*, 484 U.S. at 559 (emphasis in original; internal quotation marks omitted). The ultimate question is whether the witness's refusal to answer certain questions "precludes the defendant from testing the truth of the witness's prior testimony." *Bagby*, 932 F.2d at 137 (internal quotation marks omitted); *see also California v. Green*, 399 U.S. 149, 161 (1970)(effective cross-examination "afford[s] the trier of fact a satisfactory basis for evaluating the truth of the prior statement").

Here, as stated, counsel had the opportunity to cross-examine Ewell, but elected not to. Counsel had several avenues of cross-examination that he might have pursued based on Ewell's direct testimony. He could have attempted to impeach

48

Ewell by asking him about the incident itself; for example, whether he was able to see the shooter, or how he knew that gunshots were being fired. He also could have sought to explore whether Ewell was biased by some sort of neighborhood rivalry, given that Irrizary and defendant came from the Patterson houses. *See* Richardson, Evidence § 6-415 (Farrell 11th ed.)(*citing People v. Webster*, 139 N.Y. 73 (1893) for the proposition that "[b]ias in favor of the party calling the witness, or the witness' hostility to the other party, may be shown to affect credibility). Instead, counsel did none of these things.

In any event, if Ewell's testimony was received in error, it was harmless beyond a reasonable doubt since it was cumulative of overwhelming evidence provided from other sources. Soto testified that he observed Ewell fire "more gunfire" towards Willis Avenue, in response to the shooter, who first fired towards Brook Avenue (Soto:T.262-264). Similarly, Castro explained that she saw the shooter come from Willis Avenue and begin shooting towards Brook Avenue, and that, in response, Vargas and Ewell began shooting towards Willis Avenue (Castro:T.627-630,635-636,647). Ewell's testimony that he fired back "in self-defense" was therefore already supported by other testimony, which revealed that Ewell fired in response to the shots that were coming from Willis Avenue. Notably, as the court remarked, Ewell's testimony in no way implicated defendant (*see* T.612), and did not interfere with defendant's theory that Irrizary was the shooter; the jury was free to conclude that it was Irrizary who was firing towards Brook Avenue, with Ewell firing back "in self-

49

defense." Accordingly, there was no reasonable probability that the admission of Ewell's testimony contributed to the verdict. *See Crimmins*, 36 N.Y.2d at 243.

## POINT SIX

## DEFENDANT'S SENTENCE IS FAIR AND PROPER.

Defendant was convicted, by a jury, of Manslaughter in the First Degree (Penal Law § 125.20). His sentence of a determinate term of 25 years' incarceration and five years' post-release supervision is eminently fair.

"An intermediate appellate court has broad, plenary power to modify a sentence that is unduly harsh or severe under the circumstances, even though the sentence may be within the permissible statutory range." *People v. Delgado*, 80 N.Y.2d 780, 783 (1992); CPL § 470.15(6)(b). However, this Court generally "will not exercise its interest of justice jurisdiction absent 'extraordinary circumstances.'" *People v. Marshall*, 106 A.D.3d 1, 11 (1st Dept. 2013).

Defendant argues that his sentence should be reduced in the interest of justice, given defendant's personal history and potential for rehabilitation (*see* Def.br.,p.92). These factors, along with the Osborne Association report, which defendant now claims militate in favor of a reduction, were known to the court that sentenced him. *People v. Vera*, 194 A.D.2d 404 (1st Dept. 1993)(sentence reduction was not warranted where "the factors presented by defendant in seeking a reduction of his sentence were known to, and considered by, the sentencing court"). These factors pale in

50

comparison to the brutal nature of defendant's offenses. Notably, the prosecutor was careful in commenting on the shortcomings of the Osborne report:

> The person who did the report, given two months to do this report on behalf of the defendant, spoke to two people; the defendant and his mother. They did not review any institutional records, they did not speak to anyone outside of the defendant and his mother. They did not speak to anyone who could objectively render any kind of experience with the defendant. And in that respect, the report actually is lacking in substantive information. By way of example, the report does detail the defendant's criminal history but the report does not comment and omits the defendant's contact with the criminal justice system in Massachusetts. I can't say if that information was purposefully omitted or if the person who created the report simply did not do sufficient research to find out what the defendant has done in the past…

(S.10-12). After hearing victim impact statements, the court, referring to the Osborne report, stated:

> This unfortunate history shed little light on or explains your violent, unprovoked conduct on the day in question. Your behavior had nothing to do with your missing a father figure or your mother's issues; it had to do with a conscious decision to hurt somebody badly for no good reason…

(S.22-23). Given the factors considered by the court, defendant's 25-year sentence for his manslaughter conviction, a class B felony, is fair. *See* Penal Law § 70.06 (6)(a).

Finally, defendant has shown a complete lack of remorse. *See In re Umer K.*, 257 A.D.2d 195, 196 (1st Dept. 1999)("The first step toward rehabilitation is a sincere admission of the wrongdoing"). At his sentencing, defendant maintained his

innocence, and resisted taking responsibility for his actions, claiming, "I ain't do it, I ain't do it, I ain't do it. That's all I have to say. (*see* S.21).

In sum, defendant's sentence is fair and proper.

## **<u>CONCLUSION</u>**

**THE JUDGMENT SHOULD BE AFFIRMED IN ALL RESPECTS.**

Respectfully submitted,

DARCEL D. CLARK
*District Attorney*
Bronx County
Attorney for Respondent

PETER D. CODDINGTON
MARIANNE STRACQUADANIO
*Assistant District Attorneys of Counsel*

APRIL 2017

52

## **PRINTING SPECIFICATIONS STATEMENT**

This brief was prepared in Microsoft Word 2010, Garamond typeface, with 14-point type for the body and 12-point type for the footnotes, and was calculated by word count as containing 12,868 words.

*To be argued by*
**RACHEL T. GOLDBERG**

# New York Supreme Court

## Appellate Division -- First Department

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

- against -

Bronx County
Ind. No. 3971/09

JOSEPH DIAZ,

Defendant-Appellant.

## REPLY BRIEF FOR DEFENDANT-APPELLANT

**ROBERT S. DEAN**
**Attorney for Defendant-Appellant**
**Center for Appellate Litigation**
**120 Wall Street, 28th Floor**
**New York, NY 10005**
**rgoldberg@cfal.org**
**Phone: (212) 577-2523 ext. 529**
**Fax: (212) 577-2523**

**RACHEL T. GOLDBERG**
*Of Counsel*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

ARGUMENT IN REPLY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

POINT I
    THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE
    (Responding to RB, Point I). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

POINT II
    THE ADMISSION OF THE NON-TESTIFYING DETECTIVE'S
    CRIME SCENE REPORTS AND DIAGRAM, AS WELL AS THE
    DUPLICATE DIAGRAM COPIED BY A TESTIFYING DETECTIVE,
    VIOLATED APPELLANT'S CONFRONTATION RIGHTS
    (Responding to RB, Point II). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

PRINTING SPECIFICATIONS STATEMENT . . . . . . . . . . . . . . . . . . . . . . . A1

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

Bullcoming v. New Mexico, 564 U.S. 647 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Crawford v. Washington, 541 U.S. 36 (2004) . . . . . . . . . . . . . . . . . 6, 9, 10, 13, 14

Davis v. Washington, 547 U.S. 813 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009) . . . . . . . . . . . . . . . . . . 7, 11

## NEW YORK STATE CASES

People v. Brown, 13 N.Y.3d 332 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

People v. Concepcion, 17 N.Y.3d 192 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

People v. Crimmins, 36 N.Y.2d 230 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

People v. Demand, 268 A.D.2d 901 (3d Dept. 2000) . . . . . . . . . . . . . . . . . . . . 4, 5

People v. Freycinet, 11 N.Y.3d 38 (2008) . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10, 11

People v. Gerard, 94 A.D. 3d (1st Dept. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . 6

People v. Goldstein, 6 N.Y.3d 119 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

People v. John, 27 N.Y.3d 294 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12, 13

People v. Nieves, 67 N.Y.2d 125 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

People v. Pealer, 20 N.Y.3d 447 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

People v. Rawlins, 10 N.Y.3d 135 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 9

ii

## NEW YORK STATE STATUTES

C.P.L. § 470.15(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

iii

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: FIRST DEPARTMENT
------------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,    :

        Respondent,      .  :

                    :

    -against-           

                    :

JOSEPH DIAZ,             :

        Defendant-Appellant.     :

------------------------------------------------------------------------X

## ARGUMENT IN REPLY

This brief is submitted in reply to the People's response brief ("RB")

received by appellant on April 19, 2017, and in further support of Points I and II

in appellant Joseph Diaz's main brief ("AB").[1] Appellant relies on his main brief

with respect to Points III-VI.

## POINT I

### THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE (Responding to RB, Point I).

Contrary to the People's arguments, the verdict that Joseph Diaz fired the

fatal shot in this case is against the weight of the evidence. The People engage in

---

[1] Citations to pages of the record follow the same numbering format as in the main brief.

1

unfounded speculation to undermine that one of the prosecution's own witnesses identified Jason Irrizary as the shooter, that no physical evidence placed Diaz at the scene, and that the ballistics evidence was inconclusive at best. The People's arguments have no merit.

The People try to minimize the import of Susanna Castro's exculpatory identification by claiming that "she was afraid to give testimony in this case, <u>perhaps</u> because she did not want to implicate defendant for fear of retaliation" (RB 15) (emphasis added). Yet nothing suggests that Castro was scared of <u>Diaz</u>. If anything, she was scared of <u>Irrizary</u>, and with good reason. After all, she identified him as the shooter immediately after the incident, and never changed her story. It makes little sense that, if Castro was scared of Diaz, she would protect herself by identifying a person who physically attacked a teenager, openly threatened violence to an entire crowded block in the middle of the afternoon, and who had enough influence over his family to be able to summon them to a revenge-fueled gun battle in minutes.

The People also suggest that Castro had a "false memory" and that the jury disregarded her testimony because it "was able to view Castro's demeanor and body language while she was testifying" (RB 15). The People fail to mention the more likely reason the jury did not believe Castro: because the People were allowed to introduce hearsay evidence that police doubted Castro's identification

2

(see AB Point III). Knowing that the police disregarded Castro's account because it did not fit their working theory of the case made it easy for the jury to disregard Castro's exculpatory identification. This Court should not be so diverted.

As discussed extensively in appellant's main brief, the evidence clearly suggests that Irrizary was the shooter. The People try to rebut this conclusion by twice claiming that if Irrizary had the gun, he would have used it immediately after Gordo sliced his hand (RB 13, 15). The People are right; Irrizary likely did not have the gun on him at that point. But, that is precisely why he issued the threat that everybody should "clear the block" because he was "coming back": he planned to go home to wash his wound, pick up a gun, and return with family members to exact his revenge. That is precisely what he did, with tragic consequences for Santiago.

The People also rely on the video surveillance footage, claiming that it shows that "when defendant and Irrizary were running from the scene, defendant passed his gun to Irrizary" (RB 13). However, the surveillance footage is blurry and jerky, and it is impossible to identify any faces.[2] This is likely why, when eyewitness Michael Jones viewed the surveillance in court, he got confused, and identified at least two different people as the person he saw firing shots.

Contrary to the People's contention, the ballistics evidence does not

_____

[2] Appellant would be happy to provide this Court with copies of the two surveillance tapes (introduced as People's Exhibits 63 and 64) upon request.

3

connect Diaz to the shooting either, and does not even narrow down the number of shooters. As the People point out, a lead fragment, deformed bullet, and bullet fragment were found in front of 409-411 East 146th Street, but these items were too small to analyze (RB 14). This inconclusive ballistics evidence—along with the fact that Jones saw someone from Irrizary's crew shooting a .9mm, not a .45, and that the medical examiner did not know what type of bullet struck Santiago—raises the distinct possibility that more than one person from Irrizary's crew could have fired the shot that killed Santiago.

Finally, the People's reliance on <u>People v. Demand</u>, 268 A.D.2d 901 (3d Dept. 2000), reveals just how weak the evidence against Diaz was (RB 15). In <u>Demand</u>, the Third Department found the verdict was not against the weight of the evidence where the defendant was accused of shooting a bystander during a street fight. <u>Id.</u> at 903-04. The People called eight eyewitnesses, several of whom knew the defendant. All eight of them testified that they saw the defendant break away from the street fight and take out a gun; three of them testified that they actually saw the defendant shoot the victim. <u>Id.</u> Defense counsel called three witnesses who testified that the defendant did not have a gun. <u>Id.</u> Here, by contrast, only two of the five eyewitnesses called by the prosecution identified Diaz, and neither of these witnesses had ever seen Diaz before, undermining the strength of the identification. Orlando Soto could not identify Diaz at trial, and

4

Jones offered conflicting testimony about what he saw at the scene and in the surveillance video, and never actually saw the person fire any shots. Moreover, one of the eyewitnesses for the <u>prosecution</u> not only failed to identify Diaz but actually inculpated Irrizary, the most logical perpetrator. Thus, contrary to the People's contention, the identification testimony here was much weaker than that in <u>Demand</u>, and, coupled with the complete lack of physical evidence tying Diaz to the scene, compels reversal.

POINT II

> THE ADMISSION OF THE NON-TESTIFYING DETECTIVE'S CRIME SCENE REPORTS AND DIAGRAM, AS WELL AS THE DUPLICATE DIAGRAM COPIED BY A TESTIFYING DETECTIVE, VIOLATED APPELLANT'S CONFRONTATION RIGHTS (Responding to RB, Point II).

In his initial brief, Diaz argued that the admission of the crime scene reports and diagram that Detective Jacklitsch prepared, as well as the duplicate diagram that Detective Brown copied, violated both the Confrontation Clause and evidentiary hearsay rules. The People do not contest that this issue was preserved. Nor do they contest that the documents at issue constituted inadmissible hearsay because they do not fall under the business-records exception, compelling reversal irrespective of the Confrontation issue (<u>see</u> AB 55). Moreover, the People agree with appellant that the touchstone issue for analyzing when a statement is

5

testimonial—and therefore subject to Confrontation clause protections—is the "primary purpose" of the statement (RB 21). Yet, in an attempt to escape the inevitable conclusion that because the documents and diagrams were created by police for use in a homicide prosecution they are clearly testimonial, the People advance two primary arguments: that the documents merely represent "information gathering" (RB 22), and that the documents did not inculpate Diaz (RB 23-24). Neither argument has merit.[3]

The People ignore Supreme Court precedent establishing that investigative police reports are testimonial, which makes this a straightforward application of binding law. In Crawford, the Supreme Court provided a non-exhaustive list of testimonial statements, including "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Crawford v. Washington, 541 U.S. 36, 51–52 (2004); accord, Davis v. Washington, 547 U.S. 813, 822 (2006) (statements are testimonial when "the primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution."). Based on this "core-class" of

---

[3] The claim that crime scene reports and diagrams are not actually "statements" (RB 21) is frivolous. The People offer no legal or rational support for the proposition and, in any case, the prosecutor did not make this argument below, so the People may not argue this new admissibility theory now. See People v. Nieves, 67 N.Y.2d 125 (1986); People v. Gerard, 94 A.D. 3d 592 (1st Dept. 2012). Furthermore, the trial court did not admit the documents on those grounds, and since the issue was not determined adversely to Diaz on those grounds, this Court cannot reach it. See C.P.L. § 470.15(1); People v. Concepcion, 17 N.Y.3d 192, 194-95 (2011).

6

testimonial statements, the Supreme Court in <u>Melendez-Diaz v. Massachusetts</u>, 557 U.S. 305 (2009), made it clear that police crime-scene reports are unquestionably testimonial. The majority explicitly rejected the dissent's view, which would have made "a police officer's investigative report describing the crime scene admissible absent an opportunity to examine the officer." <u>Id.</u> at 316.

State law, too, establishes that, as a rule, police reports are testimonial. In <u>People v. Rawlins</u>, 10 N.Y.3d 135 (2008), the People urged the Court of Appeals to establish a blanket rule that business records admissible as an exception to the hearsay bar are never testimonial. The Court found that such a proposition would run afoul of the Confrontation Clause because it could also cover police records, which are testimonial. <u>Id.</u> at 449-150.

This clear rule that police reports are testimonial makes sense, because police reports describing the crime scene are, by their very nature, formalized statements made by law enforcement for <u>no other purpose</u> than to establish facts to be used at a criminal trial. Here too, the only purpose for Jacklitsch to create the crime scene reports and diagrams was "gathering evidence of a past crime . . . [in order to] ultimately apprehend a perpetrator, and [the officer] had no other expectation" in collecting that evidence. <u>Rawlins</u>, 10 N.Y.3d at 157. The People do not—and cannot—argue otherwise.

Instead, the People advance the thoroughly discredited argument that the

documents cannot be testimonial because the police investigative work was "mere

information gathering" (RB 21, 22) that recorded "objective" facts (RB 23-24).

When documents are created with the primary purpose of creating evidence for a

criminal investigation, as the Supreme Court has explicitly held, statements are

testimonial regardless of how "objective" they may be. In rejecting an argument

similar to the People's in the instant case, the Supreme Court noted:

> Most witnesses, after all, testify to their observations of
> factual conditions or events, e.g., "the light was green,"
> "the hour was noon." Such witnesses may record, on
> the spot, what they observed. Suppose a police report
> recorded an objective fact [such as] the address above
> the front door of a house or the read-out of a radar
> gun. Could an officer other than the one who saw the
> number on the house or gun present the information in
> court—so long as that officer was equipped to testify
> about any technology the observing officer deployed
> and the police department's standard operating
> procedures? As our precedent makes plain, the answer
> is emphatically "No."

Bullcoming v. New Mexico, 564 U.S. 647, 660 (2011).

The People rely heavily on several Court of Appeals cases that actually

support the proposition that the reports and diagrams are subject to

Confrontation clause protection (RB 21-23). In People v. Freycinet, the Court of

Appeals found an autopsy report nontestimonial by examining four critical factors

initially articulated in Rawlins: (1) "the extent to which the entity conducting the

procedure is 'an 'arm' of law enforcement," (2) "whether the contents of the

8

report are a contemporaneous record of objective facts, or reflect the exercise of 'fallible human judgment,'" (3) "whether a pro-law enforcement bias is likely to influence the contents of the report," and (4) "whether the report's contents are 'directly accusatory' in the sense that they explicitly link the defendant to the crime." 11 N.Y.3d 38, 41 (2008) (quoting Rawlins, 10 N.Y.3d at 149-150, 153, 154).

Contrary to the People's claims, the documents at issue here are clearly testimonial under this four-factor test. The investigating detective prepared these documents while processing the crime scene, acting as an "arm" of law enforcement whose bias could influence the documents. See Crawford, 547 U.S. at 54 n.7 (expressing a concern about the "unique potential for abuse" arising from "government officers [involved] in the production of testimony").

Moreover, as argued in detail in appellant's initial brief (AB 48-49, 56), these documents were subject to Jacklitsch's "fallible human judgment," as they required interpretive skill. Like the Court of Appeals said of DNA analysis, this Court should not "indulge in the science fiction that [processing a crime scene] is merely machine-generated, a concept that reduces [it] to an automated exercise requiring no skill set or application of expertise or judgment." People v. John, 27 N.Y.3d 294, 311 (2016). Jacklitsch exercised a significant amount of subjectivity and judgment when processing the crime scene and creating the crime scene

9

reports, not to mention the analytic decisionmaking required to convert his initial notes into a diagram of the crime scene evidence. Because the documents were prepared by police in anticipation of a criminal prosecution, the jury should have been able to hear whether Jacklitsch displayed the skill and integrity necessary to the task or—whether by neglect, mistake, or something less benign—he did not.

The People attempt to make hay out of the fourth Freycinet factor: whether the documents explicitly link a defendant to the crime. As an initial matter, the first three factors so strongly militate in favor of the need for cross-examination that the fourth factor is largely irrelevant. In any case, the documents here meet the fourth factor as well. A statement does not have to name the specific defendant in order to meet this fourth factor, as the People mistakenly believe. A closer look at the explanation of this factor provided in Freycinet is instructive. The Court found that the autopsy report did not satisfy the fourth factor because the

> report is concerned only with what happened to the victim, not with who killed her. As Crawford explains, the Confrontation Clause derives from the strongly held idea of our country's founders, derived from English common law, that a person accused should have the right to face his or her 'accuser.' . . . [The medical examiner] was not defendant's 'accuser' in any but the most attenuated sense.

Freycinet, 11 N.Y.3d at 42.

Here, the crime scene report and diagram were not created merely to

10

establish whether Santiago was the victim of a crime, or how she died, as in the Freycinet autopsy report. It was already clear that Santiago had been shot and killed during a gun battle when Jacklitsch prepared these documents—which is why he created them in the first place. Moreover, unlike the medical examiner performing an autopsy, Jacklitsch—acting as an arm of law enforcement empowered by the state to initiate criminal prosecutions—most certainly was an "accuser" in the most literal sense. Thus, even the fourth Freycinet factor suggests these documents are testimonial.[4]

In any case, the record suggests that Diaz was a suspect at the time Jacklitsch completed at least his diagram. According to Jacklitsch's Crime Scene Unit Report entitled "CSU Scene Diagram," the "activity time" for this report was September 23, 2009 at "17:20," or 5:20pm (in record on appeal). Diaz first became a suspect on the morning of September 23, 2009, hours before Jacklitsch's recorded activity time for the diagram. Police interviewed Anthony Pena-Guzman in the hospital the morning of September 23, and he gave them Diaz's name (Hearing Tr. 138-14). That afternoon, at around 3:30, police showed an

---

[4] Notably, the Supreme Court has never found that a statement is testimonial only if it links to a named defendant, either. To the contrary, a majority of Supreme Court justices have consistently rejected this argument. See Melendez-Diaz, 557 U.S. at 313 (rejecting the argument that the documents are not testimonial because they "do not directly accuse petitioner of wrongdoing [because] their testimony is inculpatory only when taken together with other evidence linking petitioner to the contraband. This finds no support in the text of the Sixth Amendment or in our case law.").

11

eyewitness—identified as John Doe Number One at the hearing—a photo array with Diaz's picture in it (Hearing Tr. 85-86, 92, 127-29, 137, 151). Thus it is clear that when Jacklitsch prepared the crime scene diagram, Diaz was already a suspect in Santiago's killing.

Ultimately, contrary to the People's contentions, the crime scene reports and diagrams are not at all similar to documents related to the routine maintenance of breathalyzer machines (found to be nontestimonial in People v. Pealer, 20 N.Y.3d 447 (2013)) or machine-generated DNA reports (found to be nontestimonial in People v. Brown, 13 N.Y.3d 332 (2009)) (RB 23-24). A breathalyzer calibration report and a machine-generated DNA report are not created by people. Nothing a machine operator does can alter the information. The machines themselves have no agency or intent, and cannot make solemn declarations. Moreover, nothing the operator does can alter the information. And, "subsequent analysis of that raw data [can] provide[]the assurance that the [information] was accurate." John, 27 N.Y.3d at 310. Here, by contrast, nobody but Jacklitsch could provide any information about how he collected this information, what tools he used, whether he was under any pressure or illness that could have affected his findings, and so on (see AB 55-56). Nor could anybody re-create or check the accuracy of his reports and diagram. The prosecution relied on the validity of these documents to convict Diaz, so it was essential for the defense

12

to be able to cross-examine their creator about whether he may have committed any errors or simply made up his results.

As the People cannot dispute, if this Court finds that Jacklitsch's diagram was testimonial, it must also find that the introduction of Brown's diagram violated Diaz's confrontation rights because, as the People acknowledge, Brown's diagram was a duplicate of Jacklitsch's (RB 25). The Court of Appeals's latest and most significant post-Crawford decision controls here. In John, the People called a criminalist to introduce and discuss lab reports regarding DNA evidence, but did not produce the analysts who generated the DNA profile in the reports. The Court concluded that, because the data-gathering required interpretation, the witness could not offer "a separate, independent and unbiased analysis of the raw data." John, 27 N.Y.3d at 310-11. It concluded that reversal on confrontation grounds is required where, as here, "a witness who never tested the . . . evidence that incriminated an accused defendant [asserts] that the nontestifying analysts' results were truthful." Id. at 304. After all, the testifying witness's "exportation of the [data] into a chart so that the jury could easily see the [information] is not the same as independently verifying the accuracy of testing conducted by the nontestifying analysts." Id. at 310. Similarly here, Brown merely transcribed Jacklitsch's work, and Brown could not convey what Jacklitsch actually knew or observed about the crime scene or anything about the process Jacklitsch employed

13

when creating his diagram.

Finally, the People's arguments that the admission of the crime scene reports and diagram was not harmful reflects a fundamental misunderstanding of the constitutional harmless error standard. The question is not whether defense could "pok[e] holes" in the prosecution's case despite the inadmissible evidence, or whether the inadmissible evidence had any "bearing on the defense's theory of the case" (RB 25-26). Rather, the question is whether the erroneously admitted evidence could have affected the verdict beyond a reasonable doubt. People v. Crimmins, 36 N.Y.2d 230, 237 (1975). People v. Goldstein, which analyzed whether a Crawford violation was harmful, is instructive. The Court of Appeals found the admission of the evidence harmful where "[t]he People's case drew some significant support from the improperly admitted statements," and while "it is true that these statements were by no means vital to the People's case . . . they were not trivial either." 6 N.Y.3d 119, 130 (2005). Because it "is reasonably possible" that any of the inadmissible evidence could have affected the jury's verdict, the error was not harmless. Id.

Here, the crime scene reports and diagrams were certainly more than trivial; in fact, they were crucial to the People's case. That evidence is what allowed the People to argue—both at trial and on appeal— that someone from Irrizary's crew fired the fatal shot (see AB 57-58; RB 13-14). Moreover, the prosecution also

relied on the diagrams to bolster its inculpatory identification evidence, and to undermine the exculpatory identification evidence (AB 58).

In sum, the People's arguments that the crime scene reports and diagrams are not testimonial or harmful must be rejected.

## CONCLUSION

FOR THE REASONS STATED ABOVE AND IN POINT I OF HIS MAIN BRIEF, APPELLANT'S CONVICTION SHOULD BE REVERSED AND THE INDICTMENT DISMISSED; FOR THE REASONS STATED ABOVE AND IN POINTS II, III, IV, AND V OF HIS MAIN BRIEF, APPELLANT'S CONVICTION SHOULD BE REVERSED A NEW TRIAL ORDERED; AS AN ALTERNATIVE, FOR THE REASONS STATED IN POINT VI OF HIS MAIN BRIEF, APPELLANT'S SENTENCE SHOULD BE REDUCED.

Respectfully submitted,

ROBERT S. DEAN
Center for Appellate Litigation
Attorney for Defendant-Appellant

Rachel T. Goldberg
*Of Counsel*
April 2017

15

PRINTING SPECIFICATIONS STATEMENT

    The brief was prepared in Word Perfect X6, using a 14-point Garamond font in the text and headings, and 12-point Garamond font in the footnotes. The word count is 3,476, excluding the Table of Contents and Table of Authorities.