# 22-1835

United States Court of Appeals

**For the Second Circuit**

———

**JOSEPH DIAZ**,

*Petitioner-Appellant,*

*- against -*

**MARK MILLER,**

*Respondent-Appellee.*

**On Appeal from the United States District Court
for the Southern District of New York**

## BRIEF FOR RESPONDENT-APPELLEE

DARCEL D. CLARK
District Attorney
Bronx County
Attorney for Respondent-Appellee
198 East 161 Street
Bronx, New York 10451
(718) 838-6667

YAEL V. LEVY
DAVID M. COHN
PAUL A. ANDERSEN*
JOSHUA P. WEISS
ASSISTANT DISTRICT ATTORNEYS

* Attorney of Record

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iii

PRELIMINARY STATEMENT ......................................................................... 1

INTRODUCTION ............................................................................................. 1

QUESTIONS PRESENTED .............................................................................. 6

STATEMENT OF THE CASE .......................................................................... 7

A. The Relevant Trial Evidence ..................................................................... 7

    1. The People's Case ............................................................................... 7

    2. The Defense Case .............................................................................. 12

B. The Verdict and Sentence ........................................................................ 12

C. Petitioner's State Appeal .......................................................................... 12

D. The Federal Habeas Petition .................................................................... 13

POINT I ........................................................................................................... 15

THE STATE COURTS REASONABLY CONCLUDED THAT THE CHALLENGED CRIME
SCENE REPORTS AND DIAGRAMS CATALOGUING THE LOCATIONS OF BALLISTICS
EVIDENCE—PREPARED FOR RECORD-KEEPING PURPOSES BEFORE ANY SUSPECT
WAS IDENTIFIED—WERE NOT TESTIMONIAL HEARSAY. ............................................ 15

    A.                The AEDPA Standard ........................................................ 16

    B.               As the State Courts Reasonably Concluded, the Challenged
Crime Scene Evidence Did Not Constitute Testimonial Hearsay ..................... 19

POINT II .......................................................................................................... 34

AS THE STATE COURT REASONABLY CONCLUDED, ANY ERROR IN THE ADMISSION
OF THE CRIME SCENE EVIDENCE WAS HARMLESS, BECAUSE IT SHED NO LIGHT ON
WHETHER PETITIONER WAS THE SHOOTER—THE SOLE CONTESTED ISSUE AT
TRIAL ............................................................................................................... 34

A.          A Federal Habeas Court Must Defer to the State Court's
Harmless Error Determination. ............................................................... 35

B.          The State Court's Harmless Error Finding Was Reasonable,
Because the Crime Scene Report Had No Bearing on the Primary Contested
Issue of Identification ............................................................................ 37

CONCLUSION ................................................................................................ 47

CERTIFICATE OF COMPLIANCE ............................................................... 48

# TABLE OF AUTHORITIES

Page(s)

<u>Federal Cases</u>

*Brecht v. Abrahamson*
507 U.S. 619 (1993) ................................................................... *passim*

*Brown v. Davenport*
142 S. Ct. 1510 (2022) ............................................................... *passim*

*Brumfield v. Cain*
576 U.S. 305 (2015) ......................................................................... 44

*Bullcoming v. New Mexico*
564 U.S. 647 (2011) ................................................................... *passim*

*Chapman v. California*
386 U.S. 18 (1967) ..................................................................... 5, 36

*Cook v. Bayle*
718 F. Appx. 51 (2d Cir. 2017) ........................................................ 26

*Crawford v. Washington*
541 U.S. 36 (2004) ................................................... 19, 20, 25, 27

*Davis v. Ayala*
576 U.S. 257 (2015) ............................................................ 35, 36, 45

*Davis v. Washington*
547 U.S. 813 (2006) ........................................... 20, 24, 29, 30

*Delaware v. Van Arsdall*
475 U.S. 673 (1986) .................................................................. 39, 41

*Eze v. Senkowski*
321 F.3d 110 (2d Cir. 2003) ............................................................ 43

*Garlick v. Lee*
1 F.4th 122 (2d Cir. 2021) ................................................... 27, 28, 41

*Garrett v. Madden*
  859 F. App'x 156 (9th Cir. 2021)......................................................31, 32

*Gutierrez v. McGinnis*
  389 F.3d 300 (2d Cir. 2004) ........................................................ 46

*Harrington v. Richter*
  562 U.S. 86 (2011) ........................................................ 18, 31, 45

*Jenkins v. Hall*
  910 F.3d 828 (5th Cir. 2018) ........................................................ 31

*King v. Brown*
  2021 WL 3417921 (6th Cir. Apr. 20, 2021)......................................... 31

*Krivoi v. Chappius*
  2022 WL 17481816,n.3 (2d Cir. Dec. 7, 2022) ............................... 44

*Lockyer v. Andrade*
  538 U.S. 63 (2003) ........................................................ 18

*Melendez-Diaz v. Massachusetts*
  557 U.S. 305 (2009) ....................................................*passim*

*Mendoza v. Sec'y, Florida Dep't of Corr.*
  761 F.3d 1213 (11th Cir. 2014) ........................................................ 44

*Michigan v. Bryant*
  562 U.S. 344 (2011) ........................................................ 20

*Mills v. Comm'r, Alabama Dep't of Corr.*
  2021 WL 5107477 (11th Cir. Aug. 12, 2021) ............................... 31

*Nevada v. Jackson*
  569 U.S. 505 (2013)........................................................ 17

*Ohio v. Clark*
  576 U.S. 237 (2015)........................................................ 20

*Shinn v. Ramirez*
  142 S. Ct. 1718 (2022)........................................................ 16

*Stuart v. Alabama*
  139 S.Ct. 36 (2018) ............................................................... 22

*United States v. Feliz*
  467 F.3d 227 (2d Cir. 2006) ............................................. 27, 29, 30

*United States v. Garcia*
  452 F.3d 36 (1st Cir. 2006) .......................................................... 30

*United States v. James*
  712 F.3d (2d Cir. 2013) ............................................................... 27

*United States v. Moskowitz*
  581 F.2d 14 (2d Cir. 1978) ........................................................... 32

*Washington v. Griffin*
  876 F.3d 395 (2d Cir. 2017) ......................................................... 26

*White v. Woodall*
  572 U.S. 415 (2014) ..................................................................... 31

*Williams v. Illinois*
  567 U.S. 50 (2012) .................................................................... 4, 21

*Williams v. Taylor*
  529 U.S. 362 (2000) ..................................................................... 17

*Woods v. Donald*
  575 U.S. 312 ................................................................................ 18

*Wright v. Van Patten*
  552 U.S. 120 (2008) ..................................................................... 31

*Yarborough v. Alvarado*
  541 U.S. 652 (2004) ..................................................................... 17

State Cases

*People v. Brown*
  13 N.Y.3d 332 (2009) .................................................................. 25

*People v. Diaz*
    151 A.D.3d 502 (1st Dept. 2017) ........................................................................ *passim*

*People v. Freycinet*
    11 N.Y.3d 38 (2008) ........................................................................ 26, 27

*People v. Garlick*
    144 A.D.3d 605 (1st Dept. 2016) ........................................................................ 27

*People v. Guidice*
    83 N.Y.2d 630 (1994) ........................................................................ 30

*People v. John*
    27 N.Y.3d 294 (2016) ........................................................................ 26, 27

*People v. Pealer*
    20 N.Y.3d 447 (2013) ........................................................................ 25

*People v. Rawlins*
    10 N.Y.3d 136 (2008) ........................................................................ 26

Federal Statutes

28 U.S.C. § 2254 ........................................................................ *passim*

State Statutes

N.Y. Penal Law § 125.20(1) ........................................................................ 1

Federal Rules

803(6) of the Federal Rules of Evidence ........................................................................ 3

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

JOSEPH DIAZ,

                       Petitioner-Appellant,           22-1835

                  -against-

MARK MILLER,

                       Respondent-Appellee.

## BRIEF FOR RESPONDENT-APPELLEE

### PRELIMINARY STATEMENT

Petitioner Joseph Diaz appeals from an August 16, 2022, order of the United States District Court for the Southern District of New York (Torres, J.), denying his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his habeas corpus application, petitioner sought to set aside his custody pursuant to a December 10, 2014, judgment of the New York State Supreme Court, Bronx County, convicting him, after a jury trial, of first-degree manslaughter and sentencing him to a prison term of 25 years to be followed by five years of post-release supervision (N.Y. Penal Law § 125.20(1)). He is currently serving his prison sentence.

### INTRODUCTION

On September 22, 2009, petitioner killed an innocent bystander, Aisha Santiago, during a shootout with a rival group. The trial evidence soundly proved petitioner's

guilt. Only one shooter fired in Santiago's direction; two witnesses identified petitioner as that shooter; and video surveillance footage showed petitioner handing his gun to an associate after the crime.

Nevertheless, petitioner complains that his trial was tainted by the admission of crime scene evidence that, he claims, constituted testimonial hearsay. Specifically, a crime scene detective, who had retired by the time of trial, processed the scene in accordance with NYPD protocol. The detective photographed the scene and prepared a crime scene report, including a diagram depicting where the ballistics evidence had been found. The crime scene report— which was created in the ordinary course of business pursuant to a business duty— was admitted into evidence at trial as a business record. Another detective, relying on that report as well as on new computer modeling of the location he visited, created his own diagram of the crime scene, and testified at trial about the crime scene evidence.

On direct appeal, the New York Appellate Division rejected petitioner's claim that the admission of the crime scene evidence violated his Sixth Amendment confrontation rights, reasoning that the challenged reports "[did] not link the commission of the crime to a particular person." *People v. Diaz*, 151 A.D.3d 502, 502-03 (1st Dept. 2017). The state court added that, in any event, any evidence was harmless, "because evidence showing the locations where the officer found cartridge cases and other ballistic evidence shed little or no light on any of the disputed issues at trial, and there is no reasonable possibility that this evidence affected the verdict." *Id.* at 503.

Petitioner renewed his confrontation claim in the instant § 2554 proceeding. The District Court, while acknowledging that there was no Supreme Court precedent directly on point, ruled that the crime scene reports and diagrams contained testimonial hearsay. The court described the reports as "formalized" documents that were created as a substitute for in-court testimony—and held that the state courts had unreasonably applied Supreme Court precedent in finding otherwise (JA107).

The District Court, however, denied the habeas petition, holding that the New York Appellate Division had reasonably found that the error was harmless. The District Court observed, "Multiple eyewitnesses named [p]etitioner as a shooter and placed him, Santiago, and the other shooting participants in locations that logically connect [p]etitioner's shooting to Santiago's death" (JA110). The court added that "[s]urveillance video footage also shows someone who appeared to be Petitioner passing a gun to another person following the shooting" (*id.*). Still, the court granted a certificate of appealability, opining that "reasonable jurists could debate whether the Appellate Division's harmless error finding was unreasonable" (JA110-11).

This Court should affirm. No Supreme Court precedent precludes the introduction of a crime scene report—created pursuant to a business duty, in the ordinary course of business, before a suspect has been identified—as a business record. Indeed, a crime scene detective who processes a scene—and then records his or her observations by making contemporaneous notes and diagrams—is not creating "testimony"; instead, the detective is following protocol and is simply doing his or her

3

job. Certainly, no clearly established Supreme Court precedent holds that such reports and diagrams are "testimonial" hearsay, and petitioner's attempt to analogize these materials to testimonial laboratory certifications[1] misses the mark. At the very least, given the splintered decision in *Williams v. Illinois*, 567 U.S. 50 (2012), the state courts did not act unreasonably by concluding that the contemporaneously-created crime scene records were akin to business records and thus fell outside the scope of the Confrontation Clause.

In any event, the state court properly concluded that any error in the introduction of the crime scene reports was harmless. After all, the trial evidence plainly established that petitioner—who was wearing a distinctive red shirt—fired a barrage of gunshots in Santiago's direction. Further, video evidence showed that petitioner—wearing the red shirt—handed off the gun after the shooting to an accomplice, who was wearing a white shirt. And, eyewitness testimony made clear that petitioner was the only shooter who fired in Santiago's direction. Thus, as the Appellate Division concluded, the challenged crime scene evidence added nothing of consequence to the trial because it "shed little or no light on any of the disputed issues." *Diaz*, 151 A.D.3d at 502-03.

Ultimately, for petitioner to obtain habeas relief, he must demonstrate that not one, but two "extreme malfunctions in the state criminal justice system" occurred

---

[1] *See Bullcoming v. New Mexico*, 564 U.S. 647 (2011); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009).

here—that the state courts unreasonably applied established Supreme Court precedent on the merits *and also* unreasonably applied the harmless error standard. *See Brown v. Davenport*, 142 S.Ct.1510 (2022). Even assuming the state court was "not merely wrong," but was "objectively unreasonable" in determining that no Confrontation Clause error occurred here, its finding of harmlessness, in the alternative, was a faithful application of *Chapman v. California*, 386 U.S. 18, 24 (1967). Indeed, even if *some* fairminded jurist could reach a different conclusion, petitioner cannot succeed unless he convinces this Court "that *every* fairminded jurist must." *See Brown v. Davenport*, 142 S.Ct.1510, 1530 (2022). Petitioner fails to clear that high hurdle.

## QUESTIONS PRESENTED

1. Did the state courts reasonably apply Supreme Court precedent by holding that a crime scene detective's contemporaneous notes—created in the ordinary course of business, pursuant to a business duty, before a suspect was identified—did not constitute testimonial hearsay?

2. Did the state court reasonably determine that any error in the admission of crime scene evidence was harmless when the challenged evidence did not add anything to the proof of the shooter's identity, which was the primary contested issue at trial?

## STATEMENT OF THE CASE

A. The Relevant Trial Evidence[2]

1. The People's Case

On the afternoon of September 22, 2009, petitioner's associate, Jason Irrizary, scuffled with a group of people on 146th Street in the Bronx, including a man named "Gordo" (T. 427-29, 431 [Irrizary]; T. 620-21 [Castro]). Irrizary was slashed during the scuffle. Tending to his wound, Irrizary left the scene and shouted, "Clear the f---ing block because I'm coming back" (T. 620 [Castro]).

A few minutes later, Irrizary returned to the block with petitioner, who had a gun (T. 251-56, 260-65 [Soto]; T. 625-30 [Castro]). Petitioner and Irrizary were standing near the corner of 146th Street and Willis Avenue. The rival group, which included Latroy Ewell and Rob Vargas, was congregated east of petitioner, in front of 409 East 146th Street, located east of Willis Avenue in the direction of Brook Avenue (T. 264-65 [Irizarry]; T. 628-30 [Castro]). The victim, Aisha Santiago, was heading to the laundromat with her nine-year-old son. Santiago was in front of her building at 445 East 146th Street, located further east on 146th Street, closer to Brook Avenue (T. 748-50 [minor son, A.F.]).

---

[2] This section briefly summarizes the relevant trial evidence. The People's Appellate Division brief includes a more detailed summary of the trial evidence, complete with detailed citations to the record (JA226-34).

As eyewitnesses watched, petitioner fired several shots eastbound, in the direction of Ewell and Vargas (T. 251-56, 260-65 [Soto]; T. 508-09 [Jones]). Petitioner, however, missed his intended targets. One bullet struck Santiago, who stood further east, in the chest (T. 266-68 [Soto]; T. 748-50 [A.F.]). The bullet pierced her aorta, killing her (T. 790-93 [Dr. Prial]). Meanwhile, Ewell and Vargas returned fire, shooting west in petitioner's direction (T. 589-90, 594-95 [Ewell]; T. 628-30 [Castro]). Petitioner handed his gun to Irrizary, and the two men fled the scene (T. 505-09, 515, 532 [Jones]). No one else fired a bullet in Santiago's direction.

An eyewitness, Orlando Soto, identified petitioner in a lineup as the shooter who fired east on 146th Street, in the direction of Ewell and Vargas (T. 268, 273, 276). Soto noted petitioner's distinctive red shirt (T. 263).[3] Another witness, Michael Jones, identified petitioner as the shooter in a photo array and at trial (T. 521-22; T. 712-16 [Det. Snyder]). Jones also noticed petitioner's red shirt (T. 509). Jones saw petitioner hand the gun to a man in a white shirt (Irrizary) after the shooting. Video surveillance footage captured petitioner—wearing a red shirt—handing the gun to Irrizary—wearing a white shirt (Exhibits 63 & 64). A third person, Susana Castro, identified Irrizary as the shooter (T. 655-66). Castro, a reluctant witness who was afraid to take

---

[3] Although Soto had positively identified petitioner as the shooter in a lineup in 2009, he did not identify petitioner at trial (T. 268, 273, 276, 278). Soto explained that his memory had faded (T. 295-96).

the witness stand (*see* T. 394), testified that she had thrown herself on the ground and was face-down during the shooting (T. 628-30 [Castro]).[4]

After the gunfight, Aisha Santiago lay, unmoving, on the stairs of her building, 445 East 146th Street (T. 748-751, 758 [A.F]). She had a wound in her chest and blood oozing from her mouth (T. 266-68 [Soto]). A paramedic on the scene did not administer medical care because Santiago was obviously deceased (T. 49-50 [Paramedic Williams]). An autopsy revealed that Santiago had died from a gunshot wound to the chest; the bullet entered her chest, perforated her heart, aorta, and left lung, and exited on the right side of her back (T. 790, 792-93 [Dr. Prial]).

Police Officer Ronald Juan arrived at the scene within two minutes (T. 225-26). Assigned by the sergeant to be first officer, Officer Juan remained at the location "in charge of all the paperwork." He was "looking over the shoulder" of the Crime Scene Unit detectives as they located evidence and memorialized their findings (T. 230-234). Vouchering the ballistics evidence was his ultimate responsibility (T. 231).

Crime Scene Unit Detective Glenn Jacklitsch examined the crime scene and prepared the Crime Scene Unit report with accompanying photographs and a Crime Scene Unit diagram (T. 64-65, 107-108 [Det. Brown]; Exhibits 57 and 62). Jacklitsch, who subsequently retired from the NYPD, did not testify at trial. Instead, the crime

---

[4] Castro recalled that three members of Irrizary's group had guns, but she saw only one of them fire shots (T. 651-52).

scene report, diagram, and accompanying photographs were introduced as business records (T. 88-97). Another Crime Scene Unit Detective, Paul Brown, testified that crime scene reports are created by the NYPD in the normal course of business, that they must be prepared contemporaneously with the processing of the crime scene, and that crime scene detectives are under a business duty to accurately record the information (T. 67-68, 86). Detective Brown, who visited the crime scene three weeks before trial, generated his own diagram, which was more comprehensive and detailed than Jacklitsch's diagram (T. 64-65; 103-04). Brown's diagram was based on his own observations, which he supplemented by consulting Google Maps as well as Detective Jacklitsch's report, diagram, and photographs (T.64-65, 107-108; *see also* Exhibits 58a,58b).[5]

The crime scene evidence showed that six Winchester .45 caliber cartridge casings were found at the corner of Willis Avenue and 146th Street; seven 9 mm discharged Winchester Luger cartridge casings were found in front of 409 to 411 East 146th Street; and shell casings from a .22 caliber rifle or cartridge were found inside a fenced area of 413 and 415 East 146th Street (T. 122-28 [Det. Brown]; T. 328-29, 333-34 [Det. Fox]; *see* Exhibits 57, 58a, 58b, 62). A deformed .45 caliber copper jacketed bullet was found inside the trunk of a car parked in front of 455 East 146th Street (T.

---

[5] An enlarged version of Det. Brown's diagram was used by the eyewitnesses to identify and memorialize their respective locations and the locations of the events they described (T. 254-256, 269 [Soto]; T. 431-32, 447-48, 457 [Irrizary]; T. 530-32 [Jones]; T. 623-24, 631, 637-639, 642-45, 667 [Castro]; T. 751-52 [A.F]).

145,196 [Det. Brown]; T. 341-42 [Det. Fox]; *see* Exhibits 57, 58a, 58b, 62). Finally, a possible "BIM" (Ballistic Impact Mark) was found in front of Santiago's building, 445 East 146th Street (T.153 [Det. Brown]; *see* Exhibit 29).

Detective Jonathan Fox, a ballistics expert, analyzed the ballistic evidence that was collected from the scene. When a gun is fired, a shell casing is ejected and lands close to where the gun is located (T. 319-20). Detective Fox determined that all six .45 caliber shell casings—found near the corner of Willis Avenue and 146th Street—were fired from the same .45 caliber firearm (T. 336). The seven 9 mm casings—found in front of 409-411 East 146th Street—were fired from the same 9 mm firearm (T. 336-37). The .22 caliber shell casings could not have been ejected from either of those guns because a firearm of a particular caliber can only fire that particular bullet, i.e., a 9 mm or .22 caliber bullet could not be fired from a .45 caliber firearm (T. 336-37).

Subsequently, after the police spoke with Castro, Vargas was arrested (T. 690-91, 704-05 [Det. Snyder]). Castro told the police that Irrizary was one of the shooters (T. 655-58 [Castro]; T.692-93 [Det. Snyder]). A detective spoke to Irrizary, who gave a statement and was not arrested. Petitioner was arrested on September 23, 2009, the day after the shooting (T. 700-02, 706-07 [Det. Snyder]).

That same day, Soto identified petitioner in a lineup (T. 710 [Det. Snyder]; T. 273 [Soto]). On September 27, 2009, Jones identified petitioner in a photo array (T. 713

[Det. Snyder]; T. 565 [Jones]; Exhibit 69). Jones subsequently identified petitioner in a lineup (T. 712-16; T. 521; *see* Exhibits 68a, b, c, 72).[6]

## 2. The Defense Case

Police Officer Berlinda Acevedo was sitting in the courtyard of 510 East 146th Street, which is across the street from 445 East 146th Street, when she heard a series of gunshots, after which she observed a lot of people—including a Black man wearing a red shirt—running from Willis Avenue towards Brook Avenue (T. 812-815).

## B. The Verdict and Sentence

The jury convicted petitioner of first-degree manslaughter (T. 1090).[7] The court sentenced petitioner, as a second felony offender, to twenty-five years in prison and five years of post-release supervision.

## C. Petitioner's State Appeal

On appeal, petitioner argued that the trial court violated his confrontation rights by admitting the non-testifying crime scene detective's crime scene report, photographs, and diagram, as well as the testifying detective's diagram (JA166-80). The New York Appellate Division, First Department, unanimously rejected petitioner's claim. The

---

[6] During the trial, the jury visited the crime scene (T. 768-72). They were limited to visiting two specific locations: the front of the Papa John's storefront at the corner of 146th Street and Willis Avenue, by where Michael Jones viewed the shooting, and the front of 445 East 146th Street, where Aisha was shot (T. 769-70). There is no record support for the assertion that they were given a diagram for reference during the visit (*cf.* petitioner's brief, p. 16). To the contrary, the court expressly instructed the jurors that they were to make observations of the locations only, without comment or discussion (T. 769-70).

[7] The jury acquitted petitioner of second-degree murder.

court reasoned that "the crime scene report and diagrams" was not testimonial because they did not link the commission of the crime to a particular person (JA2-2). As an alternative holding, the court found that any error was harmless, "because evidence showing the locations where the officer found cartridge cases and other ballistic evidence shed little or no light on any of the disputed issues at trial, and there is no reasonable possibility that this evidence affected the verdict" (JA2-2). The New York Court of Appeals denied petitioner's application for leave to appeal (JA2-25).

D. The Federal Habeas Petition

Petitioner sought habeas corpus relief under 28 U.S.C. § 2254, renewing his Confrontation Clause claim. On April 14, 2022, Magistrate Judge Debra Freeman recommended granting the writ (Report and Recommendation, "R&R"). The Magistrate Judge opined that the challenged crime scene report and accompanying documents—except for the photographs (JA57, n. 18)— were testimonial hearsay, and that the state courts unreasonably applied Supreme Court precedent in finding otherwise. The Magistrate Judge further concluded that the error in admitting that evidence was not harmless (JA58-64).

After respondent objected to the R&R, the District Court denied the writ. At the outset, the court adopted the Magistrate Judge's determination that the challenged crime scene evidence—with the exception of the photographs (JA104, n. 2)—was testimonial. The court reasoned that the crime scene report and accompanying documents were prepared during an active police investigation, were sufficiently

formalized, and were "clearly intended for use in a future trial" (JA107). The District Court concluded, however, that the Appellate Division had reasonably found the error harmless (JA108-10). The court explained that "multiple" witnesses had identified petitioner as the shooter, that the location from which he had fired the shots connected him to Santiago's death, and that surveillance video footage showed him handing off the murder weapon after the crime (JA110). The court granted petitioner a certificate of appealability (JA110-11).

## POINT I

THE STATE COURTS REASONABLY CONCLUDED THAT THE CHALLENGED CRIME SCENE REPORTS AND DIAGRAMS CATALOGUING THE LOCATIONS OF BALLISTICS EVIDENCE—PREPARED FOR RECORD-KEEPING PURPOSES BEFORE ANY SUSPECT WAS IDENTIFIED—WERE NOT TESTIMONIAL HEARSAY.

At trial, the People introduced a crime scene report prepared by a non-testifying detective, who had since retired. The report—which was prepared contemporaneously, according to a business duty, and in the ordinary course of the crime scene detective's job duties—catalogued the locations of the various pieces of ballistics evidence found at the scene. The People also introduced crime scene photographs taken by the retired detective, a diagram of the scene that he sketched, and a diagram prepared by a testifying detective (Paul Brown) that was based on the retired detective's report.

The state courts reasonably concluded that these documents were admissible as business records and did not constitute testimonial hearsay barred by the Sixth Amendment's Confrontation Clause. The crime scene materials were routine, contemporaneous statements of observable fact. The information was recorded promptly and in accordance with a business duty. The detective had a business duty to record the information accurately. And the photographs were merely pictures; they were not statements. None of this evidence constituted "testimony" in any sense of the word. The admission of this evidence, therefore, did not implicate petitioner's confrontation rights.

15

Nevertheless, the District Court held that the admission of the non-testifying detective's crime scene report, as well as Detective Brown's report that was based on the original crime scene report, was error. The District Court held that the state courts unreasonably applied Supreme Court precedent—namely, *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009)—by finding the crime scene report non-testimonial.[8] That conclusion was incorrect. No established Supreme Court precedent indicates that the crime scene report was testimonial. Instead, to the extent that the Supreme Court's precedents yield any answer to that question, they indicate that the report was non-testimonial under the particular circumstances of this case.

A. <u>The AEDPA Standard</u>

"The writ of habeas corpus is an extraordinary remedy that guards only against extreme malfunctions in the state criminal justice system." *Shinn v. Ramirez*, 142 S. Ct. 1718, 1731 (2022) (internal quotation marks omitted). Federal habeas relief is not appropriate with respect to a claim "adjudicated on the merits" in state court, unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

---

[8] The District Court did not hold that it was error to admit the crime scene photographs, as opposed to the report.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a state court decision is "contrary to" federal law when the state court arrives at a "conclusion opposite to that reached by [the Supreme] Court on a question of law" or if it "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to that of the Court. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A decision involves an "unreasonable application" of Supreme Court precedent if it "identifies the correct governing legal rule . . . but unreasonably applies it to the facts" of a particular case or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407.

"An *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410 (emphasis in original). A habeas court is not permitted to grant the writ "simply because [it] concludes in its independent judgment that the state-court decision applied [the law] incorrectly … Relief is available under § 2254(d)(1) only if the state court's decision is objectively unreasonable." *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004) (internal citation and quotation marks omitted). And a state court's application of federal law is objectively unreasonable "only if it is so erroneous that there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Nevada v. Jackson*, 569 U.S. 505, 508 (2013) (internal citation quotations omitted).

In fact, the standard is not even whether the state court committed "clear error," as that "fails to give proper deference to state courts." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "If this standard [sounds] difficult to meet, that is because it was meant to be," since "habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal," *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011) (internal quotations omitted).

Simply put, federal courts must presume that "state courts know and follow the law," and federal judges may overturn a state criminal conviction on collateral review "only when there could be no reasonable dispute" that the state court decision was "wrong." *Woods v. Donald*, 575 U.S. 312, 316 (internal quotations omitted). Beyond that, "Federal habeas review of state convictions frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Harrington*, 562 U.S. at 103 (internal quotations omitted). Indeed, federal habeas review "disturbs the state's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Id.* (internal quotations omitted).

Judged by these deferential standards, the state courts reasonably denied petitioner's confrontation claim.

B. As the State Courts Reasonably Concluded, the Challenged Crime Scene Evidence Did Not Constitute Testimonial Hearsay.

In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court explained that the Sixth Amendment grants an accused the right to confront the "witnesses" against him—that is, "those who bear testimony." *Id.* at 51 (internal quotations omitted). Thus, the confrontation right bars the "admission of *testimonial* statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53-54 (emphasis added). The Court defined "testimony" as a "solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* at 51 (internal quotations omitted).

While not offering a comprehensive definition of "testimonial," the *Crawford* Court concluded that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." *Id.* at 50. The Court held also that the Clause covers prior formal testimony and "police interrogations." *Id.* at 68. Business records, however, are not formal testimony or the product of police "interrogation," nor do they fall within the "civil-law mode" of *ex parte* examinations at which the Confrontation Clause was directed. To the contrary, business records are made for the purposes of the *enterprise*, to keep a record of its day-to-day operations and activities. They are prepared for record-keeping purposes and to ensure that employees follow standardized procedures. They are not created as "testimony."

Hence, in *Crawford*, the Court declared that business records are "by their nature" not testimonial and do not fall within the purview of the Confrontation Clause. *Crawford*, 541 U.S. at 56. Indeed, as Justice Rehnquist wrote in his concurring opinion, "To hold otherwise would require numerous additional witnesses without any apparent gain in the truth-seeking process." *Id.* at 76 (Rehnquist, C.J., concurring).

In subsequent cases, the Court explained that an out-of-court statement will not be deemed "testimonial" unless it was made for the "primary purpose" of creating evidence for use at a criminal trial. *See Ohio v. Clark,* 576 U.S. 237, 245-46 (2015); *Michigan v. Bryant*, 562 U.S. 344, 358-59 (2011); *Davis v. Washington,* 547 U.S. 813, 822 (2006). The Court declared that "[w]here no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Bryant*, 562 U.S. at 359. Hence, in *Bryant*, the Court ruled that an officer's questioning of the victim in the aftermath of a shooting was not for the primary purpose of creating evidence for trial, since there was an "ongoing emergency" in that the armed perpetrator was still at large. *Id.* at 370-74.

The Supreme Court has not applied the "primary purpose test" to crime scene reports and diagrams like those at issue here. Perhaps the closest analogy, so far, is the Supreme Court's treatment of laboratory reports that prosecutors sought to introduce as business records. And, in those cases, the Court has drawn a distinction between formalized reports created solely for trial that directly accuse a person of criminal

wrongdoing and less formal testing records that merely record factual observations and do not accuse anyone of a crime.

In that regard, the Supreme Court has held that a DNA report created pursuant to routine procedures, which was not formalized, did not accuse a specific individual of a crime, and was not prepared specifically for use a criminal trial was non-testimonial. *See Williams v. Illinois,* 567 U.S. 50 , 84-85, 111-12 (2012) (DNA report non-testimonial, because defendant was not yet a suspect, and the report was not "prepared for the primary purpose of accusing a targeted individual" or to "create evidence for use at trial" [plurality op., Alito, J.], and it lacked the formality or "solemnity of an affidavit or a deposition" [Thomas, J., concurring]). By contrast, formalized laboratory documents prepared specifically for use at trial and that constitute direct evidence of a crime have been found testimonial. *See Bullcoming v. New Mexico,* 564 U.S. 647, 664-65 (2011) (in DUI case, certified report showing defendant's blood-alcohol concentration was testimonial because it was "formalized" and was created for an "evidentiary purpose"); *Melendez-Diaz v. Massachusetts,* 557 U.S. 305, 324, 330 (2009) (sworn certificates showing nature and weight of controlled substance were "prepared specifically for use at petitioner's trial" [majority op. per Scalia, J.] and were "quite plainly" formalized "affidavits" [Thomas, J., concurring]). But as the Court observed in *Melendez-Diaz,* police documents created for an administrative reason, such as chain of custody records, are non-testimonial. *Melendez-Diaz,* 557 U.S. at 311 n.1.

As evidenced by the Supreme Court's fractured decision in *Williams*—which turned on Justice Thomas's concurrence concluding that the DNA report was not sufficiently "formalized"—there is no settled law holding that crime scene reports created pursuant to routine police procedure are testimonial. In fact, *Williams* implies that where, as here, a forensic report was created in the ordinary course of police business, pursuant to a business duty—and where, as here, there was no identified suspect whom the report could accuse of a crime—the report is non-testimonial. At the very least, no clearly established Supreme Court precedent indicates that such a report *must* be testimonial. That alone requires denial of petitioner's habeas claim here. 28 U.S.C. § 2254(d); *see Stuart v. Alabama*, 139 S.Ct. 36, 37 (2018) (Gorsuch, J., dissenting from the denial of certiorari) (noting that *Williams* "yielded no majority and its various opinions have sown confusion in courts across the country").

To be sure, the *Melendez-Diaz* majority opinion—responding to the dissent's suggestion that lab technicians are not "conventional witnesses" who are subject to confrontation—asked rhetorically, "is a police officer's investigative report describing the crime scene admissible absent an opportunity to examine the officer?" *Melendez-Diaz*, 557 U.S. at 316. But even if, by this rhetorical question, the *Melendez-Diaz* Court suggested it believed that a crime scene report is testimonial, this aside was dicta. And, moreover, it was dicta that garnered the support of only four Justices. *Melendez-Diaz* was a 5-4 decision, and one the Justices in the majority (Justice Thomas) made clear in his concurrence that he joined the Court's opinion for the sole reason that the

laboratory certifications at issue were "quite plainly affidavits." *Id.* at 330 (Thomas, J., concurring) (internal quotation marks omitted). Hence, Justice Thomas was the swing vote in both *Melendez-Diaz* and *Williams*, and in both cases, the result turned on whether the documents at issue were sufficiently formalized to be akin to "affidavits."

The crime scene report here is more like the DNA file in *Williams* than the laboratory certification in *Melendez-Diaz*. As the trial evidence showed, the original crime scene report and diagram (unlike the affidavit in *Melendez-Diaz*) were not prepared specifically for trial. Instead, Detective Jacklitsch prepared the documents contemporaneously, in the ordinary course of his duties, and pursuant to a business duty. Further, unlike the affidavit in *Melendez-Diaz,* the original crime scene report here was prepared before petitioner was identified as a suspect. And, unlike the *Melendez-Diaz* affidavit, the report did not accuse petitioner of a crime. *Melendez-Diaz* is thus easily distinguishable from the case at hand. At the very least, the Supreme Court's *holding* in *Melendez-Diaz* does not clearly establish that the crime scene report here was testimonial hearsay. And, of course, the dicta in *Melendez-Diaz* regarding police reports does not provide a basis for federal habeas relief. *Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022) ("*dicta* cannot supply a ground for relief").

In short, Detective Jacklitsch's crime scene report and the accompanying diagram were not affidavits, nor they accuse an identified suspect of a crime. In fact, the documents were prepared in the ordinary course of police business, before petitioner was identified as a suspect in the shooting. Thus, the challenged documents

here was more similar to the non-testimonial DNA file in *Williams* than to the testimonial laboratory certifications in *Melendez-Diaz* and *Bullcoming*. At the very least, given the ambiguity in the law, it was not unreasonable for the state courts to find the documents non-testimonial.

In fact, it is arguable that after *Williams*, a police report prepared in the ordinary course of business—before there was an identified suspect, and which merely records observable facts—cannot be described as testimonial. And even if such a report could conceivably be found testimonial after *Williams*, no Supreme Court precedent holds that such reports are *categorically* testimonial. Instead, courts must weigh several factors identified in *Davis*, *Bryant*, *Melendez-Diaz*, *Bullcoming*, and *Williams*, including:

1. Was the report created for the primary purpose of recording observable facts pursuant to a business or institutional duty, or—alternatively—was it created specifically for the purpose of trial?

2. Does the report accuse the defendant of a crime—or, alternatively, does it merely contain factual data that is not on its face accusatory?

3. Was there an identified suspect at the time the report was created?

4. Is the report a formalized document created for trial—or, alternatively, does it consist substantially of rote observations recorded contemporaneously pursuant to a business duty?

5. Does the report contain the scientific opinions or conclusions of a non-testifying analyst?

Here, the crime scene report (1) was created pursuant to a business duty in order to record observable facts—that is, the location of ballistics evidence; (2) contained only non-accusatory factual data; (3) was created before petitioner was identified as a suspect; (4) was not an "affidavit" (even though it was signed by the crime scene detective in accordance with standard procedure); and (5) did not contain "opinions" or "conclusions," but simply recorded measurements and other rote factual observations. Weighing those factors, therefore, the state courts reasonably applied Supreme Court precedent in finding the report non-testimonial.

Significantly, the trial court's ruling here was a faithful application of New York's precedents, which have reasonably applied *Crawford* and its progeny to forensic reports in a variety of contexts. For instance, New York courts have quite reasonably held that non-accusatory lab documents prepared pursuant to a routine business duty, which contain factual data as opposed to opinions and conclusions that prove a suspect's guilt, are non-testimonial. *See, e.g., People v. Pealer,* 20 N.Y.3d 447 (2013) (calibration and maintenance records of Breathalyzer machine, created by technicians independent of law enforcement for primary purpose of showing that machines were calibrated, "should be viewed as business records . . . which, as a class, are generally deemed nontestimonial"); *People v. Brown*, 13 N.Y.3d 332, 339-41 (2009) (DNA forensic analysis report non-testimonial: report consisted primarily of "machine-generated graphs, charts and numerical data," contained no "subjective analysis," and could not have been "tainted by a pro-law-enforcement bias to inculpate defendant," as the tests were

"conducted before defendant was ever a suspect in this case"); *People v. Freycinet*, 11 N.Y.3d 38, 42 (2008) (non-opinion portions of autopsy report were non-testimonial and properly admitted as a business record, as the report "was very largely a contemporaneous, objective account of observable facts").

By contrast, New York courts have held that laboratory reports containing the opinions and conclusions of a non-testifying analyst, which were prepared to accuse a specific individual of a crime, are testimonial. *See, e.g., People v. John*, 27 N.Y.3d 294, 307-15 (2016) (DNA report prepared after defendant had been charged, which contained opinions and conclusions of non-testifying analyst); *People v. Rawlins*, 10 N.Y.3d 136, 157 (2008) (NYPD fingerprint comparison report was "inherently accusatory," was "offered to prove an essential element of the crimes charged," and was created for the "purpose of gathering evidence of a past crime").

Likewise, this Court has held that laboratory records are non-testimonial where their primary purpose was not to create evidence for trial, and where they did not include opinions or conclusions that accuse a known suspect of a crime. *See Washington v. Griffin*, 876 F.3d 395, 410 (2d Cir. 2017) (federal habeas relief properly denied where DNA analyst who testified at trial did not conduct underlying testing, but instead "reached her own conclusions" after "consult[ing] the raw data" compiled by non-testifying lab technicians); *Cook v. Bayle*, 718 F. Appx. 51 (2d Cir. 2017) (unpublished) (admission of calibration and maintenance records was not a violation of clearly established Supreme Court precedent warranting habeas relief, since "a reasonable

court could conclude" that the "primary purpose of the tests was to confirm that the breathalyzer worked, not to obtain evidence for use against" the defendant) (internal quotation marks omitted); *United States v. James*, 712 F.3d 70 (2d Cir. 2013) (autopsy report and accompanying toxicology report were non-testimonial: autopsy was performed as a routine function before criminal investigation commenced; toxicology report, which related to a different victim, was not prepared for primary purpose of creating evidence for trial); *United States v. Feliz*, 467 F.3d 227, 234, 237 (2d Cir. 2006) (non-opinion portions of autopsy report were non-testimonial and were properly admitted under hearsay exceptions for business records and public records).

To be sure, this Court has criticized one aspect of New York's jurisprudence: the notion that an autopsy report (or other forensic report) is nontestimonial if it does not "link the commission of the crime to a particular person." *People v. Garlick*, 144 A.D.3d 605, 606 (1st Dept. 2016) (internal quotation marks omitted) (citing *John*, 27 N.Y.3d at 315, and *Freycinet*, 11 N.Y.3d at 41-42), *habeas corpus granted*, *Garlick v. Lee*, 1 F.4th 122 (2d Cir. 2021). And, the Appellate Division cited that "linkage" standard in denying petitioner's confrontation claim here. *See Diaz*, 151 A.D.3d at 502-03. But even if the "linkage" standard is not a proper application of *Crawford*, the Appellate Division's use of that language should not affect the result here. After all, the state court's decision did not turn on the fact that the crime scene report did not, by itself, "link" petitioner to the crime. As the prosecutor explained at trial—and as the trial court ruled—the crime scene report was non-testimonial for a more fundamental reason: It was a business

record created pursuant to a business duty that contained no opinions or conclusions; instead, it merely recorded non-testimonial "measurements" denoting "where things were found" (*see* T. 88-105). Therefore, as explained, the crime scene report here was more similar to the non-testimonial DNA file in *Williams* than to the laboratory certification in *Melendez-Diaz* that was quite plainly an accusatory affidavit prepared for trial.

Indeed, in granting the writ in *Garlick*, this Court recounted several factors showing that the autopsy report at issue was testimonial. Specifically, (1) the report was created to aid the investigation and prosecution of an identified suspect; (2) the report contained the non-testifying medical examiner's unredacted opinions and conclusions; (3) those opinions and conclusions were used, as a substitute for trial testimony, to identify the victim's wounds as "stab" wounds, to prove the cause of death, and to prove the defendant's intent to cause serious physical injury; and (4) the medical examiner who testified had not participated in or witnessed the autopsy, nor had the testifying witness helped prepare the report. *See Garlick* 1 F.4th at 127, 133-36. This Court, therefore, understandably concluded that the autopsy report in *Garlick* resembled the certified forensic reports in *Melendez-Diaz* and *Bullcoming*, because it contained the opinions and conclusions of a non-testifying analyst that were critical to the prosecution's case at trial. This sort of out-of-court "testimony" is barred by the Confrontation Clause absent an opportunity to for cross-examination.

Here, by contrast, the crime scene report was a true police business record, created by a crime scene detective who was duty-bound to catalogue the location of ballistics evidence in the ordinary course of business, without regard for the possibility of a future trial. While, of course, one might envision that a crime scene report might be introduced at a later trial, that alone does not render the document testimonial. Instead, under *Davis* and *Williams*, the report would be testimonial only if its "primary purpose" was to create evidence for trial—and not to catalogue, pursuant to a business routine, the various pieces of ballistics evidence found on the street. Indeed, not only was the crime scene detective here cataloguing his rote observations pursuant to a business duty, but by doing so, he was creating a chain of custody for the ballistics evidence—a decidedly non-testimonial purpose. *Melendez-Diaz*, 557 U.S. at 311 n.1. Thus, under *Davis* and *Williams*—and even under *Melendez-Diaz*—the crime scene report here was non-testimonial. It was a true police "business record," which was "fundamentally inconsistent with what the Supreme Court has suggested comprise the defining characteristics of testimonial evidence." *Feliz*, 467 F.3d at 233-34.

Significantly, too, Officer Juan was present at the crime scene and was tasked with observing the crime scene detectives as the collected the ballistics evidence. In fact, Officer Juan was ultimately responsible for vouchering the evidence recovered from the scene. Further, Officer Juan testified at trial and was available to be cross-examined about the evidence collection process (T. 230-46). For this reason, too, the present case is far different from *Melendez-Diaz* and *Bullcoming*, because an officer who

was present during the events in question—namely, the collection of the crime scene evidence—testified and was available for cross-examination. *See Bullcoming* 564 U.S. at 672-73 (Sotomayor, J., concurring) (distinguishing a situation where "someone else with a personal, albeit limited, connection to the scientific test at issue" testified at trial).

To be sure, reports prepared by law enforcement do not qualify as business records under Rule 803(6) of the Federal Rules of Evidence or as public records under Rule 803(8). *See Feliz*, 467 F.3d at 234, 237. Police reports can, however, qualify as business records under New York law. *See People v. Guidice*, 83 N.Y.2d 630, 635 (1994). Moreover, the question here is not whether the crime scene report and diagram qualified under a state-law hearsay exception; instead, the question is whether the admission of the documents violated petitioner's Sixth Amendment right against confrontation. And, as explained, the documents at issue here did not have the indicia of testimoniality identified in *Davis* and *Williams*.[9]

Beyond that, even if this Court might be inclined to find the crime scene records testimonial if reviewing the matter *de novo*, that is not the standard on federal habeas corpus review of a state criminal conviction. Even if the state court's ruling here was arguably incorrect, the writ may not be granted if there could be "fairminded disagreement" on the question. *White v. Woodall*, 572 U.S. 415, 420 (2014), quoting

---

[9] Likewise, courts have held that warrants of deportation and other immigration records are not testimonial, even when they are used to prosecute an immigrant for illegal reentry. *See, e.g., United States v. Garcia*, 452 F.3d 36, 42 (1st Cir. 2006).

*Harrington* 562 U.S. at 100. Federal courts may not use § 2554 review as "an opportunity to pass on the wisdom of extending old precedents in new ways." *Brown*, 142 S. Ct. at 1530.

As noted, the Supreme Court has not addressed whether police crime scene records—cataloguing the crime scene evidence and recording where the various items were found—is testimonial. Hence, the state court's decision cannot be contrary to, or an unreasonable application of, Supreme Court precedent, since *Williams* leaves the answer unclear. *See Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (if there is "no clear answer to the question presented ... it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law").

Indeed, the Fifth, Sixth, Ninth, and Eleventh Circuits, citing *Williams,* have held that the law governing the application of Confrontation Clause principles to forensic reports is *not* clearly established. *See Mills v. Comm'r, Alabama Dep't of Corr.*, No. 21-11534, 2021 WL 5107477, at *4 (11th Cir. Aug. 12, 2021) (denying certificate of appealability); *Garrett v. Madden*, 859 F. App'x 156, 158 (9th Cir. 2021) (denying certificate of appealability); *King v. Brown*, No. 20-2074, 2021 WL 3417921, at *2 (6th Cir. Apr. 20, 2021) (denying certificate of appealability) ,*cert. denied,*142 S. Ct. 294, (2021); *Jenkins v. Hall*, 910 F.3d 828, 835 (5th Cir. 2018). Significantly, *Garrett* involved a type of police report—a gang intelligence report—that by its nature appears far more testimonial than the crime scene records here. Still, the Ninth Circuit declined to grant habeas relief, citing "the substantial ambiguity in this area" created by *Williams. See Garrett*, 859 F.

App'x at 158. This Court should accord the same deference to the state court ruling here.

Additionally, the challenged crime scene report had little significance at trial beyond its ministerial notations of where the ballistics evidence was found. Although Detective Jacklitsch also made a sketch of the street, that sketch was replicated—in fact, improved upon—by a testifying witness, Detective Brown, who visited the location and used Google mapping technology with a new software program to create a detailed diagram of the area (T. T.64-65, 90-112). At trial, Detective Brown was subjected to cross-examination. Thus, petitioner was afforded the opportunity to cross-examine a testifying witness about the layout of the crime scene. Moreover, the accuracy of Detective Jacklitsch's notations was confirmed—at least in part—by crime scene photographs, which were plainly not testimonial hearsay, as they were not out-of-court "statements" by a "witness." Indeed, the District Court focused solely on the crime scene report and diagram and did not find the photographs to be testimonial hearsay. *See e.g. United States v. Moskowitz*, 581 F.2d 14, 21 (2d Cir. 1978) (observing that a photograph identified by a testifying witness cannot be hearsay).

Finally, it bears noting that if the crime scene evidence here is deemed to be testimonial, it might prove difficult—if not impossible—to prosecute cold case homicides where the original crime scene detectives are no longer available to testify. This would contravene public policy by placing a *de facto* statute of limitations on murder—namely, the employment tenure, health, and availability of the officers who

processed the crime scene. As explained above, there is no sound reason for placing such a limitation on the state's ability to prosecute a homicide charge, especially when the records at issue (1) involve rote descriptions of observable facts, (2) were created contemporaneously pursuant to a business duty, (3) do not accuse anyone of a crime, and (4) are necessary to the chain of custody. Regulating the introduction of these ministerial records is far removed from the core purpose of the Confrontation Clause, which is to prevent the type of "trial by affidavit" that prevailed in England centuries ago. No such "trial by affidavit" occurred here; indeed, petitioner was convicted based on the identification testimony of live witnesses as well as surveillance video. The admissibility of the crime scene records, therefore, was a matter appropriately left to the state courts, which reasonably applied Supreme Court precedent.

In sum, under the particular circumstances of this case, the state courts reasonably determined that the crime scene records were non-testimonial. They were business records prepared pursuant to a business duty, and their primary purpose was to catalogue the detective's contemporaneous factual observations regarding the location of ballistics evidence—not to create evidence for trial. In fact, the challenged crime scene records were integral to the chain of custody of the ballistics evidence—a non-testimonial purpose. Accordingly, the admission of the records did not violate petitioner's confrontation rights.

**AS THE STATE COURT REASONABLY CONCLUDED, ANY ERROR IN THE ADMISSION OF THE CRIME SCENE EVIDENCE WAS HARMLESS, BECAUSE IT SHED NO LIGHT ON WHETHER PETITIONER WAS THE SHOOTER—THE SOLE CONTESTED ISSUE AT TRIAL.**

At trial, there was no dispute that Santiago was killed during a shootout among three men: the killer (identified as petitioner) who was firing east from the corner of 146th Street and Willis Avenue, and two men (Ewell and Vargas) who returned fire from the vicinity of 409-411 East 146th Street. Undisputed eyewitness testimony established the shooters' locations. In addition, there is no dispute that the victim, Santiago, was standing near 445 East 146th Street, a few buildings east of Ewell and Vargas. Because Ewell and Vargas were firing west (toward Willis Avenue), the killer was undeniably the man who fired east (toward Ewell and Vargas) from 146th Street and Willis Avenue. In fact, he was the only shooter who could have fired the fatal bullet. The sole disputed question at trial, therefore, was whether petitioner was properly identified as that shooter.

While, on habeas review, petitioner makes much of the crime scene evidence, it had only marginal significance at trial. True, the ballistics evidence confirmed the eyewitness testimony regarding the number of shooters and their respective locations. But critically, the ballistics evidence did not tell the jury anything that it did not already know, nor did it resolve a disputed question of fact. None of the witnesses at trial saw

more than three shooters, and the witnesses gave consistent testimony regarding the shooters' locations. Further, there was no dispute about the victim's location because she fell to the ground, mortally wounded, upon being shot.

Petitioner, therefore, had only one viable defense at trial—that he was not the man who fired at Ewell and Vargas from the corner of 146th Street and Willis Avenue. Indeed, that was the principal defense raised by petitioner's attorney (T. 37-38 [opening]; T. 895-912 [summation]). The jury—crediting the testimony of two eyewitness, which was bolstered by video surveillance footage—found that petitioner was the shooter. The crime scene report contained no information either confirming or casting doubt on that identification evidence. Thus, as the Appellate Division found, there is no reasonable possibility that the admission of the crime scene report affected the verdict, because the "evidence showing the locations where the officer found cartridge cases and other ballistic evidence shed little or no light on any of the disputed issues at trial." *Diaz*, 151 A.D.3d at 503. That state court determination was eminently reasonable, rendering federal habeas relief inappropriate.

A. A Federal Habeas Court Must Defer to the State Court's Harmless Error Determination.

There are two different standards for harmless error analysis depending on the procedural posture of the case—one for direct review and one for collateral habeas review. *Davis v. Ayala*, 576 U.S. 257, 267 (2015). The standard for direct review puts the burden on the State to show an error was harmless beyond a reasonable doubt. *Id.*; *see*

*Chapman v. California*, 386 U.S. 18, 24 (1967). The standard for collateral review requires the *petitioner* to show "actual prejudice"—that is, a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks omitted). Because of the values of "finality, comity, and federalism," a habeas petitioner is not entitled to federal relief from a state court judgment based on "mere speculation"; instead, a federal court must find that "the defendant was actually prejudiced by the error." *Davis*, 576 U.S. at 267-68 (internal quotation marks omitted).

Further, to obtain federal habeas relief, a petitioner must also satisfy AEDPA, which requires deference to state court determinations. *See Brown v. Davenport*, 142 S. Ct. 1510, 1525, 1527-28 (2022). Thus, if a state court has made a harmless error finding, federal habeas relief may not be granted merely because a federal court determines that, in its own view, the petitioner suffered prejudice under the *Brecht* standard. *Id.* at 1525. Instead, the petitioner must also show that the error was so grave that "*every* fairminded jurist" would have found it prejudicial under the *Chapman* standard. *Id.* (emphasis in original). In other words, federal habeas relief may not be granted if *any* fairminded jurist could have found the error harmless. Petitioner cannot meet that heavy burden here.

B. The State Court's Harmless Error Finding Was Reasonable, Because the Crime Scene Report Had No Bearing on the Primary Contested Issue of Identification.

The admission of the crime scene report, even if error, was harmless, because as the Appellate Division found, the report did not bear on the primary contested issue at trial: identification. The only significance of the crime scene report was that it confirmed the locations of the shooters. The ballistics evidence showed that one shooter had fired a .45 caliber gun eastbound on 146th Street from Willis Avenue, and the presence of a deformed .45 caliber bullet near 455 West 146th Street—even further east than where the victim, Santiago, was standing—established that the man who fired the .45 caliber gun was the killer. In addition, the ballistics evidence showed that two shooters had returned fire westbound: one with a .22 caliber rifle from the vicinity of 413-415 West 146th Street, and one with a 9 mm handgun from the vicinity of 409-411 East 146th Street.

This ballistics evidence would have proved significant at trial *if* there had been a dispute about how many shooters were involved in the gunfight, how many shooters fired eastbound toward the victim, or where the shooters were standing. But as the trial progressed, it became clear that this ballistics evidence was entirely cumulative to the uncontested eyewitness testimony. Three eyewitnesses (Jones, Soto, and Castro) saw a single shooter firing eastbound—in the direction of Ewell, Vargas, and Santiago—from the corner of 146th Street and Willis Avenue. (T. 251-56, 260-65 [Soto]; T. 508-09 [Jones] T. 651-52[Castro]). Ewell, too, testified that someone fired at him from that

corner (T. 594-95 [Ewell]). No witnesses testified that more than one person fired eastbound on 146th Street. Thus, the eyewitness testimony established that there was only a single shooter who fired eastbound on 146th Street from Willis Avenue. And that person was obviously the killer, because he was the only person who fired a gun in Santiago's direction.[10]

Further, Soto and Castro saw two men (Ewell and Vargas) return fire from the vicinity of 409-411 East 146th Street, shooting westbound in the direction of Willis Avenue (T. 264-65 [Soto]; T. 628-30 [Castro]). Indeed, Ewell himself confirmed this fact at trial (T. 594-95). And, as noted, the eyewitnesses agreed that there were only three shooters in total. Since two of those shooters, Ewell and Vargas, were firing *away* from Santiago, they could not have fired the fatal bullet.

The crime scene evidence merely confirmed the witnesses' trial testimony about the number of shooters and the direction of the shots. It had no further significance. Critically, it had no bearing on the sole contested issue: the identity of the person who fired the fatal shot from 146th Street and Willis Avenue. Accordingly, the admission of the crime scene report and diagram was harmless, because (1) it was cumulative of the undisputed eyewitness testimony that only one shooter fired eastward, (2) the location of the shooters was corroborated by multiple eyewitnesses, and (3) no evidence

---

[10] While the ballistics expert could not exclude the possibility that two .45 caliber guns had been used in the shooting (petitioner's brief, p. 33; *see* T. 355-57 [Det. Fox]), that speculative testimony was irrelevant, because the eyewitnesses agreed that only a single shooter fired east on 146th Street from Willis Avenue.

contradicted those eyewitness accounts. *See Delaware v. Van Arsdall,* 475 U.S. 673, 684 (1986) (noting that the harmless error inquiry includes an assessment of "whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the witness on material points, … and, of course, the overall strength of the prosecution's case").

In response, petitioner attempts a bait and switch. Instead of focusing—as he did in state court—on whether there was any dispute at trial about the number and location of the shooters, he asserts that the evidence identifying *him* as the shooter who fired eastward from the corner of Willis Avenue was not overwhelming. He notes that only two witnesses (Soto and Jones) identified him as the shooter; that a third witness (Castro) said that the shooter was Irrizary; that the witnesses gave somewhat different descriptions of the shooter; and that the witnesses were not sure whether the shooter had fired a .45 caliber gun or a 9 mm pistol (petitioner's brief, pp. 31-32).

This Court should not be distracted by petitioner's focus on the identification testimony. After all, the crime scene report did not identify petitioner as the shooter, and it did not describe the shooter's clothes or physical features. Thus, the crime scene report had no bearing on the jury's conclusion that Soto and Jones had correctly identified petitioner as the shooter—and that Castro's identification of Irrizary was inaccurate. Nor did it matter that Jones, a lay eyewitness, incorrectly stated the caliber of petitioner's gun, that Castro saw two of petitioner's friends also carrying guns, or that the prosecutor referenced the crime scene report in summation (petitioner's brief,

pp. 31-34). After all, as explained, the witnesses unanimously agreed that only one man fired east from Willis Avenue. That man was obviously the killer, and the dispute at trial centered on whether petitioner was correctly identified as that man.

For those reasons, the New York Appellate Division concluded that the admission of the crime scene report was harmless, because it shed no light on the disputed issue of identification. *Diaz*, 151 A.D.3d at 503. That finding was eminently reasonable; certainly a fairminded jurist could agree with the Appellate Division's finding. Therefore, petitioner is not entitled to federal habeas relief. *See Brown*, 142 S. Ct. at 1525.

Beyond that, any infringement on petitioner's confrontation rights due to Detective Jacklitsch's failure to testify was minimal. The jury heard testimony from Officer Juan, who was "in charge of all the paperwork," including vouchering all of the ballistics evidence collected by the Crime Scene Unit. Juan testified that he "look[ed] over the shoulder" of the Crime Scene Unit detectives as they located evidence and memorialized their findings (T. 230-34). And, of course, Juan was subjected to cross-examination at trial. During that cross-examination, he testified that he had personally viewed the recovery of each piece of evidence (T. 245-46). Thus, petitioner had the opportunity to cross-examine the officer who observed and oversaw the collection of the ballistics evidence—the same evidence catalogued by Detective Jacklitsch in the crime scene report. Additionally, petitioner had the opportunity to cross-examine Detective Brown, who prepared his own, more detailed diagram of the scene after

visiting the location, reviewing the crime scene report, and utilizing Google maps with new drafting software.

Hence, petitioner's inability to cross-examine Jacklitsch was tempered by his opportunity to cross-examine Officer Juan, who was present for every step of the evidence collection, and Detective Brown, who prepared the more detailed diagram introduced at trial. This fact, too, supports the state court's finding of harmlessness. *See Van Arsdall,* 475 U.S. at 684 ("the extent of cross-examination otherwise permitted" is a factor in determining whether a confrontation error is harmless); *see also Bullcoming v. New Mexico*, 564 U.S. 647, 672-73 (2011) (Sotomayor, J. concurring); *cf. Garlick v. Lee*, 1 F.4th 122, 136 (2d Cir. 2021) (highlighting the inability of *any* witness to testify as to "any defects in the autopsy's methods, conclusions, and reliability"), *cert. denied*, 142 S. Ct. 1189 (2022).

In addition, and contrary to petitioner's contention, the trial evidence compellingly proved petitioner's identity as the shooter. Crucially, Jones had seen petitioner, *and had spoken to him*, just prior to the shooting at the intersection. When Jones returned to his car, he again saw petitioner, firing his gun "like it was nothing" (*see* T.507-09). Jones's identification of petitioner was thus eminently reliable. Soto, too, was in an excellent position to observe the shooting, and he gave a detailed description of petitioner, including that he fired a large, silver gun—consistent with the .45 caliber shell casings recovered from the corner of 146th Street and Willis Avenue (T. 263). Also, Soto and Jones both noticed petitioner's distinctive red shirt (T. 260, 294-95

[Soto]; T. 509, 513-14 [Jones]). And, surveillance video captured petitioner—in his distinctive red shirt—handing the gun to Irrizary immediately after the shooting, further confirming that petitioner, not Irrizary, was the killer (Exhibits 63 & 64).

Castro, by contrast, was in an inferior position to identify the shooter because she initially was facing northbound, toward her friend, and not in the direction of Willis Avenue. Castro also threw herself to the ground immediately after the shots rang out (T. 626-30). Additionally, Irrizary testified at trial that he was not the shooter (although he did not identify petitioner), further undermining Castro's account.[11] And, of course, the surveillance video showed petitioner (wearing a red shirt) handing the gun to Irrizary (wearing a white shirt) *after* the shooting, confirming that petitioner, not Irrizary, was the shooter. Notably, in his testimony, Irrizary confirmed that he was wearing a white t-shirt the day of the shooting, further confirming that he was not the shooter but instead the person who received the gun *after* the shooting (T. 462, 467). Hence, the jury had every reason to conclude that petitioner, not Irrizary, was the shooter.

In short, not only was the crime scene report irrelevant to the disputed question of identity, but petitioner's identity as the shooter was proven by compelling evidence. Petitioner, therefore, has not established that the admission of the report had a

---

[11] Notably, too, Castro was a reluctant witness: she did not show up for court when initially scheduled to testify, and the prosecutor told the court that Castro was afraid, because investigators had been asking questions in her neighborhood (T. 394).

"substantial and injurious" effect on the verdict under the *Brecht* standard, much less that the Appellate Division's harmless error finding was unreasonable under *Brown*.

Finally, petitioner argues that this Court should apply the *Brecht* standard rather than the *Brown* standard. In support of that claim, he notes that *Brown* was not decided until April 21, 2022, one week after the Magistrate Judge issued her Report and Recommendation. He asserts, too, that respondent did not argue to the Magistrate Judge that Appellate Division's harmless error finding should be accorded deference under AEDPA (petitioner's brief, pp. 31-32). This claim fails for multiple reasons.

First, it is the District Court's decision, not the Magistrate Judge's report and recommendation, that is before this Court for review. The District Court had the benefit of *Brown* when it issued its decision and correctly applied the *Brown* standard, as urged by respondent in the state's objections to the Report and Recommendation. This Court should apply the *Brown* standard as well.

Second, petitioner is wrong to argue that respondent "waived" application of the *Brown* standard by not arguing to the Magistrate Judge that *Brown*, which had not yet been decided, should control (petitioner's brief, pp. 30-31). Indeed, as petitioner admits in a footnote (petitioner's brief, p. 31 n.14), the standard of review cannot be waived. *See Eze v. Senkowski*, 321 F.3d 110, 120-21 (2d Cir. 2003). Unlike a procedural defense, AEDPA's standard of review is one of "general applicability . . . for all claims that have been adjudicated on the merits by a state court." *Id.* at 121. The language of § 2254(d) that a habeas petition "shall not be granted" unless a state court determination on the

merits is viewed through a deferential lens is "unequivocally mandatory." *Id.* Thus, petitioner's waiver argument is unavailing.

While petitioner asserts that the Circuits are divided on the question whether the AEDPA standard can be waived, he relies only on a case holding that a litigant may not argue for a different standard of review for the first time on appeal. *See Mendoza v. Sec'y, Florida Dep't of Corr.*, 761 F.3d 1213, 1236-37 (11th Cir. 2014). Here, however, respondent asked the District Court to apply *Brown*; it has not asked this Court to apply AEDPA deference for the first time on appeal. Hence, petitioner's reliance on *Mendoza* is inapt. Similarly, petitioner is wrong to rely on a Supreme Court case holding that a party may not ask that Court to apply a standard not identified in its certiorari papers. *See Brumfield v. Cain*, 576 U.S. 305, 322-23 (2015). Once again, respondent asked the District Court to apply *Brown*, which it did; hence, this Court should apply the same standard of review. Moreover, none of petitioner's citations involve an *intervening* Supreme Court decision issued while the case was pending in the District Court—as happened here. Under those circumstances, the District Court correctly applied the most recent decision of the Supreme Court, regardless of the parties' arguments. *Cf. Krivoi v. Chappius*, No. 21-2934-PR, 2022 WL 17481816, at *3 n.3 (2d Cir. Dec. 7, 2022) (noting that petitioner "understandably" focused on *Brecht* because he filed his brief before *Brown* was decided).

Third, all that aside, respondent did in fact ask the Magistrate Judge to apply AEDPA deference to the state court's harmless error ruling. While petitioner selectively

focuses on one portion of respondent's memorandum of law citing *Brecht* (petitioner's brief, p. 30, citing SA-70-71 [Supplemental Appendix]), in another passage, respondent expressly asked the Magistrate Judge to apply AEDPA deference:

> The crime scene report and diagrams, therefore, had no bearing on petitioner's theory of the case. It was eminently reasonable for the Appellate Division to conclude that there was no reasonable possibility that the crime scene report and diagrams-i.e., the "evidence showing the locations where the officer found cartridge cases and other ballistic evidence" (see Diaz, 151 A.D.3d at 502) affected the verdict. Accordingly, the Appellate Division's decision was not so erroneous such that "there is no possibility fair-minded jurists could disagree" (Richter, 562 U.S. at 102) that it conflicted with Supreme Court precedent, and, as such, defendant's petition must be denied.

(SA-73).

In fact, petitioner acknowledged to the Magistrate Judge that AEDPA's deferential standard must be applied to the state court's harmlessness determination. Petitioner observed in his memorandum of law that "a finding of harmlessness will not be found unreasonable 'if fair-minded jurists could disagree on its correctness.'" (SA-42, quoting *Davis v. Ayala*, 576 U.S. 257, 269 (2015). Similarly, in his reply memorandum, petitioner argued that relief was warranted because the state court's conclusion of harmlessness was "plainly unreasonable" (SA-89). Therefore, as both petitioner and respondent have urged from the outset, and as the Supreme Court made clear in *Brown*, AEDPA deference applies to the Appellate Division's harmless error finding.

Regardless, for all the reasons stated above, petitioner has not satisfied either the *Brecht* or the *Brown* standard. Accordingly, the habeas petition was properly denied.

\*\*\*

In sum, petitioner has not met his heavy burden of showing two "extreme malfunctions in the state criminal justice system"—that is, that the state courts' rejection of his confrontation claim, as well as its harmless error determination, were unreasonable applications of Supreme Court precedent. *Brown v. Davenport*, 142 S.Ct. 1510 (2022). In fact, the state courts reasonably determined that the crime scene records, which merely catalogued the collection of ballistics evidence pursuant to a routine business today, were not testimonial. At the very least, that ruling was not contrary to, or an unreasonable application of, established Supreme Court precedent. Further, because the crime scene evidence was cumulative to the eyewitness testimony about the number of shooters and their locations—and because it did not bear on the sole contested issue of identification—the Appellate Division reasonably found that any error in the admission of the challenged crime scene evidence was harmless. Indeed, because the harmless error finding was objectively reasonable, this Court "need not reach petitioner's complex [Confrontation Clause] claim." *Gutierrez v. McGinnis*, 389 F.3d 300, 303 (2d Cir. 2004).

## CONCLUSION

The judgment of the District Court, denying the petition for a writ of habeas corpus, should be affirmed.

Respectfully submitted,

DARCEL D. CLARK
District Attorney
Bronx County

BY: _____
    Paul A. Andersen
    Assistant District Attorney
    AndersenP@bronxda.nyc.gov

YAEL V. LEVY
DAVID M. COHN
PAUL A. ANDERSEN
JOSHUA P. WEISS
  Assistant District Attorneys
    Of Counsel

February 21, 2023

<u>CERTIFICATE OF COMPLIANCE</u>

In compliance with Local Rule 32.1(a)(4)(A), the word count for this brief is 11,227, excluding the Table of Contents and Table of Authorities. The word processing system used to prepare this brief and to calculate the word count was Microsoft Word. The brief is printed in Garamond, a serifed, proportionally spaced typeface. The type size is 14 points.

BY: _____
Paul A. Andersen
Assistant District Attorney