# 22-1835

United States Court of Appeals

**For the Second Circuit**

———————

**JOSEPH DIAZ**,

*Petitioner-Appellant,*

*- against -*

**MARK MILLER,**

*Respondent-Appellee.*

**On Appeal from the United States District Court
for the Southern District of New York**

## SUPPLEMENTAL APPENDIX

DARCEL D. CLARK
District Attorney
Bronx County
Attorney for Respondent-Appellee
198 East 161 Street
Bronx, New York 10451
(718) 838-6667

YAEL V. LEVY
DAVID M. COHN
PAUL A. ANDERSEN*
JOSHUA P. WEISS
ASSISTANT DISTRICT ATTORNEYS

* Attorney of Record

## TABLE OF CONTENTS

PETITIONER'S MEMORANDUM OF LAW..........................................................SA-01

RESPONDENT'S MEMORANDUM OF LAW......................................................SA-056

PETITIONER'S REPLY MEMORANDUM OF LAW.........................................SA-075

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                       :

JOSEPH DIAZ,

                                  :

                        Petitioner,

                                  :

              v.

                                  :

EARL BELL, Superintendent,
Clinton Correctional Facility,           :

                      Respondent.    :

-------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF 28 U.S.C. § 2254 PETITION

ROBERT S. DEAN (RD-0772)
Attorney for Petitioner
Center for Appellate Litigation
120 Wall Street, 28th Floor
New York, NY 10005
kskolnick@cfal.org
212-577-2323 ext. 501
Fax: 212-577-2535

Katharine Skolnick (KS-1123)
    *Of Counsel*
November 1, 2018

## TABLE OF CONTENTS

MEMORANDUM OF LAW IN SUPPORT OF 28 U.S.C. § 2254 PETITION. . . . . . . . . . . . . 1

PROCEDURAL AND FACTUAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.    <u>State Trial Court Proceedings</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

           The People's Case at Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

              Jason Irrizary is slashed and issues a threat. . . . . . . . . . . . . . . . . 2

              The shooting.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

                  Orlando Soto's account. . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

                  Michael Jones's account. . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                  Latroy Ewell's account. . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                  Susana Castro's account. . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                  Jason Irrizary's account. . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            The police investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

              Pena Directs the Police to Joseph Diaz. . . . . . . . . . . . . . . . . . . . . 12

              The prosecution admits the crime scene detective's diagram,

             photographs, and crime scene report through a substitute detective,

             as well as a duplicate diagram copied by the testifying detective. 12

           The Defense Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

           Verdict. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

           Sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    II.    <u>State Appellate Proceedings</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ARGUMENT

        THE NEW YORK STATE COURT DECISIONS FINDING THAT CRIME SCENE

        DOCUMENTS CREATED BY A NON-TESTIFYING POLICE WITNESS AND

        RELIED ON HEAVILY TO PROVE THAT MR. DIAZ WAS THE SHOOTER WERE

        NON-TESTIMONIAL CONTRAVENED SUPREME COURT PRECEDENT. U.S.

        CONST. AMENDS. VI, XIV; <u>CRAWFORD V. WASHINGTON</u>, 541 U.S. 36 (2004);

        <u>MELENDEZ-DIAZ V. MASSACHUSETTS</u>, 557 U.S. 305 (2009).. . . . . . . . . . . . . . 22

    I.    <u>Procedural Issues</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        A.    Exhaustion of State Remedies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        B.    Timeliness of Application and Successive Petitions. . . . . . . . . . . . . . 24

        C.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    II.    <u>The Constitutional Claim</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        A.    Admission of the Police-Generated Crime Scene Report, Photographs, and

            Diagrams Was Contrary to and an Unreasonable Application of Clearly

            Established Federal Law.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        B.    The State Court's finding that the admission of the out-of-court statements

            was harmless is objectively unreasonable where no other evidence

            connected Mr. Diaz to the fatal bullet.. . . . . . . . . . . . . . . . . . . . . . . . 42

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

## TABLE OF AUTHORITIES

### FEDERAL CASES

Brecht v. Abrahamson, 507 U.S. 619 (1993)..................................... 42, 43, 48

Bullcoming v. New Mexico, 564 U.S. 647 (2011). ............................... passim

Cotto v. Herbert, 331 F.3d 217 (2d Cir. 2003). .................................. 43, 47

Crawford v. Washington, 541 U.S. 36 (2004)..................................... passim

Davis v. Ayala, 135 S. Ct. 2187 (2015)............................................ 42

Davis v. Washington, 547 U.S. 813 (2006)....................................... passim

Daye v. Attorney General, 696 F.2d 186 (2d Cir. 1982)(en banc), cert. denied, 464 U.S. 1048 (1984)............................................................... 23-24

Francis S. v. Stone, 221 F.3d 100 (2d Cir. 2000) ..................................... 26

Fry v. Pliler, 551 U.S. 112 (2007) .................................................... 42

Giles v. California, 554 U.S. 353 (2008)............................................. 41

Kirby v. United States, 174 U.S. 47 (1899)....................................... 38, 40

Lockyer v. Andrade, 538 U.S. 63 (2003).......................................... 26, 42

Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009). ......................... passim

Michigan v. Bryant, 562 U.S. 344 (2011). .......................................... 37

Mitchell v. Esparza, 540 U.S. 12 (2003) ............................................. 42

Morgan v. Bennett, 204 F.3d 360 (2d Cir. 2000), cert. denied, 531 U.S. 819 (2000)......... 23

Oregon v. Hass, 420 U.S. 714 (1975) ................................................ 33

O'Sullivan v. Boerckel, 526 U.S. 838 (1999) ........................................ 23

Palmer v. Hoffman, 318 U.S. 109 (1943)............................................ 28

Sellan v. Kuhlman, 261 F.3d 303 (2d Cir. 2001)..................................... 25

Smalls v. Batista, 191 F.3d 272 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Strickland v. Washington, 466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

United States v. Henry, 226 Fed. Appx. 963, 2007 WL 1053814 (11th Cir. 2007). . . . . . . . . . 28

United States v. James, 712 F.3d 79 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

United States v. Johnson, 710 F.3d 784 (8th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

United States v. Meade, 677 Fed. Appx. 959 (6th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Washington v. Griffin, 876 F.3d 395 (2d Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Williams v. Illinois, 567 U.S. 50 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

Williams v. Taylor, 529 U.S. 362 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

## FEDERAL STATUTES

28 U.S.C. § 2244. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

28 U.S.C. § 2254. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Fed. R. Evid. 602. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

P.L. No. 104-132, 100 Stat. 1214.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

U.S. Const. amend. XIV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

U.S. Const. amend. VI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 27, 40

## STATE CASES

People v. Acevedo, 112 A.D.3d 454 (N.Y. App. Div. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . 21

People v. Crimmins, 36 N.Y.2d 230 (N.Y. Ct App. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

People v. Diaz, 151 A.D.3d 502 (N.Y. App. Div. 2017), lv. denied 86 N.E.3d 567 (N.Y. 2017).. .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 24, 43

People v. Freycinet, 11 N.Y.3d 38 (N.Y. Ct. App. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

People v. John, 27 N.Y.3d 294 (N.Y. Ct. App. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

STATE STATUTE

N.Y. Penal Law § 125.20(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
:
JOSEPH DIAZ,
:
       Petitioner,    MEMORANDUM OF LAW IN
:    SUPPORT OF 28 U.S.C. § 2254
     v.         PETITION
:
EARL BELL, Superintendent,
Clinton Correctional Facility,    :
:
       Respondent.   :

----------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF
## 28 U.S.C. § 2254 PETITION

  Joseph Diaz petitions pursuant to 28 U.S.C. § 2254 to set aside his Bronx County

conviction for first-degree manslaughter (N.Y. Penal Law § 125.20(1)). Mr. Diaz is currently

incarcerated at the Clinton Correctional Facility pursuant to a judgment of conviction rendered

December 10, 2014, sentencing him, as a second felony offender, to twenty-five years'

imprisonment, to be followed by five years' post-release supervision. The New York Supreme

Court, Appellate Division, First Department, affirmed Mr. Diaz's conviction on June 8, 2017,

and the New York Court of Appeals denied leave to appeal on August 24, 2017.

  Mr. Diaz argues, as he did in the New York State courts, that the trial court's harmful

admission of a non-testifying detective's crime scene reports and diagram, as well as a testifying

detective's duplicate diagram, deprived him of his right to confront witnesses and his due process

right to a fair trial under the United States Constitution. In this case, the prosecution presented,

over defense objections, the results of the homicide detective's initial crime scene reports and

1

map through the testimony of a detective who was brought into the case only to testify at Mr. Diaz's trial, and who took no part in the investigation and had no personal knowledge of the procedures or methodologies the crime scene detective used to analyze the evidence. Yet, this testimony was virtually the sole credible support for the prosecution's theory that Mr. Diaz was the shooter during the chaotic event.

PROCEDURAL AND FACTUAL HISTORY

I.      State Trial Court Proceedings

The People's Case at Trial

Aisha Santiago was shot and killed outside of her apartment building at 3:20 p.m. on September 22, 2009, the innocent victim of a chaotic gun battle that took place on East 146th Street in the Bronx. The shootout was the culmination of rising tensions between Jason Irrizary—the nephew of "Red," a "loanshark" in the neighborhood—and Robert Vargas, the son of Barbara Lopez, who owed Red money (Jason Irrizary A1005; Susana Castro A1202-03).

Jason Irrizary is slashed and issues a threat

On September 21, 2009, Red approached Barbara Lopez on the stoop of Lopez's apartment building at 409 East 146th Street between Willis and Brook Avenues to demand repayment (Castro A1202-03). In response, Lopez's teenaged son Robert Vargas threatened to "shoot [Red] in the face" (Irrizary A1009, A1013, A1015; Castro A1203-05). Red parted with the words, "Oh, you want to disrespect me. Okay." (Castro A1206). Red then reported the threat to her nephew Jason Irrizary (Irrizary A1008).

The next afternoon, Irrizary, who lived a few blocks away, went with his brother Raul and cousin Manuel to see Red at East 146th Street and Willis Avenue. As they were talking to Red,

2

they saw a teenager they thought was Vargas, who had said he wanted to shoot Red in the face. Irrizary threatened this sixteen-year-old Latino youth,"if anything happen[s] to my aunt there's going to be problems" (Irrizary A1017). The young man said he had nothing to do with Red, and Irrizary walked away (Irrizary A1017-18).

It turned out that the person whom Irrizary thought was Vargas was actually "Gordo," another young man from the block (Irrizary A1023).

A couple of minutes later, Red saw and confronted Lopez, because "it wasn't really about the money any more, it was about someone that disrespect[ed] her" (Irrizary A1012). As Irrizary and his family walked down the block, he again passed Gordo, and this time—still believing that Gordo was Vargas—started a fight with Gordo by telling him to get out of his face (Irrizary A1022-23).

The two began brawling, and Gordo sliced Irrizary on the hand with a knife (Irrizary A1024-25, A1037; Castro A1247-48). At trial, Irrizary claimed that he alone fought with Gordo (Irrizary A1013).

However, Gordo's friend Latroy Ewell, who witnessed the fight, said that Irrizary, Raul, and Manuel were all beating up Gordo (Ewell A1172). Ewell tried to break up the fight while Red yelled at Irrizary that he was fighting Gordo, not Vargas (Irrizary A1023, Ewell A1173-74).

Susana Castro, who lived on the block, corroborated Ewell's account that several men were hitting Gordo; she saw Irrizary and four other tall, slim Latino men fighting with Gordo (Castro A1207-08). Three of the men wore white t-shirts, and two wore black hooded sweatshirts (Castro A1207-08).

After the men stopped brawling, Irrizary shouted a threat: "Clear the fucking block

because I'm coming back" (Castro A1206, A1210, A1248).

Irrizary, bleeding heavily, wrapped his hand inside the white t-shirt he was wearing, and returned home to clean his wound (Irrizary A1025-26, A1046). He denied seeing or talking to anybody but Red on the phone, and denied getting a weapon (Irrizary A1027-28, A1036).

The shooting

Irrizary, "angry" about getting slashed by Gordo, returned to East 146th Street and Willis Avenue fifteen to thirty minutes later (Irrizary A1028-30). Irrizary claimed that he did not see his brother or cousin in the area, and went into the store on the northeast corner of Willis and East 146th Street to buy a water bottle (Irrizary A1028-33). When he exited the store and started walking east down 146th Street, he once again encountered Gordo and Ewell (Irrizary A1037-40). Ewell tried to convince Irrizary to make peace, but Irrizary refused (Irrizary A1037-40; Ewell A1174-76).

Orlando Soto, who was coming out of the laundromat at 420 East 146th Street, on the south side of the street, witnessed this argument from a car-length's distance (Soto A861-62). He saw three or four people from the neighborhood—including his friends Ewell, Gordo, and another man named Fifty—arguing with a group of four or five Hispanic men he did not recognize (Soto A830-34, A836-88, A861, A865). He thought there might be a physical fight, so he stopped to watch the argument (Soto A834, A839, A866-67). Soto's friends faced west, towards Willis Avenue, and the other men faced east (Soto A865).

Soon after this third verbal dispute, in which Irrizary refused the peace offer, a gun fight erupted.

Someone from Irrizary's crew fired shots towards Lopez's building; at least two

people—including Latroy Ewell and Robert Vargas—fired back. Ms. Santiago, who was standing east of the gunfight in front of her apartment building, was killed by an errant bullet.

Three bystander witnesses testified at trial, but none of them saw the entire gun battle unfold. However, they agreed that shots were first fired by Irrizary's crew, standing on the corner of Willis Avenue and East 146th Street, firing east. Ewell and Vargas stood in front of 409 146th Street, firing west. Ms. Santiago was standing in front of 445 East 146th Street, just east of building 409, when she was struck.

Other than agreeing on this outline of events, eyewitness recall varied. Of the eyewitnesses who testified, only two identified Mr. Diaz as the shooter, and their identifications were heavily impeached; two eyewitnesses did not point to him as the shooter; and a final witness identified <u>Irrizary</u>, not Mr. Diaz, as the man firing from Willis and East 146th Street. The People would theorize, based on ballistic evidence collected by Detective Jacklitsch, a crime scene investigator, that a .45-caliber bullet from a gun fired east was the one that struck the victim, and that Mr. Diaz, a mere acquaintance of Irrizary, was the one who shot that gun.

### Orlando Soto's account

According to Soto, his friends began walking east down the north side of 146th Street towards Brook Avenue (Soto A867-68). Just then, he heard several gunshots. He saw one of the men from the group he did not know, standing on the sidewalk at the northeast corner of 146th and Willis, pointing a large silver gun eastward (Soto A841-43, A848, A869, A886). The man was Hispanic, and Soto was "sure" that he was wearing a red shirt and blue jeans (Soto A842, A874-75). He also wore a baseball cap that was covering part of his face (Soto A870). At trial, Soto said that the hat was red, but acknowledged that he was "not too sure" about the color (Soto

A842, A874-75). He only had a "side view of a portion of his face" (Soto A870, A887). Soto said nothing about seeing a tattoo, but at the time of the incident, Diaz had a "[f]airly large" tattoo on the side of his neck that said, "loyalty" (Snyder A1294).

Soto could not see the whole group of people on the corner, and could not be certain where the shooter was standing in relation to the others (Soto A841, A869-70). He heard return gunfire coming from 409 146th Street, and saw Ewell shooting "towards the group of strangers." Soto dropped to the ground (Soto A843, A846-47, A871). He heard "a lot of guns firing" while he was on the floor, "[l]ooking straight down" (Soto A844, A873). Soto could not remember at trial what Ewell was wearing during the incident (Soto A874-75). He "d[idn]t know" how many shots were fired (Soto A844, A845, A875).

On September 23, 2009, Soto viewed a lineup at the precinct (Soto A849). It took him a "long time" to identify anybody, but he ultimately became confident that the person in position two was the shooter (Soto A850-52, A855-57, A883). At trial, Soto was shown photographs of the lineup and again said that the shooter was in position two (Soto A853-54; People's Exhibit 65A-C). Joseph Diaz was in lineup position two (Detective Bart Snyder A1297).

At trial, Soto did not identify Mr. Diaz (Soto A847, A853-56). He said that he would not be able to identify the person with the silver gun because he was "not good with faces after a certain amount of years" (Soto A847-48, A858). When asked by defense counsel if he was also "not too good with faces" on September 22, 2009, Soto at first replied, "yes," but then later said, "I don't know . . . . [W]hen everything happened that day I was able to remember what happened and saw the face, but now I don't" (Soto A875-76).

Michael Jones's account

A few minutes before the shooting started, Michael Jones, a self-described "public figure . . . in the recording industry," who had been convicted of petit larceny in 2003 and 2008 and who had previously been an eyewitness in a criminal case, had stopped his car outside the Papa John's on the northwest corner of Willis Avenue and 146th Street (Jones A1089-90). He crossed the street to use an ATM, and as he crossed back to the Papa John's, he brushed against a man in a red shirt (Jones A1091). After buying pizza, he got into his car, and, just after he put on his seatbelt, heard two shots ring out near his car (Jones A1092, A1113-14, A1120-21). He "laid [his] seat all the way back" to protect himself, but said that he was not nervous (Jones A1092, A1126).

As he leaned back all the way in his seat, he looked to the left and, with "a clear line of sight," saw the same man he had bumped into in the street, wearing a red shirt and holding the gun in front of him with his right hand (Jones A1093-95, A1114).

Jones at first claimed at trial that he saw this man "let[] off more shots," but later clarified that he never actually saw the man in the red shirt fire the gun, just hold the gun in front of him (Jones A1093, A1120). He testified that he heard eight to ten more shots while still in his car (Jones A1095, A1119). He then saw the man in the red shirt hand the gun to a man wearing a white t-shirt who in turn wrapped the gun in another white t-shirt; the men ran off in opposite directions (Jones A1093-94). Jones testified before the Grand Jury that he believed the shooter was firing a 9mm, and repeated this conclusion at trial (Jones A1095, A1126).

Jones said that, as he emerged from his car after the gunfire, the same man in the red shirt—the shooter—ran right past him (Jones A1095). Jones went into the Papa John's, "threw" a

baby and mother onto the floor, "dived" on top of the baby to protect it, and told someone from Papa John's to call 911 (Jones A1095). He heard more shots while inside the pizza shop, but did not know from which direction the shots were being fired (Jones A1119, A1132-33). He then came out of the pizza shop and saw the same man in the red shirt run past him again (Jones A1100). He checked his car for bullet holes (A1119).

Jones testified that the man in the red shirt was Hispanic, wearing jeans, and had a scruffy "wolfing out" beard, with a "low haircut" (Jones 515, A1111-12). He could tell that the shooter had a low haircut because he was not wearing a hat (Jones A1112, A1121). Asked four different times whether the man he saw shooting was wearing a hat, Jones was adamant that he was not (Jones A1099, A1101, A1111-12). He testified in the Grand Jury that he was not sure whether the shooter was wearing a red shirt or a red sweatshirt (Jones A1124).

Jones, who is 5'10", said that the man in the red shirt was a "little taller" than him (Jones A1091-92, A1111). Irrizary is 5'11" and weighed about 190 pounds at the time (Irrizary A1021-22), and Diaz is 6'2" and weighed 175 pounds (Defense Exhibit A; Snyder A1293). Jones mentioned nothing about the shooter having a tattoo on the right side of his neck.

Police recovered surveillance video from a camera outside the Papa John's, and the prosecutor played it for Jones at trial (People's Exhibit 63; Sergeant Daniel Pannisidi A792-93). While watching the video, Jones claimed that he could see the shooter—wearing red—run by at two different points, once after the first series of shots, and once after the second series of shots (Jones A1096-98). On cross-examination, Jones was forced to concede that at one point in the video, the person he identified as the shooter was not wearing a hat, and at a later point, the supposed same person was wearing a hat (Jones A1122-24).

At trial, Jones identified Mr. Diaz as the shooter (Jones A1100, A1105-07). He also identified him in a photo array and lineup (Jones A1104-09, A1152; People's Exhibits 68A-C, 69).

### Latroy Ewell's account

Ewell also testified as an eyewitness but did not identify Mr. Diaz as the shooter. He had been indicted for attempted murder for his role in this case, but he pleaded guilty to possession of a weapon with the intent to use it unlawfully; at the time of trial, he had not yet been sentenced (A1154-63). He testified that someone fired at him while he was standing in front of his apartment building at 409 146th Street, but could not remember what he saw at the corner of 146th Street and Willis Avenue (Ewell A1177-78, A1180-81). He was friends with Gordo, whose slashing of Irrizary had provoked the shooting incident (Ewell A1171-73).

### Susana Castro's account

Susana Castro also witnessed the shootout and identified Irrizary, not Mr. Diaz, as the one firing from Willis and 146th Street. Castro was standing on the stoop outside of 417 East 146th Street waiting for her son to come home from school, when she saw Irrizary and four men fighting with Gordo (Castro A1206-08). Shortly after the fight concluded with Irrizary saying he would return, Irrizary came back and started shooting toward 409 East 146th Street, followed by the four men from the earlier fight, and Ewell and Vargas fired back from that stoop (Castro A1213-27, A1249-58). Two of Irrizary's friends wearing black hooded sweatshirts had guns as well, but Castro did not see them fire (Castro A1236, A1260). Castro dove to the ground, and when she looked up, she saw Irrizary shooting a bit further east, in front of building 413-415, still shooting (Castro A1229-33, A1262-64). After the shooting stopped, the gunmen scattered

(Castro A1236-40).

After the shooting, Castro viewed a photographic array and identified Irrizary as the person shooting at 409 East 146th Street (Castro A1241-53, A1255-56; People's Exhibit 70). She recognized Irrizary's face, which she had spent "quite a while" viewing on September 22, and had no doubt in her mind that he was the one who was shooting (Castro A1233, A1257-61). In court, Castro continued to maintain that Irrizary, not Diaz, was the shooter (Castro A1244).

### Jason Irrizary's account

Irrizary claimed that he had nothing to do with the shooting, and he did not identify Mr. Diaz as the shooter. He testified that, after the final verbal dispute with Gordo and his friends, he suddenly heard an unspecified number of gunshots, but could not tell from what direction they came (Irrizary A1040-41). He did not identify a shooter at trial. He ran between cars, and could not recall how many—if any—more gunshots he heard (Irrizary A1041-46). Irrizary claimed that while he was running down East 146th Street, crossing Willis, running toward Third Avenue and eventually to his apartment, he did not see any person on the sidewalk, only cars driving by (Irrizary A1046-48). At some point while he was running, somebody pointed out to him that a person had been shot; he "turned around" and saw his stepbrother, Anthony Pena Guzman, lying on the ground in front of a bodega on the corner of Willis Avenue and 146th Street, shot in the leg (Irrizary A1047-51).

Irrizary denied seeing himself on the surveillance video (Irrizary A1056-57).

Irrizary said that his stepbrother Pena was friends with Joseph Diaz, but that he himself knew Diaz only casually (Irrizary A1051-55). Despite not being friends, Irrizary visited Diaz in jail awaiting trial and put money in his commissary as a "favor" to Pena (Irrizary A1080-84).

The police investigation

Aisha Santiago, standing in front of her building at 445 East 146th Street, was struck in the chest during the gunfight. A.F., Santiago's nine year-old son, stood on the top steps of the building while his mother stood in the middle of the sidewalk, facing building 445, talking to a friend. A.f. heard two shots and looked towards Willis Avenue, where he saw people scattering (A.F. A1335-36, A1346-49). He turned back to look at his mother and saw she had been shot (A.F. A1345-46).

Officer Ronald Juan, the first to arrive, saw "a lot of people . . . running all different kinds of directions. People yelling, screaming" (Juan A808). Soto, too, noticed "a lot" of people screaming and running toward Brook Avenue (Soto A845-46). Five minutes after the shooting, at 3:25, there were over thirty people milling around the northeast corner of Willis Avenue and 146th Street and dozens more scattered down 146th Street toward Brook (Detective Kathleen Evelly A996-97; Snyder A1306-07). Juan called for an ambulance and began securing the crime scene by ordering people away from the area (Juan A807-08).

Police saw Irrizary, wearing a bloody white t-shirt, standing over his injured stepbrother (Brandon Chin A967; Evelly A989).

When the paramedics arrived, Santiago had already died, killed by a bullet that passed through her chest (Sebastian Williams A629, A632).

Although police cars and at least twenty officers arrived at the scene, Soto did not tell any of them that he saw the shooting, nor did he mention his observations to police for the next nine hours while watching them work the scene (Soto A877-80).

That evening, when Detective O'Neil was canvassing Soto's apartment building, Soto

finally mentioned to authorities that he witnessed the incident (Soto A849). The only specific

characteristic Soto mentioned about the shooter was that he wore a "red shirt" (Soto A884-85).

<u>Pena Directs the Police to Joseph Diaz</u>

At a pretrial hearing, <u>Detective Joseph O'Neil</u> testified that he had learned of Mr. Diaz's

involvement from Diaz's friend Pena, who had been shot during the incident (O'Neil A322-24).

O'Neil visited Pena in the hospital after the shooting and spoke to Pena before he went into

surgery (O'Neil A322, A325, A335, A361, A367, A392-93).

On September 23, 2009, at 3:30 p.m., Mr. Diaz's photograph was first selected from an

array (Snyder A269-70, O'Neil A311).

<u>The prosecution admits the crime scene detective's diagram, photographs, and
crime scene report through a substitute detective, as well as a duplicate diagram
copied by the testifying detective</u>

The medical examiner who performed Santiago's autopsy said that it was impossible to

determine what kind of bullet killed Santiago (<u>Dr. Margaret Prial</u> A1386-88). She concluded that

the person who fired the fatal shot could have been anywhere from ten to over 100 feet away, but

could not determine where the shooter was standing or from what direction the bullet came (Prial

A1386-91, A1394).

Because Ms. Santiago died during a gun battle in which there were multiple shooters, and

it was impossible to tell what kind of bullet struck her, the prosecutor relied on ballistics

evidence collected by Crime Scene Unit Detective Glenn Jacklitsch to tie the fatal shot to

someone in Mr. Irrizary's crew, and to Mr. Diaz specifically.

Detective Jacklitsch arrived two hours after the shooting to process the scene, take

photographs, and collect evidence (<u>Detective Paul Brown</u> A772-73). From the information he

gathered, he later prepared crime scene reports and created a diagram depicting where he collected evidence at the scene. According to the prosecutor, Jacklitsch was "retired" at the time of Mr. Diaz's trial, so the prosecutor called Detective Brown, also a member of the Crime Scene Unit, to testify in his stead (Brown A639-40; A586).

 Brown was not assigned to this investigation but was merely called to testify on Jacklitsch's behalf. He began by giving an overview of the required training for a crime scene investigator, and explained that processing a crime scene requires a crime scene investigator to follow special step-by-step "protocol[s]" (Brown A637-43).

Brown said that "all of [the] information in this case c[a]me from Jacklitsch's reports" (Brown A639-40, A705). Brown had prepared for trial by reviewing Jacklitsch's notes and reports, and by speaking with the prosecutor (Brown A644-45). He visited the crime scene three weeks before trial—five years after the crime—to get a "feel of the location" so he would "feel comfortable testifying" (Brown A645-46, A650). He did not take any notes or photographs (Brown A650).

During Brown's testimony, the prosecutor sought to introduce several exhibits as business records:[1] photographs Jacklitsch took of the crime scene (People's Exhibits 1-56 (A1686-1701)); Jacklitsch's crime scene reports (People's Exhibit 57 (A1684-1727)), which Brown characterized as a "combination of the reports that was generated by the [sic] Detective Jacklitsch in regards to this investigation" (Brown A646-47); a diagram Jacklitsch prepared of

---

[1] Brown testified that Jacklitsch created the diagram, reports, and photos while working for the New York City Police Department ("NYPD"), he was under a duty to accurately record the information in the reports, protocol dictated that officers generate reports contemporaneously with crime scene processing, and Jacklitsch was a records custodian (Brown A648, A680-81, A685).

the crime scene and where he found each piece of evidence (People's Exhibit 62 (A1729); and a diagram Brown created (People's Exhibit 58A (A1728)) that was meant to "duplicate" Jacklitsch's diagram (Brown A687). Each of the documents Jacklitsch prepared in connection with his analysis of the crime scene listed his name, his shield number, and the "crime scene run number [09-4994], which is a number that is unique only for that particular job" (Brown A678). On each document, he also listed the crime he was investigating: "Homicide, F/A," which stood for "homicide and a felonious assault" (Brown A679; Exhibits).

The photographs in Exhibits 1-57 depicted all of the evidence Jacklitsch collected, and the crime scene report contained those same photographs in a thumbnail version, along with information about "how the photo was taken . . . the direction in which the photo was taken and the location in question, and the brief description of what the photo is" (Brown A668). The crime scene report also included written descriptions of each piece of evidence, what Jacklitsch believed it to be, and where he found it (see A1684-1727).

Brown had browsed the handwritten field report Jacklitsch made, which purportedly formed the basis of Jacklitsch's typed report that was entered into evidence, but he did not compare the two (Brown A664-65). Brown did not know whether any of the evidence depicted in the photographs had been moved, or where it was located before photos were taken (Brown A665-66). As for the measurements included in Jacklitsch's report, Brown had "an idea" of who took them, but did not know what instrument was used to take those measurements, or the accuracy of the unknown instrument (Brown A665-66). He said that in 2009, crime scene unit investigators had access to "a tape measure, and a wheel measuring device" (Brown A687).

Brown testified that, when making his own diagram of the crime scene a few weeks

14

before trial, his goal was to "duplicate" Jacklitsch's (Brown A687). Brown used Jacklitsch's

diagram as the template for where to place all twenty-five pieces of evidence on his own,

including where the ballistics evidence was found (Brown A702, A723). Using Google Maps "to

get that same location," Brown then used Jacklitsch's diagram and photographs "to duplicate

what he did" (Brown A687). He testified that "by looking at Detective Jacklitsch's diagram and

taking measurements from his diagram . . . I was able to plot the measurements of the <u>possible</u>

<u>evidence that was collected. They are not exact but there is an approximate location of where all</u>

<u>of the evidence was located</u>" (Brown A723 (emphases added)). He also used Jacklitsch's diagram

to figure out where to place the cars in his own diagram (Brown A724, A777).[2]

Brown's diagram, like Jacklitsch's, shows the location where Jacklitsch found each of the

twenty-five pieces of evidence, with small directional line markers leading to a numbered piece

of evidence. Brown added a color-coded key to his diagram, listing the twenty-five pieces of

evidence; in the key, he added a "J" in front of each number to represent that Jacklitsch had

collected the evidence.[3] After conducting voir dire of Jacklitsch's photos, crime scene report,

diagram, and the diagram Brown created from Jacklitsch's work, defense counsel objected to

their admission (A666-69, A672, A684-85, A692-93).

---

[2] There were some superficial differences in the diagrams. For example, in Jacklitsch's diagram, the distance on 146th Street from Willis Avenue to the victim is 536 feet, and there appears to be a slight curve in the road (Brown A720). However, on Brown's diagram, the distance is 544 feet, and the curve is less pronounced (Brown A721). Brown said this discrepancy was because he got his measurements from a "Google map sketching" (Brown A721). He could not be sure how Jacklitsch made his measurements but assumed he made them while "walking . . . and sketching" (Brown A721, A727). Brown added four addresses that did not appear in Jacklitsch's initial map, and added or removed some trees based on what he remembered from his walk-through of the scene a few weeks before trial (Brown A688-92).

[3] For example, in both Jacklitsch's and Brown's diagrams a cluster of numbers, 1 through 6, appear on the corner of Willis Avenue and 146th Street. In Brown's diagram, these numbers appear in red. There is a key noting that "J1 thru J6"—highlighted with a red dot— are "Win[chester] .45 Auto D/S/Casings" (see A1728-29).

Counsel first objected to the photos in Exhibits 1-56, and the crime scene report in Exhibit 57, on the ground that Mr. Diaz was denied his "Crawford right to confrontation of the individual who was there and took those photographs, made those measurements and he's not here" (A669, A672). Counsel was unable to "cross examine anybody regarding measurements, regarding where anything was found" (A669). He argued that it was unclear whether Jacklitsch was truly unavailable to testify or whether "he's in Florida and doesn't want to pay for the trip . . . or the district attorney's office doesn't want to pay" (A669).

Moreover, counsel argued the documents were testimonial, pointing out that they were not just "being introduced for purposes to establish some fact. These are to establish that my client was the shooter and this is where he was based on what is essentially set forth in those documents; where shell casings were found, forty-five caliber, nine millimeter" (A669). Specifically, "those statements in there as to measurements and where things were found are testimonial in nature and they explicitly go to the accusation part that it was my client who committed the crime" (A676). He noted that bullet trajectory was critical to the case, and that by disallowing him to probe "exact measurements," the court was "denying . . . the right to render a viable defense to this case to say this couldn't have possibly happened" (A670). By being "denied the right to cross-examine the crime scene investigator who drew up all of these documents, and who wrote it down and who did the measurements and everything else," Mr. Diaz's right of confrontation was abridged (A669-70).[4]

---

[4] In addition, counsel argued, the documents are "technically hearsay" (A673). The prosecutor responded that the crime scene report and photos were business records (A674-75). The Court agreed, finding that "these are business records and there's no doubt about it," but "[t]he question is, under these circumstances is Crawford violated by this admission" (A675-76).

After a recess, the court found that Exhibit 57 and the corresponding photographs in Exhibits 1-56 do "not violate the <u>Crawford</u> rule," noted counsel's exception, and allowed them into evidence (A676-78).

Defense counsel also objected to both Jacklitsch's and Brown's diagrams. He argued that Jacklitsch's diagram was not a business record because he was not required to prepare it, and that its admission violated his client's rights under "<u>Crawford</u>" (A684-85). Counsel objected to the admission of Brown's diagram, as well as to an enlarged, black-and-white version (People's Exhibit 58B) "for the same reasons expressed before, and based on my voir dire" (A692-93). He also argued that Jacklitsch's diagram was not accurate, which was harmful because "it's going to let the jury see that oh it's possible that a bullet would have wound up over there" (A684-85).

The prosecutor argued that Jacklitsch's and Brown's diagrams were not testimonial because "Jacklitsch's diagram [just] shows the location of evidence" (A673). He also argued for their accuracy: "Brown's diagram which has the key, which has more accurate building structures than Jacklitsch's diagram. It shows the location of evidence, where things were recovered, nothing more, nothing less" (A673). The prosecutor noted that Brown created his own diagram using Google to "correct[] what is not as accurate as one might like as far as the bend in the road" and that Brown used Jacklitsch's diagram " as a template as far as where the evidence was recovered, where the cars were, where the trees were" (A685).

The court rejected defense counsel's arguments, finding they "go to weight, not admissibility" (A685, A692-93).

 Brown testified for over 100 transcript pages about the evidence Jacklitsch collected, and the jurors were given a copy of Brown's diagram as an aid during his testimony (Brown A646-

51, A667-68, A678-84, A686-89, A693-94, A717-48, A772-86). He provided information about each of the 57 photographs Jacklitsch took, explaining where he believed Jacklitsch was standing when he took the photograph, what Jacklitsch said it depicted, and where it could be found on his diagram. Brown said repeatedly that he was relying entirely on Jacklitsch's report for this information (Brown A702-03, A705).

For instance, Brown testified that Exhibit 17 (Photograph 22) portrayed "an overall view of some of the ballistic evidence" Jacklitsch collected on the corner of Willis Avenue and 146th Street. According to Jacklitsch's reports, he recovered six casings discharged from a .45 caliber Winchester at this corner, which were designated as evidence numbers 1 through 6 on the diagrams (Brown A702-03). Also according to his reports, Jacklitsch recovered three discharged casings from a 9mm Luger in front of 409 East 146th Street (Brown A704).[5]

Brown also testified that Jacklitsch found a bullet impact mark in front of building 445, and a bullet hole in the trunk of a Nissan parked on the north side of 146th Street, in front of building 455, east of where Santiago was shot, and about two football fields away from the corner of Willis and 146th (Brown A732, A775). There was a .45 slug inside the trunk (Brown A722, A729-30, A775, A780-81). Brown admitted that the distance of that car from the curb at Willis and 146th was a measurement that "could have been made" by Jacklitsch but was not, but would have been made had Brown been the investigator (Brown A775-76).

Brown continued testifying in this manner, going through each entry in Jacklitsch's crime scene report. He testified that, based on Jacklitsch's notes, there was no test for blood evidence at

---

[5] For economy's sake, petitioner will not detail all of Brown's testimony related to each photograph and piece of evidence, including all ballistics, that Jacklitsch's recovered. Petitioner urges this Court to review A694-206 for the full scope of these descriptions.

the scene or the bullet found in the trunk of the car (Brown A780). Nor were there tests for traces of copper, lead, or brass (Brown A781).

Detective Jonathan Fox, a member of the NYPD's Firearms Analysis Section, analyzed the ballistics collected from the scene and testified at trial as a ballistics expert (Fox A901). Relying on Brown's duplicate diagram and Jacklitsch's crime scene report and analysis for illustration throughout his testimony, Fox explained that the ballistics Jacklitsch had labeled J1 to J6 were .45 auto cartridge casings all ejected from the same firearm (Fox A909-10, A917). The seven cartridge casings, marked by Jacklitsch as J7 to J12, and J15 and so marked on Brown's diagram based on Jacklitsch's findings, were 9mm Luger cartridge casings all fired from the same gun (Fox A910, A914, A917-18). According to Jacklitsch's reports, these were found in front of 413-415 East 146th Street (A1728, A1729; Fox A925-30). Fox identified the evidence Jacklitsch labeled J19 and J20 as .22 casings fired from the same gun (Fox A915-17). There were several other ballistics fragments that were too small for Fox to identify (Fox A918-22). Fox identified crime scene evidence number J22 as a .45 bullet (Fox A923). Evidence numbers J18 and J14 in the diagram were deformed jackets, and J22 was a deformed .45 bullet; all were fired from the same gun (Fox A921-25). Fox used Brown's diagram to testify that J14 was found in front of building 409, J22 was found in the car, and J18 was found in the fence outside of 413-415 East 146th Street (Fox A925-30).

Fox testified that a .45 semi-automatic ejects cartridges, but that a .45 caliber revolver would not, so it was possible that two .45 caliber weapons were used during this incident (Fox A939-40).

Throughout the trial, all eyewitnesses referred to Brown's diagram to illustrate their own

locations during the incident (Soto A833-35, A838; Irrizary A1015, A1041; Jones A1115-17; Castro A1209-10, A1223-25, A1230-31; A.F. A1338-39).[6]

Later, during summation, the prosecutor acknowledged that this was not an "easy case," given that the eyewitnesses "saw things differently" (A1527-28). He relied on ballistics evidence to theorize that Mr. Diaz stood on the northeast corner of Willis Avenue and 146th Street, shooting a .45 caliber gun east, towards Mr. Vargas's building at 409 146th Street. Mr. Vargas and Mr. Ewell shot back, facing west. The bullet that struck Ms. Santiago—who had been standing east of building 409—must have from Mr. Diaz's gun because Detective Jacklitsch had found a discharged .45 bullet east of Ms. Santiago. He repeatedly referenced the ballistics located on the crime scene diagram, arguing that the "crime scene evidence speaks for itself" (A1535-38, 1580).

The Defense Case

Officer Berlinda Acevedo testified that she was sitting in the courtyard of 510 East 146th Street, across from 445 East 146th Street when she heard five shots, a pause, then two more shots (Acevedo A1399-1402). After she heard the gunshots, she saw "a male black wearing a red shirt" running east on 146th Street towards Brook Avenue (Acevedo A1400-01).

Verdict

The jury asked for the crime scene diagram twice during its two days of deliberations, before and in conjunction with the surveillance video, after which it convicted Mr. Diaz of first-degree manslaughter (A1640-41, A1668, A1679-80).

---

[6] The jury was also permitted to visit the crime scene because, the prosecutor argued, the diagrams and photographs "do not truly to justice to" it (A958-59).

<u>Sentence</u>

On December 10, 2014, the court sentenced Mr. Diaz to the maximum term of twenty-five years' imprisonment plus five years' post-release supervision.

II.    <u>State Appellate Proceedings</u>

Mr. Diaz appealed to the Appellate Division, First Department, renewing his contention that Detective Jacklitsch's crime scene reports and diagram, as well as Detective Brown's duplicate diagram, were testimonial, and that their admission violated his due process and confrontation rights.

On June 8, 2017, the Appellate Division rejected the argument, relying on precedent from the New York Court of Appeals:

> The crime scene evidence that defendant claims was admitted in violation of his right of confrontation was not testimonial, since it "[did] not link the commission of the crime to a particular person" (quoting <u>People v. John</u>, 27 N.Y.3d 294, 315 (N.Y. Ct. App. 2016; citing <u>People v. Freycinet</u>, 11 N.Y.3d 38, 42 (N.Y. Ct. App. 2008) and <u>People v. Acevedo</u>, 112 A.D.3d 454, 455 (N.Y. App. Div. 2013)). In any event, any error in admitting the crime scene report and diagrams prepared by a nontestifying officer was harmless under the standard for constitutional error (citing <u>People v. Crimmins</u>, 36 N.Y.2d 230 (N.Y. Ct App. 1975)), because evidence showing the locations where the officer found cartridge cases and other ballistic evidence shed little or no light on any of the disputed issues at trial, and there is no reasonable possibility that this evidence affected the verdict.

<u>People v. Diaz,</u> 151 A.D.3d 502, 503-04 (N.Y. App. Div. 2017) (A1914-18).

Mr. Diaz sought discretionary review of all state and federal constitutional claims made in the Appellate Division before the New York Court of Appeals in a timely filed initial leave letter. In his follow-up application, Mr. Diaz argued that leave should be granted to address whether police-created crime scene reports—such as Detective Jacklistch's reports and diagram, as well as Brown's duplicate diagram—are testimonial. Mr. Diaz argued that, in finding the

crime scene reports and diagrams non-testimonial, the Appellate Division contravened clear United States Supreme Court precedent that defined testimonial statements as those "that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Crawford v. Washington, 541 U.S. 36, 51-52 (2004). Citing to Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), and Bullcoming v. New Mexico, 564 U.S. 647, 664 (2011), Mr. Diaz argued that crime scene reports and diagrams made in the course of a criminal investigation are testimonial because their primary purpose is to establish facts that may be used in a future criminal prosecution.[7]

On August 24, 2017, the New York Court of Appeals denied leave to appeal without comment. See People v. Diaz, 86 N.E.3d 567 (N.Y. 2017) (A1942).

## ARGUMENT

THE NEW YORK STATE COURT DECISIONS FINDING THAT CRIME SCENE DOCUMENTS CREATED BY A NON-TESTIFYING POLICE WITNESS AND RELIED ON HEAVILY TO PROVE THAT MR. DIAZ WAS THE SHOOTER WERE NON-TESTIMONIAL CONTRAVENED SUPREME COURT PRECEDENT. U.S. CONST. AMENDS. VI, XIV; CRAWFORD V. WASHINGTON, 541 U.S. 36 (2004); MELENDEZ-DIAZ V. MASSACHUSETTS, 557 U.S. 305 (2009).

I.  Procedural Issues

    A.  Exhaustion of State Remedies

A state prisoner seeking federal habeas review of his state court conviction must first exhaust all remedies available to him in the state courts. 28 U.S.C. § 2254(b)(1), (c). Exhaustion requires alerting the state courts to the federal nature of the claim and raising the claim in the

---

[7] Petitioner's June 21, 1017, initial leave letter; his July 24, 2017, follow-up leave letter; and the prosecution's August 15, 2017, response are reprinted in the Appendix at A1919-41.

highest state court. <u>See</u> O'Sullivan v. Boerckel, 526 U.S. 838, 940 (1999) ("state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process"); <u>Morgan v. Bennett</u>, 204 F.3d 360, 369 (2d Cir. 2000), <u>cert. denied</u>, 531 U.S. 819 (2000); <u>Smalls v. Batista</u>, 191 F.3d 272, 277 (2d Cir. 1999); <u>Daye v. Attorney General</u>, 696 F.2d 186, 194 (2d Cir. 1982)(en banc), <u>cert. denied</u>, 464 U.S. 1048 (1984).

Here, Joseph Diaz fully exhausted his state remedies by raising his federal constitutional claim that his due process and confrontation rights were violated at all the appropriate times in the state courts. The issues raised in this habeas petition are the precise issues presented to the Appellate Division, First Department. In his application for leave to appeal, Mr. Diaz asked the New York State Court of Appeals to focus on the violation of his rights to confrontation and due process.

In his briefs before the Appellate Division, First Department, Mr. Diaz cited to the leading cases relating to the Confrontation Clause claim—specifically, <u>Crawford v. Washington</u>, 541 U.S. 36 (2004); <u>Davis v. Washington, 547 U.S.</u> 813, 822 (2006); <u>Melendez-Diaz v. Massachusetts</u>, 557 U.S. 305 (2009); and Bullcoming v. New Mexico, 564 U.S. 647 (2011). The the leave application also cited these Supreme Court cases. Mr. Diaz also cited to the relevant constitutional amendments in both his leave application and in his Appellate Division brief—the Sixth and Fourteenth Amendments—and specifically mentioned the federal rights that were implicated, namely the rights to confront witnesses, and to due process and a fair trial.

In short, Mr. Diaz's constitutional claim was fairly presented to New York's highest court. <u>See</u> Daye, 696 F.2d at 194 ("the ways in which a state defendant may fairly present to the

state courts the constitutional nature of his claim, even without citing chapter and verse of the

Constitution, include[ ] reliance on pertinent federal cases employing constitutional analysis").

As New York's highest court declined to review Mr. Diaz's appeal, Mr. Diaz enjoys no further

right to present it in state court; thus, his remedies in that forum are exhausted. See 28 U.S.C.

§ 2254(c).

B.      Timeliness of Application and Successive Petitions

A state prisoner generally has one year from the date that his conviction became final in

which to file a petition for habeas relief in federal court. See 28 U.S.C. § 2244(d)(1). A state

judgment becomes final upon the conclusion of direct review. See 28 U.S.C. § 2244(d)(1)(A).

Mr. Diaz's conviction was affirmed by the Appellate Division, First Department, on June 8,

2017. Diaz, 151 A.D.3d 502 (N.Y. App. Div. 2017). Leave to appeal that decision was denied by

the highest state appellate court on August 24, 2017. See Diaz, 86 N.E.3d 567 (N.Y. 2017). Mr.

Diaz's time to seek a writ of certiorari from the United States Supreme Court expired on

November 22, 2017, ninety days from the conclusion of his state-court appeal. Mr. Diaz,

therefore, has until November 22, 2018, one year from that date, to file this petition. This

application is thus timely filed.

Mr. Diaz has not sought a writ of habeas corpus from this Court before. Thus, this

petition must be considered an original petition and cannot be dismissed under the rules

governing second or successive petitions. See 28 U.S.C. §§ 2244(a), (b).

C.      Standard of Review

As Mr. Diaz has exhausted his state remedies and brought a timely petition, the merits of

his petition are governed by the rules set forth in the Antiterrorism and Effective Death Penalty

Act ("AEDPA"), P.L. No. 104-132, 100 Stat. 1214.

AEDPA provides that a petition for a writ of habeas corpus that a state prisoner brings "shall not be granted" on any claim "adjudicated on the merits" by the state courts unless: (i) the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (ii) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1).

Courts have made clear the meaning of "contrary to"/"unreasonable application" and "clearly established" of the AEDPA standard under 28 U.S.C. § 2254(d)(1). To be "clearly established," the U.S. Supreme Court must have enunciated the governing constitutional standard, "not . . . a particular theory" as to how that standard is violated. Sellan v. Kuhlman, 261 F.3d 303, 309 (2d Cir. 2001) (rejecting prosecution's argument that particular theory of ineffectiveness of counsel must be "clearly established" by Supreme Court before AEDPA applies, and concluding that the Supreme Court's decision in Strickland v. Washington, 466 U.S. 668 (1984), clearly established Sixth Amendment ineffectiveness standard with which state court decisions must comport). A state court's decision would be contrary to clearly established federal law if the state court either "applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." Williams v. Taylor, 529 U.S. 362, 406 (2000).

A state court's decision is an "unreasonable application of" federal law "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably

applies that principle to the facts of the prisoner's case." <u>Williams,</u> 529 at 407; <u>see also</u> <u>Francis S.</u>

<u>v. Stone</u>, 221 F.3d 100, 107-11 (2d Cir. 2000) (discussing AEDPA standards as determined by

<u>Williams v. Taylor</u>). In other words, a federal court may grant relief when a state court has

misapplied a "governing legal principle" to "a set of facts different from those of the case in

which the principle was announced." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 76 (2003).

Reasonableness is to be determined by an objective standard. <u>See</u> <u>Williams</u>, 529 U.S. at

410. For a state court decision to be labeled unreasonable, "[s]ome increment of incorrectness

beyond error is required," but that "increment need not be great." <u>Francis S.</u>, 221 F.3d at 111.

Here, the court's decision allowing the introduction of a non-testifying detective's crime

scene reports and diagram, as well as the duplicate diagram introduced by a testifying detective,

"was contrary to" clearly established federal law "as determined by the Supreme Court of the

United States." 28 U.S.C. § 2254(d)(1). Alternatively, that decision "involved an unreasonable

application of" clearly established federal law "as determined by the Supreme Court of the United

States." 28 U.S.C. § 2254(d)(1). Accordingly, Mr. Diaz's petition for a writ of habeas corpus

should be granted.

II.     The Constitutional Claim

        A.      Admission of the Police-Generated Crime Scene Report, Photographs, and
                Diagrams Was Contrary to and an Unreasonable Application of Clearly
                Established Federal Law.

The trial court should never have allowed, over counsel's objection, the admission into

evidence of the crime scene report or the diagram showing the location of the ballistics evidence

collected at the crime scene of the lead crime scene investigator, Detective Jacklitsch, who did

not testify, nor the diagram Detective Brown duplicated from Jacklitsch's original, given the

clearly established federal precedent forbidding such testimonial statements from a non-testifying witness. The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "Witnesses" are those who give testimony about matters of which they have personal knowledge. See Fed. R. Evid. 602.

Accordingly, in Crawford, the United States Supreme Court described a "core class" of testimonial statements, including "pretrial statements that declarants would reasonably expect to be used prosecutorially;" and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." 541 U.S. at 51-52; accord Davis, 547 U.S. at 822 (statements are testimonial when "the primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution" and non-testimonial when they are primarily meant to enable the police to meet an ongoing emergency). The hallmark of these types of statements is that they are accusatory in nature, with "an essentially investigative and prosecutorial function," and of concern when "government officers" are involved "in the[ir] production." Crawford, 541 U.S. at 51-52.

Based on this "core-class" of testimonial statements, the Supreme Court in Melendez-Diaz, 557 U.S. at 310-11, explained that where the "sole purpose" of a document is evidentiary in nature, then the document is "functionally identical to live, in-court testimony" subject to cross-examination. By that logic, it went on, police crime scene reports are testimonial. See id. at 316; see also, e.g., United States v. Johnson, 710 F.3d 784, 786-89 (8th Cir. 2013) (holding that police report read into the record was proper subject of a confrontation objection, though noting that extent of confrontation right differs at supervised release revocation hearings and criminal

27

trials). <u>United States v. Meade</u>, 677 Fed. Appx. 959, 969 (6th Cir. 2017) (holding that police reports in which motorcycle owners reported bikes stolen were testimonial but finding they were admitted for a non-hearsay purpose); <u>United States v. Henry</u>, 226 Fed. Appx. 963, 2007 WL 1053814, 965–66 (11th Cir. 2007) (deeming statement in police report testimonial but finding its admission harmless). The majority explicitly rejected the dissent's view, which would have made "a police officer's investigative report describing the crime scene admissible absent an opportunity to examine the officer." <u>Melendez-Diaz</u>, 557 U.S. at 316.

The Court clarified that although "[d]ocuments kept in the regular course of business may ordinarily be admitted at trial despite their hearsay status . . . that is not the case if the regularly conducted business activity is the production of evidence for use at trial." <u>Id.</u> at 321 (citation omitted). It continued:

> Our decision in <u>Palmer v. Hoffman</u>, 318 U.S. 109 (1943), made that distinction clear. There we held that an accident report provided by an employee of a railroad company did not qualify as a business record because, although kept in the regular course of the railroad's operations, it was calculated for use essentially in the court, not in the business. . . . [P]olice reports generated by law enforcement officials . . . do not qualify as business or public records for precisely the same reason."

<u>Id.</u> (citation omitted).

Two years later, the Supreme Court made it even more clear that crime scene reports and diagrams created as part of a criminal investigation are testimonial: "A document created solely for an 'evidentiary purpose,' . . . <u>made in aid of a police investigation</u>, ranks as testimonial." <u>Bullcoming</u>, 564 U.S. at 664. This rule reflects concern about the "unique potential for abuse" arising from the "[i]nvolvement of government officers in the production of testimony." <u>Crawford</u>, 547 U.S. at 54 n.7.

When documents are created with the primary purpose of creating evidence for a criminal investigation, as the Supreme Court has explicitly held, statements are testimonial regardless of how "objective" they might appear. The Supreme Court noted:

> Most witnesses, after all, testify to their observations of factual conditions or events, e.g., "the light was green," "the hour was noon." Such witnesses may record, on the spot, what they observed. Suppose a police report recorded an objective fact [such as] the address above the front door of a house or the read-out of a radar gun. Could an officer other than the one who saw the number on the house or gun present the information in court—so long as that officer was equipped to testify about any technology the observing officer deployed and the police department's standard operating procedures? As our precedent makes plain, the answer is emphatically "No."

Bullcoming, 564 U.S. at 660. Therefore, "police reports" and what they contain are within the ambit of the Confrontation Clause.

Measured by these principles, all of the documents and photographs Jacklitsch prepared, as well as the duplicative diagram Brown prepared, unquestionably qualified as testimonial. The photos, report, and diagrams' "purpose," if not "sole purpose," was use in the prosecution of a homicide, and they were created by police officers themselves. They contained "the precise testimony [Jacklitsch] would be expected to provide if called at trial." Melendez-Diaz, 557 U.S. at 310, 316 (explicitly rejecting the logic that would render "a police officer's investigative report describing the crime scene admissible absent an opportunity to examine the officer"). Notably, documents in Jacklitsch's evidence log, a significant component of Exhibit 57, the crime scene report, contained notations that the evidence was "probative" (see A1684-1727); it is hard to imagine a term more accusatory than "probative" for evidence the police have compiled. The "incentive," plainly, was "to answer a particular question related to the issues of a particular case"—i.e., precisely what the Court held in Melendez-Diaz brought certificates based on

laboratory reports within the Confrontation Clause's reach. 557 U.S. at 318.

The only reason Detective Jacklitsch made his statements was to create evidence for the future prosecution of the crime he was investigating. He was assigned to process the scene of a known homicide, and worked as the lead crime scene investigator (Brown A644; Exhibits). All of his statements were formalized with the imprimatur of the "crime scene run number [09-4994], which is a number that is unique only for that particular job" (Brown A678). Each of the documents he prepared listed the specific crimes he was investigating, "homicide and a felonious assault" (Brown A679; see Exhibits, all of which list "Homicide, F/A" as the "Crime"). Jacklitsch also put his name and shield number on each document (Brown A679; Exhibits). There is no question that Detective Jacklitsch's formalized report, made by a police officer in the course of a specific investigation, qualifies as testimonial, as he created it for use in the eventual prosecution of the homicide he was investigating.

Furthermore, "the formalities attending" the police reports here are "more than adequate to qualify [the report] as testimonial." Bullcoming, 564 U.S. at 664-65. In Bullcoming and Melendez-Diaz, the analysts "prepared a certificate concerning the result of his analysis" and "formalized" the report in a "signed document headed a 'report.'" Bullcoming, 564 U.S. at 664-65 (internal citations omitted); Melendez-Diaz, 552 U.S. at 808. Here, too, the reports contain sufficiently formal elements. Many of the pages contain the official NYPD seal, and all of Detective Jacklitsch's reports contain his badge number and the crime scene run number. Detective Jacklitsch appeared to have used NYPD computer templates for the remaining crime scene reports (see Exhibits). The "formalities attending" the crime scene reports and diagram are thus similar to those attending the reports in Bullcoming and Melendez-Diaz.

In addition, the crime scene report, photographs, and diagrams all required skill and interpretive acumen to produce. Based on Brown's testimony, all of the documents and photographs Jacklitsch created as the crime scene detective required years of experience, specialized training and skill, and scrupulous adherence to "protocol" (Brown A637-42).

After processing the crime scene, Jacklitsch engaged in interpretive and deliberative work, producing documents that reflected his impressions. According to Brown, Jacklitsch digitally rendered 146th Street between Willis Avenue and Brook Avenue, filling in the house numbers and placing forty-three cars on the road. He gave each piece of evidence a number from one to twenty-five, and added the evidence to the diagram using small directional line markers, indicating where he found each piece of evidence. He also added measurements.

The formal, labeled, and typed crime scene report included descriptions of each piece of evidence Jacklitsch found, where he found it, and what he believed it to be. For example, Jacklitsch labeled the first entry "J1," and wrote that he believed it was a casing  from a "Winchester 45 auto," that it was of "probative" value, and included measurements of where he found it relative to Willis Avenue. The report also included thumbnail images of all of Jacklitsch's photos introduced into evidence, and blank spaces for images that were not shown to the jury. Next to each image or redacted image, Jacklitsch wrote a brief description of what it depicted, noted which way he directed the camera, and described the camera distance using adjectives like "mid-range" and "closeup." It is clear, then, that these exhibits reflected the discretionary steps Jacklitsch took to measure and document evidence for prosecution.

Thus, the People were required to introduce the diagram, photos, and report through the person who actually created them, in order to provide the defense with a fair opportunity to

cross-examine him regarding not only the information and interpretive data but also his "proficiency, the care he took in performing his work, and his veracity." Bullcoming, 564 U.S. at 661 n.7. After all, "[c]onfrontation is designed to weed out not only the [expert], but the incompetent one as well." Melendez-Diaz, 557 U.S. at 319. The People failed to do so.

Instead, the People called Detective Brown. Brown's testimony about Jacklitsch's work and process—in which he spent 100 pages of testimony detailing, based on referencing Jacklitsch's report, diagram, and photographs, what evidence Jacklitsch claimed he found at the scene, where Jacklitsch purportedly found this evidence, what measuring devices Jacklitsch might have used, where Jacklitsch might have been standing when he took the photographs, what might have been depicted in the photographs, and what tests Jacklitsch might have run—did not satisfy the requirements of the Confrontation Clause (Brown 66-71, 87-88, 98-104, 106-28, 137-68, 192-206).

The Confrontation Clause, as the Supreme Court has repeatedly held, does not allow the prosecution to present one person's testimonial statements through the trial testimony of another. Crawford, 541 U.S. at 68; Davis, 547 U.S. 813. In Melendez-Diaz, this Court further instructed that when forensic reports are presented as evidence against a defendant, the Confrontation Clause guarantees the defendant the opportunity to test through cross-examination the "honesty, proficiency, and methodology" of the analyst who actually performed the analysis. 557 U.S. at 317-21. The Constitution "does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination." Bullcoming, 564 U.S. at 662.

Unless a witness has supervised, conducted, or observed the data on which he or she

relies, his or her conclusions are inadmissible; for this reason, Brown's conclusions as well as his duplicate diagram were inadmissible too. The Bullcoming hypothetical makes this plain: "[S]uppose a police report recorded an objective fact [such as] the address above the front door of a house or the read-out of a radar gun. Could an officer other than the one who saw the number on the house or gun present the information in court[?] . . . As our precedent makes plain, the answer is emphatically 'No.'" 564 U.S. at 659-60 (internal citations omitted); accord Melendez-Diaz, 557 U.S. at 315-16. If it would violate the Confrontation Clause to admit a report that recorded a purely objective fact where the defense did not get a chance to cross-examine the person who recorded that fact, then it is error to admit a "duplicate" diagram based solely and entirely on that non-testifying officer's crime scene diagram. See Davis, 547 U.S. at 816 ("[T]he protections of the Confrontation Clause can[not] readily be evaded by having a note-taking policeman recite the unsworn hearsay testimony of the declarant . . . ." (emphasis in original); Bullcoming, 564 U.S. at 651 (disallowing surrogate testimony by someone who did not observe the creation of the original document); cf. Oregon v. Hass, 420 U.S. 714, 722 (1975) (finding that unlawfully obtained evidence may be admissible only for other purposes than as proof of guilt in the prosecution's case in chief). The Confrontation Clause cannot be so easily circumvented.

Brown's goal was to "duplicate" Jacklitsch's diagram of where the evidence was recovered, in order to present it at Mr. Diaz's trial (A586; Brown A687). Brown knew where to place all twenty-five pieces of evidence in the diagram only "by looking at Detective Jacklitsch's diagram and taking measurements from his diagram," as well as by looking at Jacklitsch's photos (Brown A687, A725). In fact, all of the "pieces of evidence" in Brown's diagram were "lifted

directly from Jacklitsch's diagram" (Brown A723). But, because Brown did not supervise, conduct, or observe Jacklitsch's collection and assessment of the evidence, or the creation of his report or diagram, Brown's testimony was not an adequate substitute for Jacklitsch's. Detective Brown did <u>no</u> independent analysis, and was not even in a position to agree or disagree with Jacklitsch's findings. Instead, Brown merely transcribed Jacklitsch's work. He repeatedly testified that "<u>all</u> [the] information in this case come from Jacklitsch's reports" (emphasis added), including the location of all evidence recovered and where all of the cars were parked (Brown A687, A702-03, A705, A723-24).

And, indeed, a cursory comparison of the two diagrams makes it crystal clear that Brown's diagram was merely a duplicate of Jacklitsch's, save for a few trees, buildings, and the color-coded key Brown added—using Jacklitsch's report—at the bottom left to identify each of the twenty-five pieces of evidence.

The prosecutor never argued that Brown's diagram served any different function or was materially different than Jacklitsch's; in fact the prosecutor said that Brown's diagram just "has the key . . . [and] more accurate building structures than Jacklitsch's" but was introduced to "show[] the location of evidence, where things were recovered, nothing more, nothing less" (A673). Because everything in Brown's diagram that implicated Diaz came solely and entirely from Jacklitsch's work, defense counsel was effectively prevented from cross-examining Brown about the information contained in the diagram. The prosecution cannot be insulated from the confrontation rules merely by having a testifying witness duplicate an inculpatory testimonial document prepared by a non-testifying witness.

While Brown did a "walk-through" of the crime scene five years after the crime, it was

not to check the accuracy of any of the initial interpretations or to gather information so he could draw his own conclusions about the evidence, much of which, notably, was long removed by that point. Instead, he walked through the scene to get a "feel" for it so he would be more comfortable testifying (Brown A645-46, A650).

Brown used Google Maps to ensure the accuracy of the building addresses and curvature of the street, but conducted no independent analysis or interpretation of the testimonial evidence contained in Jacklitsch's diagram, which Brown lifted directly from Jacklitsch's work. He used Google Maps only "as my means of illustration to place the items in question that [Jacklitsch] has on his diagram" (Brown A687, A690). Thus, while Brown may have independently checked Google Maps to confirm the bird's eye view of immoveable objects like the street and buildings, the critical and inculpatory elements of this exhibit—the pieces of evidence collected and where they were found—came from Jacklitsch, who was not subject to cross-examination. Because defense counsel had no opportunity to cross-examine Jacklitsch, who supplied all of the incriminating information that Brown incorporated in his own diagram, Diaz was denied his confrontation rights.

It was critical for counsel to be able to cross-examine Jacklitsch. Brown could not answer any questions about the equipment or procedures used to generate the reports, photos, or diagrams. As defense counsel argued to the court, he was prevented from cross-examining anybody about "measurements, regarding where anything was found" or "how it was found" (A669-73).

For instance, Brown testified that did not know whether Jacklitsch moved any evidence before he photographed it, who took the measurements Jacklitsch used in diagram, what

35

instruments were used to take those measurements, whether those instruments were accurate, or the steps Jacklitsch took when he translated his written field notes to a typed field report (Brown A665-66). Had Jacklitsch testified, he could have answered those questions, plus many more, including whether he edited his photographs, the specific steps he used to collect the ballistics evidence, whether or how he made contemporaneous notes about the location of the ballistics, or whether he relied on his memory. Moreover, as the prosecutor himself complained when arguing for the jury to visit the crime scene, the diagrams and photographs "do not truly do justice to the nature of this crime scene," a problem that Jacklitsch could have addressed had he testified (A958-59). Given that defense counsel engaged in extensive cross-examination of all testifying police officers in this case, there is no doubt that counsel would have held Jacklitsch to equal, if not higher, standards of accuracy, memory, and competence, had counsel the opportunity to question him.

Jacklitsch exercised a significant amount of subjectivity and judgment when processing the crime scene and creating the crime scene reports, not to mention the analytic decisionmaking required to convert his initial notes into a diagram of the crime scene evidence. Because the documents were prepared by police in anticipation of a criminal prosecution, the jury should have been able to hear whether Jacklitsch displayed the skill and integrity necessary to the task or— whether by neglect, mistake, or something less benign—he did not.

Supreme Court precedent clearly required a finding that the crime scene reports and diagrams in this case were subject to confrontation. After all, "the most important instances in which the [Confrontation] Clause restricts the introduction of out-of-court statements are those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain

evidence at trial." <u>Michigan v. Bryant</u>, 562 U.S. 344, 358 (2011). Police reports describing the crime scene are, by their very nature, formalized statements made by law enforcement for <u>no other purpose</u> than to establish facts to be used at a criminal trial. Police reports are in fact a paradigmatic example of the kind of "core class" of testimonial statements whose purpose 'is to establish or prove past events potentially relevant to later criminal prosecution." <u>Davis</u>, 547 U.S. at 822. There could be no other conclusion but that Detective Jacklitsch's reports and Detective Brown's surrogate testimony were testimonial, and the Appellate Division's finding otherwise is contrary to, and an unreasonable application of, clearly established federal law. <u>See</u> 28 U.S.C. § 2254(d)(1).

The Supreme Court has issued clear guidelines to courts reviewing the admission of evidence for Confrontation violations: "As we suggested in <u>Davis</u>, when a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the 'primary purpose of the interrogation' by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs." <u>Bryant, 56</u>2 U.S. at 370; <u>accord</u> Davis, 547 U.S. at 822 (finding a statement is testimonial "when the circumstances objectively indicate . . . that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution"). Rather than following Supreme Court mandate, which would have lead to the inescapable conclusion that the crime scene reports and diagrams were testimonial, the Appellate Division used a test that has been explicitly rejected by the Supreme Court.

The New York courts unreasonably applied clearly established Supreme Court law in ruling that the evidence was not testimonial because it "[did] not link the commission of the

crime to a particular person" (A1916). The Supreme Court expressly rejected such an identity-based argument in Melendez-Diaz, writing: "Respondent first argues that the analysts are not subject to confrontation because they are not 'accusatory' witnesses, in that they do not directly accuse petitioner of wrongdoing; rather, their testimony is inculpatory only when taken together with other evidence linking petitioner to the contraband. This finds no support in the text of the Sixth Amendment or in our case law." 557 U.S. at 313. The Court went on: "to the extent the analysts were witnesses . . . they certainly provided testimony against petitioner, proving one fact necessary for his conviction—that the substance he possessed was cocaine." Id. In support of its finding, the Court cited Kirby v. United States, 174 U.S. 47 (1899), where "the Court considered Kirby's conviction for receiving stolen property, the evidence for which consisted, in part, of the records of conviction of three individuals who were found guilty of stealing the relevant property. . . . Though this evidence proved only that the property was stolen, and not that Kirby received it, the Court nevertheless ruled that admission of the records violated Kirby's rights under the Confrontation Clause" Melendez-Diaz, 557 U.S. at 314 (citations to Kirby omitted).

As the Supreme Court held in Crawford, admission of testimonial statements from a non-testifying witness is admissible only where that witness was "unavailable" and "the defendant had a prior opportunity for cross-examination." 541 U.S. at 53-54, 59. It has declined to carve out a "forensic evidence" exception, see Bullcoming, 564 U.S. at 658 (citing Melendez-Diaz, 557 U.S. at 317-21), and similarly there is no exception to the Confrontation Clause's prohibition against surrogate testimony for cases in which that testimony is not tied to or does not identify a particular defendant. See Davis, 547 U.S. at 826 (holding Confrontation Clause covered "interrogations solely directed at establishing the facts of a past crime, in order to identify (or

provide evidence to convict) <u>the perpetrator</u>" (emphases added)).

The Supreme Court has never found that a statement is testimonial only if it links to a known defendant. "Where that test comes from is anyone's guess." <u>Williams v. Illinois</u>, 567 U.S. 50, 135 (2012) (Kagan, J., plurality) (citations omitted); <u>accord</u> id. at 114-15 (Thomas, J., concurring in the result alone) (disagreeing with separate plurality's "new primary purpose test," which asks whether the statement at issue "has 'the primary purpose of accusing a targeted individual,'" and noting the lack of "textual justification" for such a rule and that "[h]istorical practice confirms that a declarant could become a 'witnes[s]' before the accused's identity was known" (internal citation omitted)). Indeed, the <u>Melendez-Diaz</u> majority, and five Justices in <u>Williams</u>, expressly rejected this "accusation" standard. <u>Williams</u>, 567 U.S. at 133-35 (Kagan, J., plurality) (citations omitted); <u>accord</u> id. at 114-15 (Thomas, J., concurring);[8] <u>Melendez-Diaz</u>, 557 U.S. at 313 (rejecting argument that the documents are not testimonial because they "do not directly accuse petitioner of wrongdoing [because] their testimony is inculpatory only when taken together with other evidence linking petitioner to the contraband. This finds no support in the text of the Sixth Amendment or in our case law."). Notably, the Second Circuit has since opined that <u>Williams</u> did nothing to alter the rules set forth in <u>Melendez-Diaz</u> and <u>Bullcoming</u>, which

---

[8] In contrast to the police reports here, the primary purpose of the Cellmark report in <u>Williams</u> "was not to accuse petitioner or to create evidence for use at trial. When the ISP lab send the sample to Cellmark, its primary purpose was to catch a dangerous rapist who was still at large, <u>not to obtain evidence for use against petitioner</u>." 567 U.S. at 84 (emphasis added). For that reason, forensic reports may be subject to sub-classification as either testimonial or not, depending on their primary purpose, which might be accusatory, as in <u>Melendez-Diaz</u>, but might be <u>primarily</u> aimed at catching an at-large individual, as in <u>Williams</u>. <u>See</u> <u>United States v. James</u>, 712 F.3d 79, 87-88 (2d Cir. 2013) (noting that while recent Supreme Court precedent might call into doubt that forensic reports are categorically inadmissible absent confrontation, it still adhered to the primary purpose test outlined in <u>Davis</u>); <u>Washington v. Griffin</u>, 876 F.3d 395, 409-11 (2d Cir. 2017) (holding that what <u>Williams</u> altered about the Confrontation Clause landscape was the question of what the primary purpose of DNA testing is). On the other hand, police reports, especially by an investigating detective, are plainly within the "core" class of testimonial statements identified in <u>Crawford</u>, as the main purpose for their creation is accusatory—<u>i.e.</u>, statements that "declarants would reasonably expect to be used prosecutorially." 541 U.S. at 51.

remain controlling law. James, 712 F.3d at 95-96 (noting that five judges disagreed with a standard requiring direct accusation of a specific individual because that rule would "conflict directly with Melendez-Diaz" and adhering to the pre-Williams rule "that a statement triggers the protections of the Confrontation Clause when it is made with the primary purpose of creating a record for use at a later criminal trial").[9]

Yet, an identity-based exception was the basis for the Appellate Division's finding in Mr. Diaz's case. This direct-accusation standard seized on by the New York courts, with no basis to be found in either the Supreme Court, limits the Sixth Amendment to cross-examination of testimony by itself proving that the defendant is the person who committed the offense. But, of course, a defendant has the right to cross-examine "witnesses" regarding all relevant facts, not just those bearing on "identity." See Melendez-Diaz, 557 U.S. at 313-14; U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him"). Melendez-Diaz further confirmed that an identity limitation "would be contrary to longstanding case law," as the Supreme Court had previously held that the Confrontation Clause applies to non-identity evidence. Id. at 314 (explaining that in Kirby, the Supreme Court held that although the records proved "only that the property was stolen, and not that [defendant] received it . . . admission of the records violated [defendant's] rights under the Confrontation clause").

Given that the documents were testimonial, they should not have been introduced unless

---

[9] In any event, Williams involved a cold hit, whereas here the timeline suggests that right around when Jacklitsch was gathering evidence, Mr. Diaz was being identified by Pena as a suspect to a fellow member of the NYPD. By the time Jacklitsch was compiling documents in his report, many of which are timed and dated 5:20 p.m. on September 23, 2009, Mr. Diaz's photograph had already been selected from a photo array.

the prosecutor could show that (1) the declarant was unavailable, and (2) the defendant had a

prior opportunity to cross-examine the declarant. <u>Crawford</u>, 541 U.S. at 68. Fundamentally, as the

Supreme Court has noted, "[t]he text of the Sixth Amendment does not suggest any

open-ended exceptions from the confrontation requirement to be developed by the courts." <u>Id.</u> at

54. Nor is it "the role of courts to extrapolate from the words of the [Confrontation Clause] to the

values behind it, and then to enforce its guarantees only to the extent they serve (in the courts'

views) those underlying values." <u>Giles v. California</u>, 554 U.S. 353, 375 (2008).

Here, the prosecution met neither condition to show that the sole exception applied.

Defense counsel had no chance to cross-examine Jacklitsch about these documents,[10] and the

People, whose burden it was, failed to show that he was unavailable. <u>See</u> Crawford, 541 U.S. at

57 (referencing the confrontation rule that "exclude[s] testimony where the government ha[s] not

established unavailability of the witness"). The prosecutor claimed that Jacklitsch was

unavailable to testify because he was retired, but, as defense counsel noted, the prosecution failed

to demonstrate whether he was truly unavailable—because of death, infirmity, or mental

---

[10] Had Mr. Diaz's confrontation rights been honored, he could have challenged the report's reliability by
asking Detective Jacklitsch about, among other things:
- his training and qualifications;
- the specific steps he used to collect the ballistics evidence;
- whether anybody helped him collect and measure the location of the ballistics evidence;
- what equipment he or someone else used to measure the relative locations of the ballistics evidence;
- whether he moved any of the evidence before photographing or measuring it;
- how he knew whether the instruments he used were accurate;
- the steps he took when translating his written field notes into typed reports;
- whether there were any differences between his initial, hand-drawn draft and the final report;
- whether and how he made contemporaneous notes about the location of the ballistics, or whether he relied
  on his memory;
- whether he edited his photographs;
- whether he was overworked at the time of the reports' preparation; and
- whether he omitted any information from the reports or diagram.

illness—or because it was merely inconvenient to procure his presence (A586, A669). Under these circumstances, Jacklitsch's failure to testify violated Mr. Diaz's confrontation rights.

The pre-arrest, identity-based exception to the Confrontation Clause that the Appellate Division decision, as ratified by the Court of Appeals' leave denial, is out of step with clear Supreme Court precedent. See Melendez-Diaz, 557 U.S. at 313 (rejecting the argument that the documents are not testimonial because they "do not directly accuse petitioner of wrongdoing [because] their testimony is inculpatory only when taken together with other evidence linking petitioner to the contraband"). Accordingly, Mr. Diaz's right to confront a critical witness against him was violated.

> B. The State Court's finding that the admission of the out-of-court statements was harmless is objectively unreasonable where no other evidence connected Mr. Diaz to the fatal bullet.

Under AEDPA, habeas relief is appropriate if "the [state court] applied harmless error review in an 'objectively unreasonable' manner." Mitchell v. Esparza, 540 U.S. 12, 18 (2003) (quoting Lockyer v. Andrade, 538 U.S. 63, 75–77 (2003)); accord Fry v. Pliler, 551 U.S. 112, 119 (2007) ("A federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable."). In general, a finding of harmlessness will not be found unreasonable "if fair-minded jurists could disagree on its correctness." Davis v. Ayala, 135 S. Ct. 2187, 2199 (2015).

In order to find harm, the federal reviewing court must find more than a "reasonable possibility" that the error was harmful. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); see Davis, 135 S. Ct. at 2199 ("[A] prisoner who seeks federal habeas corpus relief must satisfy Brecht"). Rather, the test is whether the error "had substantial and injurious effect or influence in

determining the jury's verdict." Brecht, 507 U.S. at 637 (internal citations omitted).

When a habeas court reviews the state court's constitutional error for harmlessness regarding a Confrontation Clause claim, it must consider: "[1] the importance of the witness' testimony in the prosecution's case; [2] whether the testimony was cumulative; [3] the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; [4] the extent of cross-examination otherwise permitted; and . . . [5] the overall strength of the prosecution's case." Cotto v. Herbert, 331 F.3d 217, 254 (2d Cir. 2003). Analyzing these five factors, there can be no dispute that denying Mr. Diaz the full potential of cross-examination had a "substantial and injurious effect or influence in determining the jury's verdict." Id. at 257 (quoting Brecht, 507 U.S. at 637).

In this case where no forensic, surveillance, ballistics, or statement evidence tied Mr. Diaz to the shot that killed Aisha Santiago, much less even placed him at the scene, the state court's finding that the crime scene reports and diagrams admitted into evidence were not harmless because they "shed little or no light on any of the disputed issues at trial," Diaz, 151 A.D.3d 502, was unreasonable. To the extent Detective Jacklitsch's analysis of the crime scene was not "disputed," the reason is because petitioner was utterly unable to cross-examine the person who made these statements. And, Detective Jacklitsch's statements about the ballistics evidence, and Detective Brown's surrogate testimony, were crucial to the case, because the medical examiner could not determine what type of bullet killed Ms. Santiago, how far away the shooter was standing, or from what direction the shot came. Moreover, the eyewitnesses did not provide clarity on what kinds of guns the shooters were firing during the gun battle. In fact, this was a case in which Joseph Diaz, a mere casual acquaintance of one of the parties involved in the

dispute, was linked by no physical or statement evidence to the crime, and whose identification as having been involved was heavily impeached—and even contradicted—at trial. Therefore, establishing through forensic evidence the location of the shooter, and what kind of gun he fired, was critical to the People's case—and came only from the crime scene reports and diagrams, and the 100 pages of testimony relying on those documents.

The prosecutor's theory was that the fatal shot must have come from a person standing on the northeast corner of Willis Avenue and 146th Street, since, according to Detective Jacklitsch's crime scene reports, the .45 expelled casings were found at that corner. According to Detective Jacklitsch's written statements and Detective Brown's surrogate testimony, Jacklitsch claimed that deformed jackets from two .45 caliber bullets were found east of that corner in front of building 409, and a .45 bullet was found in the car at the far east end of 146th Street. The prosecution claimed that because Mr. Diaz was shooting from that corner, he was the only person who could have fired the fatal shot. This crucial evidence about the location of the ballistics came solely and directly from the improperly admitted evidence.

Detective Fox, the ballistics expert for the prosecution, relied on Jacklitsch's analysis of the crime scene to explain where each and every piece of the ballistics evidence he identified was found at the scene and put the crucial evidence together. He numbered each piece of ballistics evidence and explained to the jury that his own numbering system matched up with the numbering system that Detective Jacklitsch used, so that the jury would understand where Jacklitsch said that each piece had been recovered when looking at his diagram (Fox A910-30). Fox testified about the items Jacklitsch labeled J14 and J18 (both deformed jackets), and J22 (a deformed bullet), which Fox explained were all fired from the same .45 caliber weapon (Fox

A921-25). In dramatic fashion, the last thing the prosecutor asked Fox on direct examination was to circle on the crime scene diagram where Detective Jacklitsch said each of these items had been found: in front of 409/411 East 146th Street where petitioner was standing, and in front of 455 East 146th Street, east of where the victim was shot (Fox A929-30). This crucial information tied Mr. Diaz to the bullet that struck Ms. Santiago. Without information about where each bullet, casing, cartridge, or fragments were found—information that came directly from Jacklitsch's statements about the crime scene—Fox's testimony would not have tied Mr. Diaz to the shooting.

The prosecution needed Detective Jacklitsch's analysis to fill a gap left by incoherent and contradictory eyewitness accounts; without the evidence from the crime scene report, there was no way to establish that Mr. Diaz was the shooter. For instance, Michael Jones[11] testified that the person standing at the corner of Willis and 146th Street was shooting a 9mm, but this evidence was contradicted by the crime scene diagram and crime scene reports, which suggested someone at that corner person was shooting a .45—which supported the prosecutor's theory that someone from Mr. Irrizary's crew fired the fatal shot. Susana Castro testified that at least three people from Mr. Irrizary's crew might have been shooting east, but the prosecutor used the crime scene evidence to undercut her testimony and argue that Mr. Diaz was the sole shooter from that corner. All of the eyewitnesses testified that there were at least three shooters in total, and none of the eyewitnesses saw the entirety of the gun battle. Only the crime scene reports and diagrams

---

[11] Jones's assertion that Mr. Diaz was even present was called into serious doubt as well, as he omitted a crucial detail that he surely would have noticed upon viewing the shooter twice: a prominent neck tattoo. Mr. Diaz and Jason Irrizary—the person whom Susana Castro identified as the shooter—shared similar "low" haircuts, facial hair, heights, and weights. As counsel noted in summation, the two men "look similar" (A1500).

filled the evidentiary gap that allowed the prosecutor to argue that, because a .45 bullet was found east of Ms. Santiago and because ballistics suggested that the two other shooters were shooting west using 9mm and .22-caliber weapons, someone from Mr. Irrizary's crew had fired the fatal shot.

Even where two of the five eyewitnesses identified Mr. Diaz as shooting the gun, the crucial question in this case—in which Mr. Diaz was <u>not</u> accused as an accomplice but as personally shooting the fatal shot during a multi-person gun battle—was which bullet killed Ms. Santiago. This information came exclusively and entirely from the crime scene reports and diagram. Yet Mr. Diaz was denied the right to cross-examine their creator.

That the prosecutor made heavy use of the crime scene diagram in summation demonstrates how critical this evidence was to its underwhelming case against Mr. Diaz. As in <u>Crawford</u>, 541 U.S. at 40-41, where the prosecution had called the testimonial evidence "damning" during closing arguments, here the prosecutor leaned heavily on Jacklitsch's work product to tie Mr. Diaz to the fatal shot, as even he "agree[d] witnesses saw things differently" (A1528). Because "no one can say" which bullet killed Ms. Santiago, the prosecutor was forced to rely on the diagram, arguing that it was the .45 bullet that had killed Ms. Santiago, referring to the location of the slug, fragments, and casing from that bullet on the crime scene diagram, which had been fired from a gun in the hands of a man standing at Willis and 146th Street (A1535-36). He also used the diagram to argue that Susana Castro, who had observed not only the initial altercation between Irrizary and Gordo but also the shooting, after which she identified <u>Irrizary</u> as the shooter, could not have observed what she said she did (A1546).

The jurors were keyed into the importance of this evidence as well. In their first note, the

jurors asked to review the crime scene diagram. Later in their deliberations, they asked to view the surveillance video[12]; after they watched the surveillance footage, they asked to view it again, but this time with the crime scene diagram in hand. Clearly, then, Detective Jacklitsch's crime scene diagram played a key role in their deliberations.

This evidence was so devastating precisely because the remaining evidence against Mr. Diaz was so weak. Without Detective Brown's surrogate testimony and Detective Jacklitsch's out-of-court assertions about the location of the ballistics evidence, the prosecution's case would have rested on grainy surveillance video that did not show the shooting, and shaky eyewitness testimony that barely placed Mr. Diaz, a mere acquaintance of one of the parties who began the initial altercation, at the scene.

Based on the foregoing, "the overall strength of the prosecution's case" was not strong. Cotto, 331 F.3d at 254 (2d Cir. 2003). Even if the jury believed Soto and Jones that Mr. Diaz was present at the scene, the only evidence tying him to the fatal shot was Detective Jacklitsch's crime scene analysis. Without it, equally, if not more, logical and credible alternative scenarios are apparent. The shot that hit Santiago might have come from Ewell or Vargas, both of whom were firing guns that afternoon, and who were friends of Soto, one of the ey ewitnesses who had only a side view of the baseball-hatted perpetrator, identified Mr. Diaz in a lineup only after a "long time," and then could not identify him at trial. Or, it could have come from any one of the multiple, unidentified people wearing red shirts that afternoon, including the two men wearing red tops in the surveillance video, or the black man wearing red whom Officer Acevedo saw

---

[12] Faces and other identifying features are not meaningfully visible in the low-resolution video footage. This evidence can be furnished to the Court upon request.

running east on 146th Street after she heard shots.

Even if Mr. Diaz had been shooting a gun, a second shooter might have fired the fatal shot—and such a scenario would explain the mountains of conflicting eyewitness testimony. After all, Castro testified that she saw two other Latino men with guns standing with Irrizary, whom she had the opportunity to observe not once but <u>twice</u> that afternoon. Jones repeatedly testified that the shooter was not wearing a hat, but Soto said that the shooter wore a baseball cap. Jones believed the person he saw was shooting a 9mm gun, but the People argued that Santiago was shot with a .45mm weapon. Jones and Soto said that the shooter was wearing a red top, but Castro did not identify any of Irrizary's crew as wearing red.

Given the paucity of other evidence implicating Mr. Diaz, the crime scene reports and diagrams demonstrating that the bullet found east of the victim was fired from the same gun as discharged the bullet jackets found where Mr. Diaz was purportedly standing, was harmful under <u>Brecht</u>. Any finding to the contrary was unreasonable.

In light of the dynamics at play in this case, the crime scene reports, and the diagrams of where Detective Jacklitsch found the ballistics evidence in particular, played an important role in the jury's assessment of who killed Ms. Santiago. The Confrontation Clause required the court to allow Mr. Diaz to probe Jacklitsch's qualifications, methodology, and crucial work on the case. <u>See</u> <u>Bullcoming</u>, 564 U.S. 647; <u>Melendez-Diaz</u>, 558 U.S. 305. Because Jacklitsch did not testify, Mr. Diaz had no opportunity to do so, and his rights were violated.

## CONCLUSION

ACCORDINGLY, FOR THE REASONS SET FORTH ABOVE, THE
PETITION FOR A WRIT OF HABEAS CORPUS SHOULD BE GRANTED.

Respectfully submitted,

ROBERT S. DEAN (RD-0772)
Attorney for Petitioner

BY: _____
KATHARINE SKOLNICK (KS-1123)
Of Counsel

November 1, 2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
JOSEPH DIAZ,

                              Petitioner,


                                                    18 Civ. 10121 (AT)(DCF)

              -against-

EARL BELL, Superintendent, Clinton
Correctional Facility,

                              Respondent.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X



## MEMORANDUM OF LAW



                                        DARCEL D. CLARK
                                        District Attorney
                                        Bronx County
                                        198 East 161st Street
                                        Bronx, New York 10451
                                        (718) 838-6103


PETER D. CODDINGTON
MARIANNE STRACQUADANIO
Assistant District Attorneys
        Of Counsel

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
JOSEPH DIAZ,

               Petitioner,

                                 18 Civ. 10121 (AT)(DCF)

           -against-

EARL BELL, Superintendent, Clinton
Correctional Facility,

               Respondent.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## **RESPONDENT'S MEMORANDUM OF LAW**

## **STATEMENT**

    This memorandum of law is submitted in opposition to the instant petition for

a writ of habeas corpus.

# THE FACTS

The facts relied upon in this memorandum of law are contained in the accompanying affidavit of Assistant District Attorney Marianne Stracquadanio, the exhibits attached hereto, and the minutes of the trial provided under separate cover to this Court. For a full exposition of the facts in the case, the Court is respectfully referred to respondent's brief to the Appellate Division, First Department (see Exhibit 2, pp. 3-11).

Briefly, on September 21, 2009, Elizabeth Thomas, a loan shark, went to 409 East 146th Street to speak with Barbara Lopez about money owed to her. Lopez's son, Rob Vargas, told Thomas that Lopez was not going to give her money, and told her that he was going to shoot her. Thomas told her nephew, Jason Irrizary, what had transpired—that somebody owed her money, and that when she asked for it, the debtor's son threatened to shoot her.

The next day, Thomas, Irrizary, Irrizary's brother (Raul Irrizary) and Irrizary's cousin (Manuel Irrizary) went to 146th Street. Thomas saw Lopez and approached her about the money. "Gordo"—a man who was mistakenly thought to be Vargas—was also there, and the Irrizary men got into a "scuffle" with him because they believed him to be Vargas. Latroy Ewell observed Gordo fighting with the others, and was able to stop the fight by acting as peacemaker, and by pulling Gordo away. When Jason Irrizary left, he exclaimed, "Clear the fucking block because I'm coming back."

A few minutes after Irrizary's warning, the shooting began. Michael Jones, an entertainer in the recording industry, had just left the Papa John's on 146th Street and Willis Avenue, and was in his car when he heard shots ring out. He reclined his seat so that he would not get caught in the cross-fire. As he was leaning back in his seat, he could see petitioner across the street, "letting off like it was nothing." Petitioner was wearing a red shirt, and Jones recognized him as a man who he had just seen in the street.

Orlando Soto and Susanna Castro—who were both standing on 146th Street—saw petitioner and others come from Willis Avenue onto 146th Street, and begin shooting towards Brook Avenue. Mr. Soto noticed that the shooter was wearing a red shirt, red cap, and blue jeans, and was using a big silver gun; Mr. Soto observed Ewell fire in response to petitioner, towards Willis Avenue, and Ms. Castro also observed Vargas and Ewell—who Ms. Castro knew from her building—fire in response, towards Willis Avenue. Ewell himself testified that he used his gun in "self-defense."

Eventually, Mr. Soto and Mr. Jones observed petitioner run back towards Willis Avenue. Mr. Jones observed that after petitioner let off more shots, petitioner turned around and "gave his pistol to a kid in a white t-shirt"—i.e., Irrizary.[1] Petitioner ran in one direction, and Irrizary ran in another.

---

[1] Video surveillance footage obtained from 475 and 477 Willis Avenue depicted petitioner handing his gun to Irrizary, who was wearing a white shirt, while the two were running away from the incident location. Both videos were played numerous times for the jury.

After the shooting, Aisha Santiago lay on the stairs of her building, 445 East 146th Street. She was not moving, with a gunshot in her chest and blood oozing from her mouth. The arriving paramedic on the scene did not administer any medical care to her because she exhibited "signs of obvious death." Dr. Margaret Prial, from the Office of the Chief Medical Examiner determined that Ms. Santiago's manner of death was homicide, and the cause of death was a gunshot wound of the chest; the bullet's path led from the middle of her chest through her heart, aorta, and left lung, with the exit wound was on the right side of her back.

Crime Scene Unit Detective Glenn Jacklitsch, who was retired by the time of trial, generated the Crime Scene Unit report and a Crime Scene Unit diagram (see Respondent's Trial Exhibits 57 and 62 at A1684-A1727 and A1729, respectively)[2]. Det. Paul Brown testified at trial in his place after visiting the scene of the incident and generating his own computerized diagram based on Det. Jacklitsch's diagram (see Respondent's Trial Exhibit 58A at A1728). Detective Jonathan Fox analyzed the ballistic evidence that was collected from the scene.[3] Six .45 caliber casings—found near the corner of Willis Avenue and 146th Street—were fired from the same firearm, and

---

[2] References preceded by "A" refer to page numbers in petitioner's appendix; references preceded by "T" refer to minutes from defendant's trial, which are being electronically filed along with respondent's declaration and memorandum of law.

[3] Six Winchester .45 caliber cartridge casings were found in front of the corner of Willis Avenue and 146th Street. Seven 9 mm discharged Winchester Luger cartridge casings were found in front of 409 to 411 East 146th Street. Shell casings from a .22 caliber rifle or cartridge were found inside of a fenced area of 413 and 415 East 146th Street. A deformed .45 caliber copper jacketed bullet was found inside of the trunk of a car parked in front of 455 East 146th Street. Finally, a possible "BIM," (Ballistic Impact Mark) was found in front of Ms. Santiago's building, 445 East 146th Street.

that the seven 9 mm casings—found in front of 409-411 East 146th Street—were fired from the same firearm.

Accordingly, it was the People's theory that Ms. Santiago died as a result of petitioner's shooting his gun eastbound, toward Brook Avenue. Based on the evidence, the only shooter that could have caused her gunshot wound was petitioner. He had been summoned to the scene with his gun by Irrizary, who had a motive for the gunfight. Petitioner stood on the corner of Willis Avenue and 146th Street and fired eastbound towards Brook Avenue, targeting Ewell and Vargas, who were standing in front of 409 East 146th Street. Ewell and Vargas fired back in self-defense at petitioner—i.e., westbound. Because Ms. Santiago had been positioned farther east from Ewell and Vargas, at 445 East 146th Street, petitioner's gun fired the fatal bullet that caused Ms. Santiago's death; put differently, Vargas and Ewell—who were positioned west of Ms. Santiago—could not have caused her death, since Vargas and Ewell were shooting at petitioner "in self-defense," and, therefore, had no occasion to shoot in an eastward direction, toward Brook Avenue in the direction of Ms. Santiago.

Ms. Castro identified Vargas and Irrizary as the shooters. Vargas was arrested and charged with attempted murder. Irrizary provided a statement to detectives, but was not arrested for Ms. Santiago's death. Petitioner was arrested after a detective spotted him on the street. Mr. Soto and Mr. Jones identified petitioner as the shooter.

**ARGUMENT**

**POINT**

**THE STATE COURT'S REJECTION OF PETITIONER'S CLAIM THAT THE TRIAL COURT ERRED IN ADMITTING THE CRIME SCENE REPORT AND DIAGRAMS WAS NEITHER CONTRARY TO NOR AN UNREASONABLE APPLICATION OF SUPREME COURT PRECEDENT, NOR WAS IT BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS.**

In his appellate brief, petitioner claimed that the trial court violated his confrontation rights by admitting a non-testifying crime scene detective's crime scene report, photographs, and diagram, as well as the testifying detective's duplicate diagram (see Exhibit 1, pp. 45-59). The Appellate Division, First Department, unanimously rejected petitioner's claim, and the New York Court of Appeals subsequently denied petitioner's leave application. Petitioner now raises this exhausted claim before this Court. He cannot prevail on federal habeas review, however, because the determination of the State court was neither contrary to nor an unreasonable application of Supreme Court precedent, nor was it based on an unreasonable determination of the facts.

"The Antiterrorism and Effective Death Penalty Act of 1996 ["AEDPA"] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002); see also

Harrington v. Richter, 562 U.S. 86, 100 (2011) (noting that AEDPA imposes, with limited exceptions, a "relitigation bar"); Parker v. Matthews, 567 U.S. 37, 38 (2012) (per curiam) (AEDPA proscribes "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts" [internal quotation marks omitted]). To advance these objectives, 28 U.S.C. § 2254 (d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The Supreme Court has explained that under § 2254(d)'s "contrary to" clause, a habeas court may only issue the writ if the state court applied a different rule from the governing precedent established by the Court, or if, on a materially indistinguishable set of facts, the state court reached a different result than the Supreme Court has reached. Bell, 535 U.S. at 694. A habeas court may grant relief pursuant to AEDPA's "unreasonable application" clause "if the state court correctly identified the governing legal principle but unreasonably applie[d] it to the facts of a particular case." Id. But "an unreasonable application of federal law is different from an incorrect application of federal law." Eze v. Senkowski, 321 F.3d 110, 124–25 (2d Cir. 2003) (emphasis in original), quoting Williams v. Taylor, 529 U.S. 362, 410 (2000). Indeed, a habeas court

is not permitted to grant the writ "simply because [it] concludes in its independent judgment that the state-court decision applied [the law] incorrectly. . . . Relief is available under § 2254(d)(1) only if the state court's decision is objectively unreasonable." Yarborough v .Alvarado, 541 U.S. 652, 665 (2004) (internal citation and quotation marks omitted). And a state court's application of federal law is objectively unreasonable "only if it is so erroneous that 'there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'" Nevada v. Jackson, 569 U.S. 505, 508 (2013) (per curiam). "If this standard [sounds] difficult to meet, that is because it was meant to be," since "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal," Richter, 562 U.S. at 102–103.[4]

With respect to factual questions, 28 U.S.C. § 2254(d)(2) governs, and provides that a federal court can grant habeas relief only if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." State court determinations of factual issues are "presumed to be correct," and this presumption can be rebutted only by "clear and convincing

---

[4] Notably, petitioner cites Francis S. v. Stone, 221 F.3d 100 (2d Cir. 2000) to articulate that the standard for AEDPA review is that "some increment of incorrectness beyond error" is required (see petitioner's memorandum of law, p. 26). However, in Garner v. Lee, 908 F.3d 845, 861 n. 14 (2d Cir. 2018), the Second Circuit clarified that this standard was essentially abrogated by Richter, which imposed a more deferential standard that the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." See Garner, 908 F.3d at 861 n. 14 (quoting Richter, 562 U.S. at 103).

evidence." 28 U.S.C. § 2254(e)(1); see also Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding"). Judged under these deferential standards, petitioner cannot prevail on his challenge to the court's admission of the crime scene report and diagrams and attendant testimony.

Petitioner asserts—as he did in his direct appeal—that the trial court admitted a non-testifying detective's crime scene report and diagram in contravention to the Confrontation Clause. However, the New York State Supreme Court Appellate Division, First Department rejected petitioner's claim, finding that the crime scene evidence at issue was not testimonial, since it "did not link the commission of the crime to a particular person" People v. Diaz, 151 A.D.3d 502, 502–03 (1st Dept. 2017). The court also held that any error in admitting the documents was harmless under the standard for constitutional error, since "evidence showing the locations where the officer found cartridge cases and other ballistic evidence shed little or no light on any of the disputed issues at trial, and there is no reasonable possibility that this evidence affected the verdict."

A defendant has the right to confront witnesses "who bear testimony against him." See Crawford v. Washington, 541 U.S. 36, 51 (2004); U.S. Const. Amend. VI. This essentially means that out-of-court testimonial statements may not be introduced against a defendant at trial to establish the truth of the matter asserted. See Crawford,

541 U.S. at 42; <u>Davis v. Washington</u>, 547 U.S. 813 (2006). Equally clear, however, is that this rule does not bar the use of out-of-court statements by declarants who are not "witnesses"-that is, those who do not "bear testimony." <u>See e.g.</u>, <u>Davis</u>, 547 U.S. 813; <u>Michigan v. Bryant</u>, 562 U.S. 344 (2011); <u>Ohio v. Clark</u>, 135 S. Ct. 2173 (2015).

In recent years, the Supreme Court has articulated whether various out-of-court statements are testimonial. <u>See</u> <u>Davis</u>, 547 U.S. 813 (victims' statements to 911 operator and affidavit given to police officer); <u>Giles v. California</u>, 554 U.S. 353 (2008)(deceased victim's statements to police officer); <u>Melendez-Diaz v. Massachusetts</u>, 557 U.S. 305 (2009)(laboratory analyses certifying that police-seized material was a certain quantity of cocaine); <u>Bryant</u>, 562 U.S. 344 (victim's identification and description—during an ongoing emergency—of the shooter and the location of the shooting); <u>Bullcoming v. New Mexico</u>, 564 U.S. 647 (2011)(forensic laboratory analysis certifying that defendant's blood-alcohol level was above the legally permissible limit for driving); <u>Williams v. Illinois</u>, 567 U.S. 50 (2012) (expert's testimony that DNA profile found on rape victim matched defendant's DNA profile); <u>Clark</u>, 135 S. Ct. 2173 (victim's statements to preschool teacher).

To date, the Supreme Court has not addressed the question of whether a police crime scene report and diagram—which in this case was a catalogued inventory of crime scene evidence, including photographs—is testimonial. Hence, the decision of the Appellate Division cannot be contrary to or an unreasonable application of Supreme Court precedent. <u>See</u> <u>Wright v. Van Patten</u>, 552 U.S. 120, 126 (2008)(if there is "no

clear answer to the question presented ... it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law;" see also Pierre v. Ercole, 560 F.App'x 81, 83 (2d Cir. 2014).

However, in Clark, the Court reiterated the following test to determine if a statement is testimonial: "whether in light of all the circumstances, viewed objectively, the 'primary purpose' of the [statement] was to 'create an out-of-court substitute for trial testimony.'" Clark, 135 S. Ct. at 2180 (quoting Bryant, 562 U.S. at 358).[5] Utilizing this test, it is evident that there was no Confrontation Clause violation here, because the crime scene report and diagram at issue was not created for the primary purpose of being a substitute for trial testimony. Rather, they were created pursuant to the New York Police Department's protocol in processing a crime scene. As respondent asserted in reply to petitioner's appellate brief, the actions taken by the non-testifying detective, Det. Jacklitsch, in collecting the evidence and memorializing this collection in his report and diagram was mere information gathering and reporting. There was nothing testimonial about Det. Jacklitsch's report and diagram, because the information

---

[5] The Court's analyses in Melendez-Diaz, Bullcoming, and Williams, utilized the above-mentioned "primary purpose test." Melendez-Diaz held that certificates identifying a substance as cocaine were testimonial because "under Massachusetts law the sole purpose of the affidavits was to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substances"; thus, the certificates were "functionally identical to live, in court testimony, doing 'precisely what a witness does on direct examination.'" See 557 U.S. at 310-311 (internal citations omitted). Bullcoming rejected the results of a blood-alcohol-content test as "surrogate testimony" because it was "made for the purpose of proving a particular fact" and admitted through a witness who did not perform the test. See 564 U.S. at 652. Williams held that a DNA profile created by a non-testifying witness was non-testimonial, since it was relayed by an expert witness—who was subject to cross-examinaton—solely for the purpose of explaining his opinion, and was, therefore not offered for its truth. See 567 U.S. at 57-58.

contained therein reflected only a neutral catalog of what potential evidence existed at the scene; the report and diagram did not implicate anyone or opine about what the evidence meant (see Exhibit 2, page 21-22). Indeed, the fact that the NYPD processes a crime scene does not mean that criminal prosecution will follow; information gleaned from a crime scene may exonerate, or support a defense theory such as justification, third-person responsibility, or mitigation thereby resulting in the prosecutor's dismissal of charges.

In this way, an NYPD crime scene report—and the creation of a concomitant diagram—is no different from an autopsy report, which has been held to be non-testimonial, since an autopsy report is "not prepared primarily to create a record for use at a criminal trial." United States v. James, 712 F.3d 79, 99 (2d Cir. 2013); see also People v. Garlick, 144 A.D.3d 605 (1st Dept. 2016), cert. denied, Garlick v. New York, 138 S. Ct. 502, 503 (2017). Put differently, like an autopsy report, which is "concerned only with what happened to the victim, not with who killed [the victim]," (People v. Freycinet, 11 N.Y.3d 38 [2008]), a crime scene report is concerned only with what was found at the scene, not with who committed the crime.

Not only was the information documented in the crime scene report non-testimonial, but, in the first place, such information did not constitute "statements" under the Crawford formulation of "bear[ing] testimony." See 541 U.S. at 51. Notably, the report consisted of an inventory of the ballistics found at the scene, photographs of what they looked like, and a "bird's eye view" map of where they were located. The

report states repeatedly that an "unknown perp shot victims," thereby showing that the perpetrator—i.e., petitioner—*was unknown to the Crime Scene Unit*. Additionally, both diagrams indicate that they were "not to scale; for illustration use only" (see A1728-A1729), thereby showing that they were merely demonstrative tools.

As respondent argued in state court (see e.g., Exhibit 2, p. 25-16 and Exhibit 4, p. 3-4), when examining the diagrams (see A1728-A1729) next to the report (see A1684-A1727), it is clear that the precise location of the ballistic evidence was not material to the People's case. Indeed, the exact locations and measurements of where the bullets, fragments, shell casings, etc., were found vis-à-vis other markers at the scene—which was detailed in the "specific locations and measurements sections" of the report—were largely inconsequential; a juror would not be able to discern the exact location of such evidence by reading the "specific locations and measurements sections" of the report, nor would they be able to ascertain this information in viewing Det. Jacklitsch's or Det. Brown's bird's eye view diagrams.

Accordingly, assuming *arguendo* that Det. Jacklitsch was imprecise in measuring the *exact* location of the ballistic evidence at the scene and that his measurements were "off" by a marginal degree—which would have necessitated[6] that their positions on the diagram be adjusted by a millimeter or so—the fact remains that respondent's case focused on the theory that petitioner was on the corner of Willis Avenue shooting

---

[6] Respondent maintains that since both diagrams indicated that they were not to scale, and were for illustrative purposes only, such an adjustment actually would not have been necessary.

eastbound towards a rival group, in the direction where Ms. Santiago happened to be standing. Therefore, petitioner's suggestion that cross-examination would have helped ascertain the location and procedures regarding where the evidence was found (see, e.g., petitioner's memorandum of law, p. 35-36, 41) does not persuade, because such cross-examination would have made little to no difference in this case.[7]

Contrary to petitioner's contentions (see, e.g., petitioner's memorandum of law, p. 28-30) the decision in this case squarely aligns with the Supreme Court's precedent, including Melendez-Diaz and Bullcoming. The main worry in those cases was that the substituted testimony at issue—i.e, the certification stating that seized material was cocaine and the certification stating that defendant's blood alcohol content was above the legal limit, respectively—were *per se* evidence of the defendants' culpability. This type of direct evidence established the elements of those crimes, which were required to be proved. Put differently, the contents of those reports could be "nothing but testimonial" since they "directly linked the accused to the charged crimes." See People v. Pealer, 20 N.Y.3d 447, 454 (2013). Here on the other hand, the ballistic evidence that was recovered from the scene was circumstantial evidence, from which the elements of manslaughter—and defendant's involvement in it—could be inferred.

---

[7] As respondent noted on direct appeal (see, e.g., Exhibit 2, p. 52), Det. Brown's diagram, which was prepared years after the crime scene was processed, nonetheless still does not "accuse" petitioner by linking him to the scene (see A1728); aside from corrections to Det. Jacklitsch's diagram due to new Google mapping technology, there is nothing different between Det. Jacklitsch's diagram and Det. Brown's (compare A1728-1729). Det. Brown himself was vigorously cross-examined at trial (see T.54-206), and, accordingly, there was no violation of petitioner's right of confrontation.

Over time, the New York Court of Appeals has adopted a four-part primary purpose test that includes, in pertinent part, the consideration of whether the report accuses the defendant by directly linking him or her to the crime. See People v. John, 27 N.Y.3d 294, 323 (2016). Here, as noted, there was nothing accusatory about Det. Jacklitch's assessment of the crime scene and the evidence that it contained; it was recorded not for the primary purpose of furthering a particular prosecution or to accuse a targeted individual of wrongdoing, but, instead, to document where evidence was found. Accordingly, the Appellate Division's conclusion that "[t]he crime scene evidence…was not testimonial, since it '[did] not link the commission of the crime to a particular person'" (see Diaz, 151 A.D.3d at 502) was a sound application of federal law as echoed and illuminated by the New York Court of Appeals. Not all "fair-minded jurists could disagree" that the Appellate Division's decision conflicted with the Supreme Court's precedent, and, therefore, habeas relief should be denied. See Richter, 562 U.S. at 102.

Similarly, the Appellate Division's conclusion that in the alternative, any error in admitting the crime scene report and diagrams was harmless, since there was no reasonable possibility that they affected the verdict (see Diaz, 151 A.D.3d at 502), was sound. Contrary to petitioner's assertions (see petitioner's memorandum of law, Section B), this decision did not rest on any unreasonable factual determinations.

Under Brecht v Abrahamson, 507 U.S. 619 (1993), constitutional errors are harmless for purposes of habeas review unless the error had a "substantial and injurious

effect" on the verdict. Fry v Pliler, 551 U.S. 112, 116–117 (2007). The Brecht analysis considers: "(1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence." Grigg v Phillips, 401 Fed.Appx. 590, 593–95 (2d Cir. 2010) (citing Zappulla v New York, 391 F.3d 462, 468 [2d Cir. 2004]) (references to defendant's silence were error, but harmless because they were "a small part of the record and were largely cumulative of properly admitted evidence" and the prosecution's evidence "was certainly weighty").

Given this "more forgiving" harmlessness standard, petitioner cannot prevail. Fry, 551 U.S. at 116. There is no doubt—and petitioner barely disputed—that Aisha's shooter was standing near the corner of Willis Avenue, shooting eastbound towards Brook Avenue, in the direction of Ewell and Vargas. Indeed, petitioner's main theory was one of misidentification; counsel's main defense was that it was not petitioner but Irrizary who shot eastbound towards Brook Avenue (see, e.g., T.895-912).

Indeed, this was petitioner's most plausible defense, since the testimony of Mr. Jones, Mr. Soto, and Ms. Castro shored up the theory that petitioner—who was standing on 146th Street shooting eastbound toward Ewell and Vargas—was the only one who could have caused Ms. Santiago's death. Crucially, Mr. Jones had previously seen petitioner just prior to the shooting. When he got back into his car, he saw petitioner again, firing his gun "like it was nothing" (see T.507-509). Mr. Soto and Ms.

Castro both saw the shooter come from Willis Avenue onto 146th Street, and begin shooting towards down 146th Street eastbound toward Brook Avenue (see T.251-256, T.260-265, T.627-630). Mr. Soto observed Ewell fire westbound in response to the shooter, towards Willis Avenue, and Ms. Castro observed Vargas and Ewell fire in response to the shooter, towards Willis Avenue (see T.264-265; T.628). Accordingly, petitioner's assertion that the evidence regarding the location of the ballistics came "solely and directly" from the crime scene report and diagrams (see Petitioner's memorandum of law, p. 44) is incorrect. Moreover, Irrizary and Ewell themselves testified about their roles in the gunfight, and this was corroborated by the testimony relating to motive and the videotape surveillance footage—especially the footage that featured petitioner handing off his gun to Irrizary (see T.513-514).

Given this evidence, there was no question that petitioner was the shooter who was shooting eastbound. Most importantly however, the chief theories petitioner advanced on summation—i.e., that the crime scene was tainted and that there were multiple people shooting .45 calibers, etc.—could be advanced irrespective of the crime scene report and diagrams; there was nothing in the report or diagrams that hindered petitioner's ability to explore these areas, and, in fact, defense counsel spent significant time questioning the People's witnesses with regard to whether the evidence could have been moved before crime scene was secured (see, e.g., T.85, T.204-205, T.236-239, T.244-245), and whether the .45 caliber bullets and casings could have been fired from two separate guns (see T.355-357).

The crime scene report and diagrams, therefore, had no bearing on petitioner's theory of the case. It was eminently reasonable for the Appellate Division to conclude that there was no reasonable possibility that the crime scene report and diagrams—i.e., the "evidence showing the locations where the officer found cartridge cases and other ballistic evidence" (see Diaz, 151 A.D.3d at 502) affected the verdict. Accordingly, the Appellate Division's decision was not so erroneous such that "there is no possibility fair-minded jurists could disagree" (Richter, 562 U.S. at 102) that it conflicted with Supreme Court precedent, and, as such, defendant's petition must be denied.

\* \* \*

Finally since none of petitioner's claims raises issues of constitutional law about which reasonable jurists could disagree (see Slack v. McDaniel, 529 U.S. 473, 484 [2000]), or which are fairly debatable (see Miller-El v. Cockrell, 537 U.S. 322, 342-43, 347 [2003]), this Court should refuse to issue a Certificate of Appealability.

## <u>CONCLUSION</u>

**PETITIONER'S APPLICATION FOR A WRIT OF HABEAS CORPUS SHOULD BE DENIED IN ITS ENTIRETY AND NO CERTIFICATE OF APPEALABILITY SHOULD ISSUE.**

Respectfully submitted,

By:
/s/_____
PETER D. CODDINGTON (PC8642)
Chief Appellate Attorney


/s/_____
MARIANNE STRACQUADANIO (MS0727)
Assistant District Attorney


DARCEL D. CLARK
District Attorney
Bronx County
198 East 161st Street
Bronx, New York 10451
(718) 838-6103


PETER D. CODDINGTON
MARIANNE STRACQUADANIO
Assistant District Attorneys
   *Of Counsel*

MARCH 2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X
                                     :

JOSEPH DIAZ,

                      Petitioner,       :

                  v.                     :

EARL BELL, Superintendent,
Clinton Correctional Facility,       :

                    Respondent.    :

-----------------------------------------------------------------X

## REPLY MEMORANDUM OF LAW IN SUPPORT OF 28 U.S.C. § 2254 PETITION

ROBERT S. DEAN (RD-0772)
Attorney for Petitioner
Center for Appellate Litigation
120 Wall Street, 28th Floor
New York, NY 10005
kskolnick@cfal.org
212-577-2323 ext. 501
Fax: 212-577-2535

Katharine Skolnick (KS-1123)
   *Of Counsel*
April 15, 2019

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

REPLY MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S PETITION FOR
   HABEAS CORPUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

POINT
   THE SUPREME COURT HAS NEVER REQUIRED THAT, TO BE TESTIMONIAL,
   EVIDENCE MUST BE LINKED TO A PARTICULAR SUSPECT; IN SO FINDING IN
   THIS HOMICIDE PROSECUTION THAT CONNECTED JOSEPH DIAZ TO THE
   CRIME ONLY BY TENUOUS IDENTIFICATION EVIDENCE AND THE NON-
   TESTIFYING DETECTIVE'S CRIME SCENE DOCUMENTS, NEW YORK STATE
   COURTS VIOLATED MR. DIAZ'S RIGHT TO CONFRONTATION.
   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
   A.   Respondent Misconstrues Both the Nature of the "Primary Purpose" Test and 28
        U.S.C. § 2254(d)(1)'s "Contrary to" or "Unreasonable Application of" Federal
        Law Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   B.   Admission of the Testimonial Evidence Had a "Substantial and Injurious Effect"
        on the  Outcome of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## TABLE OF AUTHORITIES

### FEDERAL CASES

Brecht v. Abramson, 507 U.S. 619 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Bullcoming v. New Mexico, 564 U.S. at 647 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7

Crawford v. Washington, 541 U.S. 36 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-4, 6-8

Davis v. Washington, 547 U.S. 813 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6

Giles v. California, 554 U.S. 353 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Hamilton v. Lee, 94 F.Supp.3d 460 (E.D.N.Y. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009). . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 7

Michigan v. Bryant, 562 U.S. 344 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Middleton v. Roper, 455 F.3d 838 (6th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Miller-El v. Cockrell, 537 U.S. 473 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Ohio v. Clark, 135 S.Ct. 2173 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-4, 6

Ohio v. Roberts, 447 U.S. 56 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Orlando v. Nassau County D.A. Office, 246 F.Supp.3d 569 (E.D.N.Y. 2017), rev'd sub nom.
Orlando v. Nassau County Dist. Attorney's Office, 915 F.3d 113 (2d Cir. 2019) . . . . . . . . . . 11

Panetti v. Quarterman, 551 U.S. 930 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Pierre v. Ercole, 560 F.App'x 82 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. James, 712 F.3d 79 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 8

United States v. Saget, 377 F.3d 223 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Williams v. Illinois, 567 U.S. 50 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Williams v. Taylor, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Wright v. Van Patten, 552 U.S. 120 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

FEDERAL STATUTES

28 U.S.C. § 2253. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

28 U.S.C. § 2254(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5

STATE CASES

People v. Diaz, 151 A.D.3d 502 (N.Y. App. Div. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

People v. LeGrand, 8 N.Y.3d 449 (N.Y. Ct. App. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 9

State v. Henderson, 208 N.J. 208 (N.J. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JOSEPH DIAZ,                                                   :

                Petitioner,                    :

                               :

        -against-                             :        18 Civ. 10121 (AT) (DCF)

                               :

EARL BELL, SUPERINTENDENT,
CLINTON CORRECTIONAL FACILITY,              :

                Respondent.                    :

-------------------------------------------------------------------X

### REPLY MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S PETITION FOR HABEAS CORPUS

      Petitioner submits this memorandum in reply to Respondent's Declaration and

Memorandum of Law in Opposition to Petitioner's Petition for Habeas Corpus. Its purpose is to

counter several of Respondent's legal and factual assertions, and to show why the New York

courts misapplied Supreme Court law in a way that resulted in precisely the sort of error that

federal court supervision is meant to address.

### POINT

      THE SUPREME COURT HAS NEVER REQUIRED THAT, TO BE
TESTIMONIAL, EVIDENCE MUST BE LINKED TO A PARTICULAR
SUSPECT; IN SO FINDING IN THIS HOMICIDE PROSECUTION THAT
CONNECTED JOSEPH DIAZ TO THE CRIME ONLY BY TENUOUS
IDENTIFICATION EVIDENCE AND THE NON-TESTIFYING DETECTIVE'S
CRIME SCENE DOCUMENTS, NEW YORK STATE COURTS VIOLATED
MR. DIAZ'S RIGHT TO CONFRONTATION.

      As Respondent concedes, Mr. Diaz exhausted his claim (see Resp. Mem. at 6). Thus, the

only question for this Court to address is whether a writ must issue because Mr. Diaz's right to

confront a key witness against him was violated. As discussed below and in Section II of the main petition, that answer must be yes.

A.   Respondent Misconstrues Both the Nature of the "Primary Purpose" Test and 28 U.S.C. § 2254(d)(1)'s "Contrary to" or "Unreasonable Application of" Federal Law Standard.

Respondent relies heavily on a too-narrow articulation of the primary-purpose test: that it must be to "create an out-of-court substitute for trial testimony." See Resp. Mem. at 11 (quoting Michigan v. Bryant, 562 U.S. 344 (2011) (emphasis added)). Under Davis v. Washington, however, this is not the test. 547 U.S. 813, 822 (2006) (holding statements are testimonial when "the[ir] primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution" (emphasis added)). Instead, there are different contextual factors, such as the formality of the statement-gathering or the identity of the interrogator, that also come into play in determining whether a statement is testimonial. Ohio v. Clark, 135 S.Ct. 2173, 2180 (2015); see also Bryant, 562 U.S. at 369–70.[1]

By Respondent's logic, the statements at issue in Crawford v. Washington, 541 U.S. 36 (2004)—a witness's tape-recorded statement to police—would not qualify as testimonial because it would not likely fall within a hearsay exception and thus could not itself be admitted at trial; and at no point in either Bryant or Clark, 135 S.Ct. 2173, did the Supreme Court suggest that it was overruling Crawford and returning to the Ohio v. Roberts, 447 U.S. 56 (1980), regime. Yet, this would be the effect of substituting this narrower formulation that depends in great part on hearsay exceptions for admissibility. Cf. Davis, 547 U.S. at 822 (defining testimonial statements

---

[1] In fact, as the Court went on to say in Clark, "[t]here is no indication that the primary purpose of the conversation was to gather evidence for Clark's prosecution. On the contrary, it is clear that the first objective was to protect [the child complainant]." 135 S.Ct. at 2181. Thus, it is plain that evidence gathering—and not just evidence substitution—is a primary purpose that makes a statement testimonial.

as those establishing facts "potentially relevant to later criminal prosecution"). Rather, the Court in Clark stated that it was clarifying that the only acceptable primary purpose to overcome a Confrontation Clause objection need not be the necessity of meeting an ongoing emergency. 135 S.Ct. at 2180. But, the touchstone remains whether the declarant has the "awareness or expectation that his or her statements may later be used at trial." United States v. Saget, 377 F.3d 223, 228 (2d Cir. 2004).

Under the proper articulation of the primary-purpose test, the police-created crime scene documents here are undoubtedly accusatory such that they fall within the Confrontation Clause's ambit; they were not made to meet any ongoing emergency but rather to determine what happened and who committed the crime—which, as described in Mr. Diaz's opening petition, see Pet. Mem. at II(B), and in Part B, infra, were inextricably intertwined. Viewed in context, as the Clark Court counsels, see 135 S.Ct. at 2181, this is precisely the sort of evidence that was gathered to be used as proof at trial; it is difficult to fathom for what other purpose than eventual prosecution a police detective would go about establishing what occurred at a crime scene. Indeed, "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact" has always been considered testimonial—even if made simply to serve an "investigative function[]" as opposed to create evidence for a trial. Crawford, 541 U.S. at 51-53 (internal citation omitted); see also Bullcoming v. New Mexico, 564 U.S. at 647, 664–65 (2011) (report must be made in connection with criminal "investigation or prosecution") (emphasis added); Melendez-Diaz v. Massachusetts, 557 U.S. 305, 310 (2009). This distinguishes a police report from an autopsy report, making Respondent's analogy to and reliance on United States v. James, 712 F.3d 79 (2d Cir. 2013), misplaced. Specifically, the Second Circuit found an autopsy

report in that particular case not to be testimonial because (1) the autopsy was performed to determine whether a crime had been committed at all, (2) the autopsy report was finished well before any criminal investigation had begun, and (3) the agency conducting the autopsy, the Office of the Chief Medical Examiner, was not a law enforcement entity but rather a neutral actor. See id. at 88, 97–102. None of those things is true here, where the primary purpose was to find out how the shooting had occurred and who might have done it.

Furthermore, applying a "substitute for trial testimony" rule in the context of formal documentary evidence such as police reports would subvert history and gut the Confrontation Clause. This Court has observed that "[i]t is doubtful that the original purpose" of the certified statements taken under the 16th century Marian bail and committal statutes "was to produce evidence admissible at trial." Crawford, 541 U.S. at 43–44. Yet, despite this history, the Confrontation Clause was adopted to prevent the introduction of precisely these sorts of statements without an opportunity for cross-examination. Id. at 50. Thus, whatever the rule may be with respect to statements made in informal conversation, as in Clark, "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact"—as was the case with the documents containing police seals and officer tax identification numbers that Detective Jacklitsch created here—must be deemed testimonial.[2] Crawford, 541 U.S. at 51–53 (citation omitted).

---

[2] That said, the Court has never adopted the formalistic approach articulated in a concurrence by Justice Thomas in Melendez-Diaz, where he opined that only "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions[,]" are testimonial. 557 U.S. at 329 (Thomas, J., concurring) (internal citation omitted). Thus, statements by a police officer contained in an official police report would clearly qualify as testimonial under Melendez-Diaz and other Court precedents.

But, even if the test is that a declarant's primary purpose must be to create a substitute for trial testimony, these police reports meet that definition. On the belief that these police-created documents could be admitted as business records—as, in fact, the prosecutor ultimately sought—in lieu of Detective Jacklitsch having to testify, it is possible that Jacklitsch created them with the intent to replace his live testimony about what had happened at the scene.

Respondent also urges this court to find that because the Supreme Court has not considered the specific questions of whether crime scene reports, diagrams, and photographs are testimonial, Mr. Diaz cannot meet the AEDPA standard of showing that the New York courts misapplied binding Supreme Court precedent. However, this is not so, as AEDPA permits relief for unreasonable applications of Supreme Court law to new sets of facts, not just to factual scenarios identical to those the Court has considered. See 28 U.S.C. § 2254(d)(1); see also Panetti v. Quarterman, 551 U.S. 930, 953 (2007) ("AEDPA does not 'require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied.'" (internal citation omitted)); Williams v. Taylor, 529 U.S. 362, 407 (2000) (a state-court decision is an unreasonable application where the court "unreasonably refuses to extend [a Supreme Court law] principle to a new context where it should apply").

For instance, in Hamilton v. Lee, while the district court found and the Second Circuit ultimately affirmed on procedural grounds that the writ should not issue for a Confrontation Clause violation, in discussing the reasoning for its alternative merits holding, the court analyzed whether palmprint photographs and accompanying notations were testimonial, finding that they were not because the primary purpose was arrest-processing, not evidence creation. 94 F.Supp.3d 460, 471–72 (E.D.N.Y. 2015). No Supreme Court case had analyzed palmprints per se, yet the

district court did not find that to be the basis for denying the habeas petition. Similarly, in Middleton v. Roper, a Sixth Circuit case reviewing a habeas denial, the statement at issue was one that had passed between a sheriff and a prosecutor about a witness at Middleton's trial, after which charges against the witness were dropped. 455 F.3d 838, 854–55 (6th Cir. 2006). The Sixth Circuit analyzed whether a statement of this type could be testimonial, finding that it was not, but in so doing, it reasoned from the schema set up in Crawford rather than finding that because this particular type of statement had not previously been analyzed, a court sitting in habeas review could not make a determination about whether the state courts had unreasonably applied Supreme Court law. Id. at 856–57.

> The Crawford Court itself spelled out three categories of testimonial statements:
>
> [1] ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially, . . . [2] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions, . . . [and 3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

541 U.S. at 51–52 (internal citations omitted). Plainly, police-created documents could fall within the first and the third categories, which focus on the objective perspective of a declarant making certain out-of-court statements, as they are generated for the purpose of solving crimes that will eventually be prosecuted in court. In several post-Crawford cases, the Supreme Court displayed a particular concern with statements made to law enforcement or state actors. See Hammon v. Indiana, 547 U.S. at 820 (deciding in companion case to Davis whether a "battery affidavit" signed by a purported domestic violence survivor was testimonial); Clark, 135 S.Ct. at

6

2181 (finding statements accusing defendant of recent and potentially ongoing abuse a child complainant made to preschool teachers were non-testimonial, though declining to find categorically that statements to non-law enforcement individuals could never be testimonial).

Implicit in these cases was an understanding that law enforcement has a particular interest in crime-solving that means statements and documents that it creates or obtains, unless designed to meet an ongoing emergency, are likely in preparation for litigation and thus testimonial. Thus, Respondent's argument that a crime scene report cannot be testimonial because it "is concerned only with what was found at the scene, not with who committed the crime," see RB at 12, does not answer the central question that this case presents: whether evidence-gathering is testimonial. As the Supreme Court in Crawford made clear when it stated, "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact" has always been considered testimonial, even if made simply to serve an "investigative function," the answer is yes. 541 U.S. at 51-53 (internal citation omitted) (emphasis added). Melendez-Diaz, 557 U.S. 305, and Bullcoming, 564 U.S. at 647, answer that question as well: those cases, too, were concerned not as much with "who" as with "what happened," and there the Court was clear that documents generated to prove a substance and intoxication, respectively, were testimonial. Thus, Wright v. Van Patten, 552 U.S. 120, 126 (2008), and Pierre v. Ercole, 560 F.App'x 82, 83 (2d Cir. 2014), which Respondent cites (Resp. Mem. at 10–11), do no more than establish the general proposition that there must be a clear answer in Supreme Court law to the question presented—which is not in dispute. Accordingly, they lend him no aid in answering the question of whether that standard was met in this particular case.

In focusing on "unreasonable application," moreover, Respondent ignores that Mr. Diaz's principal claim is that the New York State courts applied a rule that was "contrary to" established Supreme Court law. Specifically, the Appellate Division grafted on a known-suspect requirement, a rule <u>never</u> dictated by the Supreme Court's Confrontation Clause jurisprudence. <u>See</u> <u>Crawford</u>, 541 U.S. at 53-54, 59 (stating that testimonial statements may be admitted <u>only</u> where a witness is unavailable and there has been a prior opportunity for cross-examination, without enumerating any other exceptions); <u>see generally</u> <u>Giles v. California</u>, 554 U.S. 353, 377 (2008) (declining to "approve an exception to the Confrontation Clause unheard of at the time of the founding or for 200 years thereafter"). In fact, in <u>Williams v. Illinois</u>, 567 U.S. 50 (2012), five justices expressly reaffirmed that there is no such requirement for a statement to be deemed testimonial. <u>See</u> Pet. Mem. at 39 (discussing vote count in <u>Williams</u>); <u>James</u>, 712 F.3d at 95 (rejecting that a majority of the Court adopted a "primary purpose of accusing a targeted individual"). Respondent does little to address this claim, pointing only to New York case law, not to any out of the Supreme Court, for the known-suspect test (<u>see</u> Resp. Mem. at 15). Thus, in finding that "[t]he crime scene evidence that defendant claims was admitted in violation of his right of confrontation was not testimonial, since it "[did] not link the commission of the crime to a particular person" (internal citations omitted), the Appellate Division, First Department, plainly erred. <u>See</u> <u>People v. Diaz</u>, 151 A.D.3d 502, 503–04 (N.Y. App. Div. 2017). Therefore, the only question is whether that court misapplied harmless error analysis.

B.    <u>Admission of the Testimonial Evidence Had a "Substantial and Injurious Effect" on the Outcome of the Case.</u>

Contrary to what Respondent argues, this error was not harmless. Rather, the crime scene documents that Detective Jacklitsch created were the first major investigative action that the police took in this case, locking in a narrative about what happened and where the shooter of Aisha Santiago had stood. Thus, as discussed more fully in Mr. Diaz's petition (<u>see</u> Section II(B)), the Appellate Division's conclusion that "evidence showing the locations where the officer found cartridge cases and other ballistic evidence shed little or no light on any of the disputed issues at trial" was plainly unreasonable. <u>See</u> <u>Diaz</u>, 151 A.D.3d at 503.

To the contrary, all evidence of what happened and that tied Mr. Diaz to the fatal shot flowed from the investigative documents that Jacklitsch created, yet he was never subject to confrontation in court. The crime scene documents undoubtedly made a difference in a case where the only other evidence against Mr. Diaz was weak identification evidence that was contradicted by eyewitness Susana Castro and undercut by a lack of any motive.[3] Furthermore, even though two witnesses identified Mr. Diaz, several factors that have been shown to diminish the accuracy of eyewitness identifications were present here, such as weapon focus and a stressful, brief event, calling into further doubt whether he was even at the scene. <u>See generally</u> <u>State v. Henderson</u>, 208 N.J. 208, 288–93 (N.J. 2011) (detailing revised framework for evaluating reliability of identifications). Moreover, no evidence corroborated his presence there. <u>See</u> <u>People v. LeGrand</u>, 8 N.Y.3d 449, 452, 456–57 (N.Y. Ct. App. 2007) (finding it was

_____

[3] By contrast, Jason Irrizary, whom Castro identified as the shooter, <u>had</u> experienced physical and verbal conflict with the other group involved in the shooting, made a threat to return to the site of the altercation, and had a build and appearance similar to Mr. Diaz's.

improper not to allow an expert to testify about eyewitness identification accuracy where there was nothing to corroborate the two eyewitness identifications). But, to the extent he was present, all that tied him to the fatal bullet was the crime scene diagram.

Yet, Respondent does not meaningfully address issues with the amount of proof, instead arguing that a defense of crime scene taint could be "advanced irrespective of the crime scene report and diagrams" (Resp. Mem. at 17).[4] But, what this argument ignores is that Jacklitsch had been the one to <u>create</u> the documents that established the People's trial theory of where each actor was situated at the time of the incident, and his statements and assumptions were never able to be tested in court. Thus, one cannot simple assume, as Respondent urges, that the only flaw was that Jacklitsch's measurements were "'off' by a marginal degree" (<u>see</u> Resp. Mem. at 13); rather, without him being subject to cross-examination, there is no way to know <u>anything</u> about the accuracy of what he wrote in his report. This was the key error, and the two heavily impeached identifications and a ballistics report that <u>flowed from</u> Jacklitsch's findings could not otherwise establish Mr. Diaz's guilt.[5] Thus, the violation of his confrontation rights certainly had a "substantial and injurious effect" on the verdict. <u>See</u> <u>Brecht v. Abramson</u>, 507 U.S. 619, 637–38 (1993) (internal citation omitted). Accordingly, his petition for a writ of habeas corpus must be granted.

---

[4] Moreover, in so doing, Respondent assumes to be true certain facts which were not conclusively or even minimally proven at trial. For instance, Respondent states that Orlando Soto and Castro "saw petitioner," but Castro was clear throughout her testimony that she did not see Mr. Diaz at the scene at any point (<u>see</u> Resp. Mem. at 3).

[5] Similarly, Detective Brown's substitute testimony was predicated on Jacklitsch's findings and thus was not an adequate proxy.

CONCLUSION

For the reasons stated above and in Joseph Diaz's petition and opening memorandum, his

petition for a writ of habeas corpus should be granted, the conviction vacated, and a new trial

ordered.[6]

                Respectfully submitted,

                ROBERT S. DEAN (RD-0772)
                Attorney for Petitioner

BY:                                 
                KATHARINE SKOLNICK (KS-1123)
                Of Counsel

                April 15, 2019

---

[6] In the alternative, though we maintain that a writ should issue, in the event that Mr. Diaz's petition is denied, we submit that because he has "made a substantial showing of the denial of a constitutional right," a certificate of appealability should be issued. See 28 U.S.C. § 2253; see also, e.g., Orlando v. Nassau County D.A. Office, 246 F.Supp.3d 569 (E.D.N.Y. 2017) (granting a certificate of appealability on Confrontation Clause issue), rev'd sub nom. Orlando v. Nassau County Dist. Attorney's Office, 915 F.3d 113 (2d Cir. 2019) (granting writ); Miller-El v. Cockrell, 537 U.S. 473, 342 (2003) ("The question [of whether a certificate of appealability should issue] is the debatability of the underlying constitutional claim, not the resolution of that debate.").